IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF RHODE ISLAND

--------------------------------x

HUMAN SERVICES CONSULTANTS, :
LTD, d/b/a GERICARE, :
RONALD MARK STEWART, MD, :
Plaintiffs : CA No. 06 486
-v- :
ANN TAMULE a/k/a :
ANN M. SULLIVAN, Alias, and :
MEDOPTIONS, INC., :
Defendant. :

--------------------------------x

Deposition of ANN MARIE SULLIVAN, taken pursuant to the Federal Rules of Civil Procedure, at the Law Offices of Pepe & Hazard, 30 Jelliff Lane, Southport, Connecticut, before James A. Martone, LSR and Notary Public, in and for the State of Connecticut, on November 5, 2007 at 11:20 a.m.

the question, but unless I tell you not to answer, you should go ahead and answer the question.

A. Yes.

Q. Did you review any documents to prepare for this deposition?

A. There were documents, yes.

Q. Okay. And what were those documents?

A. The papers that I have been sent already. There's a document of -- a letter from Wiggin & Dana, and a request from the State of Rhode Island Superior Court, and e-mail messages from Mr. Peikes.

Q. I noticed you've just produced a green folder?

A. Yes.

Q. Did you review any other documents contained in that folder for this deposition?

MR. PEIKES: Objection to the form. You can answer.

A. I looked on the computer for my resignation letter from Dr. Stewart and for the letters that I had with regards to MedOptions. So I made copies of those.

Q. And that computer that you referred to,

which you looked for your letter of resignation, where was that computer located?

A. It's at the Mother House at 314 Osgood Avenue in New Britain.

Q. And is that letter the property -- that computer, I'm sorry, the property of the Mother House or you?

A. Me.

Q. All right. And you just referred to some letters from MedOptions that you referred to, to prepare for this deposition?

A. Letters that I generated to MedOptions, and letters, the letter I -- that's what I mean, the ones that I wrote. That were on my computer.

Q. And the letters, those letters that you generated to MedOptions that are on your computer, you referred to as "being on my computer." Those would be the same computer that is at the Mother House?

A. Yes.

Q. Okay. Have you ever been a party to any other lawsuit before this?

A. I don't know what that means.

MR. PEIKES: Have you ever been a plaintiff or a defendant in a civil suit? Either

A. I can't say honestly. I met with them at Panera Bread. And they had positions open. And encouraged me to apply for a position, and I did apply for a position. How I did it, I can't recall.

Q. Did you provide MedOptions with a set of references?

A. Gee, I don't remember. I don't remember.

Q. Did MedOptions ask if it was all right for them to contact any previous employers?

A. I don't remember that either.

Q. Did MedOptions ask if it was all right if they talk to GeriCare about you?

A. I don't remember.

Q. Did MedOptions ask you to sign anything allowing for former employers to talk about you?

A. I -- again, I don't remember.

Q. How did you find out you got the job?

A. I was contacted by Melissa Ferdinande for orientation.

Q. And on what date did she contact you?

A. I don't recall.

Q. When was orientation?

A. Melissa asked me to meet her at Oakland

Grove Health Center in Woonsocket for orientation.

Q. What did orientation consist of?

A. Learning the paperwork and codes. There were different billing codes which was notable because the practice was different there. That I was not using the same billing codes.

So having an understanding of what the expectations were was part of my orientation.

Q. And how were the codes different?

A. The codes are identifying the level of evaluation and management of care, and they were not the same codes as I had been used to with GeriCare.

Q. How were they different?

A. I don't know the numbers of them. The -- my understanding was that they were nursing codes. That the codes that were used at GeriCare were codes that were associated with a different -- different treatment modalities than the ones that were on the paperwork for MedOptions.

Q. What sort of codes did -- how were the treatment modalities, the codes associated with certain treatment modalities at GeriCare

Q. So a billing code would translate into a numerical value, which would be added up to reach, to make a productivity unit?
A. Yes.
Q. Okay. Who assigned the codes? If you saw a particular patient, how would it be determined what code would be used?
A. The codes had Medicare requirements for what was the skilled level of care expected for each of the codes. So Medicare did that.
Q. You, yourself, did not say this code would apply to this service, that you just provided?
A. Oh, yes, I did. That's -- you're -- I misunderstood the question I think.
When I saw the patient, I looked at what the patient's needs were and I found the code from the list that the company provided, that matched what I did.
Q. And where else besides Oakland and Bayberry did you provide services on behalf of MedOptions?
A. Eventually I provided services with -- at The Holiday Nursing Home, the Heritage Hills Nursing Home, the Hebert Nursing Home, Grand

View, and Balou. I had two other homes that were called the Hospice St. Antoine and Mount St. Rita Health Care.

Q. When did you provide services to The Holiday Nursing Home on behalf of MedOptions?

A. I don't recall the date.

Q. When did you begin to provide service for Heritage on behalf of MedOptions?

A. It was a month after I began with MedOptions.

Q. At what time did you begin providing services at Hebert on behalf of MedOptions?

A. It was in the fall. Maybe it wasn't. I don't recall. I must say I don't recall.

Q. When did you begin providing services at Grand View on behalf of MedOptions?

A. I don't recall.

Q. When did you begin providing services to Balou on behalf of MedOptions?

A. I don't recall.

Q. When you were working for MedOptions, did you provide staff training to the nursing homes?

A. No. Not classes. I -- you know, I could qualify that because I was always teaching

covenants, and the name, title, address and telephone number of any persons having custody of any document reflecting such knowledge acquired by any officer, director, employee, agent or servant of Defendant, MedOptions. Response. Ms. Sullivan provided MedOptions a copy of the agreement but has no recollection as to when this transpired."

Q. Why did you provide MedOptions with a copy of the agreement?

A. At the discussion at Panera Bread, I told Laurel Wood that there was a noncompete agreement in the contract that I had agreed with with Dr. Stewart. And Laurel Wood and Melissa Ferdinande shared with me that Ann Rameika had formerly been with GeriCare and moved to MedOptions and had been binded by the same agreement, because we both worked for GeriCare, and was -- there was no adverse consequence to her.

And that was why the discussion about the noncompete agreement came up at that time.

Q. Okay. But do you recall -- so you told them, you told them at Panera, eventually -- but

you say here you eventually were provided with a copy of the agreement. Was that before or after you were hired?

A. I couldn't tell you the date. I had the concern about the noncompete agreement, and asked them at MedOptions company, what had happened with Ann Rameika, or you know, that I had the concern, I expressed the concern that there was a noncompete agreement in the contract. And I was assured by the MedOptions company, that that was not to be a concern, because that other woman had been in the situation, and had gone through that without any adverse consequences to her.

I had also been assured that this was not able to be enforced the way that it was written. So showing the noncompete agreement clause, the MedOptions company gave me the advice that this was not able to be enforced.

Q. Did you verify that with a lawyer?

A. No. I trusted -- actually I had been told that a lawyer from MedOptions would assess this.

Q. Did they give you the lawyer's name?

A. No.

Q. After your conversation at Panera, did the lawyer contact you in any way?
A. No.
Q. Were you ever given correspondence from that lawyer?
A. No.
Q. Did you discuss the agreement with any other personnel besides the Panera conversation?
A. Well, Ann Rameika, because I contacted Ann because I knew her, and I -- before I made the decision to go with MedOptions, I asked how she liked the company, and if she had had any repercussions, and she said no.
Q. But why did you provide them with an actual copy?
A. I believed that that would help with validating that it was -- I didn't want to have any bad consequences come to me from this noncompete agreement. So showing this to a lawyer from MedOptions, could give me the assurance that it was not going to have any -- any repercussions to me.
So it was mostly to reassure myself that the company's advice to me was based on valid information. That they could read it,

an attorney could read it and then say "This is something you need not worry about possible ramifications, because I've read it and I've assessed it."

Q. To whom specifically at MedOptions did you give a copy of the agreement?

A. Laurel Wood, who is the director.

Q. Was this before or after you were hired?

A. It was before I believe. Although I don't know the date. I couldn't tell you when.

Q. And when you gave it to Laurel Wood, what did she say she was going to do? Did she take any further action that you know about?

A. I don't know.

Q. Did she ever get back to you about it?

A. I was reassured that it was -- that the agreement was not enforceable.

Q. Did she tell you that at the time that you gave it to her?

A. I don't recall.

Q. Do you have any agreement with MedOptions regarding the payment of your legal fees in this matter?

A. I don't have any documents of that

A. It was before.
Q. So September 11th would be after you started?
A. That's true.
Q. You were referencing a green folder a few minutes ago?
A. Yes.
Q. What's contained in that green folder?
A. These documents. (Indicating).
Q. Okay. By these documents, you mean --
A. The interrogatories, and the document information that I was e-mailed by my attorney.
Q. Were you given -- does it contain a copy of a request the produce?
A. I don't think so, no. No, I don't know what the request to produce is.
Q. Did you provide MedOptions with any documents to respond to a request to produce?
A. No.
Q. Did you give your attorney any documents that you had from your employment at MedOptions?
A. No.
Q. When you were working for MedOptions, did you receive an employee handbook?

A. Yes.
Q. Did you receive employment policies?
A. Yes.
Q. And what did you do with those?
A. I believe they are in a file cabinet. I filed them in the file cabinet.
Q. Which file cabinet?
A. Well, there's two things you've mentioned. One is the employee handbook and the other is the -- what else did you mention?
Q. Policy.
A. Policy. And I have moved since, a number of times. I can't tell you if those are with me at the Mother House. I don't feel sure that they are.
Q. Do you have any possessions that are not at the Mother House?
A. There's some storage in my sister's attic in Massachusetts.
Q. I'd also like to refer you back to Exhibit 6 for a moment. Page 2. Can you read the last sentence of the paragraph marked "Response"?
A. "Subject to and without waiving these objections, during the course of her Association