# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

-------------------------------x

HUMAN SERVICES CONSULTANTS, :
LTD, d/b/a GERICARE, :
RONALD MARK STEWART, MD, :
Plaintiffs : CA No. 06 486
-v- :
ANN TAMULE a/k/a :
ANN M. SULLIVAN, Alias, and :
MEDOPTIONS, INC., :
Defendant. :

-------------------------------x

Deposition of ANN MARIE SULLIVAN, taken pursuant to the Federal Rules of Civil Procedure, at the Law Offices of Pepe & Hazard, 30 Jelliff Lane, Southport, Connecticut, before James A. Martone, LSR and Notary Public, in and for the State of Connecticut, on November 5, 2007 at 11:20 a.m.

which you looked for your letter of resignation, where was that computer located?

A. It's at the Mother House at 314 Osgood Avenue in New Britain.

Q. And is that letter the property -- that computer, I'm sorry, the property of the Mother House or you?

A. Me.

Q. All right. And you just referred to some letters from MedOptions that you referred to, to prepare for this deposition?

A. Letters that I generated to MedOptions, and letters, the letter I -- that's what I mean, the ones that I wrote. That were on my computer.

Q. And the letters, those letters that you generated to MedOptions that are on your computer, you referred to as "being on my computer." Those would be the same computer that is at the Mother House?

A. Yes.

Q. Okay. Have you ever been a party to any other lawsuit before this?

A. I don't know what that means.

MR. PEIKES: Have you ever been a plaintiff or a defendant in a civil suit? Either

you sued somebody or somebody sued you?
A. Yes.
Q. Yes. And what was that?
A. That was because of a car accident.
Q. Okay. And in what court was that suit brought?
A. I don't remember.
Q. Was it in Rhode Island?
A. No. It was in Massachusetts.
Q. And about when was the suit brought?
A. I don't remember that either.
Q. Was it in the last ten years?
A. No, it was before that.
Q. And your current marital status?
A. I'm a religious Sister.
Q. Religious Sister. Have you ever been married?
A. Yes.
Q. Okay. And when did you get married?
A. 1993.
Q. To whom?
A. Harold Tamule. T A M U L E.
Q. And how did that marriage terminate?
A. That was a divorce, and annulment.
Q. And where was the divorce granted?

Wallingford.

Q. Brook Hollow Mental --

A. Brook Hollow Health Care Center.

Q. Do you have any children?

A. No.

Q. Could you describe your educational background?

A. I have a high school diploma. I have a Bachelor's Degree in Nursing. I have a Master's Degree in Nursing. And I have an Advanced Graduate Certificate as an Adult Nurse Practitioner.

Q. And where did you get your Bachelor's Degree in Nursing?

A. Boston College.

Q. And your Master's?

A. Boston University.

Q. And your advanced graduate studies?

A. Mass General Institute of Health Professions.

Q. All right. And could you describe your employment history.

A. I've recently left MedOptions.

Q. When did you leave MedOptions?

A. June.

Q. June. And was the work at Brook Hollow part of your employment at -- by MedOptions?

A. Yes.

Q. Okay. And when did you begin working for MedOptions?

A. June of 2006.

Q. And who was your employer prior to that?

A. GeriCare.

Q. And when did you work for GeriCare?

A. 2002 to 2006.

Q. And prior to GeriCare, how were you employed?

A. I taught nursing at Simmons College in Boston.

Q. And prior to Simmons?

A. I worked for the Visiting Nurse Association of Boston.

Q. And on what dates was that employment?

A. 1988 to 1999.

Q. And what was your employment prior to that Visiting Nurse of Boston?

A. I taught nursing at Assumption College in Worcester.

Q. What were the dates of that employment?

A. '86 to '88.
Q. And how were you employed before you worked for Assumption?
A. I was a student actually in graduate school. I was at Boston University '84 to '86.
Q. Okay. And while you were a graduate student, were you employed?
A. I worked some for the Visiting Nurse Association of Boston.
Q. And before you did your graduate work, how were you employed?
A. Let's see. I also worked for the Visiting Nurse Association of the South Shore in Braintree, Massachusetts. I can't think of when I started there. But I was there until I went to graduate school.
Q. And prior to your working for Visiting Nurse of South Shore at Braintree, how were you employed?
A. I worked at Carney Hospital in Dorchester.
Q. What were the dates of your employment there?
A. This is quite a ways back. I -- '79 I finished at BC. So '79 -- it was between 1979

and 1984.

Q. All right. And have you ever held political office?

A. No.

Q. Have you ever performed volunteer work?

A. Yes.

Q. Where have you performed volunteer work?

A. I'm doing it now at Bojnowski Manor. B O J N O W S K I.

Q. And Bojnowski Manor, and what is Bojnowski Manor?

A. It's a nursing home.

Q. It's a nursing home. And what are the nature of services are you providing?

A. I play the guitar and I pray the Rosary, and pray with people. I'm also a religious education -- I teach CCD, that's volunteer.

Q. Okay. And what professional licenses do you currently hold?

A. I have licenses from Massachusetts and Connecticut as a Registered Nurse and as a Nurse Practitioner.

Q. And do you currently hold any

professional licenses in Rhode Island?
A. They expired in the spring, and I did not renew them because our community doesn't go to Rhode Island.
Q. And what were those licenses in Rhode Island that you held, that expired?
A. RN and Nurse Practitioner.
Q. Are your Massachusetts Registered Nurse and Nurse Practitioner'S licenses currently current?
A. Yes.
Q. Okay. When did you first obtain the Massachusetts Registered Nurse license?
A. 1977.
Q. And when did you first obtain the Massachusetts Nurse Practitioner license?
A. 1999.
Q. And when did you first apply for the Connecticut Registered Nurse license?
A. You asked me when did I first apply?
Q. Yes.
A. Let's see. Either August or November of '06. So the fall -- the fall of '06.
Q. And at the same time did you apply for the Nurse Practitioner's license in Connecticut?

A. Yes. Simultaneously for both.

Q. Okay. And when were you granted those licenses in Connecticut?

A. I don't have the date. Before practicing in Connecticut, which began in January.

Q. That would be January, '07, correct?

A. Yes.

Q. And have you ever held any other professional licenses, besides the ones we've discussed, Registered Nurse and Nurse Practitioner license in Rhode Island and Connecticut and Massachusetts?

A. No.

Q. Okay. Have you ever had a license suspended?

A. No.

Q. Have you ever had a license revoked?

A. No.

Q. Have you ever applied for a license and been denied?

A. No.

Q. Have you ever agreed to surrender a license to avoid a suspension?

A. No.

Q. Have you ever agreed to surrender a license to avoid revocation?

A. No.

Q. Have you ever been subjected to professional discipline by any licensing board?

A. No.

Q. You've referenced a Registered Nurse license and a Nurse Practitioner's license. What is the difference between a Registered Nurse and a Nurse Practitioner? If any?

A. The level of practice of a Nurse Practitioner is an advanced nursing practice.

Q. What is it that a Nurse Practitioner can do that a Registered Nurse cannot?

A. Nurse Practitioners diagnose and treat many health problems and can prescribe medications, make treatment plans, in an advanced way. By comparison with a Registered Nurse.

Q. And can a Nurse Practitioner practice on her own or does she need to be supervised by a physician?

A. It depends on which State, how the State guides the practice. Because Nurse Practitioners are independently licensed. So there is a level of practice that Nurse

Practitioners can do that's independent with physicians, and there are also collaborative practices with physicians.

Q. Could you explain the difference between independent practicing and collaborative practicing?

A. Practicing in nursing, I'm completely independent in any State. So that I'm able to make decisions as regards to nursing care. Practicing for prescribing medications and for making diagnoses and treatment, is collaborative with a physician.

Q. And collaborating with a physician for the purpose of prescribing and diagnosing, would that be, that collaboration be required in any State? Collaborating with the physician, would that be required in any State?

A. Well, I'm not familiar with all the State Practice Acts.

Q. In Rhode Island, would that be required?

A. Could you please rephrase the question?

Q. In Rhode Island, in order to prescribe or diagnose as a Nurse Practitioner, would you be required to collaborate with a physician?

A. Yes.

Q. In Massachusetts, would you be required to collaborate with a physician in order to prescribe or diagnose?

A. I haven't practiced in Massachusetts. I haven't practiced in Massachusetts.

Q. In Connecticut, in order to prescribe or diagnose, would you be required to collaborate with a physician?

A. No.

Q. You referenced beginning in 2000, you began to work for GeriCare?

A. Yes.

Q. All right.

A. 2000 -- what year did I say?

Q. I believe that was 2002.

A. 2002, yes.

Q. Okay. Now how did you first learn about GeriCare?

A. There was an advertisement in the newspaper.

Q. Which newspaper was that?

A. I don't recall.

Q. Okay. Where were you -- were you employed at the time that you saw this ad, do you

know?

A. Yes.

Q. Where were you employed then?

A. At Simmons College.

Q. You testified while you were at Simmons College you were teaching nursing?

A. Yes.

Q. Okay. Where is Simmons College located?

A. Boston.

Q. Boston. And when did you apply for a position at GeriCare?

A. I don't recall the date.

Q. And what did your application consist of? Did you have to fill out a form given to you by GeriCare? Did you send in a resume'?

A. I was called -- I remember going to Starbuck's, and meeting with Dr. Stewart at Starbuck's, and that -- that was how the employment began.

Q. Which Starbuck's was that?

A. It was in Whalen Square in Providence.

Q. And what position did you apply for?

A. A Nurse Practitioner position.

Q. Did you provide -- Withdrawn.

A. I don't recall.
Q. Did you ask that changes be made to this noncompete agreement?
A. No.
Q. Did anybody at GeriCare explain to you why they wanted you to sign that agreement?
A. No.
Q. Did you talk to a lawyer about this agreement?
A. No.
Q. Had you ever signed a noncompete agreement before this time?
A. No.
Q. Did you speak to anybody else about this agreement?
A. My husband. At that time.
Q. Your husband. Okay.
A. Yes.
MS. BEJMA: I'm going to have this agreement marked.
(Plaintiffs' Exhibit 3 marked For identification.)
Q. If I can direct your attention to the last page of that agreement. And is that your signature?

A. Yes.

Q. Okay. And when did you sign this agreement?

A. June 16th, 2004.

Q. Okay. May I redirect your attention to the first page of that agreement.

A. Yes.

Q. Okay. And if you could review section 1.

A. Yes.

Q. Would you agree that this general noncompete agreement is the same as the one in Exhibit 2?

A. Yes.

Q. Okay. When did you first receive a copy of Exhibit 3, the second agreement?

A. June 16th, 2004.

Q. Who gave it to you?

A. I don't recall, if it was Dr. Stewart or Christine Richards. But it was given to me by GeriCare.

Q. Did you discuss the contents of the agreement with anybody at GeriCare?

A. I don't recall.

Q. Did you ask that changes be made?

A. No.

Q. Did anybody at GeriCare explain why they wanted you to sign the new agreement?

A. I don't recall.

Q. Did you discuss this agreement with a lawyer?

A. No.

Q. Did you discuss it with anybody else?

A. No.

Q. And what were the nature of the services you provided for Human Services?

A. I did mental health treatment of patients in nursing homes in Rhode Island.

Q. And what did that consist of?

A. Evaluating and assessing patients who were referred from the nursing homes for mental health evaluations. And implementing treatment plans, planning treatment plans for them.

Q. You referred to an orientation.

A. Yes.

Q. At The Holiday.

A. Yes.

Q. Who gave you that orientation?

A. Dr. Stewart.

Q. And what did that orientation consist

Q. And what was the nature of your dissatisfaction?

A. A key factor was not being able to get health insurance, that GeriCare does not provide health insurance.

Q. Was there any other reason?

A. Is the question about what started my discontent?

Q. What started your -- yes, please tell me what started your discontent.

A. So what started the discontent was this problem at Morgan, where my paperwork was missing. And we were not able to -- I felt I wanted to leave there, but I didn't want to leave the patients with no one to take care of them.

And I asked Dr. Stewart and Christine to find somebody to replace me. And they were not able to do that. But then I made the decision I had to leave regardless, because this situation was compromising the care that I wanted to give. So that started it.

Q. And was there any other situation that caused you to be unhappy while working for GeriCare?

A. Yes.

Q. And what was that situation?

A. In the spring of 2006, Alice Mellucci, who is the director at Hebert, requested to meet with me, and told me that she was ending her contract, their contract with GeriCare.

Q. Did she explain why?

A. She did. She wanted to tell me, because she explained that she was happy with my services, but that she did not want to continue with GeriCare, and had concerns about Dr. Stewart's services.

Q. Did she explain why she wasn't happy with Dr. Stewart's services?

A. Yes.

Q. What did she say about why she was dissatisfied?

A. Alice described that she had received in the mail an envelope postmarked from Florida with paperwork from Dr. Stewart, and that she had not seen Dr. Stewart in the building, and that included in that paperwork were documentations for a patient who was not in the building on the date that Dr. Stewart's paperwork said that he saw this person.

Q. Did she give any other reasons for

being dissatisfied with Dr. Stewart?

A. Not that I can recall.

Q. Did she give any other reasons for being dissatisfied with GeriCare in general?

A. Again, not that I can recall.

Q. Was there any other situation that caused you to be dissatisfied with your employment?

A. No.

Q. What made you decide to leave GeriCare?

A. The decision to leave was based on Alice Mellucci's conversation with me.

Q. Did you discuss Alice Mellucci's conversation with Dr. Stewart?

A. No.

Q. Did you discuss Alice Mellucci's conversation with Christine Richards?

A. No.

Q. Did you discuss Alice Mellucci's conversation with anybody?

A. There was a social worker working at the facility also. Debbie Robataille was her name, and she and I talked because Alice had revealed that she would end the contract with GeriCare, so that would effect Debbie Robataille

Massachusetts, the -- my goal was to work in the north -- northern Massachusetts border communities, or in northern Rhode Island on the Massachusetts border. And Pine Grove was on the distant corner, the other corner of the State.

Q. After you gave them your resignation letter of April 9th, 2006, did you discuss with anybody at GeriCare arrangements you would be making for transitional care?

A. After --

Q. After you submitted your resignation letter of April 9th, 2006, did you discuss with anybody at GeriCare, arrangements for transitional care of your patients?

A. Yes.

Q. And with whom did you have those discussions?

A. Dr. Stewart.

Q. And what did those discussions consist of?

A. Dr. Stewart called me at work, and I asked that he call me at home.

Q. All right.

A. And he called me at home. And I asked about orienting another person, and Dr. Stewart

did not have anybody planned for me to orient.
Q. And when did this conversation take place?
A. About ten days after.
Q. And did you discuss anything about the transition with the nursing homes?
A. No.
Q. What nursing homes were you working for at the time?
A. Holiday, Heritage Hills, Balou, Grand View, and that's what I can recall.
Q. And you did not discuss with anybody at Holiday, Heritage, Balou or Grand View, what arrangements were going to be made to take over the care of these patients?
A. At this time, no.
Q. At any other time did you discuss with anybody at Holiday, Heritage, Balou, Grand View or any other nursing home that you were working for about arrangements to care for these patients after you left?
A. It did come up in the discussion, yes.
Q. Which discussion was that?
A. I don't understand the question.
Q. We'll break it down. After giving

GeriCare the letter of April 9th, 2006, did you discuss with anybody at Holiday what arrangements were going to be made to take care of the patients at Holiday once you left GeriCare?

A. I did not inform anybody at the nursing homes about my resignation. This letter went to Dr. Stewart. He and I had a phone conversation, and then I heard from the nursing homes that Dr. Stewart had canceled the contracts with them. All except for Heritage Hills.

Q. Who at Holiday informed you that the contracts had been canceled?

A. Elaine DelSesto.

Q. Where does she work?

A. She's the Director of Nursing.

Q. Where?

A. Holiday Nursing Home.

Q. When did she inform you that the contract had been canceled?

A. I don't know the date.

Q. Did she say who canceled the contract?

A. That Dr. Stewart had canceled the contract.

Q. And did you discuss your departure with anybody at Heritage?

MR. PEIKES: Objection to the form. Go ahead, you can answer.

A. At Heritage Hills, there's a nurse named Mary Ann Caouette, who is the coordinator for Infection Control. She agreed to recommend me to the religious life.

Heritage Hills has a Chapel, and the Chapel got damaged, and the Blessed Sacrament was brought to Mary Ann's office. So Mary Ann and I had a discussion about God. And I said I want to work for God. And Mary Ann agreed to write a recommendation for me to the Sisters, the Daughters of Mary, after I had found them in May.

Q. I'm sorry, which order?

A. The Daughters of Mary.

Q. And did you discuss with anybody at Heritage Hills any arrangements for care of the patients that you would be leaving?

A. Discussing arrangements for care of the patients is something that I did every time I was at the facility. Because I gave a report to the nursing supervisor at Heritage Hills at the end of the day.

So they always asked me to discuss the care of the patients with them at that

facility.

Q. Did you discuss with anybody at Heritage Hills specifically about who would be taking -- about how the patients would be cared for once you had left?

A. I was told by people at Heritage Hills that Dr. Stewart was going to continue with them after I left.

Q. And who told you that Dr. Stewart would be continuing?

A. Joyce Sormanti.

Q. Did you discuss with anybody at Balou what arrangements were going to be made for the treatment and care for your patients once you had left?

MR. PEIKES: Objection to the form of the question. You can answer.

A. Mary DuPre, who is the director at Balou, had expressed that they were very happy with me, and they wished that I would continue and stay. And I told them that I was committed to going forward with the religious life.

They didn't know where they'd find another company. They were very anxious about finding another company, because Dr. Stewart had

finished their contract. And so they expressed a lot of concern about that for the patient care.

Q. And when did this conversation take place?

A. Again, I don't know the date.

Q. At the time that you left, were you still performing services at Grand View?

A. At Grand View, a very interesting thing happened at Grand View. When Dr. Stewart ended the contract with Grand View, Grand View signed on with MedOptions. So when they brought to my attention, they said we know that you're leaving Dr. Stewart, "we know that Dr. Stewart is not continuing here, we've signed on with MedOptions," I asked them questions about that company. "How did you find out about that company?" And they said it's a nurse run company. It's run by a Nurse Practitioner. And it's based in Connecticut. And I wished them well.

Q. Now prior to that, had you ever heard of MedOptions?

A. No.

Q. And who did you have this conversation with at Grand View?

A. John Partridge.

Q. And at Hebert, were you still providing services at Hebert?

A. No, because they finished. They ended the contract with Dr. Stewart.

Q. When did they end the contract?

A. I don't know. But I expect that it was before -- it was earlier, because they had met with me in April to tell me.

Q. Were you still providing services at East Gate?

A. No.

Q. Were you still providing services at Pine Grove?

A. No.

Q. Were you still providing services at Haven Health?

A. No.

Q. Were you providing services at Grand Island?

A. No. I never did provide any services at Grand Island.

Q. Did you inform any of your patients that you were leaving?

A. Eventually, yes.

Q. So a billing code would translate into a numerical value, which would be added up to reach, to make a productivity unit?

A. Yes.

Q. Okay. Who assigned the codes? If you saw a particular patient, how would it be determined what code would be used?

A. The codes had Medicare requirements for what was the skilled level of care expected for each of the codes. So Medicare did that.

Q. You, yourself, did not say this code would apply to this service, that you just provided?

A. Oh, yes, I did. That's -- you're -- I misunderstood the question I think.

When I saw the patient, I looked at what the patient's needs were and I found the code from the list that the company provided, that matched what I did.

Q. And where else besides Oakland and Bayberry did you provide services on behalf of MedOptions?

A. Eventually I provided services with -- at The Holiday Nursing Home, the Heritage Hills Nursing Home, the Hebert Nursing Home, Grand

View, and Balou. I had two other homes that were called the Hospice St. Antoine and Mount St. Rita Health Care.

Q. When did you provide services to The Holiday Nursing Home on behalf of MedOptions?

A. I don't recall the date.

Q. When did you begin to provide service for Heritage on behalf of MedOptions?

A. It was a month after I began with MedOptions.

Q. At what time did you begin providing services at Hebert on behalf of MedOptions?

A. It was in the fall. Maybe it wasn't. I don't recall. I must say I don't recall.

Q. When did you begin providing services at Grand View on behalf of MedOptions?

A. I don't recall.

Q. When did you begin providing services to Balou on behalf of MedOptions?

A. I don't recall.

Q. When you were working for MedOptions, did you provide staff training to the nursing homes?

A. No. Not classes. I -- you know, I could qualify that because I was always teaching

the staff how to care for the patients, but not education classes.

Q. Did MedOptions provide staff training to the nursing homes, formal classes, in services?

A. I don't know.

Q. What was your title at MedOptions?

A. Nurse Practitioner.

Q. And what services did you provide?

A. Mental health services.

Q. What did those mental health services consist of?

A. Evaluation and treatment.

Q. Were they the same type of services that you provided at GeriCare?

A. Similar. With different billing codes. Similar.

Q. You say that they were similar. You provided similar services on behalf of MedOptions as you did at GeriCare. How were they different?

A. The billing codes were different. The -- really that's what's different. The billing codes are different.

Q. When you worked for Holiday, Heritage, Hebert or Grand View, did you see any of the

patients that you had formerly seen for GeriCare?

A. Yes.

Q. How many?

A. I don't know.

Q. When you saw a patient for MedOptions that you had formerly seen at GeriCare, did you treat that as an initial visit?

A. Some of the patients needed to have an initial evaluation. Some were already involved with MedOptions, and some were not.

Q. If you had been treating them at GeriCare, why would they need another initial evaluation?

A. Well, the treatment, the companies were different, so the patients had to be admitted and registered for MedOptions. The initiation of the treatment plan with this company involved signing them up with the recommending -- registering them, and admitting them to the other agency.

Q. And how was it determined which nursing homes you would be providing services?

A. MedOptions assigned work to me.

Q. Did MedOptions provide you with any professional development?

A. Yes.

officer, director, employee, agent or servant's knowledge of the provisions of said restrictive covenants. And the name, title, address and telephone number of any person having custody of any document reflecting such knowledge acquired by any officer, director, employee, agent, or servant of Defendant, MedOptions."

Q. Keep going.

A. "Response, MedOptions objects to this interrogatory on the grounds that it is overly broad, and seeks information that is neither relevant nor reasonably calculated to lead to the discovery of admissible evidence in this action. Subject to and without waiving this objection, on or about September 11, 2006, Ms. Sullivan provided MedOptions a copy of the agreement containing certain restrictive covenants that she was required to sign in connection with her provision of services to GeriCare."

Q. Now is that statement true? The last sentence on the response, is that statement true? On September 11th, 2006, did you provide MedOptions with an agreement?

A. I'm not certain --

MR. PEIKES: Object to the form.

A. I'm not certain about the date. And I did discuss this with my attorney, because --

MR. PEIKES: Don't go into discussions that you and I had.

A. I'm not certain.

Q. Would September 11th have been the first time you provided this agreement to MedOptions, anyone from MedOptions?

MR. PEIKES: Objection to the form.

A. The question is about the document?

Q. The agreement with GeriCare.

A. Could you please say the question again.

Q. Was September 11th, 2006, the first time you gave MedOptions a copy of the GeriCare agreement containing the restrictive covenant?

MR. PEIKES: Object to the form.

A. And I don't know is the right answer. No, I don't know.

Q. When did you start working for MedOptions?

A. I don't have my start date.

Q. Was it before on are after September 11th?

A. It was before.

Q. So September 11th would be after you started?

A. That's true.

Q. You were referencing a green folder a few minutes ago?

A. Yes.

Q. What's contained in that green folder?

A. These documents. (Indicating).

Q. Okay. By these documents, you mean --

A. The interrogatories, and the document information that I was e-mailed by my attorney.

Q. Were you given -- does it contain a copy of a request the produce?

A. I don't think so, no. No, I don't know what the request to produce is.

Q. Did you provide MedOptions with any documents to respond to a request to produce?

A. No.

Q. Did you give your attorney any documents that you had from your employment at MedOptions?

A. No.

Q. When you were working for MedOptions, did you receive an employee handbook?

A. Yes.
Q. Did you receive employment policies?
A. Yes.
Q. And what did you do with those?
A. I believe they are in a file cabinet. I filed them in the file cabinet.
Q. Which file cabinet?
A. Well, there's two things you've mentioned. One is the employee handbook and the other is the -- what else did you mention?
Q. Policy.
A. Policy. And I have moved since, a number of times. I can't tell you if those are with me at the Mother House. I don't feel sure that they are.
Q. Do you have any possessions that are not at the Mother House?
A. There's some storage in my sister's attic in Massachusetts.
Q. I'd also like to refer you back to Exhibit 6 for a moment. Page 2. Can you read the last sentence of the paragraph marked "Response"?
A. "Subject to and without waiving these objections, during the course of her Association

interviewed by Melissa Ferdinande, and may I ask the other person's name?

A. Laurel Wood.

Q. Laurel Wood. What's Laurel Wood's title?

A. Oh, gee, she's a vice-president, but I couldn't tell you exactly.

Q. And Melissa Ferdinande?

A. Nursing supervisor.

Q. When did you leave the employ of MedOptions?

A. Mid-June, this year.

Q. And if I may direct your attention to interrogatory 9. On page 7.

MR. PEIKES: Which set is this?

Q. Exhibit 7, I'm sorry. Could you read that for me.

A. I have the wrong one.

Q. 7.

A. "Please indicate whether Defendant, Sullivan, is still providing services on behalf of Defendant, MedOptions, and if not, please provide the date on which Defendant, Sullivan, ceased to provide services on behalf of Defendant, MedOptions. The reasons why

Defendant, Sullivan ceased to provide services on behalf of Defendant, MedOptions, the date, time and place of any communications to any facilities and/or patients regarding the cessation of services, and/or any arrangements made to provide replacement services and the name, title, address and telephone number of any persons having custody of any record of said communications. Response. Ms. Sullivan resigned from MedOptions effective June 15, 2006, at Ms. Sullivan's request, responsibility for servicing the facilities in question were transferred to other practitioners in late December, 2006."

Q. Is that a true statement?

A. No.

Q. Why is it not true?

A. It's true that the -- at my request, the servicing of the facilities was transferred in January, 2007.

Q. And when did you make that request?

A. I requested to transfer my position from Rhode Island to Connecticut in November of 2006.

Q. And why did you make that request?

A. Because I was accepted into the Sisters

of the Daughters of Mary October 7th.

Q. October 7th.

A. October 7th, I was accepted to the Daughters of Mary. And then I made plans to move to Connecticut.

Q. What nursing homes were you servicing at the time that you ceased -- I'm sorry. For what period of time did you provide services on behalf of MedOptions at Balou?

A. Oh, I don't know my start time. And I finished in January of 2007.

Q. Did you finish working for Grand View on behalf of MedOptions at the same time?

A. Yes.

Q. Hebert, did you finish working for Hebert on behalf of MedOptions at the same time?

A. Yes.

Q. Did you finish working at Heritage Hills on behalf of MedOptions at the same time?

A. Same week.

Q. Did you finish working for Holiday at the same time?

A. Yes.

Q. Did you finish working for Morgan on behalf of MedOptions at the same time as you

ceased working --

A. No. No, I did not. I did not work at Morgan on behalf of MedOptions.

Q. Did you work for East Gate on behalf of MedOptions?

A. No.

Q. Did you work for Pine Grove on behalf of MedOptions?

A. No.

Q. Did you work for Haven Health on behalf of MedOptions?

A. No.

Q. Did you work for Grand Island on behalf of MedOptions?

A. No.

Q. Why did you leave MedOptions?

A. I transferred from Rhode Island to Connecticut, in order to go to the Sisters. And I left MedOptions entirely in June of 2007, in order to be a Sister.

Q. Were you ever dissatisfied with your employment at MedOptions?

A. No.

MS. BEJMA: Give me one minute.

(Pause in the Proceedings)