**UNITED STATES DISTRICT COURT**
**DISTRICT OF RHODE ISLAND**

| | | |
|---|---|---|
| HUMAN SERVICES CONSULTANTS, LTD, dba GERICARE, and RONALD MARK STEWART MD, | : | Case. No. 1:06-cv-00486-ML-DLM |
| Plaintiffs, | : | |
| v. | : | |
| ANN TAMULE, aka, ANN M. SULLIVAN, alias, and MEDOPTIONS INC., | : | |
| Defendants. | : | |

**DEFENDANT MEDOPTIONS, INC.'S MOTION FOR SUMMARY JUDGMENT**

Pursuant to Fed. R. Civ. P. 56, defendant MedOptions, Inc. ("MedOptions") hereby moves for summary judgment. As grounds for this Motion, MedOptions relies on the Statement of Undisputed Facts, appended exhibits, and Memorandum of Law filed herewith.

Respectfully submitted,

DEFENDANT,
MEDOPTIONS, INC.
By its Attorneys,

/s/ Christine K. Bush
Christine K. Bush (#5587)
Rachelle R. Green (#5870)
DUFFY, SWEENEY & SCOTT, LTD.
One Turks Head Place, Suite 1200
Providence, RI 02903
(401) 455-0700-telephone
(401) 455-0701-facsimile

and

Lawrence Peikes
Admitted *Pro Hac Vice*
lpeikes@wiggin.com
WIGGIN AND DANA LLP
400 Atlantic Street
P.O. Box 110325
Stamford, CT 06911-0325
(203) 363-7600-telephone
(203) 363-7676 -facsimile

Dated: February 22, 2008

## CERTIFICATE OF SERVICE

I hereby certify that the within **Defendant MedOptions' Motion for Summary Judgment** was filed through the ECF system on this 22nd day of February, 2008 and will be sent electronically to the below named counsel who are registered participants identified on the Notice of Electronic Filing:

Stephen M. Robinson, Esq.
The Law Offices of Stephen M. Robinson
155 South Main Street
Suite 402
Providence, RI 02903

Vicki J. Bejma, Esq.
The Law Offices of Stephen M. Robinson
155 South Main Street
Suite 402
Providence, RI 02903

/s/ Christine K. Bush
Christine K. Bush

H:\Clients\MedOptions\Tamule\Pleadings\USDC RI\MSJ MedOptions.DOC

**UNITED STATES DISTRICT COURT**
**DISTRICT OF RHODE ISLAND**

| | | |
|---|---|---|
| HUMAN SERVICES CONSULTANTS, LTD, dba GERICARE, and RONALD MARK STEWART MD, | : | Case. No. 1:06-cv-00486-ML-DLM |
| Plaintiffs, | : | |
| v. | : | |
| ANN TAMULE, aka, ANN M. SULLIVAN, alias, and MEDOPTIONS INC., | : | |
| Defendants. | : | |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT MEDOPTIONS' MOTION FOR SUMMARY JUDGMENT**

By way of this action, plaintiffs Human Services Consultants, Ltd. d/b/a GeriCare ("GeriCare") and its owner, Ronald Mark Stewart, M.D. ("Dr. Stewart") (collectively "plaintiffs"), endeavor to cloak garden-variety competition in the garb of a tort. They claim that by providing services to certain customers that plaintiffs had abandoned, MedOptions, Inc. ("MedOptions") somehow tortiously interfered with plaintiffs' *former* business relationships. Because plaintiffs' claims cannot withstand scrutiny under the governing law, MedOptions is entitled to summary judgment.

## I. INTRODUCTION

Although plaintiffs allege two separate counts sounding in tortious interference with advantageous business relationships against MedOptions, both are predicated on the same factual asseverations and concern MedOptions' procurement of contracts for the provision of psychiatric care to residents of several nursing homes that were previously serviced by GeriCare. Plaintiffs' claims are doomed by the undisputed fact that GeriCare

unilaterally terminated its contracts with the nursing homes in question well before MedOptions ever came on the scene. The nursing homes, moreover, contacted MedOptions about the prospect of taking over for GeriCare as their provider of on-site psychiatric care. All MedOptions did was respond to these inquiries and make a pitch for the business. MedOptions' actions, therefore, were taken in furtherance of legitimate business interests, not for the purpose of harming plaintiffs.

Because, as demonstrated below, the record conclusively shows that, at the operative time, plaintiffs had *no* actual or expectant business relationships to protect, and MedOptions did not employ wrongful means to procure service contracts with any of GeriCare's former customers, summary judgment is properly entered in MedOptions' favor.

## II. STATEMENT OF FACTS

Per LR Cv 56(a), the facts of materiality are set out in the accompanying Statement of Undisputed Facts. These facts are summarized below and supplemented as necessary to provide context.

### A. Background

The central event triggering this dispute is MedOptions' hiring of co-defendant Ann Sullivan in the immediate aftermath of her resignation from GeriCare.

Sullivan joined MedOptions on June 1, 2006. (Undisputed Fact, "UF," ¶ 11). Before that Sullivan had been employed by GeriCare as a nurse practitioner for four years, conducting psychological evaluations and assessments of nursing home residents at various facilities serviced by GeriCare in Rhode Island. (UF ¶¶ 2, 4–6). Sullivan performed these same basic functions for MedOptions. (UF ¶ 14).

As a condition of her employment by GeriCare, Sullivan executed a Provider Agreement containing a broad six-month non-competition covenant. (UF ¶ 3). Plaintiffs contend that by accepting a position with MedOptions, Sullivan breached this restrictive covenant. (Complaint ¶ 29).

### B. GeriCare Terminates its Service Contracts

On April 9, 2006, Sullivan resigned from her employment by GeriCare effective June 1, 2006. (UF ¶ 6). Within a matter of days after learning that Sullivan would be resigning, Dr. Stewart, by letter dated April 20, 2006, notified all but one of Sullivan's assigned facilities that GeriCare was terminating their service contracts effective June 1, 2006. (UF ¶ 7).

In the interim, GeriCare asked another nurse practitioner on staff, Sharon Borges, whether she would be interested in taking over responsibility for any of the nursing homes serviced by Sullivan, but she declined.[1] Beyond that, GeriCare did nothing to recruit a nurse practitioner to fill Sullivan's spot in the week or so between learning of her decision to resign and issuing notice to the nursing homes that it was terminating their contracts. (UF ¶ 9).

### C. MedOptions' Employment of Defendant Sullivan

When it hired Sullivan, MedOptions assigned her to two Rhode Island nursing facilities not previously serviced by GeriCare, namely Oakland Grove Health Care Center and Bayberry Commons, as well as Grandview Center ("Grandview"), a facility that had been serviced by Sullivan on behalf of GeriCare. (UF ¶ 13). Grandview had contacted MedOptions after GeriCare terminated its contract because it needed psychiatric care for

[1] Ms. Borges did offer to cover Heritage Hills Nursing Home on a limited basis -- "going in once a week after 4PM and seeing 8 to 10 patients weekly..." -- but Heritage Hills rejected that arrangement as unworkable. (UF ¶ 8).

its residents. (UF ¶ 15). Sullivan played no role in MedOptions' procurement of a service agreement with Grandview. (UF ¶ 16).

Eventually, Hebert Nursing Home ("Hebert"), The Holiday Retirement Home ("Holiday"), Heritage Hills Nursing Home ("Heritage Hills") and Ballou Home for the Aged ("Ballou") also contacted MedOptions in search of an alternative provider of psychiatric services; each of these facilities eventually retained MedOptions. (UF ¶¶ 17, 18). Again, Sullivan was uninvolved. (UF ¶ 19). She had no dealings with any of these facilities on behalf of MedOptions until after service agreements were executed and she was assigned there. (UF ¶ 20).

Notably, at the time Grandview, Hebert, Holiday, Heritage Hills and Ballou contacted MedOptions about replacing GeriCare as the provider of on-site psychiatric services, MedOptions had no knowledge of any ongoing or expectant business relationship between those facilities and GeriCare. (UF ¶ 21). Indeed, prior to contracting with MedOptions, none of those facilities even identified GeriCare as their former provider of psychiatric services. (UF ¶ 21).

**E. Sullivan's Departure From MedOptions**

Before joining MedOptions, Sullivan had decided to leave the private sector and initiated steps toward pursuing a religious life. (UF ¶ 12). On October 7, 2006, Sullivan received notice that she had been accepted into a convent located in New Britain, Connecticut where, consistent with her calling, she would be able to utilize her skills and experience as a nurse in furtherance of a charitable mission. (UF ¶ 22). To facilitate her transition, Sullivan requested a reassignment to facilities in the New Britain area and a reduction in hours. MedOptions obliged, transferring Sullivan to Connecticut in January

2007 and assigning her responsibility for two nursing homes. Sullivan remained at MedOptions and worked a part-time schedule until June 2007, when she entered the convent on a permanent basis. (UF ¶ 23).

### F. Plaintiffs' Suit

On October 17, 2006, plaintiffs brought suit against Sullivan and MedOptions in Providence County Superior Court alleging common law claims for breach of contract against Sullivan and tortious interference with advantageous business relationships against both Sullivan and MedOptions. The case was timely removed to federal court on the basis of diversity of citizenship.

Plaintiffs contend that even though, within a matter of moments after learning that Sullivan would be moving on, GeriCare volitionally terminated its service contracts with all but one of the facilities to which Sullivan had been assigned, MedOptions somehow interfered with plaintiffs' *past* relationships by eventually taking over for GeriCare at certain of these nursing homes after it was solicited to do so by those nursing homes, and that Sullivan somehow engaged in improper competition by accepting her new employer's assignment to service the facilities GeriCare had forsaken.

As demonstrated below, plaintiffs' claims are unsustainable as a matter of law.

## III. LAW AND ARGUMENT

### A. Summary Judgment Standard

"The object of summary judgment is 'to pierce the boilerplate of the pleadings and assay the parties' proof in order to determine whether trial is actually required.'" Davila v. Corporacion de Puerto Rico Para La Difusion Publica, 498 F.3d 9, 12 (1st Cir. 2007)(Citation omitted).

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). "For this purpose, an issue is genuine if 'a reasonable jury could resolve the point in favor of the nonmoving party.' By like token, a fact is material if it has the potential to determine the outcome of the litigation." Davila, 498 F.3d at 12 (Citations omitted).

"The moving party bears the burden of demonstrating that no genuine issue of material fact exists. 'In determining whether that burden is met, a court must view the record in the light most favorable to the nonmoving party and give that party the benefit of all reasonable inferences in its favor.' Once the moving party has made this preliminary showing, the nonmovant 'may not rest upon the mere allegations or denials of its pleading,' but must 'produce specific facts, in suitable evidentiary form, to establish the presence of a trialworthy issue.' 'Nor may the court accept the nonmovant's subjective characterizations of events, unless the underlying events themselves are revealed.' 'As to any essential factual element of its claim on which the nonmovant bears the burden of proof at trial, its failure to come forward with sufficient evidence to generate a trialworthy issue warrants summary judgment to the moving party.'" Vineberg v. Bissonnette, 2007 WL 4571154, at *1 (D.R.I. Dec. 27, 2007)(Lisi, J.)(Citations and alterations omitted).

"Importantly, in an action such as this one, summary judgment is not necessarily precluded where the plaintiffs' claims involve 'elusive concepts such as motive or intent' if plaintiffs oppose the motion with only 'conclusory allegations, improbable inferences,

and unsupported speculation.'" Feinstein v. Brown, 432 F. Supp. 2d 258, 263 (D.R.I. 2006)(Citation omitted). Yet that is the best plaintiffs can possibly do here.

**B. Tortious Interference With Advantageous Business Relationships.**

Under Rhode Island law, the elements of a claim for tortious interference with prospective or advantageous business relations are: "(1) the existence of a business relationship or expectancy, (2) knowledge of the interferer of the relationship or expectancy, (3) an intentional act of interference, (4) proof that the interference caused the harm sustained, and (5) damages to the plaintiff." Avilla v. Newport Grand Jai Alai LLC, 935 A.2d 91, 98 (R.I. 2007)(Citations and internal quotation marks omitted).

Assuming "the plaintiff establishes these prima facie elements, 'the burden of proving sufficient justification for the interference shifts to the defendant.' To demonstrate intentional interference, a claimant need not show actual malice or ill will. Legal malice, 'an intent to do harm without justification,' is sufficient. To prevail, then, the plaintiff must prove that, ultimately, the defendant acted 'without justification' or for an 'improper' purpose." UST Corp. v. General Road Trucking Corp., 783 A.2d 931, 937 (R.I. 2001)(Citations omitted).

***1. GeriCare Had No Business Relationship or Expectancy Once it Terminated the Service Contracts***

It is undisputed that on or about April 20, 2006, plaintiffs sent identical letters to Grandview, Ballou, Holiday, Morgan and Hebert, advising that (i) Sullivan had tendered her resignation effective May 31, 2006, (ii) "[f]inding another Advance Practice Nurse (APN) is not expected to be possible in the near future," and, consequently, (iii) "GeriCare must terminate our contract with your facility as of June 1, 2006." (UF ¶ 7).

It is likewise undisputed that the contracts did in fact terminate effective June 1, 2006. (UF ¶ 10).

Notwithstanding these undisputed facts, plaintiffs allege that MedOptions somehow committed a tort by replacing GeriCare as a provider of psychiatric care. MedOptions, however, did not enter into a contract with any of the facilities in question until after the GeriCare contracts expired and, aside from Grandview, MedOptions had no contact whatsoever with a representative of these facilities prior to June 1, 2006. (UF ¶¶ 15, 17). Moreover, the facilities contacted MedOptions after GeriCare terminated their contracts and left them with no provider of psychiatric services to their residents. (UF ¶¶ 15, 18). The record therefore conclusively demonstrates that MedOptions took no action to interfere with any of GeriCare's *ongoing* business relationships.

Plaintiffs contend, however, there remained an expectancy of reviving these relationships by virtue of a "belie[f] that had we been able to procure a substitute, we could have persuaded the above nursing homes to enter into a new contractual relationship." That's a hope, not an expectancy. And that hope was not objectively reasonable given Dr. Stewart's acknowledgment in the termination notices he sent out on April 20, 2006 that he had *no expectation* of procuring a substitute for Sullivan at any point in the foreseeable future. (UF ¶ 7; see also Exh. D to MedOptions' Statement of Undisputed Facts). Indeed, plaintiffs admit that aside from Heritage Hills, they never presented any of the nursing homes with a proposed replacement for Sullivan; and, as for Heritage Hills, that facility rejected the lone nurse practitioner plaintiffs' offered in place of Sullivan, as was their absolute right. (UF ¶¶ 8-10).

Thus, "the summary judgment record ... [reveals] no evidence of the existence of a business relationship or the expectancy of one. As such, as a matter of law, Plaintiffs['] interference with prospective contractual relations' claim fails." Champlin's Realty Assoicates v. Carcieri, 2006 WL 2927632, at *5 (D.R.I. Oct. 12, 2006)(Lisi, J.).

***2. Plaintiffs Have Adduced No Evidence That MedOptions Had Knowledge of an Actual or Prospective Business Relationship or Expectancy***

Plaintiffs have likewise adduced no evidence suggesting that MedOptions, at the time it initiated business relationships with the former GeriCare accounts, had reason to believe there was some prospect of GeriCare re-contracting with those facilities in the future. Again, these facilities contacted MedOptions to inquire about the possibility of taking over as their provider of on-site psychiatric care, the obvious inference being that the facility had a need for MedOptions' services. (UF ¶¶ 15, 18). Indeed, Laurel Wood, the MedOptions executive responsible for negotiating contracts with the former GeriCare customers, testified without contradiction that, consistent with industry practice, her counterparts never even identified GeriCare as their former service provider. (UF ¶ 21). The undisputed facts therefore preclude plaintiffs from establishing the knowledge element of their claims for tortious interference with business relationships.

For this separate and independent reason, summary judgment is properly entered in MedOptions' favor as to Counts Two and Three of plaintiffs' Complaint.

***3. Plaintiffs Have Adduced No Evidence That MedOptions Acted Without Justification or With an Improper Purpose***

It is well-settled that "a defendant may not be held liable for tortious interference unless the defendant's conduct was 'improper' or unjustified. Otherwise, a defendant would be subject to liability for such lawful and benign activities as 'competing with a

plaintiff for business.'" Pharmacy Services, Inc. v. Swarovski North America Limited, 2006 WL 753055, at *4 (D.R.I. March 21, 2006)(Citations omitted). Thus, "the elements of the tort require showing an 'intentional and improper' act of interference, not merely an intentional act of interference." Avilla, 935 A.2d at 98 (Citations omitted).

"Viewed through this prism, [the court] must determine whether there is any issue of material fact about whether [defendants] engaged in an improper interference. In making this determination, [the court must] consider (1) the nature of the actor's conduct; (2) the actor's motive; (3) the contractual interest with which the conduct interferes; (4) the interests sought to be advanced by the actor; (5) the balance of the social interests in protecting freedom of action of the actor and the contractual freedom of the putative plaintiff; (6) the proximity of the actor's conduct to the interference complained of; and (7) the parties' relationship. Determining improper conduct depends upon the judgment and choice of values in each situation, therefore, the factors listed above are not exhaustive for making such a determination." Id. (Citations and internal quotation marks omitted).

Each of these factors, and any others that might be pertinent, reveal an absence of so much as a hint of impropriety on defendants' part.

1. *The Actor's Conduct:* MedOptions merely accepted invitations to market its services to various facilities abandoned by GeriCare; this is far from out of the ordinary, much less underhanded or otherwise inappropriate. Also, contrary to Dr. Stewart's suspicions, MedOptions did not exploit Sullivan's relationships with GeriCare's former customers to gain an entrée. (UF ¶¶ 16, 19).

But, even were it otherwise, the identity of these nursing homes and their contact points is no secret; rather, such information is readily ascertainable by a phone call and, therefore, lawfully accessible by MedOptions through Sullivan or any other source. (UF ¶ 25). Go-Van Consolidators, Inc. v. Piggy Back Shippers, Inc., 306 A.2d 164, 165 (R.I. 1973)(trade secret status does not attach to customer identities that are readily ascertainable); Callahan v. Rhode Island Oil Co., 240 A.2d 411, 413-14 (R.I. 1968)(same); Chemart Co. v. Nixon, 1992 WL 813516, at *6 (R.I. Super. Feb. 21, 1992)(same); Eastern Scientific Co. v. Yapchaian, 1985 WL 663131, at *4 (R.I. Super. Jan. 15, 1985)(same); see also Chelo's of Woonsocket, Inc. v. Chelo, 2004 WL 603417, at *5 (R.I. Super. March 8, 2004)("Unlike a trade secret or confidential customer information, ... items [that are] easily visible and discoverable to the public [] are [] non-protectable.").

2. *The Actor's Motive:* MedOptions' motives are patently obvious and perfectly legitimate – the company simply seized an opportunity to expand its business in Rhode Island by contracting with former GeriCare customers following GeriCare's unilateral termination of its service contracts with those customers.

3. *The Contractual Interest With Which the Conduct Interferes:* At the time of the alleged interference, plaintiffs had no contractual relationship with any of the facilities in question, nor have plaintiffs adduced a shred of evidence suggesting there was any realistic prospect of regaining this business.

4. *The Interests Sought to be Advanced by the Actor:* As alluded to above in regard to item 2, MedOptions' interests were purely economic.

5. *The Balance of the Social Interests in Protecting Freedom of Action of the Actor and the Contractual Freedom of the Putative Plaintiff:* Without question, this balance strikes in favor of MedOptions since its actions occurred *after* plaintiffs terminated the contracts, and hence their business relationships, with the customers serviced by Sullivan.

6. *The Proximity of the Actor's Conduct to the Interference Complained of:* Again, MedOptions first entered into contracts with GeriCare's former customers *after* plaintiffs' relationships with these customers ended.

7. *The Parties' Relationship:* MedOptions and GeriCare are competitors; battling over customers is a fundamental component of any such relationship. Hence, in terms of proving a claim for tortious interference, "the hurdle is even higher." Pascale Service Corp. v. International Truck and Engine Corp., 2007 WL 2905622, at *4 (D.R.I. Oct. 1, 2007).

Apart from these specific factors, it bears emphasis that "[c]onduct in furtherance of business competition is generally held to justify interference with others' contracts [or business relationships], so long as the conduct involves neither wrongful means nor unlawful restraint of trade." Id. (Citation and internal quotation marks omitted). Even were plaintiffs capable of proving interference (which they plainly cannot since the customer relationships were non-existent when MedOptions came on the scene), the record is devoid of evidence remotely suggesting that MedOptions utilized "wrongful means" to procure business in Rhode Island. MedOptions' actions "are therefore privileged and legally justified." Barkan v. Dunkin' Donuts, Inc., 520 F. Supp. 2d 333, 342 (D.R.I. 2007).

On this alternative ground as well, plaintiffs' claims for tortious interference with business relationships fails as a matter of law and is properly disposed of on summary judgment. Id. (dismissing tortious interference claim where defendant merely acted to safeguard a bona fide business interest); Feinstein v. Brown, 432 F. Supp. 2d 258, 268 (D.R.I. 2006)(granting summary judgment on tortious interference claim where defendant's "motive was to obtain payment" and there was no evidence that defendant had an intent to harm plaintiff without justification).

### *4. Plaintiffs Have Adduced No Evidence Of Causation*

Even assuming plaintiffs were capable of establishing an act of interference on MedOptions' part, "[u]nder Rhode Island law, [plaintiffs] must prove either that 'but for' [MedOptions'] interference, it would not have suffered injury, or that 'it is reasonably probable that but for the interference' [plaintiffs] would not have been injured. [Plaintiffs] must therefore prove that it is at least 'reasonable and probable' that [GeriCare] would have completed a [new] deal to [provide services to the nursing homes in question] had [MedOptions] not interfered improperly ..." APG, Inc. v. MCI Telecommunications, Inc., 436 F.3d 294, 304 (1st Cir. 2006).

In the APG, Inc. case, the First Circuit "construe[d] this to be a high level of probability—at least more likely than not—given the 'but for' starting point for the causation inquiry," noting that "[i]n another context, the Rhode Island Supreme Court has ruled that such a likelihood depends on evidence that is reasonably definite and is neither speculative nor remote." Id. (Citation omitted). Here, plaintiffs' own actions portray an expectation that as of June 1, 2006 the business at issue would be lost, not resurrected.

Dr. Stewart admitted at deposition that the reason termination notices were sent out so quickly after Sullivan announced her intention to resign was to allow the nursing homes ample opportunity to find another provider. (UF ¶ 7). The notices say as much: "Therefore, regretfully, in fairness to you, GeriCare must terminate our contract with your facility as of June 1, 2006. We cannot maintain our quality service standards and cover all your needs in the near future." (UF ¶ 7; see also Exh. D to MedOptions' Statement of Undisputed Facts).

To be sure, GeriCare's relationship with Heritage Hills was terminated by the facility, not GeriCare, but under the circumstances this is a distinction without a legal difference. It is undisputed that the only nurse practitioner presented by GeriCare to Heritage Hills, Sharon Borges, had limited availability and could not satisfy Heritage Hills' requirements. (UF ¶ 8). Consequently, assuming Heritage Hills wished to continue providing on-site psychiatric care for its residents, it necessarily had to seek out and retain an alternative vendor. That, of course, is precisely what Heritage Hills did, eventually contracting with MedOptions. (UF ¶ 17).

Plaintiffs' gripe with MedOptions, then, is not the loss of business -- that was a foregone conclusion -- but rather the alleged exploitation of Sullivan's relationships to procure this business for MedOptions. But whether it was MedOptions or some other GeriCare competitor, the business was, by dint of GeriCare's own actions, going elsewhere. As such, there is no causal link between the conduct Dr. Stewart speculatively (and erroneously) attributes to MedOptions and the damage plaintiffs claim to have incurred, specifically the loss of a fruitful relationship with Grandview, Hebert, Holiday, Heritage Hills and Ballou.

This absence of causation provides yet another separate and independent basis for dismissing plaintiffs' tortious interference claims against MedOptions. APG, Inc., 436 F.3d at 304-05 (affirming grant of summary judgment on tortious interference claim for want of evidence sufficient to establish a connection between the defendant's improper interference and the plaintiff's loss of earnings).

## IV. CONCLUSION

For the foregoing reasons, there is no genuine issue of material fact at issue in this case and, consequently, summary judgment is properly entered in favor of MedOptions as to all counts.

Respectfully submitted,

DEFENDANT,
MEDOPTIONS, INC.

By its Attorneys,

/s/ Christine K. Bush
Christine K. Bush (#5587)
DUFFY, SWEENEY & SCOTT, LTD.
One Turks Head Place, Suite 1200
Providence, RI 02903
(401) 455-0700-telephone
(401) 455-0701-facsimile

and

Lawrence Peikes
Admitted *Pro Hac Vice*
lpeikes@wiggin.com
WIGGIN AND DANA LLP
400 Atlantic Street
P.O. Box 110325
Stamford, CT 06911-0325
(203) 363-7600-telephone
(203) 363-7676 -facsimile

Dated: February 22, 2008

**CERTIFICATE OF SERVICE**

I hereby certify that the within **Memorandum of Law in Support of Defendant MedOptions' Motion for Summary Judgment** was filed through the ECF system on this 22nd day of February, 2008 and will be sent electronically to the below named counsel who are registered participants identified on the Notice of Electronic Filing:

Stephen M. Robinson, Esq.
The Law Offices of Stephen M. Robinson
155 South Main Street
Suite 402
Providence, RI 02903

Vicki J. Bejma, Esq.
The Law Offices of Stephen M. Robinson
155 South Main Street
Suite 402
Providence, RI 02903

/s/ Christine K. Bush
Christine K. Bush

H:\Clients\MedOptions\Tamule\Pleadings\USDC RI\Mem in Support of MedOptions MSJ.DOC