**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

| | | |
|---|---|---|
| **HUMAN SERVICES CONSULTANTS, LTD.,** | **:** | |
| **Dba GERICARE** | **:** | |
| **RONALD MARK STEWART MD** | **:** | |
| **Plaintiffs** | **:** | |
| | **:** | |
| | **:** | |
| | **:** | |
| **vs.** | **:** | **C.A. # 06-486** |
| | **:** | |
| | **:** | |
| **ANN TAMULE, aka ANN M. SULLIVAN,** | **:** | |
| **Alias, and MEDPTIONS INC.** | **:** | |
| **Defendants** | **:** | |

**PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

Now come the Plaintiffs, and move for summary judgment pursuant to Fed.R.Civ.P. 56. In support of said Motion, Plaintiffs rely upon their Memorandum and Statement of Undisputed Facts, attached hereto and made a part hereof.

Respectfully submitted,

/s/ Stephen M. Robinson
Stephen M. Robinson #2103
The Law Offices of Stephen M. Robinson
155 South Main Street, Suite 402
Providence, RI 02903
(401) 331-6565
(fax) 331-7888
February 22, 2008
srobinson@smrobinsonlaw.com

/s/ Vicki J. Bejma
Vicki J. Bejma #6498
The Law Offices of Stephen M. Robinson
155 South Main Street, Suite 402
Providence, RI 02903
(401) 331-6565
(fax) 331-7888
February 22, 2008
vbejma@smrobinsonlaw.com

**CERTIFICATION**

I, the undersigned, hereby certify that on February 22, 2008, I sent a true copy of the within by electronic filing to all of the parties below:

Christine K. Bush, Esq.
Rachelle R. Green, Esq.
Duffy Sweeney & Scott, Ltd.
One Turks Head Place, Suite 1200
Providence, RI 02903

Lawrence Peikes, Esq.
Wiggin & Dana, LLP
400 Atlantic Street
P.O. Box 110325
Stamford, CT 06911-0325

/s/ Vicki J. Bejma

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

| | | |
|---|---|---|
| **HUMAN SERVICES CONSULTANTS, LTD., Dba GERICARE RONALD MARK STEWART MD** | : | |
| **Plaintiffs** | : | |
| **vs.** | : | **C.A. # 06-486** |
| **ANN TAMULE, aka ANN M. SULLIVAN, Alias, and MEDPTIONS INC.** | : | |
| **Defendants** | : | |

**PLAINTIFFS' MEMORANDUM IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT**

## I. INTRODUCTION

This matter comes before this Honorable Court on Plaintiffs' Complaint. As outlined in Plaintiff's Complaint, at issue is a non-compete agreement entered into by Plaintiffs and Defendant Sullivan, and the devastation worked upon Plaintiffs' business after Defendant Sullivan breached that agreement. Defendant Sullivan had been providing services as a nurse practitioner under contract with Plaintiffs, who were in the business of providing specialized geriatric psychiatric services to nursing home patients across the State. Said agreement provided that Defendant Sullivan would not engage in or be employed by any business competing with Plaintiffs for a period extending up to six months after she left Plaintiffs.

In spite of this agreement, Defendant Sullivan began working for Plaintiffs' competitor, Defendant MedOptions, almost immediately after terminating her contract with the Plaintiffs. Defendant Sullivan provided these services as Defendant MedOptions' employee in many of the same nursing homes in which she had provided services on behalf of Plaintiffs. Said nursing

homes – many of whom had been serviced by Plaintiffs for many years -- had in fact contracted with Defendant MedOptions in the place of Plaintiffs.

Plaintiffs brought various state law claims against Defendants. Count I of Plaintiff's Complaint alleged that Defendant Sullivan breached her non-compete agreement by accepting employment with Plaintiffs' competitor, Defendant MedOptions. Furthermore, Counts II and III of Plaintiffs' Complaint alleged that Defendant Sullivan and Defendant MedOptions, working in concert, tortiously interfered with Plaintiffs' advantageous business relationships. This action was initially filed in Providence County Superior Court, but was removed to this Court pursuant to its diversity jurisdiction under 28 U.S.C. § 1332. A pretrial order scheduling discovery and submission of dispositive motions entered on or about June 7, 2007. Discovery closed on February 8, 2008. Plaintiffs at this time now seek summary judgment pursuant to Fed.R.Civ.P. 56.

## II. FACTS AND TRAVEL

Plaintiff, Human Services Consultants, was founded by Plaintiff Dr. Ronald Stewart in 1973 for the purposes of providing psychiatric services. (Exhibit A, Deposition of Dr. Ronald Stewart, p. 17:16-20; Statement of Undisputed Fact ("SUF") ¶ 1.) GeriCare, a division of Human Services Consultants, was founded in 2000. Its psychiatric practice is far more specialized, that is, it services the unique psychiatric needs of the elderly residing in various nursing homes throughout the State of Rhode Island. (Exhibit A, p. 17:25-18:4, 19:2-5; SUF ¶ 2) GeriCare provides these services through the individual nursing homes. The nursing home staff would refer to GeriCare those patients felt to be in need of psychiatric services. (Exhibit B, Deposition of Ann Sullivan, p. 39:15-23; SUF ¶ 4.) GeriCare also provides to the nursing homes other specialized services, such as forensic psychiatry services, assistance in risk management

issues unique to the nursing home population, as well as staff training. These are provided to the nursing homes free of charge. (Exhibit C, Plaintiffs' Response to First Set of Interrogatories, #6; SUF ¶ 5.) Even before the establishment of GeriCare, Dr. Stewart himself had provided similar services for numerous nursing homes across the state. (Exhibit A, p. 18:5-15; SUF ¶ 3.)

Beginning in 2002, Defendant Sullivan was under contract to GeriCare to provide services to nursing home patients in her capacity as nurse practitioner. (Exhibit B, p. 29:6-18; Exhibit D; SUF ¶ 6-8.) As part of the Provider Agreement setting out the terms and conditions under which she would be providing her services, Defendant Sullivan initially agreed to a covenant not to compete with GeriCare that extended for a period of six months after she left GeriCare. (Exhibit D; SUF ¶ 6.) Later, in 2004, Defendant Sullivan signed an Amended Provider Agreement containing exactly the same non-compete language. (Exhibit B, p. 32:23-34:4, Exhibit E; SUF ¶ 7.)

Dr. Stewart provided Defendant Sullivan with the extensive training necessary to perform her duties within GeriCare's highly specialized practice. Prior to this time, Defendant Sullivan had not specialized in the treatment of mental health patients. (Exhibit B, p. 51:23-52:8; SUF ¶ 16.) As part of her orientation, Dr. Stewart provided instruction in concepts of geriatric psychiatry, nursing home issues, and geriatric issues. (Exhibit A, p. 37:11-20; 62:2-6; SUF ¶ 9.) Defendant Sullivan was also provided with instruction about the administrative matters of her practice. In particular, Defendant Sullivan was provided with access to forms developed by GeriCare for purposes of assessment, case opening, and billing, as well as training information. (Exhibit A, p. 32:2-7, 17-21; Exhibit B. 34:19-36:6; SUF ¶ 10-11.) Over the course of her employment, Defendant Sullivan would also be provided with professional development relating

to the clinical and business aspects of her practice. (Exhibit A, p. 35:7-19; Exhibit B, p. 38:11-23; 51:9-22; Exhibit C, Responses to Interrogatories #9; SUF ¶ 17.)

Dr. Stewart also introduced Defendant Sullivan to the key personnel at the nursing homes serviced by GeriCare, and discussed with her the culture and personality of the specific nursing homes that she would be servicing. (Exhibit A, p. 32:2-7; 37:11-15; 62:2-6; SUF ¶ 14.) Prior to her contract with GeriCare, Defendant Sullivan had neither worked for any of the nursing homes that she serviced while working for GeriCare, nor had she performed services at said nursing homes, nor had she treated patients at these nursing homes at any time. (Exhibit B, p. 36:25-37:4; SUF ¶ 15.)

During the course of Defendant Sullivan's contract with GeriCare, Defendant Sullivan provided services in evaluating and assessing patients, implementing treatment plans, case management, and medication management. (Exhibit B, p. 34:14-18, 53-25-54:20; Exhibit F; SUF ¶ 8.) She would provide these services on behalf of GeriCare at the Morgan Health Care Center, the Holiday, Heritage Hills Nursing Center, Hebert Nursing Home, Ballou Home, Grand View Center, the East Gate Nursing Center, Haven Health of Greenville, and Pine Grove. (Exhibit B, p. 36:14-12 and 56:16-17; Exhibit F; SUF ¶ 12.) GeriCare had written contracts with most if not all of these entities. (Exhibit G; SUF ¶ 12.) Defendant Sullivan would also provide orientation for new staff members. (Exhibit A, p. 33:19-34:5, 34:25-35:4; Exhibit C, Response to Interrogatory #5, SUF ¶ 18.)

On or about April 9, 2006, Defendant Sullivan provided GeriCare with a letter of resignation. (Exhibit H; SUF ¶19.) That letter indicated that effective June 1, 2006, she would no longer be providing services to GeriCare, and also indicated that "[i]t is now time for me to move forward with my life in Massachusetts." (Exhibit H.) Roughly a week to ten days after

providing that resignation, she informed Dr. Stewart that she was going to Massachusetts to take care of her aging parents and then enter a religious order. (Exhibit A, p. 68:22-70:8; SUF ¶ 20.) GeriCare made immediate attempts to locate a replacement for Defendant Sullivan. (Exhibit C, Responses to Interrogatory #5; SUF ¶ 23.) Indeed, even before Defendant Sullivan indicated her intention to leave, GeriCare had made ongoing efforts to recruit nursing staff. (Exhibit C, Response to Interrogatory #5; Exhibit I; SUF ¶ 24.) However, it quickly became apparent that GeriCare could not guarantee a replacement in enough time to ensure continuity of care. Accordingly, in the interests of fulfilling its medical and ethical obligations to its patients, GeriCare was forced to send letters to some of its nursing homes indicating that it was releasing these nursing homes from their contracts and giving them the option of finding replacement services. (Exhibit A, p. 79:11-24; 82:12-20; Exhibit J; SUF ¶ 25.)

Defendant Sullivan did not go to Massachusetts, as she had told Dr. Stewart. As she would reveal at her deposition, her parents had not even been in need of care that would require her to go to Massachusetts. (Exhibit B, p. 50:22-51:8; SUF ¶ 21.) As Defendant Sullivan also revealed at her deposition, she did not even have any firm plans to join any particular religious order. She testified that she had hoped to do so at some point, and was a candidate at two Massachusetts-based orders, but at the time of her resignation was only in the application process. By spring of 2006, she testified, it had been decided that neither order was suitable for her. (Exhibit B, p. 47:6-50:5; SUF ¶ 22.)

In truth, Defendant Sullivan accepted employment from Defendant MedOptions. Defendant MedOptions provided to nursing home patients the same type of services as provided by GeriCare. (Exhibit B, p. 80:20-81:3; 82-7-17; Exhibit K, Deposition of Laurel Wood, p. 13:21-14:23; Exhibit L, Deposition of Jeffrey Kinnel, p. 25:10-19; SUF ¶ 26.) Defendant

MedOptions seemed very eager to retain Defendant Sullivan's services. Laurel Wood and Melissa Ferdinandi, who at that time were Defendants' Vice President of Operations and Regional Manager, respectively, first met with Defendant Sullivan at the Panera Bread in Greenville, Rhode Island. (Exhibit B, p. 66:9-17; 68:14-17; Exhibit K, p. 11:13-21; Deposition of Melissa Ferdinandi, Exhibit M, p. 19:16-25; SUF ¶ 27-28.). During that interview at Panera Bread, Defendant Sullivan revealed to Ms. Wood and Ms. Ferdinandi the existence of her non-compete agreement with GeriCare. Ms. Wood indicated to Defendant Sullivan that that agreement would not be enforced. (Exhibit B, p. 97:11-23; Exhibit K, p. 40:3-41:15; SUF ¶ 30.)

Defendant Sullivan was offered a position as nurse practitioner on the spot during the Panera Bread interview. (Exhibit B, p. 72:14-73:5; Exhibit K, p. 34:24-35:4; SUF ¶ 31.) This offer was eventually confirmed by a letter dated May 19, 2006. (Exhibit N; SUF ¶ 32.) This letter came the day after Defendant Sullivan had submitted a written application. (Exhibit O SUF ¶ 33.) Significantly, on or about the same day that she submitted her application, she would send to Ms. Wood a fax indicating that she had spoken to Elaine DelSesto from The Holiday and Barbara Langshaw-Soares from Heritage Hills Nursing Center. (Exhibit P; SUF ¶ 34.) It is also significant that these individuals were not listed as potential references in Defendant Sullivan's application materials. (Exhibit O.)

Defendant Sullivan began providing services on behalf of MedOptions on or about June 2, 2006 – days after leaving GeriCare. (Exhibit Q, p. M-00089; SUF ¶ 39.) Defendant MedOptions even put Defendant Sullivan to work before her standard background checks were completed. (Exhibit L, p. 31:19-32:2; Exhibit R; Exhibit S; SUF ¶ 36-37.) While employed by MedOptions, Defendant Sullivan provided services virtually identical to those which she had provided on behalf of GeriCare. (Exhibit B, p. 80:20-81:3; 82:7-17; SUF ¶ 38.) Most

significantly, Defendant Sullivan's employment at MedOptions also took her to many of the same nursing homes that she had been servicing on behalf of GeriCare – in some cases with barely even a week's break in service. She began working at Grand View Center on June 2, 2006. (Exhibit Q, p. M-00089; SUF ¶ 39); The Holiday on June 6, 2006 (Exhibit Q, p. M-00089; SUF ¶ 40); and Heritage Hills on July 5, 2006 (Exhibit Q, p. M-00098; SUF ¶ 40.) (Deposition of Sullivan, p. 80:20-81:3; 82:7-17.). She would even be seeing many of the same patients as she saw while providing services for GeriCare. (Exhibit B, p. 82:24-83:3; SUF ¶ 42.)

Since Defendant Sullivan had announced her departure, these nursing homes in fact had contracted with MedOptions in lieu of GeriCare. Defendant MedOptions signed a contract with The Holiday, effective June 1, 2006, on May 31, 2006; a contract with Grand View, effective June 1, on May 15, 2006; and a contract with Heritage Hills, effective July 1, 2006, on July 27, 2006. (Exhibit T; SUF ¶ 43-45.) Although no written contract has ever been produced for the period immediately after Sullivan's departure from GeriCare, it is apparent that Defendant Sullivan, at least no later than September 22, 2006, provided services for Hebert Nursing Home on behalf of MedOptions. (Exhibit Q, p. M-00112; SUF ¶ 46.) Again, even though no written contract has been produced for that period, Defendant Sullivan provided services for Defendant MedOptions at Ballou no later than October 4, 2006. (Exhibit Q, p. M-00157; SUF ¶ 47.) Later, Defendant MedOptions would acquire contracts with other homes formerly serviced by GeriCare and Defendant Sullivan, such as Pine Grove, on March 1, 2007; and Morgan Health Center, on June 17, 2007. (Exhibit T; SUF ¶ 48-49.)

In the cases of some of the nursing homes, GeriCare had simply been unable to provide a replacement for Defendant Sullivan despite search efforts that had been in place even before Defendant Sullivan had announced her intended departure. (Exhibit C, Response to

Interrogatories, #1, 5; Exhibit J; SUF ¶ 25.) Heritage Hills, on the other hand, refused to accept the replacement offered by Plaintiffs, and tried to terminate its contract with GeriCare before the 30-day period agreed to in its contract. (Exhibit C, Plaintiff's Responses to Interrogatories #1 and 5, See Exhibit U; SUF ¶ 51.) Immediately after that period expired, Heritage Hills signed an agreement with MedOptions – although it is clear that Heritage Hills and MedOptions had begun discussions at least by June 1, 2006. (Exhibit T, p. M-00009, "Commencement Date;" SUF ¶ 51.)

In September, 2007, Jeffrey Kinnell, the co-CEO of MedOptions, Inc., received correspondence from Dr. Stewart reminded Defendant MedOptions of the existence of the non-compete agreement. (Exhibit L, p. 50:2-25; SUF ¶ 52.) Nevertheless, Defendant MedOptions continued Defendant Sullivan in its employ in Rhode Island nursing homes until roughly January, 2007. At that point, Defendant Sullivan was transferred to Connecticut nursing homes at her own request because she had found a religious order in that state she was interested in joining. (Exhibit B, p. 112:18-113:5; SUF ¶ 53.) Defendant Sullivan resigned from Defendant MedOptions in June, 2007, when she in fact did enter that religious order. (Exhibit B, p. 114:18-20; SUF ¶ 54.) In the meantime, GeriCare's business has been decimated.

## III. LEGAL ARGUMENT

In order to obtain summary judgment, the movant must demonstrate that ". . . the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The reviewing court does not make factual determinations itself, or decide which edition of the facts to accept; it merely determines whether ". . . a fair-minded jury could return a verdict for the plaintiff on the case

presented." *See* Lipsett v. University of Puerto Rico, 864 F.2d 881, 895 (1st Cir. 1988). The record is reviewed in the light most favorable to the non-moving party. *See* Rossy v. Roche Products, Inc., 880 F.2d 621, 623 (1st Cir. 1989). All factual inferences must be drawn in favor of the non-moving party. *See* Rossy at 623.

Additionally, partial summary judgment is available. Pursuant to Fed.R.Civ.Pro. 56(d)(2), an interlocutory summary judgment may be rendered on liability alone, even if there is a genuine issue on the amount of damages. Furthermore, under Fed.R.Civ.Pro. 56(d)(1), even if a motion for summary judgment is not rendered on the whole action, the motion for summary judgment may serve as a tool to determine what facts are not at issue:

> **(1) *Establishing Facts.*** If summary judgment is not rendered on the whole action, the court should, to the extent practicable, determine what material facts are not genuinely at issue. The court should so determine by examining the pleadings and evidence before it and by interrogating the attorneys. It should then issue an order specifying what facts--including items of damages or other relief--are not genuinely at issue. The facts so specified must be treated as established in the action.

The standard for adjudicating such partial summary judgments are identical to a Rule 56(c) motion for summary judgment. *See* Access Solutions Internat'l v. Data/Ware Development, Inc., 70 F.Supp.2d 92, 96 (D.R.I. 1999)

## A. PLAINTIFFS ARE ENTITLED TO SUMMARY JUDGMENT AGAINST DEFENDANT SULLIVAN ON THE ISSUE OF HER LIABILITY FOR BREACH OF CONTRACT.

As with any other contract, the contract existing between the Plaintiffs and Defendant Sullivan must be interpreted and applied in accordance with the unambiguous language of that agreement. *See, e.g.*, Pawtucket Fraternal Order of Police Lodge #4 v. City of Pawtucket, 869 A.2d 67, 70 (R.I. 2005), citing Town of North Providence v. Local 2334 International Association of Fire Fighters, 763 A.2d 604, 606 (R.I. 2000). Under the unambiguous language

of that agreement, Plaintiffs had a specific non-compete agreement with Defendant Sullivan. There is no material dispute of fact that Defendant Sullivan, acting in concert with Defendant MedOptions, chose to ignore that language, thus breaching that agreement. As such, both are liable.

At the time that she first began providing services to the Plaintiffs in June, 2002, Defendant Sullivan entered into a written agreement providing a specific non-compete provision. (Exhibit D) The language of that agreement could not have been less ambiguous:

> **I. GENERAL NON-COMPETE AGREEMENT**
>
> The Contractor agrees to not directly or indirectly compete with the business of the Company during the period of contraction. The term 'non compete' shall mean that the Contractor shall not directly or indirectly own, operate, consult to or be employed by any firm in a business substantially similar to or competitive with the present business of the Company or such business activity in which the Company may engage during the term of the agreement and for six (6) months thereafter.
>
> The Contractor hereby acknowledges that the Company shall or may in reliance of this agreement provide the contractor access to trade secrets, customers and other confidential data, and that this agreement is reasonably necessary to protect the Company and its clients.

(Exhibit D). The contract between Plaintiffs and Defendant Sullivan was amended in 2004. That amended document included the same non-compete language. (Exhibit E.) Defendant Sullivan does not dispute that she had entered into either the original contract with the Plaintiff, nor does she dispute that she had entered into the amended contract. (Exhibit B, p. 29:17-33:17; SUF ¶6-7.)

It is also beyond cavil that Defendant Sullivan acted in direct contravention of that agreement. Defendant Sullivan provided services as a nurse practitioner for Plaintiffs. In that capacity, Defendant Sullivan provided mental health treatment of patients in nursing homes in Rhode Island. (Exhibit B, p. 34:10-13; SUF ¶ 8.) This consisted of evaluating and assessing

patients who were referred from the nursing homes for mental health evaluations, implementing treatment plans, case management, and medication management. (Exhibit B, p. 34:14-18; 53:25-54:3; SUF ¶ 8.)

No less than three days after ceasing to provide services on behalf of Plaintiffs, Defendant Sullivan began her employment with Defendant MedOptions. Defendant MedOptions, like GeriCare, also provides specialized psychiatric services to nursing home patients. (Exhibit K, p. 13:21-14: 23; Exhibit L, p. 25:10-19; SUF ¶ 26.) This type of service was of course identical to that provided by Plaintiffs. Furthermore, Defendant Sullivan provided precisely the same type of services as she did at GeriCare -- (Exhibit B, p. 80:20-81:3; 82:7-17; SUF ¶ 38.)

Finally, when employed by Defendant MedOptions, and during the period in which the non-compete agreement was in effect, Defendant Sullivan worked in many of the same facilities in which she had provided services on behalf of Plaintiffs. (Exhibit B, p. 80:20-81:3; 82:7-17; Exhibit Q; SUF ¶ 38-47.) She would even be seeing many of the same patients as she saw while providing services for GeriCare. (Exhibit B, p. 82:24-83:3; (SUF ¶ 42.)

Clearly, then, Defendant Sullivan's employment with Defendant MedOptions breached her non-compete agreement. Defendant MedOptions was a competitor of GeriCare in that it provided virtually identical types of services. Defendant Sullivan provided Defendant MedOptions virtually the same types of services that she had provided for GeriCare, in many of the same nursing homes, and often even to the same patients. Furthermore, she did this within the 6-month period stipulated by an agreement that she had signed on to not once, but twice. For that reason, summary judgment should issue on the issue of whether Defendant Sullivan had breached her contract.

We anticipate that the Defendants may challenge the validity of the non-compete agreements. This argument has no validity. A non-compete agreement is enforceable under Rhode Island law, provided that the agreement 1) is ancillary to an otherwise valid transaction or relationship; 2) supported by adequate consideration; and 3) there exists a legitimate interest that the provision is designed to protect. *See* Durapin v. American Products, Inc., 559 A.2d 1051, 1053 (R.I. 1989). The agreement must be reasonable. *See id*.

Defendant Sullivan's non-compete agreement fulfilled all of these conditions. The non-compete agreements were ancillary to the agreements under which she worked for GeriCare. As conditions of her employment, they were supported by adequate consideration. Furthermore, the interests that the agreement was intended to protect were entirely legitimate. Courts have also enforced non-compete covenants where an employer had provided an employee training in a unique or novel service. *See* Dial Media v. Schiff, 612 F.Supp. 1483, 1489 (D.R.I. 1985). Non-compete covenants may also be enforced where aimed at protecting goodwill. *See id*. This is particularly so when the promisor is in a position to develop a "special relationship" can be with clients. That "special relationship" is formed where the promisor has become aware of the special and otherwise unknown needs of the customer. *See* Durapin v. American Products, Inc., 559 A.2d 1051, 1057 (R.I. 1989), *citing* Rego Displays, Inc. v. Fournier, 379 A.2d 1098, 1101 (1977).

Defendant Sullivan's employment encompassed virtually every type of legitimate interest that can be served by a non-compete agreement. Plaintiffs were in the business of providing a highly specialized medical service. GeriCare's practice was not limited to psychiatry, but geriatric psychiatry. That was narrowed to an even further sub-specialty, that is, the unique needs of nursing home patients. (Exhibit A, p. 17:25-18:4, 19:2-5; SUF ¶ 2.) Defendant

Sullivan received the benefit of training in this particular sub-specialty from GeriCare, both in its clinical and administrative aspects. (Exhibit A, p. 35:7-19; 37:11-20, 62:2-6; Exhibit B, p. 38:11-23; 51:9-2; Exhibit C, Response to Interrogatories, #9; SUF ¶ 8-12, 17.) Defendant Sullivan also had access to materials developed by GeriCare, such as its manual and forms. (Exhibit A, p. 32:2-7, 17-21; Exhibit B, p. 34:19-36:6, SUF ¶ 8-12.) This type of extensive training and knowledge is considered worthy of protection by a non-compete agreement. *See* Dial Media v. Schiff, at 1489.

Plaintiffs also had also developed strong business relationships with their nursing home clients, and had gained information regarding the specific culture, wants, and needs of the particular nursing homes serviced by GeriCare. Defendant Sullivan similarly received the benefit of this information from Dr. Stewart. Defendant Sullivan was also introduced and had access to important contacts within the nursing homes themselves. (Exhibit A, p. 32:2-7; 37:11-15; 62:2-6; SUF ¶ 13-14.) Defendant Sullivan, then, was certainly in the position of being able to develop the "special relationship" with GeriCare's clients that could be protected by a non-compete agreement.

Finally, the agreement itself was far from unreasonable in scope. It has been recognized in Rhode Island law that one of the legitimate concerns to be protected by a non-compete agreement is the opportunity for a business to prove itself to its existing clients once a key employee leaves. *See* Block v. Vetcor of Warwick, LLC, 2000 WL 1634784, *6 (Williams, J.), *citing* Concord Orthopedics Professional Ass'n v. H. James Forbes, M.D., 702 A.2d 1273, 1276 (N.H. 1997). Six months would not be an unreasonable amount of time for an intensely service-oriented business such as GeriCare to be given a chance to prove itself. Indeed, in the case of Block, a non-compete agreement of two years was not deemed unreasonable.

Accordingly, then, Defendant Sullivan is clearly liable for having breached her non-compete agreement with the Plaintiffs. Summary judgment should accordingly be granted on that issue.

## II. PLAINTIFFS ARE ENTITLED TO SUMMARY JUDGMENT AGAINST DEFENDANTS ON THE ISSUE OF WHETHER THEY HAD TORTIOUSLY INTERFERED WITH PLAINTIFFS' BUSINESS ADVANTAGE.

Counts II and III of Plaintiff's Complaint brought claims against both Defendant Sullivan and Defendant MedOptions for tortious interference with Plaintiffs' advantageous business relationships. Admittedly, there are still material issues of fact to be decided by a jury insofar as Plaintiffs' claims relate to allegations that Defendant MedOptions and Defendant Sullivan made specific efforts to divert GeriCare's nursing home clients to their own benefit. Plaintiffs accordingly do not seek summary judgment on that element of their claims at this time. However, the uncontroverted evidence on record demonstrates that both Defendants are liable for tortious interference with the advantageous business relationship that existed between the Plaintiffs and Defendant Sullivan.

In order to establish a wrongful interference with economic advantage, one must establish the existence of a business relationship or expectancy, knowledge by the interferor of the relationship or expectancy; an intentional act of interference; proof that the interference caused the harm sustained; and damages to the plaintiff. *See* L.A. Ray. Realty v. Town Council of the Town of Cumberland, 698 A.2d 202, 207 (R.I. 1997). When an employer hires an employee despite the employer's knowledge that the proposed employment will violate the employee's non-compete agreement, that hire is recognized as a species of tortious interference. *See* Gorman Publishing Co. v. Stillman, 516 F.Supp. 98, 106 (N.D. Ill. 1981); Corroon & Black of Illinois, Inc. v. Magner, 494 N.E.2d 785 (Ill.App. 1986).

GeriCare clearly had an advantageous business relationship as a result of its agreement with Defendant Sullivan. Although Defendant Sullivan had handed in her resignation on or about April 9, 2006, Defendant Sullivan had announced her intention to continue providing services to the Plaintiffs until June 1, 2006. (Exhibit H; SUF ¶ 19.) Even after that date, Plaintiffs and Defendant Sullivan still had a contractual relationship flowing from their non-compete agreement, which was to remain in effect for six months after she ceased to provide services on behalf of Plaintiffs. (Exhibit E; SUF ¶ 7.)

Defendant MedOptions was well aware of the existence of that agreement, and intentionally interfered with that agreement by encouraging and assisting Defendant Sullivan in her breach of it. Defendant Sullivan informed Defendant MedOptions' representative of the existence of that agreement at her job interview at Panera Bread. (Exhibit B, p. 97:11-23; Exhibit K, p. 40:3-41:15.) Nevertheless, Defendant MedOptions pressed forward with employing Defendant Sullivan, offering her a position at the Panera Bread interview. (Exhibit B, p. 72:14-73:5; Exhibit K, p. 34:24-35:4; SUF ¶ 31.) Defendant MedOptions even assured Defendant Sullivan that the agreement would not be enforced. (Exhibit B, p. 97:11-23; Exhibit K, p. 40:3-41:15; SUF ¶ 30.) Even after having been contacted by Plaintiffs regarding the non-compete agreement, Defendants did not alter their course of conduct. Defendant Sullivan continued to provide services in Rhode Island on behalf of Defendant MedOptions until she herself requested a transfer to Connecticut on her acceptance into a religious order, in January, 2007. (Exhibit B, p. 112:18-113:5; SUF ¶ 52-54.)

Defendant MedOptions, then, must be deemed liable for having tortiously interfered with Plaintiff's agreement with Defendant Sullivan. Furthermore, Defendant Sullivan, although a party to the non-compete agreement, similarly incurs liability for tortious interference based

upon the fact that she had acted in concert with Defendant MedOptions in their tortious behavior. Where a party breaching a non-compete agreement acts in concert with others to bring about that breach, the party to a non-compete agreement may be liable for both the breach of the agreement and for tortious interference with that agreement. ***See*** Hart, Niniger and Campbell Associates, Inc. v. Rogers, 548 A.2d 758, 764 (Conn.App. 1988).

Furthermore, there is virtually no question that the Defendants' actions were injurious to the Plaintiffs. At very least, the Defendants' underhanded activities cost Plaintiffs an opportunity to persuade Defendant Sullivan to return to work for them, and thus regain their ability to service their nursing home clients. Instead, Defendant MedOptions took the benefit of Plaintiffs' investment in training Defendant Sullivan, and then, having the benefit of a trained nurse practitioner at its disposal, swept up Plaintiffs' clients as well. (Exhibit T; SUF ¶ 43-51.)

Although we anticipate that Defendants will argue that Plaintiffs had in fact surrendered those clients, the fact remains is that Plaintiffs had a longstanding business relationship with those nursing homes. Plaintiffs, in the interests of ensuring continuity of patient care, did send communications to some of their clients indicating that they would not hold them to their contract with GeriCare if they were to find replacement services. (Exhibit J; SUF ¶ 25.) However, Plaintiffs at the same time left open the possibility that they might, before Defendant Sullivan's departure date, find a replacement and be in the position of providing services again. Because Defendant MedOptions had not only taken their key employee, but then taken their clients, Plaintiffs never received this opportunity.

Defendants' course of conduct, then, clearly constituted a tortious interference with the advantageous business relationship that Plaintiffs had held with Defendant Sullivan. Therefore, Plaintiffs are entitled to summary judgment on this issue as well.

## IV. CONCLUSION

For the above-referenced reasons, the Plaintiffs' Motion for Summary Judgment should be GRANTED.

Respectfully submitted,

/s/ Stephen M. Robinson
Stephen M. Robinson #2103
The Law Offices of Stephen M. Robinson
155 South Main Street, Suite 402
Providence, RI 02903
(401) 331-6565
(fax) 331-7888
February 19, 2008
srobinson@smrobinsonlaw.com

/s/ Vicki J. Bejma
Vicki J. Bejma #6498
The Law Offices of Stephen M. Robinson
155 South Main Street, Suite 402
Providence, RI 02903
(401) 331-6565
(fax) 331-7888
February 19, 2008
vbejma@smrobinsonlaw.com

## CERTIFICATION

I, the undersigned, hereby certify that on February 22, 2008, I sent a true copy of the within by electronic filing to all of the parties below:

Christine K. Bush, Esq.
Rachelle R. Green, Esq.
Duffy Sweeney & Scott, Ltd.
One Turks Head Place, Suite 1200
Providence, RI 02903

Lawrence Peikes, Esq.
Wiggin & Dana, LLP
400 Atlantic Street
P.O. Box 110325
Stamford, CT 06911-0325

/s/ Vicki J. Bejma