**EXHIBIT A**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

HUMAN SERVICES CONSULTANTS, LTD
d/b/a GERICARE; RONALD MARK STEWART, M.D.

vs. C.A. No. 06-486

ANN TAMULE a/k/a ANN M. SULLIVAN
alias, and MEDOPTIONS, INC.

DEPOSITION OF RONALD M. STEWART, M.D., a Plaintiff in the above-entitled case, taken on behalf of the Defendants, before Linda L. Guglielmo, RPR-RMR, a Notary Public in and for the State of Rhode Island, at the offices of Stephen M. Robinson, Esquire, 155 South Main Street, Providence, Rhode Island on February 6, 2008 at 2:00 P.M.

APPEARANCES:

FOR THE PLAINTIFFS....LAW OFFICE OF STEPHEN M. ROBINSON
BY: VICKI BEJMA, ESQUIRE
155 SOUTH MAIN STREET
PROVIDENCE, RI 02903

FOR THE DEFENDANTS....WIGGIN AND DANA
BY: LAWRENCE PEIKES, ESQUIRE
400 ATLANTIC STREET
STAMFORD, CT 06911

ALLIED COURT REPORTERS, INC.
115 PHENIX AVENUE
CRANSTON, RHODE ISLAND 02920
401/946-5500

B-u-s-h, and that was in 19 -- I think '83 or '84. And he was put in the Forensic Unit at the request of his social worker who had the charges pressed by some drug store that he had taken a travel toothbrush and a little tube of toothpaste, a total value, less than $2.

So the police arrested him, they caught him on camera. They got hold of the mental health center he went to, said, well, he's on the street all the time, we've got to get him into the system. So we'll press -- go ahead, press charges.

They pressed the charges, the judge had him sent to the Forensic Unit for examination. So, I, of course, examined him, and I said he was cognitively impaired, he had dementia, he could never stand trial.

The judge dropped the charges and the State was in the process of wanting to transfer him to a nursing home, and he did not have what they call a D number, it's a Social Security -- Medicare Medicaid, one of those numbers, public welfare, and he didn't have that number. So he had to get the number. That was on a Wednesday. And you know, everything with the State process takes a long time. So it sat on somebody's desk, I think



two days later, whatever, he's in the shower, unsupervised by the people who were supposed to supervise him. He was always asking people to scratch his back, he had dermatitis on his back, I guess. He asked the wrong guy to scratch his back. A guy who murdered people before because of homosexual fears, this guy murdered some homosexuals, he was in for two murders, he was schizophrenic. So this fellow knocked this guy down, he was an old man, then he was an old man, maybe my age now, but he was infirm. He stomped on him and broke his sternum and punctured his pericardium and he died.

So, his family, who had not wanted anything to do with him, had restraining orders against him, all of a sudden became outraged at the lack of consortium, whatever they had with him. So they sued the state.

The insurance company, over my objection, because I guess there was a clause in the insurance policy, settled the case for, I think, $25,000. It was with Kelly, Joe Kelly's law firm. He's a malpractice lawyer here in town. So they settled that case. That was a malpractice case.

Q. How did you get involved in it, they sued the



State?

A. They sued everybody. They sued the nurse, they sued me, they sued everybody.

Q. What was your relationship with the Forensic Unit at the time?

A. I was a consultant of the Forensic Unit.

Q. Were there other psychiatrists who were also consultants?

A. Yes, there was a head of the Forensic Unit at the time, I think he had just left the job or something, but I'm still a consultant. I wasn't a full-time employee, I was just consulting. I did what I was supposed to do. I did the competency evaluation and I -- the case was so egregious, I called the judge and said we've got to get this guy out of here, he doesn't belong here. He belongs in a nursing home. So the judge agreed, and he released him and they just left him there, and he got killed. I got caught in the basket with -- my insurance company paid the money and then the State paid some money and that was it. The relatives went away happy.

Q. Did the Forensic Unit have consulting relationships with other psychiatrists besides yourself?



A. I think I was doing all the psychiatric. I was doing all the psychiatric work. That was back 23 years ago. But if there were, there were consultants like me who were there on a part-time basis.

Q. Do you still serve as a consultant to the Forensic Unit?

A. No.

Q. When did you stop doing that?

A. '93.

Q. Has your forensic practice since that time been limited to serving as an expert witness?

A. Yes, for the most part. I think I did something with the AG one time or something, but not a lot.

Q. Did you found the company called Human Services Consultants?

A. Yes, sir.

Q. When did you found Human Services Consultants?

A. That was incorporated in 1973.

Q. For what purpose?

A. For the purpose of delivering professional psychiatric, professional medical care to patients.

Q. And when did GeriCare come into existence?

Page 18

A. GeriCare was created in the year 2000.
Q. For what purpose?
A. For the purpose of rendering psychiatric services to nursing facilities in Rhode Island.
Q. Prior to that point in time had you been rendering psychiatric services to nursing facilities?
A. Yes.
Q. Through Human Services Consultants?
A. Well, to some extent through Human Services Consultants and through a company called Arbor Senior Care. Prior to that it was Aegis. These companies got bought up, very much like the company you're involved, got bought up by another company.
Q. Were these companies that you had ownership interest in?
A. No.
Q. So what was your relationship with these other two entities you just mentioned?
A. To some extent I was salaried and then at other times I was fee-for-service.
Q. Did you always maintain a private practice in addition?
A. All the time.
Q. And are you the one who founded GeriCare?

Page 19

A. Yes.
Q. What is the relationship between GeriCare and Human Services Consultants?
A. GeriCare is a wholly-owned subsidiary of Human Services Consultants.
Q. Does Human Services Consultants still exist?
A. Yes. Thank God.
Q. Does GeriCare still exist?
A. Yes, thank God.
Q. In terms of your psychiatric practice, what is the difference between services you provide through Human Services Consultants and services you provide through GeriCare?
A. Human Services encompasses the office practice, which is my practice, social workers practicing in the office and other psychiatrists practicing in the office, Ph.D. psychologist, and GeriCare is subsumed under Human Services and goes out to nursing homes with nurse practitioners and with LICSW social workers and psychologists, Ph.D. psychologist and a doctor, a psychiatrist, myself.
Q. Does Human Services Consultants, separate and apart, from GeriCare have any employees?
A. Yes.
Q. Would that be the other psychiatrist?

Page 20

A. No. The other psychiatrist is not there long enough to be an employee. He's an independent contractor. He comes and goes as he pleases. He's mainly in Naples, Florida.
Q. Who are the employees of Human Services?
A. Elizabeth Cavanagh.
Q. What position does she hold?
A. She's a secretary. Office manager, secretary.
Q. Who else?
A. Christine Richards.
Q. What is her position?
A. Executive director of GeriCare, and she's a LICSW counselor for GeriCare and for Human Services Consultants. She has both office practice and works in the nursing homes.
Q. Is she your wife?
A. Yes.
Q. How long have you two been married?
A. Five years.
Q. Who else is employed by Human Services Consultants?
A. Me.
Q. Now, is there anybody else employed by GeriCare other than yourself, Ms. Richards and perhaps Ms.

Page 21

Cavanagh?
A. Not employed, not employees, but independent contractors.
Q. Okay. Independent -- these independent contractors, are what type -- strike that. What type of services do the independent contractors provide?
A. Nurse practitioner and LICSW and the psychologist, Ph.D. psychologist.
Q. What does LICSW stand for?
A. Licensed Independent Clinic Social Worker. It's a Master's level social worker who has special licensing to do independent work.
Q. How many psychologists do you have independent contractor relationships with?
A. One, now.
Q. Who is that?
A. Richard Ober, Ph.D.
Q. Can you spell his last name?
A. O-b-e-r.
Q. How many LICSWs does GeriCare have as independent contractors?
A. I think we have three at the present time.
Q. Do you know who they are by name?
A. Lee Bearsley. I'm not sure how to spell --

be whether she would be in violation of the noncompete, as you understand it, by simply going to work for MedOptions?
A. I think the non-compete, I think the law in the spirit of the noncompete agreement is to protect, correct me if I'm wrong, to protect the parties involved in the noncompete from transferring secrets or privileged information and conveying information or association of value to another entity without proper consideration to the party, you know, who drew the noncompete.
So, I don't think that she was in fact in violation of the spirit of our noncompete. I think, you know, if you want to say, had the time run? No, the time hadn't run totally up. But we had no litigation regarding that, we had no complaint about her because she was straight-up and aboveboard, and very much as if Ann Sullivan/Tamule had come to us and -- in fact, she had done all these things she said she was going to do, she said to us, look, I need to go to work, blah, blah, blah, then, maybe, or if MedOptions would have called us up, we would have made some sort of arrangement, maybe, but that didn't happen, and I thought it was egregious deception



on the part of Ed Sullivan and MedOptions, and that's why the lawsuit was brought.
I thought we were badly treated. We were treated unfairly by Ann Sullivan-Tamule or Ann Tamule-Sullivan and MedOptions. Otherwise, I wouldn't have gotten involved in this whole complicated process of litigation. I'm 66 years old, and I'm very savvy about legal processes, as much as a layman can be, I guess, and, you know, I'm not likely to -- I don't go around suing people. It's not a good thing to do. It's complicated, and it's difficult, and it's a pain in the neck. So if I didn't feel very, very wronged by this whole thing, I wouldn't have pursued it.
Q. I appreciate your explanation, but just try to confine yourself to my questions if you can.
A. Thank you.
Q. What sort of confidential information would Ann Rameaka have been provided by GeriCare? You indicated the noncompete, at least the spirit of it was defined to protect confidential information; did I get that right?
A. Yes.
Q. What kind of confidential information would any



nurse practitioner be provided from GeriCare?
A. All of them would have had our manual or our training information and our forms, our patient evaluation forms, our case opening forms, our contacts with, whoever the contact people were at the facility, administrator, the director of nursing, nursing supervisors.
Q. You mean just knowledge of who those people are?
A. And their actual names and telephone numbers.
Q. Why couldn't somebody find that out by calling the home or looking it up in the phone book?
A. Because they had relationships with these people. They would talk to them. They would make friends with them.
Q. But what's confidential about the identity of the contact people at a nursing home?
A. I think our forms are confidential in that they're only used inpatient assessment. They have confidentiality and also they're proprietary information. They're our forms, we designed those forms.
Q. Do you have any reason to believe that Ann Sullivan took any copies of GeriCare's forms?
A. I don't know. She may have. She very well may have, just by the fact she's going back into



our nursing homes within a very short period of time she has access to those patient's forms that we had produced with her.
Q. Those patients forms -- you said when Ann Sullivan went back into the nursing homes on behalf of MedOptions, she had been servicing for GeriCare, she then had access to GeriCare's forms, right?
A. Yes, and my forms.
Q. And those forms were provided to her by the nursing home, right?
A. Correct. But if she hadn't gone back in there, MedOptions wouldn't have had those forms.
Q. What makes you think MedOptions took those forms?
A. She's a MedOptions employee. If she has access to them, MedOptions has access to them.
Q. Wouldn't any service provider need access to those forms if they're going to see residents of the nursing home?
A. Not without -- not without -- not knowing the significance of these forms as Ann did and not being privileged to the training she's done for us, she was a trainer for us and virtually all of our nursing homes. When a nurse practitioner would leave a nursing home, she would go to that nursing home, virtually any nursing home in the

Page 34

state that we had, and she would bring a new hire in there and orient that hire, she really had a lot more than just like Ann Rameaka, let's say. Comparing her and Ann Rameaka is comparing apples and oranges.
Q. Let me just ask you about the GeriCare forms. When a nurse practitioner goes in to a facility as a representative of GeriCare, she uses the GeriCare forms, right?
A. Yes.
Q. Okay. And then those GeriCare forms are put in the patient's file, right?
A. Correct.
Q. And the reason they're put in the file is so there is a record of whatever treatment or evaluation has been made, right?
A. For continuity of care.
Q. And so if the nursing home for whatever reason discontinues its relationship with GeriCare, and goes to another provider, whether it's MedOptions or somebody else, you would expect that that subsequent provider would have access to the GeriCare forms?
A. Yes.
Q. Okay. Now you said that Ms. Sullivan also was

Page 35

responsible for orienting your new hires?
A. Yes.
Q. That's training she provided to other people?
A. On behalf of GeriCare.
Q. Did GeriCare provide her with any training?
A. Yes, it did.
Q. What kinds of training did GeriCare provide?
A. Specific training was provided by our executive director, Christine Richards who had manual -- she did the training with Ann. I would -- and with the other hires. And I would do some clinical work with them. But as far as the administrative end of the business she would be doing that with initially with Ann and then Ann would be transmitting it to other new hires.
Q. What kind of administrative aspects of the business was Christine training Ann with respect to?
A. Billing and in-servicing, and things like that.
Q. When Ann came to GeriCare she had an advanced degree, right?
A. When Ann came to GeriCare, Ann had been at I believe Simmons College as an assistant professor or some clinical instructor, I'm not sure exactly

Page 36

what her academic position was. She had married and come to Rhode Island, her husband -- ex-husband was a professor at Providence College. Dr. Tamule. Now, when she came here, she was an instructor or professor of nursing at this college in Boston, Simmons or Wheaton, one of those, we lock, Simmons or Wheelock and she left the academic world for one reason or another or she went part time with them and then came to Rhode Island. She interviewed with us and interviewed with Dr. Salloway at Butler Hospital for some research program that he had started. She wasn't happy with Dr. Salloway, and then she came back -- she called us up and said she didn't feel she had a good experience at Butler, or they offered her a position, she started for a day or so. She wanted to leave. She was more comfortable with us, and she stayed us with us for three years, did very well, was very happy and then called up -- wrote a letter to Christine, I think some time in April or whatever, May, and said that she was going to be leaving GeriCare for purpose of going back to Massachusetts to look after her elderly parents.
Q. You're jumping ahead of me. When Ann Sullivan came to GeriCare, this was 2002, right?

Page 37

A. Yes, I believe it was 2002.
Q. She was already qualified to provide services as a nurse practitioner to nursing home residents; is that right?
A. She was a nurse practitioner. Now, as far as having worked in nursing homes, to the best of my recollection, she had no experience in nursing homes and we did all of her training for nursing homes.
Q. What did that entail?
A. Orienting her to nursing home practice, getting her to understand the concepts of geri psychiatry, geriatric issues, nursing home issues, culture of the nursing home, personalities of these various nursing homes. Some of these nursing homes that were taken from me by MedOptions and Ann were with me for 20 years. I was with them with Arbor Senior Care from 1980 something, '88 or whatever. 18 years, long-term relationships with holiday, Heritage Hills, Grand View I had long-term relationships with these people, very happy with me. Never would have left me. So it was especially egregious that Ann would have left saying that she's going home to take care of her parents and then on the phone and to

Christine and other people on our staff she said after she gets her parents squared away with their health care issues and their living accommodations she was going to pursue the religious life.

Fine. So it wasn't even a question of can we offer you anything to make you stay with us. It's not like I'm going to another nursing home company because you guys aren't giving me what I need. Had nothing to do with that. It had to do with I'm going home to take care of my parents then I'm going into a religious convert which made perfect sense because she was a very spiritual person and always going on retreats and asking Christine to join her at church for various vigils and things like that. Fine. So it came as a tremendous shock to me when I found out through a long time associate of mine whose relative was at Grand View Nursing Home, the associate said to me, this nurse said to me, why do you still have my cousin on that antidepressant I thought you were going to take him off it. I said what do you mean. He's up at Grand View and he's on this antidepressant. I said well, maybe he is, maybe he isn't. He said you have him on it. It's your nurse. I said I know we're both getting old, but



I know I'm not at that nursing home. I haven't been at that nursing home in four months. What the hell are you talking about. She said my cousin just told me that, that your nurse gave him the antidepressant. I said, she couldn't have, she hasn't been here in three months. So then she said, I'll ask my cousin to describe the nurse. She described her as a tall person named Ann Sullivan, and it was Ann Sullivan.

So, I called the nursing home up, and I asked to speak to Jane, Jean, one of the nurses on the unit. I said, is Ann Sullivan there, what the hell is she doing there? My mind -- I was boggled. I was incredulous about the whole thing. She said yes, she's been here since -- she said she never left, is essentially what she said. I said, what, she never left, are you kidding. I called up Christine. I said, Christine, what the hell is going on. What is Ann Sullivan doing at Grand View?

Q. Who is the nurse who had the cousin at Grand View?

A. Isabelle McGee.

Q. What is --

A. She's a registered nurse/anesthetist. When I entered at Rhode Island hospital, she was a



nurse/anesthetist. I met her then and, Isabelle, I've known Isabelle for 40 years, and Isabelle when my aunt had starting getting dementia when she got very old, Isabelle was her companion, would drive when the children had graduations and stuff like that, would drive up around, whatever. Then she took care of my stepfather when he was sick and he was failing. So she would do some private duty for us. We've maintained a little, you know -- when her husband got sick with lung cancer, she called me up. So, you know, we maintained -- send Christmas cards, the whole thing. It was a friendship that went on.

Q. Do you know whether Ann Sullivan did any training while she was working at MedOptions?

A. I personally don't know what she did at MedOptions, I wasn't there.

Q. Do you know whether she used any of GeriCare's training manuals or training paperwork on behalf of MedOptions?

A. I don't know what she gave MedOptions except for the fact that coincidentally half dozen of my nursing homes are MedOptions, and at least three or four of them with Ann Sullivan within a very very brief period of time. How does this happen?



Q. Do you know what, if anything, Ann was doing in the April/May 2006 time frame to enter the religious life?

A. I was at a deposition in Connecticut that you were at and Ms. Bejma was at where she said that she went to various convents and made certain inquiries.

Q. Do you have any reason to believe that's not true?

A. Maybe she did, maybe she didn't. I have no reason to believe she did or didn't. She might have made inquiries, I don't know what was in -- it still doesn't make any sense to me that she would -- that there would be this situation where Heritage Hills, we have a contract with them, we never, ever released them from their contract and she sends a fax to these homes -- to your company to MedOptions saying she's already arranged everything with all these directors of nursing to go into all these nursing homes.

Q. What fax is that?

A. That's a fax of May 18th.

Q. And that says that she's made arrangements to go these nursing homes?

A. She's contacted all these directors of nursing.

I don't deal with all that stuff. So I don't -- see, she had a nurse practitioner license. As I said before, as I testified before, she had to be oriented to nursing home psychiatry, nursing home psychiatry, nursing home practice and to the various peculiarities of working in nursing homes, since she hadn't worked in nursing homes before.

Q. What did that entail?

A. I'll tell you something, I really don't -- I didn't do it, except for the fact that maybe I saw some patients with her and went over some clinical stuff with her as far as medications and things like that, but as far as the nuts and bolts of the orientation and getting somebody set up to work for you as a staff person, that's something Christine did, I didn't do that.

Q. How long would that take?

A. Maybe a couple weeks, three to four days, I don't know. I'm guessing. I don't really know. I don't know for sure.

Q. Did you ever hire any other nurse practitioners who didn't have experience working in nursing homes?

A. We might have. Some did and some didn't. One woman, we have had a tremendous amount of



nursing home experience. One we had who had done office practice and then groomed her to nursing homes.

Q. Do you think that the fact that Ann didn't have nursing home experience when she came to you made her unqualified for the job?

A. No. I mean, it's like saying, you know, are you unqualified to be an intern when you come out of medical school. Some medical schools, like my medical school had an active internship. You were an acting intern in your senior year and you could do a lot of the things that the interns assume. When we went to school, internship was an easy transition. Some of the other guys from the other schools didn't have that, it was harder transition for them. It all depends. There is so many different models in education and in training. It's not a cookie-cutter process. Very individualized.

MR. PEIKES: We've already seen these documents I'm about to mark as exhibits, but just to make -- to avoid confusion, I'm going to mark them separate, we're going to use letters for us. So this will be A and B.



(DEFENDANTS' EXHIBITS A AND B MARKED FOR IDENTIFICATION)

Q. Dr. Stewart, the reporter has just marked as Exhibits A and B to your deposition, two documents both of which are entitled Provider Agreement. The second one, B, says Provider Agreement with Amendments to Page 2. These appear to be provider agreements that were signed by Ann Sullivan during the course of her employment by GeriCare; is that right?

A. Hold on a second. A was signed by Ann Tamule, who is the same person as Ann Sullivan, but it's actually signed Ann Tamule, and B is signed by Ann Tamule, not Ann Sullivan, but they are in fact the same person after the divorce.

Q. Just to avoid --

A. She took back her maiden name.

Q. To avoid any confusion, do you have any problem with me referring to her as Ann Sullivan?

A. These documents are Ann Tamule on the front of the document, and they're signed Ann Tamule. So I think it would be clearer and more on the -- if we say Ann Tamule aka or Ann Sullivan aka Ann Tamule. They're signed by Ann Tamule. So, let's keep things correct.



Q. Let me just call her Ann for the time being. It's the same person, though, right?

A. Yes, sir.

Q. What is different about Exhibit B from Exhibit A?

A. Well, one says provider agreement, the other says provider agreement with amendments to Page 2.

Q. So is it your understanding that A and B are exactly the same, other than certain changes that were made on Page 2?

A. I can't say that. I haven't read these through completely. It's going to take me awhile to read them through. I'm not going to say that unless I read both of these through in detail. If you want me to do that, I'll do that, and then I'll tell you what I think.

Q. Let me ask you a preliminary question. Exhibit A was signed by Ann when she first started at GeriCare; is that right?

A. Third day of June 2002.

Q. Does that square with your recollection as to when she first started?

A. Yes.

Q. Exhibit B was signed by Ann on --

A. 16 June 2004.

Q. Why was Ann requested to sign a different provider

agreement in 2004 than the one she signed in 2002?
A. I don't know. Christine Richards, executive director, wrote these and she felt that we needed the amended contract for administrative reasons. I can't address that intelligently right now without reading these both through in detail. If you'd like me to, I will.
Q. If you look at Section 4 of Exhibit A, which is entitled compensation an Section 3 of Exhibit B is also entitled compensation?
A. Where is this, please? Compensation, okay, I found it. Paragraph 4.
Q. Now, on B, it's the section III, also says compensation.
A. Compensation, okay.
Q. Those two compensation provisions appear to be different. Take a moment and read them and let me know -- you can explain in what way they're different.
A. Well, Paragraph A on compensation on Exhibit B, it says, forms will be submitted on a timely, at least every two weeks basis, to health care management billing services with their processing. On A, it said forms will be submitted on a timely minimum of biweekly basis to health care



management billing services for their processing. I feel every two week and biweekly is probably the same thing.
Q. Was there any change made to the compensation --
A. Here's what happens, I'm sorry to do this, I'm anticipating what you're asking. On the third-year anniversary of hire, contractors will be given an increase to 55 percent of said receipts, and that's C. That's what -- now I recollect that she was with us three years and she was given a 5 percent bonus or something along those lines, which also is an administrative decision Christine made. I don't have much to do with that stuff.
Q. Is it your understanding that her compensation arrangement was improved when Exhibit B was entered into?
A. It appears so, by 5 percent.
(RECESS)
(DEFENDANTS' EXHIBITS C THROUGH F MARKED FOR IDENTIFICATION)
Q. Dr. Stewart, how, if at all, does GeriCare market its services?
A. Mostly word of mouth.
Q. Did Ann Sullivan when she was employed or worked



for GeriCare have any role in generating new business?
A. Not that -- not that I'm aware. I'm not involved in marketing. Our executive director does that.
Q. To your knowledge, did Ann Sullivan play any role in marketing on behalf of GeriCare?
A. I don't know. I don't really know except for the fact that nursing homes may have said she was doing a great job or whatever, in that way, you know, it would get around.
Q. Did you ever get feedback from any nursing homes about Ann?
A. Yes.
Q. Was it all positive, all negative, mixed?
A. Virtually all positive.
Q. While we were on break, the reporter marked some documents as exhibits. If you could look at Exhibit C, tell me whether that's the resignation letter that was submitted by Ann Sullivan?
A. Yes.
Q. Did you have a conversation with Ann at or around the time that she tendered her resignation?
A. About a week, eight, ten days later. At Christine's behest, I called Ann up to just kind



of say good-bye, and I said to her, you know, we're sorry you're leaving, Ann, if there is anything Christine and I can do to be of assistance with you, with your family issues or whatever, if we can be of any help to you in the future, please let us know and, you know, Christine, and I will remember you in our prayers, that's about it.
Q. Did you ever talk to Ann about the reasons she left?
A. No. I -- she did say to me, that she was going into the religious life. She was going to settle her parents down. As I said before, parents had these health care problems, heart disease or something, they're complicated. They're older people and had health care problems. She wanted to help her sister or relatives out with stuff, and she was the health care professional in the family. She had run back and forth to Massachusetts to see her parents, somewhere outside of Boston, and then she said after she gets her parents settled down, she will be entering the religious life, and that spoke pretty for itself. There is nothing more to say. She didn't say she was going to work for any other

Page 70

companies or anything else. If she said anything like that, I would have said, gee whiz, what can we do to keep you.
Q. When Ann told you about going to settling her parents down and entering the religious life, is that in the conversation you had with her about her resignation?
A. That's when I called her up to wish her well.
Q. When did Ann actually stop working for GeriCare?
A. I don't know. Christine has all that stuff. I don't know, some time, whenever, in June or May or whatever. I don't really know for sure.
Q. Between the time that you had the conversation with Ann on the subject of her resignation and to wish her well and the time she actually stopped working for GeriCare, did you speak to her at all?
A. No, I don't believe. No, the next time I saw her, I didn't speak to her, was at the deposition.
Q. After you received Ann's resignation letter, what, if anything, did you do to try and backfill her spot, in other words, to try and hire somebody?
A. We had a nurse who worked with us, Sharon Borges, who was going to go in there to Heritage Hills, and Christine was advertising and polling our various nurse practitioners if they could take

Page 71

another home and whatever.
Q. What else, if anything, did you do to find somebody to replace Ann?
A. She was doing -- Christine was doing that stuff. I wasn't doing -- I'm not the one who does that stuff. That's her job, not mine. I'm supposed to see the patients and do my practice in my office, forensic stuff.
Q. Did you offer any of the homes other than Heritage Hills a replacement for Ann?
A. Christine would have done that. I wouldn't do it.
Q. Take a look at Exhibit D, that's an E-mail exchange with Sharon Borges and Christine?
A. Yes.
Q. The E-mail address here that says psychlawmd@aol.com, whose address that?
A. That's me. Where is that -- where did you see that?
Q. On Exhibit D on the first page towards the middle. E-mail sent Sunday, April 16th?
A. That's a copy to me. That's cc to me. That's what that it, it was sent to Christine and copied to me and Christine cc'd me to keep me in the loop.

Page 72

Q. And according to this E-mail, Christine offered Sharon Borges a number of Ann's homes, including Ballou, Grand View, Heritage Hills, The Holiday and Morgan as well as East Gate, right?
A. Yes.
Q. And the only one that Sharon Borges was interested in was Heritage Hills, right?
A. Yes.
Q. The others were too far away from her?
A. Apparently so.
Q. Is that how you assigned them to facilities, based on proximity to their residence?
A. As was testified to by the executive from MedOptions, we try to keep people as close to their homes as possible. You know, it makes it a lot easier for them and the home and everybody else. But then again, the assignments and who goes where and moving the pieces on the chess board is very much Christine's deal, not mine. Sorry, I don't mean to not answer your question.
Q. I'm only asking about what you know. Did you ever speak to somebody at Heritage Hills about the possibility of Sharon Borges taking over for Ann?
A. I believe I may have talked to Barbara Langshaw about it. I just clearly don't recall

Page 73

right now.
Q. Do you know whether Christine spoke to Heritage Hills about Sharon taking over?
A. I guess she may have. I don't know for sure. I can't remember for sure one way or the other.
Q. Did Sharon Borges ever take over for Ann at Heritage Hills?
A. I think that Heritage Hills cancelled our contract because they were already hooked up with MedOptions and Ann Sullivan before Sharon could go in there.
Q. Do you know whether Heritage Hills rejected Sharon as a replacement for Ann?
A. I don't know for sure. I don't know for sure how that all went down.
Q. Okay. If you look at the top E-mail from Sharon to Christine, the first sentence says, "If Heritage Hills is open to me going in once a week after 4:00 P.M. and seeing eight to ten patients weekly, they are my choice to replace Grand Islander." Do you recall those restrictions as outlined in the first sentence of this E-mail on Exhibit D were not acceptable to Heritage Hills?
A. I imagine they weren't, or they would have taken Sharon. Unless, of course -- see, they

the contract on 30-days' notice; is that right?
A. The nursing homes, yes, we did.
Q. You were fulfilling that requirement with regard to these letters, right?
A. Yes, sir.
Q. So the six homes that this letter was sent to, Exhibit E, all of those contracts were terminated by GeriCare effective June 1, 2006, right?
A. Except for Heritage Hills, they didn't get a letter.
Q. Whoever this letter was sent to, those contracts were terminated on June 1, 2006, right?
A. To the best of my knowledge, yes.
Q. And one of the reasons that you gave these homes more than 30-days' notice was because you wanted to give them the best opportunity to find an alternative provider?
A. Yes.
Q. You understood once your agreement with these homes terminated, they would be looking for somebody to replace GeriCare, right?
A. Yes.
Q. And who else provided such services in Rhode Island other than yourself and MedOptions?
A. There's Dr. Cass's group and Dr.



Rosensweig -- Dr. Rosensweig hadn't gone to MedOptions yet, I don't think. And a doctor from the Miriam Hospital I can't think of his name right now -- Dr. Besdine, and there's is another group from St. Joseph's that's providing services, we're about five groups.
Q. Did you refer any of these homes to whom this letter was sent to one of those other alternative providers?
A. No.
Q. Why did you send, you and Ms. Richards, sent Exhibit E the letter so quickly after Ann tendered her resignation, it's about a ten-day gap or so?
A. Well, what went on, actually, is that I was more inclined to try to staff the homes myself, and Christine said, well, for continuity of care, and to be fair to the nursing homes, you have to give them the opportunity to find somebody else and if they want -- it was just a fairness and aboveboard thing. We were having trouble finding new staff and we didn't want them to feel that they were tied in -- tied up, whatever. We had a good relationship with these people for many, many years, so...
Q. Keep Exhibit E out for a minute. We had sent you



some discovery requests in this case. One such request was asking you to admit certain factual statements, and we asked you to admit that pursuant to this letter that's Exhibit E, GeriCare terminated its service agreement with Grandview Center effective June 1, 2006 and you denied that. Why?
A. I don't recall right now. I mean, do I have my interrogatories here? Do you have them here, my responses?
Q. Let's just make it a little clearer.
(DEFENDANTS' EXHIBITS G THROUGH I MARKED FOR IDENTIFICATION)
Q. Dr. Stewart, if you look at Exhibits G and H side-by-side for a moment.
THE WITNESS: Which two?
Q. G and H. G is our request to admit and H is your responses. If you look at Number 3, we're asking you to admit that by virtue of this letter that's been marked Exhibit E to your deposition --
A. Are you reading "Admit." Let me orient. Locate me on this page.
Q. Request Number 3?
A. "Admit pursuant to the letter attached hereto as to Exhibit B bearing the Bates Number 92



plaintiff terminated its service agreement with the Grandview effective June 1, 2006."
Q. You will see Exhibit E has the Bates number at the bottom, number 92; do you see that?
A. Yes, okay.
Q. So, the letter that's been marked as Exhibit E to your deposition is the letter that's referred to in request Number 3?
A. Okay.
Q. All right. And then you see in your response to request Number 3, you say denied?
A. Denied. See our response to Defendant's second set of interrogatories.
Q. My question for you is what the basis for your denying --
THE WITNESS: What is the second set of interrogatories?
Q. That is in front of you, right here. Take a moment to read that, if you will.
(PAUSE)
A. As to request number 3, 5, 7 and 9, the letters referenced were intended to give the nursing homes in question the option of finding another provider in the event that we were unable to locate a substitute nurse practitioner by June

1, 2006. This was done to ensure continuity of care in the event that our efforts were untruthful. "Plaintiff, in fact, continually made efforts to locate and recruit potential nurse practitioners as a business practice even before defendant Sullivan's notice."
Q. Given what you just read, how is it that you deny that by virtue of the letter that's been marked as Exhibit E to your deposition that GeriCare terminated its service agreement with Grandview effective June 1, 2006?
A. I think it wasn't so much that we were specifically terminating our agreement by our choice. It was that we were giving them the permission and the option to seek continuity of care from another provider. Were they to find it, we were not going to come back at them and say, look, what business do you have going to somebody else and we still have this agreement with you. We were taking them off the hook.
Q. You're specifically telling Grand View Center and the other homes to whom this letter was sent that GeriCare was terminating a contract with the facility as of June 1, 2006?
A. But that's in a void. Before this letter was



sent, there were conversations with each of these nursing homes, with Christine, that explained to them that we weren't terminating them in a casual or cavalier fashion. We weren't terminating them because we had greener pastures somewhere else. We were terminating it because of this dire consequence we find ourselves in because of Ann leaving.
Q. But request Number 3 doesn't ask you to admit that you had a reason or another for terminating, it just asked you to admit that you terminated the agreements by way of this letter; that's exactly what happened, isn't it?
A. Well, I guess in a vacuum, it did.
Q. And other than Heritage Hills, did you present any of the nursing homes that Ann had been servicing with an alternative nurse practitioner?
A. I don't specifically know. I'm not aware.
Q. None that you're aware of?
A. None that I'm aware of.
Q. Other than Heritage Hills, did GeriCare do anything to try and retain business or retain the relationship with any of the facilities that Ann Sullivan was servicing?
A. Not that I'm aware of.



Q. Since June 1, 2006 has GeriCare done anything to try to get this business back, other than what you've described for me with regard to Grandview?
A. No. We're under the impression that these people were with MedOptions and they were contracted to MedOptions, and we were in litigation with MedOptions so, of course, we wouldn't make any overtures to any of these facilities.
Q. If MedOptions hadn't hired Ann Sullivan, would you have any problem whatsoever with them taking over these various facilities that GeriCare had previously been servicing?
A. I don't understand -- I don't know why I would. I don't see why I would. We didn't have a noncompete agreement with MedOptions.
(OFF THE RECORD)
Q. During the period between the time when Ann notified you of her resignation effective June 1 2006, and the termination of those agreements on June 1, 2006, did GeriCare interview any candidates to replace Ann, as far as you know?
A. I'm not aware. I don't know if Christine did or not. I didn't interview anybody.
Q. Would you ordinarily interview nurse practitioners



before they were hired?
A. Some of them I would. Sometimes I didn't. Mostly, I would.
Q. Have you rejected -- has GeriCare rejected any candidates for a nurse practitioner position since Ann left?
A. I don't recall because -- I don't know because Christine doesn't tell me about every single person who applies. We get applications. Every time you put an ad in the paper, if you've ever advertised for any job, you get people who are outrageously underqualified, unlicensed, maybe they're home health aides or something. I don't know whether she has or not. You'd have to ask her.
Q. You don't know whether there were any qualified candidates who submitted applications that were rejected by GeriCare?
A. I don't know for sure, but I don't think so.
MR. PEIKES: I think that's all I have. Thank you for your cooperation. Thank you very much.
(DEPOSITION CLOSED AT 4:12 P.M.)