# EXHIBIT B

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

---------------------------------x

HUMAN SERVICES CONSULTANTS, :
LTD, d/b/a GERICARE, :
RONALD MARK STEWART, MD, :
Plaintiffs : CA No. 06 486
-v- :
ANN TAMULE a/k/a :
ANN M. SULLIVAN, Alias, and :
MEDOPTIONS, INC., :
Defendant. :

---------------------------------x

ORIGINAL

Deposition of ANN MARIE SULLIVAN, taken pursuant to the Federal Rules of Civil Procedure, at the Law Offices of Pepe & Hazard, 30 Jelliff Lane, Southport, Connecticut, before James A. Martone, LSR and Notary Public, in and for the State of Connecticut, on November 5, 2007 at 11:20 a.m.

Dr. Stewart at Whalen Square, did he hire you at that point?

A. I believe so.

Q. Do you recall the date you were hired?

A. No.

MS. BEJMA: I'm going to have this document marked Exhibit 2.

(Plaintiffs' Exhibit 2 marked For identification.)

Q. Can you review that document briefly.

A. Yes.

Q. Can I draw your attention to the last page of that document.

A. Yes.

Q. Is that your signature?

A. Yes.

Q. Okay. And the date of that document?

A. 3rd day of June, 2002.

Q. Do you have any reason to believe that document, or that date is incorrect?

A. No.

Q. I'd also like to draw your attention to the first page of that agreement.

A. Yes.

Q. Section 1.

A. I don't recall.
Q. Did you ask that changes be made to this noncompete agreement?
A. No.
Q. Did anybody at GeriCare explain to you why they wanted you to sign that agreement?
A. No.
Q. Did you talk to a lawyer about this agreement?
A. No.
Q. Had you ever signed a noncompete agreement before this time?
A. No.
Q. Did you speak to anybody else about this agreement?
A. My husband. At that time.
Q. Your husband. Okay.
A. Yes.
MS. BEJMA: I'm going to have this agreement marked.
(Plaintiffs' Exhibit 3 marked For identification.)
Q. If I can direct your attention to the last page of that agreement. And is that your signature?

A. Yes.
Q. Okay. And when did you sign this agreement?
A. June 16th, 2004.
Q. Okay. May I redirect your attention to the first page of that agreement.
A. Yes.
Q. Okay. And if you could review section 1.
A. Yes.
Q. Would you agree that this general noncompete agreement is the same as the one in Exhibit 2?
A. Yes.
Q. Okay. When did you first receive a copy of Exhibit 3, the second agreement?
A. June 16th, 2004.
Q. Who gave it to you?
A. I don't recall, if it was Dr. Stewart or Christine Richards. But it was given to me by GeriCare.
Q. Did you discuss the contents of the agreement with anybody at GeriCare?
A. I don't recall.
Q. Did you ask that changes be made?

A. No.
Q. Did anybody at GeriCare explain why they wanted you to sign the new agreement?
A. I don't recall.
Q. Did you discuss this agreement with a lawyer?
A. No.
Q. Did you discuss it with anybody else?
A. No.
Q. And what were the nature of the services you provided for Human Services?
A. I did mental health treatment of patients in nursing homes in Rhode Island.
Q. And what did that consist of?
A. Evaluating and assessing patients who were referred from the nursing homes for mental health evaluations. And implementing treatment plans, planning treatment plans for them.
Q. You referred to an orientation.
A. Yes.
Q. At The Holiday.
A. Yes.
Q. Who gave you that orientation?
A. Dr. Stewart.
Q. And what did that orientation consist

of?

A. I went with Dr. Stewart to meet the people who were in charge at that nursing home.

Q. All right.

A. He introduced me to people. And I was instructed about the paperwork. So orientation to the facility and to the paperwork.

Q. What kind of paperwork did you receive instruction about?

A. The assessment forms that were for GeriCare.

Q. And these assessment forms, did you just testify these assessment forms were provided to you by GeriCare?

A. Yes.

Q. And what were the nature of these assessments?

A. Mental health, psychiatric mental health, comprehensive, in the sense that lab work was included, mental status evaluation, but for the purposes of the mental health care of the patients.

Q. Were there any forms provided to you from GeriCare about billing?

A. Yes.

Q. What were those? What did those consist of?

A. Registration form that was used to -- to document the patient's emergency contact person and health insurance numbers.

Q. Okay. Do you recall what date the orientation at The Holiday was?

A. No.

Q. Did you on behalf of GeriCare work for any nursing homes besides The Holiday?

A. I did gradually.

Q. Okay. What were the other nursing homes you worked for?

A. I worked at Morgan Health Care Center in Johnston. I worked at The Holiday in Lincoln. I worked at Heritage Hills Nursing Center in Smithfield. I worked at Hebert Nursing Home in Smithfield. I worked at the Balou Home, B A L O U Home. I worked at Grand View Center in Cumberland. Throughout the years I worked at East Gate Nursing Center. Haven Health of Greenville. That's what I can recall.

Q. Did you ever work at the Grand Island?

A. No.

Q. Now prior to your being employed by

that -- I listed that I was on that committee.
But the committee didn't really accomplish that much in terms of playing a role. If you're asking me what I did, I agreed to serve on the committee. But I really can't recall doing anything. But I did agree to serve on that committee.

Q. Did GeriCare provide you with any kind of professional development?

A. Yes.

Q. What did that professional development consist of?

A. Monthly meetings. Generally pharmaceutical reps would come and explain about medications or treatments.

Q. What other topics were discussed?

A. Diagnoses, medications and treatments generally.

Q. And besides pharmacy reps, who would provide that?

A. Sometimes Dr. Stewart would give a lecture also. Other psychiatrists occasionally.

Q. Did GeriCare provide training to the nursing home staff?

A. Through me.

Q. Through you, and what training did you provide them?

A. I gave conferences at The Holiday monthly.

Q. Any other nursing homes did you give conferences?

A. Not on a regular basis. But I also gave some at Hebert and some at Heritage Hills.

Q. And what topics were covered at these conferences?

A. I talked about the brain, I talked about dementia, Parkinson's Disease, behavior problems, a number of power point classes that I did for The Holiday. I had a number.

Q. How would a patient come to be referred to you for treatment?

A. The staff would submit their name and request an evaluation. After having talked with the nursing department or the doctor for the patient, they would make a referral to me. So patients were referred to me.

Q. The patients were referred --

A. By the nursing home.

MS. BEJMA: I'm going to have this document marked as Exhibit 4.

the second paragraph, "it is now time for me to move forward with my life in Massachusetts."
A. Yes.
Q. What were you referring to by your "life in Massachusetts"?
A. At that time, I had hoped to enter religious life. And I was a candidate with the Poor Clares Sisters in Jamaica Plain, and the Sisters of the Precious Blood in Manchester, New Hampshire.
Q. And when had you first applied to become a candidate with the Poor Clares?
A. I was in the phase before writing an application with them. I had met with them and was planning to go on retreat with them in August.
Q. August of what year?
A. August of 2006.
Q. And when had you first applied for Precious Blood?
A. The Sisters of the Precious Blood, I had began to visit in the spring of 2006. Prior to this letter.
Q. What happened during that visit?
A. The Sisters of the Precious Blood, and

the Sisters of the Poor Clares Sisters are both contemplative Sisters, meaning they don't work as nurses. In the meeting with the Sisters in New Hampshire, I talked about my call, and asked for advice about -- I asked them to pray about if I would be wise to not continue in nursing and to go to a contemplative lifestyle, meaning I would only -- I wouldn't work, that I would be a person in prayer. Rather than in work.

Q. Did you eventually -- Withdrawn.
And what happened after your visit to -- what happened with your visit to Poor Clares?

A. The Poor Clares visit went very well and they were interested in me for being a -- the Sisters of the Poor Clares -- the Poor Clares went very well. But they would have wanted me to do nursing for their elderly Sisters in the cloister.

The Sisters of the Precious Blood did not want me to do nursing at all. Their mission is only prayer.

Q. What is the Poor Clares' mission?

A. Their mission is prayer too, but they had elderly Sisters, who they felt needed help, so the concern about why the Poor Clares weren't

a good choice for me was that it was going to be a hybrid, that they wanted me to do nursing in their cloister.

Q. Did you eventually apply to either group?

A. No. I received a letter from the Sisters of the Precious Blood, after I met with them, and in their letter, they advised me that they felt that I needed to continue to do nursing. So they said "we don't think that you're called to be the contemplative."

Q. All right.

A. I didn't do an application for that reason.

Q. And why did you -- did you apply to the Poor Clares?

A. No.

Q. Why not?

A. Because they're contemplative too. Once I felt that God's message was saying contemplative isn't right for you, I didn't apply with them either.

Q. And about when did you make the decisions not to apply to either the Poor Clares or the Precious Blood?

A. Well, after this letter and before May 13th, I got the letter from the Sisters of the Precious Blood. That said "we don't recommend that you apply." So the decision came after that. I don't know the date.

Q. Now do you have parents living?

A. Yes.

Q. And where are they living?

A. Randolph, Massachusetts.

Q. And how old are they?

A. They were born in 1928 and 1929.

Q. And how would you describe their general health?

A. My mother has multiple sclerosis, so she has a chronic illness. My father is in good health.

Q. And about the time you were -- you wrote the letter to GeriCare, resigning your employment, were they having any particular health problems?

A. My mother has ongoing health issues.

Q. Did your parents' health problems play any role in your determining to resign from GeriCare?

A. No.

MR. PEIKES: Objection to the form.

Q. And did your parents' health problems play any role in your deciding to go to Massachusetts?

MR. PEIKES: Objection to the form. You can answer.

A. No.

Q. To refer you back to the letter, the second sentence of the second paragraph. "During my five years of employment with GeriCare, I have learned a great deal." What were you referring to when you said "I have learned a great deal"?

A. I couldn't say. I don't recall.

Q. Okay. First sentence of the last paragraph. "Thank you for your contribution to my professional development." What were you referring to when you referenced "contributions to professional development"?

A. That's a thank-you to Dr. Stewart for helping me with becoming comfortable and knowledgeable in the mental health field.

Q. Now prior to working for GeriCare, had you worked in the mental health field?

A. I had done mental health care for

people within the VNA of Boston because the home care included it, but the answer is no. Not within the mental health field, but then the answer is yes, because many of the people who are being treated for other illnesses have a lot of mental health problems, particularly in Boston. So no to the field, but yes to treating mental health problems.

Q. Did you ever work at Butler Hospital?

A. I was very briefly orienting there. I did work with them for so short a time, that I can't even recall how long. Very, very short. I went there hopeful that I would like the position, and didn't stay.

Q. And what was the position?

A. It was at the Memory Clinic with Dr. Salloway. And I spent one day with him, and said I can't work here.

Q. And when was this one day of employment?

A. I can't recall.

Q. Do you recall the year?

A. It was 2006.

Q. And why did you tell Dr. Salloway "I can't work here?"

A. The pace was -- it was -- I didn't agree with the way that the practice was going. It was not going to be helpful for me to minister as a nurse there.
Q. And why did you believe that it wouldn't be -- why did you not agree with the manner of the practice?
A. Well, for my comfort level of practice, the pace, the appointments were every 15 minutes.
Q. All right.
A. And to see someone with a memory problem, and only spend 15 minutes on them, would be not practicing in a way that I could be comfortable.
Q. And what was your last day of working for GeriCare?
A. I don't recall.
Q. And about how many patients were you seeing total at the time that you left? Do you recall that?
A. No. I don't recall that either. Generally I was seeing about 40 patients per week. But I could not recall the volume, and it varied.
Q. What were the nature of the services

you were providing to them?

A. Case management, medication management. And evaluation and treatment for mental health.

Q. What would treatment consist of?

A. Recommendations for nursing care, and medications.

Q. What sort of recommendations for nursing care would you make?

A. Suggestions, such as shower this person after you give them Tylenol. Or, you know, treatment recommendations that would help with facilitating the care of the patient.

Q. What did case management consist of?

A. The ongoing follow-up of the patients once they were admitted to psychiatric care. So may be an evaluation for side effects of medication, may be an evaluation for involuntary motion related to medication.

The case management was the ongoing follow-up of the active patients.

Q. Would you describe the kind of mental health issues that the nursing home population tended to present? Was there any particular type that stood out of mental health problem that stood out as prominent, as appearing frequently?

Q. Were you unhappy working at East Gate?
A. Well, I was -- yes. Yes.
Q. Why were you unhappy working at East Gate?
A. That the nursing department was difficult to work with there.
Q. In what way was the nursing department at East Gate difficult to work with?
A. Again, probably was regarding personality, but one of the personalities was difficult.
Q. Which personality was that?
A. Nan. Nan Allen.
Q. And in what way was she difficult?
A. I found her domineering.
Q. When did you leave Pine Grove?
A. I don't recall.
Q. Why did you leave Pine Grove?
A. Pine Grove was a -- the greatest distance for me.
Q. What was the Pine Grove the greatest distance from?
A. My home. My commute.
Q. And where were you living at the time?
A. Oh, I don't recall. After I moved to

A. Because I preferred that my former husband not know where I lived.

Q. On what date did you receive that postcard?

A. I don't recall.

Q. On what date did you apply for a position?

A. I don't know that either.

Q. And what did your application -- did you submit any materials to MedOptions by way of application?

A. The MedOptions, Laurel Wood was the manager and Melissa Ferdinande met me for coffee at Panera Bread, and gave me some information about the company.

Q. Panera, and where was this located?

A. Greenville, Rhode Island.

Q. On what date did this meeting take place?

A. I know it was a Thursday because I was in Greenville, but I can't tell you what date.

Q. Do you know where you had been on that date?

A. I had been at the Hebert Nursing Home. I'm sorry. That can't be right. I'm not sure

Q. Did they discuss the company itself?
A. That Lucia Catalano, they talked a little about Lucia, the founder of the company.
Q. What did they tell you about Lucia?
A. That she's from Connecticut, and that she wanted to help nurses to get what they needed, and so she decided to make a nurse run company that would give the nurses flexibility around their hours, and health insurance benefits.
Q. Did they indicate specifically what openings were available in Rhode Island?
A. They mentioned Grand View.
Q. Now did this meeting take place before or after you had submitted your letter of April 9th?
A. After.
Q. Did they discuss any other openings besides Grand View?
A. That there was work in the northern corner. They talked about Oakland Grove Health Care Center in Woonsocket, because Melissa Ferdinande, the nursing supervisor with MedOptions, was commuting from Jamestown, Rhode Island, or someplace down south, all the way up

"what are you going to do," I said "I don't know. I want to be a Sister. I want to work for God. And I just have the find the right place."

And then she said she would recommend me there. I think I'll have to work, if I can't go to Precious Blood I'll have to work some because I have to support myself while I figure this out I said. So Elaine had planned to recommend me there. When I told them that I was going to be finishing at The Holiday.

Q. Now between the time of June 1st, 2006, to June 1st, 2005, had you applied anywhere else?
A. No.
Q. Now you had the meeting at Panera?
A. Yes.
Q. What happened after that?
A. MedOptions met with me at Panera. Offered me a position.
Q. Did you submit an application? Had you submitted an application to MedOptions?
A. I don't recall.
Q. Did you submit a resume' to MedOptions?
A. I don't recall that either.
Q. Did you fill out a form provided by MedOptions?

A. I can't say honestly. I met with them at Panera Bread. And they had positions open. And encouraged me to apply for a position, and I did apply for a position. How I did it, I can't recall.
Q. Did you provide MedOptions with a set of references?
A. Gee, I don't remember. I don't remember.
Q. Did MedOptions ask if it was all right for them to contact any previous employers?
A. I don't remember that either.
Q. Did MedOptions ask if it was all right if they talk to GeriCare about you?
A. I don't remember.
Q. Did MedOptions ask you to sign anything allowing for former employers to talk about you?
A. I -- again, I don't remember.
Q. How did you find out you got the job?
A. I was contacted by Melissa Ferdinande for orientation.
Q. And on what date did she contact you?
A. I don't recall.
Q. When was orientation?
A. Melissa asked me to meet her at Oakland

Q. So a billing code would translate into a numerical value, which would be added up to reach, to make a productivity unit?
A. Yes.
Q. Okay. Who assigned the codes? If you saw a particular patient, how would it be determined what code would be used?
A. The codes had Medicare requirements for what was the skilled level of care expected for each of the codes. So Medicare did that.
Q. You, yourself, did not say this code would apply to this service, that you just provided?
A. Oh, yes, I did. That's -- you're -- I misunderstood the question I think.
When I saw the patient, I looked at what the patient's needs were and I found the code from the list that the company provided, that matched what I did.
Q. And where else besides Oakland and Bayberry did you provide services on behalf of MedOptions?
A. Eventually I provided services with -- at The Holiday Nursing Home, the Heritage Hills Nursing Home, the Hebert Nursing Home, Grand

View, and Balou. I had two other homes that were called the Hospice St. Antoine and Mount St. Rita Health Care.

Q. When did you provide services to The Holiday Nursing Home on behalf of MedOptions?

A. I don't recall the date.

Q. When did you begin to provide service for Heritage on behalf of MedOptions?

A. It was a month after I began with MedOptions.

Q. At what time did you begin providing services at Hebert on behalf of MedOptions?

A. It was in the fall. Maybe it wasn't. I don't recall. I must say I don't recall.

Q. When did you begin providing services at Grand View on behalf of MedOptions?

A. I don't recall.

Q. When did you begin providing services to Balou on behalf of MedOptions?

A. I don't recall.

Q. When you were working for MedOptions, did you provide staff training to the nursing homes?

A. No. Not classes. I -- you know, I could qualify that because I was always teaching

the staff how to care for the patients, but not education classes.
Q. Did MedOptions provide staff training to the nursing homes, formal classes, in services?
A. I don't know.
Q. What was your title at MedOptions?
A. Nurse Practitioner.
Q. And what services did you provide?
A. Mental health services.
Q. What did those mental health services consist of?
A. Evaluation and treatment.
Q. Were they the same type of services that you provided at GeriCare?
A. Similar. With different billing codes. Similar.
Q. You say that they were similar. You provided similar services on behalf of MedOptions as you did at GeriCare. How were they different?
A. The billing codes were different. The -- really that's what's different. The billing codes are different.
Q. When you worked for Holiday, Heritage, Hebert or Grand View, did you see any of the

patients that you had formerly seen for GeriCare?
A. Yes.
Q. How many?
A. I don't know.
Q. When you saw a patient for MedOptions that you had formerly seen at GeriCare, did you treat that as an initial visit?
A. Some of the patients needed to have an initial evaluation. Some were already involved with MedOptions, and some were not.
Q. If you had been treating them at GeriCare, why would they need another initial evaluation?
A. Well, the treatment, the companies were different, so the patients had to be admitted and registered for MedOptions. The initiation of the treatment plan with this company involved signing them up with the recommending -- registering them, and admitting them to the other agency.
Q. And how was it determined which nursing homes you would be providing services?
A. MedOptions assigned work to me.
Q. Did MedOptions provide you with any professional development?
A. Yes.

covenants, and the name, title, address and telephone number of any persons having custody of any document reflecting such knowledge acquired by any officer, director, employee, agent or servant of Defendant, MedOptions. Response. Ms. Sullivan provided MedOptions a copy of the agreement but has no recollection as to when this transpired."

Q. Why did you provide MedOptions with a copy of the agreement?

A. At the discussion at Panera Bread, I told Laurel Wood that there was a noncompete agreement in the contract that I had agreed with with Dr. Stewart. And Laurel Wood and Melissa Ferdinande shared with me that Ann Rameika had formerly been with GeriCare and moved to MedOptions and had been binded by the same agreement, because we both worked for GeriCare, and was -- there was no adverse consequence to her.

And that was why the discussion about the noncompete agreement came up at that time.

Q. Okay. But do you recall -- so you told them, you told them at Panera, eventually -- but

Defendant, Sullivan ceased to provide services on behalf of Defendant, MedOptions, the date, time and place of any communications to any facilities and/or patients regarding the cessation of services, and/or any arrangements made to provide replacement services and the name, title, address and telephone number of any persons having custody of any record of said communications.
Response. Ms. Sullivan resigned from MedOptions effective June 15, 2006, at Ms. Sullivan's request, responsibility for servicing the facilities in question were transferred to other practitioners in late December, 2006."
Q. Is that a true statement?
A. No.
Q. Why is it not true?
A. It's true that the -- at my request, the servicing of the facilities was transferred in January, 2007.
Q. And when did you make that request?
A. I requested to transfer my position from Rhode Island to Connecticut in November of 2006.
Q. And why did you make that request?
A. Because I was accepted into the Sisters

of the Daughters of Mary October 7th.
Q. October 7th.
A. October 7th, I was accepted to the Daughters of Mary. And then I made plans to move to Connecticut.
Q. What nursing homes were you servicing at the time that you ceased -- I'm sorry. For what period of time did you provide services on behalf of MedOptions at Balou?
A. Oh, I don't know my start time. And I finished in January of 2007.
Q. Did you finish working for Grand View on behalf of MedOptions at the same time?
A. Yes.
Q. Hebert, did you finish working for Hebert on behalf of MedOptions at the same time?
A. Yes.
Q. Did you finish working at Heritage Hills on behalf of MedOptions at the same time?
A. Same week.
Q. Did you finish working for Holiday at the same time?
A. Yes.
Q. Did you finish working for Morgan on behalf of MedOptions at the same time as you

ceased working --
A. No. No, I did not. I did not work at Morgan on behalf of MedOptions.
Q. Did you work for East Gate on behalf of MedOptions?
A. No.
Q. Did you work for Pine Grove on behalf of MedOptions?
A. No.
Q. Did you work for Haven Health on behalf of MedOptions?
A. No.
Q. Did you work for Grand Island on behalf of MedOptions?
A. No.
Q. Why did you leave MedOptions?
A. I transferred from Rhode Island to Connecticut, in order to go to the Sisters. And I left MedOptions entirely in June of 2007, in order to be a Sister.
Q. Were you ever dissatisfied with your employment at MedOptions?
A. No.
MS. BEJMA: Give me one minute.
(Pause in the Proceedings)

I, Ann M. Sullivan, have read the foregoing transcript of the testimony given at my deposition on, November 5, 2007, and it is true and accurate to the best of my knowledge and belief as originally transcribed and/or with the changes as noted on the attached errata sheet.

Ann M. Sullivan

ANN M. SULLIVAN

SUBSCRIBED AND SWORN TO BEFORE ME, the undersigned authority, on this the 19th day of November, 2007.

M. Jennifer Carroll

NOTARY PUBLIC

My commission expires:

M. JENNIFER CARROLL
*NOTARY PUBLIC*
MY COMMISSION EXPIRES SEP. 30, 2012

# ERRATA SHEET

**CAPTION: HUMAN SERVICES vs. TAMULE**
**DEPOSITION OF: ANN MARIE SULLIVAN**
**DATE OF DEPOSITION: NOVEMBER 5, 2007**

**In order to make this deposition more nearly conform to the testimony, the deponent wishes to make the following changes:**

| PAGE# | LINE# | NOW READS | SHOULD READ |
|---|---|---|---|
| 8 | 13 | that Mother | for Mother |
| 9 | 10 | document of- a | document- a |
| 11 | 20 | 1993 | 1994 |
| 15 | 20 | the perpetually | perpetual |
| 17 | 13 | that's the - that | that |
| 21 | 17 | I'm also a | also in |
| 24 | 18 | way. by | way in |
| 27 | 22 | Whalen Square | Wayland Square |
| 56 | 9 | Again, probably | Again it probably |
| 56 | 19 | was a - the | was the |
| 57 | 1 | Massachusetts, the | Massachusetts - my |
| 57 | 2 | north - northern | northern |
| 64 | 4 | I left in - so | I left - so |
| 66 | 20 | I know it was a Thursday | I don't know |
| 68 | 23 | Ferdinande | Ferdinandi |
| 72 | 3 | have the find | have to find. |
| 76 | 6 | very fairable | very favorable |
| 100 | 10 | It was before I believe | I don't know |