**EXHIBIT K**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

HUMAN SERVICES CONSULTANTS, LTD., :
d/b/a GERICARE :
RONALD MARK STEWART, M.D. :
v. : C.A. NO. 06-486
:
ANN TAMULE, aka ANN M. SULLIVAN, :
Alias, and MEDOPTIONS, INC. :

DEPOSITION OF LAUREL WOOD, a WITNESS in the above-entitled cause, taken on behalf of the Plaintiffs, before Patricia A. Magnone, RPR, a Notary Public in and for the State of Rhode Island, at the Law Office of Stephen M. Robinson, 155 South Main Street, Suite 402, Providence, Rhode Island, on January 10, 2008 at 2:00 p.m.

PRESENT FOR:

THE PLAINTIFFS. . . . LAW OFFICE OF STEPHEN M. ROBINSON
155 SOUTH MAIN STREET SUITE 402
PROVIDENCE, RI 02903
BY: VICKI J. BEJMA, ESQ.

THE DEFENDANTS. . . . WIGGIN & DANA, LLP
AND WITNESS 400 ATLANTIC STREET
STAMFORD, CT 06911
BY: LAWRENCE PEIKES, ESQ.

ALSO PRESENT:
RONALD STEWART, M.D.

ALLIED COURT REPORTERS, INC.
115 PHENIX AVENUE
CRANSTON, RI 02920

Page 10

A. Initially hired as a primary clinician. And then I was director of social services. And then I was a program manager for inpatient adult psychiatry. And then I was a program director for adult and adolescent child inpatient psychiatry.
Q. And why did you leave your employment at Elmcrest?
A. To join MedOptions. I thought it was a good opportunity.
Q. And what employment did you have pre-Elmcrest?
A. Just internships through Columbia University. I did an internship at Columbia Presbyterian Medical Center. And I did an internship at Yale-New Haven Hospital.
Q. Before the internships, did you have any --
A. Waitress.
Q. Have you ever been terminated from a job?
A. Never.
Q. Have you ever been laid off from a job?
A. Never.
Q. Have you ever resigned in order to avoid termination?
A. Never.
Q. Have you ever held public office?
A. No.
Q. Have you ever worked for any charities, performed

Page 11

any volunteer work?
A. I do volunteer work.
Q. Where do you do volunteer work?
A. For a dog club, two different dog clubs. I'm on the board of directors of two different all-breed kennel clubs.
Q. Which ones are those?
A. Bernese Mountain Dog Club, B-E-R-N-E-S-E, of Nashoba Valley. I'm on the board of directors. I'm also on the board of directors for the Elm City Kennel Club in New Haven, Connecticut.
Q. And what positions have you held with MedOptions?
A. I believe I was hired in 2002 as director of clinical services. I was then promoted to vice president of clinical services. And then -- I'm not sure of the year of that. But then two years ago, I was promoted to vice president of operations, which is what I currently, my current title.
Q. So about 2005, you were promoted to vice president of operations?
A. I would say so. Yes.
Q. And when was MedOptions, Inc., established?
A. I believe it was 11 years ago. I don't know the date, month or year. Maybe 12 years ago, at this point. I'm not sure. I want to say, actually,

Page 12

1996. I don't know the month, I do know the year.
Q. And do you know who established it?
A. Lucia Catalano, who is currently the president of the company. And it's C-A-T-A-L-A-N-O. She is an APRN.
Q. And about how many employees does MedOptions presently have?
A. Currently, I would guess, about 120 employees, full time and part time.
Q. Are you familiar with an entity known as Advanced Care Options?
A. I am.
Q. And does that have any relationship with MedOptions, Inc.?
A. Advanced Care Options was a sister facility to MedOptions. MedOptions was primarily a behavioral health company. Advanced Care was developed as a primary care nurse practitioner company. Since then, since the company was sold in, I think it was February of 2006, the two have now become one under MedOptions.
We provide both primary care and behavioral health. So Advanced Care Options no longer exists in terms of day-to-day operations.
Q. When you say that the company was sold, which

Page 13

company were you referring to?
A. MedOptions, Inc.
Q. MedOptions, Inc., was sold...
A. To -- it is now run by, I should say, by Jeff Kinell and Jennifer Gallagher. And there are other venture capitalists involved in the company now.
Q. And who had previously owned MedOptions?
A. It was owned partly by Lucia Catalano, Lisa Foley and Nancy Brown, with a small percentage to Jeffrey Gottlieb and Dennis Caffrey.
Q. And these five people you just mentioned sold it to Kinell and Gallagher?
A. Yes.
Q. And those five individuals also owned Advanced Care?
A. Correct.
Q. And what was the difference between the primary kind of care Advanced Care offered versus the behavioral types of care that MedOptions offered; what was the difference?
A. Behavioral health care is psychiatric care. It includes a psychiatrist, nurse practitioner, psychologists and social work. Advanced Care is a primary care model, which is a nurse practitioner who specializes in general medicine. With Advanced

Page 14

Care, the nurse practitioner goes into the nursing home and provides general medicine, or what we call primary care, to residents in the nursing home, so looking at medical issues.
With MedOptions, behavioral health, the psychiatrist, the nurse-practitioners go into the nursing home to provide med management for psychiatric issues. The social worker and the psychologist provide behavioral health, psychotherapy, generally. Again, based in psychiatry.
Q. All right. Are you familiar with an entity known as MedOptions Behavioral Health Associates, LLC?
A. Yes. That's probably the current, doing business currently as MedOptions, after being bought by Jeff and Jennifer, I would imagine.
Q. And about when did MedOptions start doing business in Rhode Island?
A. Let me see. Either late 2005, early 2006, by my recollection. I don't know that for a fact.
Q. And does MedOptions limit itself to nursing homes?
A. That and assisted livings. They're separate, licensed.
Q. And what was the first nursing home or assisted living in Rhode Island that MedOptions --

Page 15

A. That would be Briarcliffe Manor in Johnston, Rhode Island.
Q. Now, to get back to you, what duties did you perform for MedOptions when you started as director of clinical services, I believe it was; what were your duties?
A. Supervision of the behavioral health clinicians, to include psychiatrists, nurse practitioners, psychologists and social workers. I also did marketing for the company, to include going to market nursing homes and to sell our service. Those are the two primary functions that I did.
Q. And what were your duties as vice president of clinical services?
A. Mostly the same, but with broader supervision, a larger staff. A lot more marketing. We went into Rhode Island, I think, at that time. And taking over more of the calls, the complaints, or the problems. Taking more of a lead in that role.
Q. And what are your duties as far as vice president of operations?
A. They would include those issues; marketing and supervision. It would also include program development, financial responsibility for the business.

Page 16

Q. And could you define what you mean by program development?
A. Looking at other avenues that we may look into to grow the company further. It might be things we have not done yet, but things that we are considering doing. So a little bit of research about what other opportunities might be out there that we could look into providing a service for.
Q. And would I be correct in saying that you were involved in the first efforts at marketing in Rhode Island?
A. Yes.
Q. And what did your marketing campaign consist of?
A. We actually got Briarcliffe Manor, our first nursing home, because a nurse that used to work with us in Connecticut moved to Rhode Island, and she had had very good care at the nursing home in Connecticut, so she asked if we could come into Rhode Island. So that's how we first started.
Q. Who was this?
A. I don't recall her name. She's no longer even in the state, as far as I know. But we went and we spoke to her at Briarcliffe Manor. And our marketing was, basically, we had a brochure which discussed our services, to include the staff that I

Page 17

had mentioned, the psychiatrist, nurse practitioner, the psychologist, the social worker. It described what each of those different disciplines do, medication management or psychotherapy.
It described that we had 24/7 call coverage during emergencies. So I would go in and provide this brochure. It had a service agreement that pretty much outlined what our service is and what we did.
And I would generally bring that to a building, discuss our services and what we can do for the residents in terms of clinical care and, also, just a general, like I said, call coverage and things like that.
Q. About when did you begin marketing in Rhode Island?
A. Again, I don't have it written down anywhere. I want to say, late in 2005, early in 2006.
Q. And how would the nursing homes get this brochure?
A. I would -- the one case, I would -- the person knew me, so they put a call in to MedOptions and asked for me to come in and to present the brochure and our services to the administrator at the home -- and I don't recall his name at the time -- and the director of nursing, who already knew about us. Generally, nursing homes will call us for services.

Page 34

us who would go out and market facilities based on their contact to us, inquiring about our services.
MS. BEJMA: I'd like to have this marked as Exhibit 4.
(PLAINTIFFS' EXHIBIT 4 MARKED FOR I.D.)
Q. And if you could take a look at Exhibit 4, and can you identify that document?
(Witness perusing document)
A. I haven't seen it before. It appears to be part of an HR hiring process.
MS. BEJMA: Okay. I'd like to have this marked as Exhibit 5.
(PLAINTIFFS' EXHIBIT 5 MARKED FOR I.D.)
Q. Okay. And if you could look at Exhibit 5, can you identify that document?
A. It looks like a hire letter.
Q. And the date on that hiring letter?
A. May 19, 2006.
Q. And by whom is it signed?
A. Marianne Wright, the recruiter.
Q. And would Marianne Wright have made the decision to hire?
A. No.
Q. Who would have made the decision?
A. Myself and/or Melissa Ferdinandi. And we agreed

Page 35

upon that together.
Q. And when did you agree upon that?
A. I think, the day we interviewed her at Panera Bread.
MS. BEJMA: I'd like to have this marked Exhibit 6.
(PLAINTIFFS' EXHIBIT 6 MARKED FOR I.D.)
Q. If you could look at Exhibit 6, can you identify that document?
(Witness perusing document)
A. It looks familiar. Let's see what it would be. It looks like a reference, return reference, on Ann.
Q. I'm sorry, could you look at the name at the top? I'm sorry.
A. "Confidential Clinician Evaluation Form. Clinician's name: Maria D'Onofrio."
Q. If I could just draw your attention to the first page of that. This is a fax cover sheet to you, to Laurel Wood from Ann Sullivan?
A. Yes.
Q. Could you read the bottom of that, please?
A. "I spoke to Elaine Delsesto, the Holiday," with the phone number 401-765-1440, "and Barbara Langshaw-Soares, the" and the word is cut off. I would guess it would be "Heritage Hills Nursing

Page 36

Center. I will be at Grandview Center in," it looks like "Cumberland," but the word is cut off, "tomorrow a.m. I could orient with Melissa at Oakland Thursday 0601 and Grandview Friday 0602."
Q. And do you recall seeing this document before?
A. Yes.
Q. And you must have had some conversation with Ann before this; correct?
A. I would guess so, although, I don't recall having it or what the content of the conversation would have been.
Q. Okay. Why would she have been telling you, "I spoke to Elaine Delsesto at the Holiday"?
A. I have no idea. My guess would be that she is using her as a reference, as, to check references.
Q. Okay. Do you have any idea why she would be speaking to Barbara Langshaw-Soares at the Heritage Hills Nursing Center?
A. I would guess, for the same reason, but I do not know for sure.
MS. BEJMA: Okay. All right. I would like to have this marked as Exhibit 7.
(PLAINTIFFS' EXHIBIT 7 MARKED FOR I.D.)
Q. If you could take a look at that Exhibit 7, have you seen this document before?

Page 37

A. No, I haven't.
Q. Would you agree it was a confidential clinician evaluation form?
A. Yes.
Q. Would this be what you would be using as a reference?
A. Yes. Yes. It appears to be.
Q. And what is the date on this reference?
THE WITNESS: The date it was sent to us?
MS. BEJMA: Yes.
A. 5-30-06, it says on the bottom of the second page.
Q. And who filled this out?
A. It looks to be a social worker from, on the front page it says, the Ballou Home, B-A-L-L-O-U, Home. It looks like a reference.
Q. And who signed this?
A. Jocelyn Dubois, LICSW, MSW, RN.
Q. And to your knowledge, did you or anyone else from MedOptions speak directly to Ms. Dubois?
A. I know I did not. Did our HR person, or since Marianne was in the picture at the time? I do not know. They may not have spoken to her, but it looks like she was used as a reference and sent this in as

part of Ann's hire reference evaluation.
Q. And would you agree that you received this after you had hired Ann?
A. Yes.
MS. BEJMA: Okay. Can I have this marked as Exhibit 8.
(PLAINTIFFS' EXHIBIT 8 MARKED FOR I.D.)
(Witness perusing document)
Q. If you can look at Exhibit 8, can you identify this document?
A. I have never seen it before. Aliher Blyther, who it's attention to, was an HR person who was not with us for very long. I'm not sure what this document is saying. It doesn't say anything. Some felony or misdemeanor seven years ago.
MS. BEJMA: Okay. I'd like to have this marked as Exhibit 9.
(PLAINTIFFS' EXHIBIT 9 MARKED FOR I.D.)
Q. If you can take a look at Exhibit 9, have you seen this document before?
A. Yes.
Q. And what is this document?
A. A change in employment status.
Q. Why was Ms. Sullivan's employment status changed?
A. She requested it. She didn't want to work -- to



earn $54,000, she had to do a certain amount of billable units, what I had spoken about earlier. And she didn't want to have the pressure to work that many billable units, is my recollection. But what they're saying is, if you do in excess of 50 in a pay period, which is two weeks, you will be compensated the billable unit rate for those units.
Q. And while she was at MedOptions, what nursing homes did she work at?
A. My recollection is, Bayberry Commons, Oakland Grove, Grandview, the Holiday, Heritage Hills, Hebert. And that's all I can recall. There may be others, but those are the ones that I can recall.
Q. And how was it determined that Sullivan would be working at those particular homes?
A. We generally put our nurse practitioners in a proximity that's close to where they live. So we market facilities, and we place staff near where they are together so it's convenient for both.
Q. Now, were you aware that Ann Sullivan had signed a noncompete agreement with Human Services Consultants and/or GeriCare?
A. She did say that to us.
Q. By "us," you mean...
A. To Melissa and myself.



Q. When did she say that?
A. At Panera Bread.
Q. And what did she tell you about what that noncompete consisted of?
A. She didn't tell me what it consisted of.
Q. Did she say how long it lasted?
A. No. I didn't get the details from her on that. I think, further down the road, she provided Jeff Kinell with a copy of it. I did not ever receive a copy of it, so I didn't know what it said.
Q. Now, did, at any time, you ever tell Ms. Sullivan that the noncompete would not be enforced or was not enforceable?
A. I don't recall if it was Melissa or I, but I recall that we had hired Ann Rameika, another nurse practitioner who had worked for GeriCare, who, I guess, had a noncompete clause, as well, and there was no problems with it. It never came up as an issue.
Q. Did you ever tell Ms. Sullivan about Ann Rameika?
A. Yes. Again, I'm not sure if it was myself or Melissa Ferdinandi, but I recall that being said.
Q. Was that at the Panera Bread interview?
A. Yes.
Q. And what was your understanding as to the noncompete



agreement entered into by Ann Rameika?
A. I didn't have any details about that, as well. I never saw it. I had heard about it. I don't think she told me directly about it.
Q. Do you know who Ann Rameika had worked for before MedOptions?
A. I don't really have a good memory of hiring her, or anything about her, so I can't answer to that. I don't know.
Q. When did Ann Rameika start working for MedOptions?
A. Again, I can't even give you a guess. It was before Ann Sullivan, I know that. But I do not know the exact month or even year. I mean, it could have been a year before Ann started. I'm just guessing.
Q. Did you ever discuss Ann Sullivan with Ann Rameika?
A. No.
Q. Okay. Did you ever tell Ms. Sullivan at any time that the noncompete was invalid and unenforceable?
A. I would not have done that because I haven't seen it. So, no.
Q. Are you aware that Ms. Sullivan has testified that you told her that the agreement was invalid?
MR. PEIKES: Objection to the form. You can answer it.
A. No, I was not aware.