**EXHIBIT L**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

HUMAN SERVICES CONSULTANTS, LTD
d/b/a GERICARE; RONALD MARK STEWART, M.D.

vs. C.A. No. 06-486

ANN TAMULE a/k/a ANN M. SULLIVAN,
alias, and MEDOPTIONS, INC.

DEPOSITION OF JEFFREY KINELL, a Witness in the above-entitled case, taken on behalf of the Plaintiffs, before Linda L. Guglielmo, RPR-RMR, a Notary Public in and for the State of Rhode Island, at the offices of Stephen M. Robinson, Esquire, 155 South Main Street, Providence, Rhode Island on February 6, 2008 at 11:00 A.M.

APPEARANCES:

FOR THE PLAINTIFFS....LAW OFFICE OF STEPHEN M. ROBINSON
BY: VICKI BEJMA, ESQUIRE
155 SOUTH MAIN STREET
PROVIDENCE, RI 02903

FOR THE DEFENDANTS....WIGGIN AND DANA
BY: LAWRENCE PEIKES, ESQUIRE
400 ATLANTIC STREET
STAMFORD, CT 06911

ALSO PRESENT: RONALD STEWART, M.D.

ALLIED COURT REPORTERS, INC.
115 PHENIX AVENUE
CRANSTON, RHODE ISLAND 02920
401/946-5500

Page 22

company, she's been vice president of operations.
Q. What are her duties as vice president of operations?
A. To schedule staff, to work with clients, to get involved with recruiting and sales.
Q. When did you come to be employed by MedOptions?
A. February 6 of 2006.
Q. Are you familiar with Melissa Ferdinandi?
A. Yes.
Q. How did you know Melissa Ferdinandi?
A. Melissa was our regional manager for Rhode Island.
Q. When did she hold that position?
A. I don't know when she was hired by the company, but she was an employee of the company when we purchased it.
Q. What were her duties as regional manager?
A. To training for staff, to cover facilities, see patients in facilities and coordinate recruiting activities.
Q. Is that recruiting of staff?
A. Yes.
Q. Okay. When did Ms. Ferdinandi leave MedOptions?
A. I believe it was the summer of 2007.
Q. What was the reason for leaving?

Page 23

A. She wanted to pursue a position with the VA system.
Q. Are you familiar with an Andrew Rosensweig?
A. Yes.
Q. How did you first come to know Mr. Rosensweig?
A. We contacted him.
Q. Who is we?
A. Jennifer Gallagher and myself.
Q. How did you contact him?
A. We contacted him to see if he would be interested in working with us in Rhode Island.
Q. How did you get his name?
A. I don't recall.
Q. When did you contact him?
A. Spring of 2006.
Q. What was the result of that contact?
A. We engaged in a series of discussions with him and his partner, and ultimately agreed to -- he agreed to merge his practice into our company.
Q. And who was his partner?
A. Mustafa Surti, S-u-r-t-i.
Q. Had either you or Ms. Gallagher known Mr. Surti before?
A. No, we had not.
Q. And when was the merger complete?

Page 24

A. On or about September 1st of 2006.
Q. What is his current position now?
A. He is our medical director in Rhode Island.
Q. Which entity does he work for?
A. He works for, today, Long-term Care Psychiatry.
Q. Is Long-Term Care Psychiatry a corporation?
A. Long-Term Care Psychiatry, I don't know the exact form of the legal structure. It's an entity which provides medical services to those patients which MedOp Services manages.
Q. When was Long-Term Care Psychiatry formed?
A. I don't know.
Q. Was it before or after the merger?
A. Before.
Q. When did MedOptions start doing business in Rhode Island?
A. I don't know.
Q. When you first learned about the company, was it doing business in Rhode Island?
A. Yes.
Q. What was the nature of its business in Rhode Island?
A. It was providing psychiatric services to roughly 10 skilled nursing facilities.

Page 25

Q. Which nursing facilities were those?
A. I don't know.
Q. Did MedOptions need to obtain a licenses or permits to provide services in Rhode Island?
A. I don't know.
Q. Did MedOptions need to obtain any authorizations from insurance companies before it could begin providing services in Rhode Island?
A. I don't know.
Q. And what types of services -- could you describe in more detail what kind of services are provided, psychiatric services provided to the skilled nursing facilities?
A. We have a team of nurse practitioners who provide consultative services, principally managing medications. We also have a team of psychologists and social workers who provide behavior management and other potentially psychotherapy services.
Q. How is MedOptions compensated?
A. MedOptions is compensated through a billing arrangement pursuant to which we bill the individual patient's insurance.
Q. Does the skilled nursing facility provide any payment to MedOptions?

Page 30

(PLAINTIFFS' EXHIBIT 3 MARKED FOR IDENTIFICATION)
Q. Take the opportunity to review that. Have you ever seen that letter before?
A. No.
Q. Have you ever seen a letter like that before?
A. I don't recall.
Q. Do you have -- I would assume that -- would I be correct in assuming that MedOptions prepares an annual budget?
A. Yes.
Q. Would advertising and solicitation and marketing be on that budget?
A. Yes.
Q. And what would the total budget be for advertising, solicitation and marketing?
A. I don't have any idea, sitting here today.
Q. Can you give me an estimate?
A. Not a good one.
Q. The best estimate you can give.
A. It would be less than $10,000.
Q. Do you have a standard set of materials that you give to nursing homes that might be interested in your services, brochure?
A. Yes.

Page 31

Q. What would be your standard package?
A. The brochure would include a summary description of the company, summary description of our behavioral services, what those entail, our primary care services and a standard template contract.
Q. Can you describe any efforts you make to recruit staff?
A. Yes.
Q. Could you describe those?
A. We have ads on Career Builder, on monster.com, also send out materials in the mail, postcards on a periodic basis. We attend various job fairs and other such industry events.
Q. Do you have a budget for recruitment?
A. Yes.
Q. How much would that amount to in a year?
A. I don't know.
Q. When you have a potential employee, do you make any effort to check their background?
A. Yes. We generally ask for references.
Q. You ask for references. Do you check their criminal records?
A. We do review it to determine if they are excluded from the Medicare program.

Page 32

Q. What would exclude one from the Medicare program?
A. Bad deeds, fraud, et cetera.
Q. Would you speak to their former employers?
A. Generally, we don't.
Q. Why is that?
A. Because generally it's just too sensitive.
Q. Sensitive in what way?
A. They might be currently employed. We just generally ask for references.
Q. Okay. Who makes the decisions on hiring?
A. I would say it's really the regional people who make that decision.
Q. Has that always been true, so long as you've been the CEO?
A. Yes.
Q. Does Laurel Wood have the authority to hire?
A. Yes, she does.
Q. How is it determined at what nursing company a nurse practitioner would provide services?
A. It's generally based upon location. We try to schedule them as close to their homes as we could.
Q. Now, you wouldn't put anyone to work for you that didn't happen -- you didn't check their background and do the background check or check their

Page 33

references or anything, would you?
A. No. That would not be something that we would do as a matter of course.
Q. As a matter of course?
A. Yes.
Q. Would there be any reason that you would put someone to work for you when you hadn't checked their references or done --
A. Might have been somebody that somebody knew, for example.
Q. When did you first hear of Ann Sullivan?
A. I believe it was in the summer of 2006.
Q. How did you first come to know about her?
A. Laurel Wood interviewed her for a position.
Q. When did Laurel interview her for a position?
A. I don't recall the exact date.
Q. Were you present at that interview?
A. No, I was not.
Q. How do you know an interview took place?
A. Because she approached me wanting to get approval to make an offer.
Q. Okay. How did she approach you with that, did she come to you in person, did she E-mail to you, did she write to you?
A. We spoke on the phone, I believe as we

Page 50

A. No.
Q. When did you first learn of a noncompete agreement between GeriCare and Ann Sullivan?
A. When we received the letter from Dr. Stewart.
Q. To which letter are you referring?
A. The letter that was received in September.
Q. What year?
A. 2007, I guess, yes.
Q. What was the content of that letter?
A. The content was a dispute about Ann Sullivan and our interfering with Mr. Stewart's business.
Q. To whom was that letter addressed?
A. I don't recall.
Q. What did you do when you got that letter?
A. I called our attorney.
Q. Who would that have been?
A. Paul Hughes.
Q. And what further actions would have been taken after that?
A. Paul referred me to Larry and we discussed --
MR. PEIKES: Don't tell her any discussions you had with me.
MS. BEJMA: I'd like to have this marked 11.

Page 51

(PLAINTIFFS' EXHIBIT 11
MARKED FOR IDENTIFICATION)
Q. Can you identify this document?
A. It appears to be a provider agreement.
Q. Okay. Can you review Paragraph 1?
(PAUSE)
A. Yes.
Q. Have you seen this document prior to today?
A. I don't recall.
MS. BEJMA: Okay. Could I have this marked as Exhibit 12.
(PLAINTIFFS' EXHIBIT 12
MARKED FOR IDENTIFICATION)
Q. Can you identify Exhibit 12?
A. This is a provider agreement.
Q. Who is it between?
A. Ann Sullivan-Tamule and GeriCare.
Q. And you're aware that Ann Sullivan was formerly known as Ann Tamule?
A. Yes, I am.
Q. You can review the first paragraph. Have you seen this document prior to today?
A. I don't recall that I have.
Q. Did you at any time have any occasion to discuss any noncompete agreement between Sullivan and

Page 52

GeriCare with Ms. Sullivan?
A. Yes.
Q. When did that discussion take place?
THE WITNESS: Where?
MS. BEJMA: When.
A. After we received the letter from Dr. Stewart.
Q. Where did this meeting take place?
A. It was a phone conversation.
Q. About what time of the day?
A. I don't remember.
Q. Who initiated the phone call?
A. I think that Ann called me.
Q. What did she tell you?
A. That she was concerned because she had been served with papers.
Q. Did she tell you what the papers were?
A. Yes.
Q. How did she describe the papers?
A. She said it was a matter involving Dr. Stewart.
Q. Did she tell you more specifically what it was about?
A. Yes, she read parts of the letter to me.
Q. Okay. What was your response?

Page 53

A. That we would do what we needed to do, work with our attorneys, take the next step with her.
Q. Okay. Did you discuss this matter with her at any other time?
A. We may have had a couple of other conversations about it.
Q. And where would those conversations have taken place?
A. Over the phone.
Q. You never called her into the office?
A. Don't believe I did, no.
Q. Did you ever remove her from any assignments as a result of Dr. Stewart's letter?
A. I don't know. I don't know.
Q. Did you at any time tell Ms. Sullivan the agreement would not be enforced?
A. No, I don't I would have said that.
Q. Did you at any time ever tell Ms. Sullivan the agreement wasn't valid?
A. I don't recall.
Q. Did you ever discuss the noncompete agreement with Laurel Wood?
A. No.
Q. Did you ever discuss the noncompete agreement with Melissa Ferdinandi?