**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

| | | |
|---|---|---|
| **HUMAN SERVICES CONSULTANTS, LTD.,** | **:** | |
| **Dba GERICARE** | **:** | |
| **RONALD MARK STEWART MD** | **:** | |
| **Plaintiffs** | **:** | |
| | **:** | |
| | **:** | |
| | **:** | |
| **vs.** | **:** | **C.A. # 06-486** |
| | **:** | |
| | **:** | |
| **ANN TAMULE, aka ANN M. SULLIVAN,** | **:** | |
| **Alias, and MEDPTIONS INC.** | **:** | |
| **Defendants** | **:** | |

**PLAINTIFFS' STATEMENT OF UNDISPUTED FACTS**

Now come Plaintiffs, pursuant to LR Cv. 56, and submit their Statement of Undisputed Facts in support of their Motion for Summary Judgment.

1. Plaintiff Dr. Ronald Stewart incorporated Human Services Consultants in 1973 by for the purpose providing psychiatric care. (Exhibit A[1], p. 17:16-20.)

2. GeriCare is a subsidiary of Human Services Consultants, and came into existence in 2000 for the purpose of providing psychiatric services to nursing home patients. (Exhibit A, p. 17:25-18:4; 19:2-5.)

3. Prior to the formation of GeriCare, Dr. Stewart provided psychiatric services to nursing home patients through Human Services Consultants, and also through a company known as Arbor Senior Care (formerly known as Aegis). (Exhibit A, p. 18:5-15.)

4. GeriCare provided such psychiatric services to a number of nursing homes across the state of Rhode Island. Nursing home staff would refer patients to GeriCare that the nursing home staff felt were in need of mental health services. (Exhibit B, p. 39:15-23.)

5. GeriCare also provides to the nursing homes other specialized services, such as forensic psychiatry services, assistance in risk management issues unique to the nursing home population, as well as staff training. These are provided to the nursing homes free of charge. (Exhibit C, Plaintiffs' Responses to First Set of Interrogatories, #6.)

[1] Exhibit numbers pertain to those exhibits appended to Plaintiff's Motion for Summary Judgment.

6. On or about June 3, 2002, Defendant Sullivan entered into a "Provider Agreement" between herself and GeriCare. (Exhibit B, p. 29:6-18; Exhibit D.)

7. On or about June 16, 2004, Defendant Sullivan entered into an amended "Provider Agreement" with herself and GeriCare. (Exhibit B, p. 32:23-33:4, Exhibit E.)

8. While under contract for GeriCare, Defendant Sullivan provided mental health treatment of patients in nursing homes in Rhode Island. (Exhibit B, p. 34:10-13.) This consisted of evaluating and assessing patients who were referred from the nursing homes for mental health evaluations, implementing treatment plans, case management, and medication management. (Exhibit B, p. 34:14-18; 53:25-54:3; Exhibit F.)

9. When initially under contract by GeriCare, Defendant Sullivan received orientation from Plaintiff Dr. Ronald Mark Stewart. (Exhibit B, p. 34:23-24.) This orientation consisted in part of training in concepts of geriatric psychiatry, nursing home issues, and geriatric issues. (Exhibit A, p. 37:11-20; 62:2-6.)

10. As part of said orientation, Defendant Sullivan was also provided instruction about the paperwork necessary for Defendant Sullivan to perform her duties. This paperwork included assessment and billing forms provided by GeriCare. (Exhibit B, p. 34:19-36:6.)

11. While providing services for GeriCare, Defendant Sullivan would have been provided with GeriCare's training information and patient evaluation forms and case opening forms. These forms had been developed by GeriCare. (Exhibit A, p. 32:2-7, 17-21.)

12. While under contract for GeriCare, Defendant Sullivan would eventually provide services a number of nursing homes, including but not limited to, the Morgan Health Care Center in Johnston, The Holiday in Lincoln, Heritage Hills Nursing Center in Smithfield, the Hebert Nursing Home in Smithfield, the Ballou Home in Woonsocket, the Grand View Center in Cumberland, the East Gate Nursing Center, Haven Health of Greenville, and Pine Grove. (Exhibit A, p. 36:14-12; 56:16-17; Exhibit F.) MedOptions had written contracts with most if not all of these entities. (Exhibit G.)

13. While under contract for GeriCare, Defendant Sullivan would be introduced to GeriCare's contact people at the nursing homes. (Exhibit A, p. 32:2-7.)

14. Part of Defendant Sullivan's orientation at GeriCare consisted of training regarding the culture and personality of the specific nursing homes that she would be servicing. (Exhibit A, p. 37:11-15; 62:2-6.)

15. Prior to her contract with GeriCare, Defendant Sullivan had neither worked for any of the above-referenced nursing homes, nor had she performed services at said nursing homes, nor had she treated patients at these nursing homes at any time. (Exhibit B, p. 36:25-37:4.)

16. Prior to her contract with GeriCare, Defendant Sullivan had not specialized in the treatment of mental health patients. (Exhibit B, p. 51:23-52:8.)

17. While under contract to GeriCare, Defendant Sullivan was provided with professional development. This included training in both the clinical and business aspects of GeriCare's business. (Exhibit A, p. 35:7-19; Exhibit B, p. 38:11-23, 51:9-22; Exhibit C, Response to Interrogatory #5.)

18. While under contract to GeriCare, Defendant Sullivan would provide training to other nurse practitioners providing services to the nursing homes. (Exhibit A, p. 33:19-34:5, 34:25-35:4; Exhibit C, Response to Interrogatory #5.)

19. On or about April 9, 2006, Defendant Sullivan provided a letter of resignation to GeriCare. (Deposition of Sullivan, p. 46:13-47:3; 57:11-15, Exhibit H.)

20. About a week or ten days after Defendant Sullivan submitted her letter of resignation, she indicated to Dr. Stewart on the telephone that she was going home to take care of her parents and then enter a religious order. (Exhibit A, p. 68:22-70:8.)

21. Defendant Sullivan did not go to Massachusetts to take care of her parents, and their health did not factor into any decision to go to Massachusetts. (Exhibit B, p. 50:22-51:8.)

22. At the time she submitted her letter of resignation to GeriCare, Defendant Sullivan had not joined any religious order, but was in the process of exploring the possibility of joining two Massachusetts-based orders. By spring of 2006, it had been decided that neither order was suitable for her. (Exhibit B, p. 47:6-50:5.)

23. GeriCare made immediate attempts to locate a replacement for Defendant Sullivan. (Exhibit C, Responses to Interrogatory #5.)

24. Even before Defendant Sullivan submitted her resignation, GeriCare had been making ongoing efforts to recruit nursing staff. (Exhibit C, Response to Interrogatory #5; Exhibit I.)

25. GeriCare realized that it could not guarantee a replacement for Defendant Sullivan in enough time to ensure continuity of care. In the interests of fulfilling its medical and ethical obligations to its patients, GeriCare was forced to send letters to some of its nursing homes indicating that it was releasing these nursing homes from their contracts and giving them the option of finding replacement services. (Exhibit A, p. 79:11-24; 82:12-20; Exhibit J.) GeriCare was unable to provide a replacement for most of these nursing homes by the time Defendant Sullivan was to leave. (Exhibit C, Response to Interrogatory #1 and #5.)

26. Defendant MedOptions provides mental health services to nursing home patients and assisted living residents. (Exhibit K, p. 13:21-14: 23; Exhibit L, p. 25:10-19.)

27. Defendant Sullivan was interviewed by Laurel Wood and Melissa Ferdinandi at the Panera Bread in Greenville, Rhode Island. (Deposition of Sullivan, p. 66:9-17; 68:14-17.)

28. Laurel Wood had been hired by Defendant MedOptions in 2002 as Director of Clinical Services, was then promoted to Vice President of Clinical Services, and then roughly in 2005 was promoted to Vice President of Operations. Laurel Wood serves as Vice President of Operations to the present day. (Exhibit K, p. 11:13-21.)

29. Melissa Ferdinandi was first hired by Defendant MedOptions in 2005 as a Nurse Practitioner. (Exhibit M, p. 14:14-18.) In March, 2006, Melissa Ferdinandi became the Regional Manager. (Exhibit M, p. 19:16-25.)

30. During the discussion at Panera Bread, Defendant Sullivan informed Laurel Wood that there was a non-compete agreement in her contract with Plaintiffs. Laurel Wood and Melissa Ferdinandi indicated that another of their employees, Ann Rameika, had formerly worked for GeriCare, had had a similar agreement, and had incurred no adverse consequences. (Exhibit B, p. 97:11-23; Exhibit K, p. 40:3-41:15.)

31. Defendant Sullivan was offered a position at Defendant MedOptions during the meeting at Panera Bread. (Exhibit B, p. 72:14-73:5; Exhibit K, p. 34:24-35:4.)

32. Defendant MedOptions' job offer to Defendant Sullivan was eventually confirmed by a letter dated May 19, 2006. (Exhibit N.)

33. Defendant Sullivan submitted a written application on May 18, 2006. (Exhibit O.)

34. On or about May 18, 2006, Defendant Sullivan sent to Ms. Wood a fax indicating that she had spoken to Elaine DelSesto from The Holiday and Barbara Langshaw-Soares from Heritage Hills Nursing Center. (Exhibit P.)

35. Defendant Sullivan began providing services on behalf of MedOptions on or about June 2, 2006. (Exhibit Q, p. M-00089.)

36. Defendant MedOptions typically conducted background checks of employees. (Exhibit L, p. 31:19-32:2.)

37. Defendant Sullivan was working for MedOptions before that background check was completed. (Exhibit R; Exhibit S.)

38. While employed by Defendant MedOptions, Defendant Sullivan had the title of Nurse Practitioner, and provided mental health services at The Holiday Nursing Home, the Heritage Hills Nursing Home, the Hebert Nursing Home, Grand View, and Ballou. The nature of the mental health services were similar to those she provided at GeriCare, consisting of evaluation and treatment, except that the billing codes were different.

(Exhibit B, p. 80:20-81:3; 82:7-17.)

39. Defendant Sullivan began working at Grand View Center on behalf of MedOptions on June 2, 2006 (Exhibit Q, p. M-00089).

40. Defendant Sullivan began working at The Holiday on behalf of MedOptions on June 6, 2006 (Exhibit Q, p. M-00089).

41. Defendant Sullivan began working at Heritage Hills on behalf of MedOptions on July 5, 2006. (Exhibit Q, p. M-00098) (Deposition of Sullivan, p. 80:20-81:3; 82:7-17.).

42. While working for MedOptions, Defendant Sullivan saw some of the same patients as she saw while providing services for GeriCare. (Exhibit B, p. 82:24-83:3.)

43. Defendant MedOptions signed a contract with The Holiday, effective June 1, 2006, on May 31, 2006. (Exhibit T.)

44. Defendant MedOptions signed a contract with Grand View, effective June 1, on May 15, 2006. (Exhibit T.)

45. Defendant MedOptions signed a contract with Heritage Hills, effective July 1, 2006, on July 27, 2006. (Exhibit T.)

46. Beginning September 22, 2006, Defendant Sullivan provided services for Hebert Nursing Home on behalf of MedOptions. (Exhibit Q, p. M-00112.)

47. Beginning October 4, 2006, Defendant Sullivan provided services for Defendant MedOptions at Ballou Home for the Aged. (Exhibit Q, p. M-00157.)

48. Defendant MedOptions entered into a written contract with Pine Grove, on March 1, 2007. (Exhibit T.)

49. Defendant MedOptions entered into a written contract with Morgan Health Center, on June 17, 2007. (Exhibit T.)

50. Heritage Hills refused to accept the replacement offered by Plaintiffs, and by letter dated May 31, 2006, tried to terminate its contract with GeriCare before the 30-day period agreed to in its contract. (Exhibit C, Plaintiff's Responses to Interrogatories #1 and 5, See Exhibit U.)

51. Heritage Hills signed an agreement with MedOptions effective July 1, 2006. (Exhibit T, p. M-00009, "Commencement Date.")

52. In September, 2007, Jeffrey Kinnell, the co-CEO of MedOptions, Inc., received correspondence from Dr. Stewart reminded Defendant MedOptions of the existence of

the non-compete agreement. (Exhibit L, p. 50:2-25.)

53. Defendant MedOptions continued Defendant Sullivan in its employ in Rhode Island nursing homes until roughly January, 2007, at which point she transferred to Connecticut nursing homes at her own request because she had found a religious order in that state she was interested in joining. (Exhibit B, p. 112:18-113:5.)

54. Defendant Sullivan resigned from Defendant MedOptions in June, 2007, when she in fact did enter a religious order. (Exhibit B, p. 114:18-20.)

Respectfully submitted,

/s/ Stephen M. Robinson
Stephen M. Robinson #2103
The Law Offices of Stephen M. Robinson
155 South Main Street, Suite 402
Providence, RI 02903
(401) 331-6565
(fax) 331-7888
February 22, 2008
vbejma@smrobinsonlaw.com

/s/ Vicki J. Bejma
Vicki J. Bejma #6498
The Law Offices of Stephen M. Robinson
155 South Main Street, Suite 402
Providence, RI 02903
(401) 331-6565
(fax) 331-7888
February 22, 2008
vbejma@smrobinsonlaw.com

**CERTIFICATION**

I, the undersigned, hereby certify that on ___________________ I sent a true copy of the within by regular mail to all of the parties below:

Christine K. Bush, Esq.
Duffy Sweeney & Scott, Ltd.
One Turks Head Place, Suite 1200
Providence, RI 02903

Lawrence Peikes, Esq.
Wiggin & Dana, LLP
400 Atlantic Street
P.O. Box 110325
Stamford, CT 06911-0325

______________________