# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF RHODE ISLAND

-------------------------------x

HUMAN SERVICES CONSULTANTS, :
LTD, d/b/a GERICARE, :
RONALD MARK STEWART, MD, :
Plaintiffs : CA No. 06 486
-v- :
ANN TAMULE a/k/a :
ANN M. SULLIVAN, Alias, and :
MEDOPTIONS, INC., :
Defendant. :

-------------------------------x

Deposition of ANN MARIE SULLIVAN, taken pursuant to the Federal Rules of Civil Procedure, at the Law Offices of Pepe & Hazard, 30 Jelliff Lane, Southport, Connecticut, before James A. Martone, LSR and Notary Public, in and for the State of Connecticut, on November 5, 2007 at 11:20 a.m.

and 1984.

Q. All right. And have you ever held political office?

A. No.

Q. Have you ever performed volunteer work?

A. Yes.

Q. Where have you performed volunteer work?

A. I'm doing it now at Bojnowski Manor. B O J N O W S K I.

Q. And Bojnowski Manor, and what is Bojnowski Manor?

A. It's a nursing home.

Q. It's a nursing home. And what are the nature of services are you providing?

A. I play the guitar and I pray the Rosary, and pray with people. I'm also a religious education -- I teach CCD, that's volunteer.

Q. Okay. And what professional licenses do you currently hold?

A. I have licenses from Massachusetts and Connecticut as a Registered Nurse and as a Nurse Practitioner.

Q. And do you currently hold any

professional licenses in Rhode Island?
A. They expired in the spring, and I did not renew them because our community doesn't go to Rhode Island.
Q. And what were those licenses in Rhode Island that you held, that expired?
A. RN and Nurse Practitioner.
Q. Are your Massachusetts Registered Nurse and Nurse Practitioner'S licenses currently current?
A. Yes.
Q. Okay. When did you first obtain the Massachusetts Registered Nurse license?
A. 1977.
Q. And when did you first obtain the Massachusetts Nurse Practitioner license?
A. 1999.
Q. And when did you first apply for the Connecticut Registered Nurse license?
A. You asked me when did I first apply?
Q. Yes.
A. Let's see. Either August or November of '06. So the fall -- the fall of '06.
Q. And at the same time did you apply for the Nurse Practitioner's license in Connecticut?

A. Yes. Simultaneously for both.
Q. Okay. And when were you granted those licenses in Connecticut?
A. I don't have the date. Before practicing in Connecticut, which began in January.
Q. That would be January, '07, correct?
A. Yes.
Q. And have you ever held any other professional licenses, besides the ones we've discussed, Registered Nurse and Nurse Practitioner license in Rhode Island and Connecticut and Massachusetts?
A. No.
Q. Okay. Have you ever had a license suspended?
A. No.
Q. Have you ever had a license revoked?
A. No.
Q. Have you ever applied for a license and been denied?
A. No.
Q. Have you ever agreed to surrender a license to avoid a suspension?
A. No.

A. Yes.
Q. In Massachusetts, would you be required to collaborate with a physician in order to prescribe or diagnose?
A. I haven't practiced in Massachusetts. I haven't practiced in Massachusetts.
Q. In Connecticut, in order to prescribe or diagnose, would you be required to collaborate with a physician?
A. No.
Q. You referenced beginning in 2000, you began to work for GeriCare?
A. Yes.
Q. All right.
A. 2000 -- what year did I say?
Q. I believe that was 2002.
A. 2002, yes.
Q. Okay. Now how did you first learn about GeriCare?
A. There was an advertisement in the newspaper.
Q. Which newspaper was that?
A. I don't recall.
Q. Okay. Where were you -- were you employed at the time that you saw this ad, do you

Dr. Stewart at Whalen Square, did he hire you at that point?

A. I believe so.

Q. Do you recall the date you were hired?

A. No.

MS. BEJMA: I'm going to have this document marked Exhibit 2.

(Plaintiffs' Exhibit 2 marked For identification.)

Q. Can you review that document briefly.

A. Yes.

Q. Can I draw your attention to the last page of that document.

A. Yes.

Q. Is that your signature?

A. Yes.

Q. Okay. And the date of that document?

A. 3rd day of June, 2002.

Q. Do you have any reason to believe that document, or that date is incorrect?

A. No.

Q. I'd also like to draw your attention to the first page of that agreement.

A. Yes.

Q. Section 1.

A. Yes.
Q. Could you read that for us?
A. "General Noncompete Agreement. The contractor agrees not to directly or indirectly compete with the business of the company during the period of contraction. The term 'noncompete' shall mean that the contractor shall not directly or indirectly own, operate, consult to or be employed by any firm in a business substantially similar to or competitive with the present business of the company or such business activity in which the company may engage during the term of the agreement and for six months thereafter." The contractor hereby acknowledges that the company shall or may in reliance of this agreement provide the contractor access to trade secrets, customers and other confidential data and that this agreement is reasonably necessary to protect the company and its clients."
Q. And when did you first see this document?
A. I believe -- I don't know. Clearly I saw it on June 3rd, 2002.
Q. Do you remember who gave it to you?
A. Christine Richards.

Q. Christine Richards. And what position did Christine Richards have?
A. She was involved with leadership in the GeriCare company.
Q. Were you given this document before or after your conversation with Dr. Stewart?
A. After.
Q. About how long after?
A. I don't know.
Q. Had you begun working for GeriCare at the time that you were given this document?
A. I don't know.
Q. Did you read this document before you signed it?
A. Yes.
Q. And what was your understanding as to what that section, general noncompete agreement, what was your understanding as to what that agreement meant?
A. I believe that meant that I was not -- I was agreeing to not accept a position of a competitor of GeriCare for six months after leaving GeriCare.
Q. Did you discuss the contents of that section with anybody at GeriCare?

Q. What were those? What did those consist of?
A. Registration form that was used to -- to document the patient's emergency contact person and health insurance numbers.
Q. Okay. Do you recall what date the orientation at The Holiday was?
A. No.
Q. Did you on behalf of GeriCare work for any nursing homes besides The Holiday?
A. I did gradually.
Q. Okay. What were the other nursing homes you worked for?
A. I worked at Morgan Health Care Center in Johnston. I worked at The Holiday in Lincoln. I worked at Heritage Hills Nursing Center in Smithfield. I worked at Hebert Nursing Home in Smithfield. I worked at the Balou Home, B A L O U Home. I worked at Grand View Center in Cumberland. Throughout the years I worked at East Gate Nursing Center. Haven Health of Greenville. That's what I can recall.
Q. Did you ever work at the Grand Island?
A. No.
Q. Now prior to your being employed by

GeriCare, had you worked with, for any of these, performed services at any of these nursing homes at any time?

A. No.

Q. And prior to working for GeriCare, had you treated any of these patients at any time?

A. No.

Q. And what were the terms of your employment for GeriCare? What did they pay you?

A. A percentage of the earnings generated by the visits to the patients.

Q. And how were those payments processed?

A. I submitted the information regarding the patients that were seen, and the billing codes that were appropriate for those patient visits to the health care management billing people, and they submit the bills, and then the money was sent to them, and then a check would be mailed to me.

Q. Are you familiar with the GeriCare Educational Developmental Committee?

A. Yes.

Q. And did you play any role in that?

A. The committee was not -- could you re -- tell me what you mean by that? Because

Q. Through you, and what training did you provide them?
A. I gave conferences at The Holiday monthly.
Q. Any other nursing homes did you give conferences?
A. Not on a regular basis. But I also gave some at Hebert and some at Heritage Hills.
Q. And what topics were covered at these conferences?
A. I talked about the brain, I talked about dementia, Parkinson's Disease, behavior problems, a number of power point classes that I did for The Holiday. I had a number.
Q. How would a patient come to be referred to you for treatment?
A. The staff would submit their name and request an evaluation. After having talked with the nursing department or the doctor for the patient, they would make a referral to me. So patients were referred to me.
Q. The patients were referred --
A. By the nursing home.
MS. BEJMA: I'm going to have this document marked as Exhibit 4.

the second paragraph, "it is now time for me to move forward with my life in Massachusetts."

A. Yes.

Q. What were you referring to by your "life in Massachusetts"?

A. At that time, I had hoped to enter religious life. And I was a candidate with the Poor Clares Sisters in Jamaica Plain, and the Sisters of the Precious Blood in Manchester, New Hampshire.

Q. And when had you first applied to become a candidate with the Poor Clares?

A. I was in the phase before writing an application with them. I had met with them and was planning to go on retreat with them in August.

Q. August of what year?

A. August of 2006.

Q. And when had you first applied for Precious Blood?

A. The Sisters of the Precious Blood, I had began to visit in the spring of 2006. Prior to this letter.

Q. What happened during that visit?

A. The Sisters of the Precious Blood, and

the Sisters of the Poor Clares Sisters are both contemplative Sisters, meaning they don't work as nurses. In the meeting with the Sisters in New Hampshire, I talked about my call, and asked for advice about -- I asked them to pray about if I would be wise to not continue in nursing and to go to a contemplative lifestyle, meaning I would only -- I wouldn't work, that I would be a person in prayer. Rather than in work.

Q. Did you eventually -- Withdrawn. And what happened after your visit to -- what happened with your visit to Poor Clares?

A. The Poor Clares visit went very well and they were interested in me for being a -- the Sisters of the Poor Clares -- the Poor Clares went very well. But they would have wanted me to do nursing for their elderly Sisters in the cloister.

The Sisters of the Precious Blood did not want me to do nursing at all. Their mission is only prayer.

Q. What is the Poor Clares' mission?

A. Their mission is prayer too, but they had elderly Sisters, who they felt needed help, so the concern about why the Poor Clares weren't

a good choice for me was that it was going to be a hybrid, that they wanted me to do nursing in their cloister.

Q. Did you eventually apply to either group?

A. No. I received a letter from the Sisters of the Precious Blood, after I met with them, and in their letter, they advised me that they felt that I needed to continue to do nursing. So they said "we don't think that you're called to be the contemplative."

Q. All right.

A. I didn't do an application for that reason.

Q. And why did you -- did you apply to the Poor Clares?

A. No.

Q. Why not?

A. Because they're contemplative too. Once I felt that God's message was saying contemplative isn't right for you, I didn't apply with them either.

Q. And about when did you make the decisions not to apply to either the Poor Clares or the Precious Blood?

A. Well, after this letter and before May 13th, I got the letter from the Sisters of the Precious Blood. That said "we don't recommend that you apply." So the decision came after that. I don't know the date.

Q. Now do you have parents living?

A. Yes.

Q. And where are they living?

A. Randolph, Massachusetts.

Q. And how old are they?

A. They were born in 1928 and 1929.

Q. And how would you describe their general health?

A. My mother has multiple sclerosis, so she has a chronic illness. My father is in good health.

Q. And about the time you were -- you wrote the letter to GeriCare, resigning your employment, were they having any particular health problems?

A. My mother has ongoing health issues.

Q. Did your parents' health problems play any role in your determining to resign from GeriCare?

A. No.

finished their contract. And so they expressed a lot of concern about that for the patient care.

Q. And when did this conversation take place?

A. Again, I don't know the date.

Q. At the time that you left, were you still performing services at Grand View?

A. At Grand View, a very interesting thing happened at Grand View. When Dr. Stewart ended the contract with Grand View, Grand View signed on with MedOptions. So when they brought to my attention, they said we know that you're leaving Dr. Stewart, "we know that Dr. Stewart is not continuing here, we've signed on with MedOptions," I asked them questions about that company. "How did you find out about that company?" And they said it's a nurse run company. It's run by a Nurse Practitioner. And it's based in Connecticut. And I wished them well.

Q. Now prior to that, had you ever heard of MedOptions?

A. No.

Q. And who did you have this conversation with at Grand View?

A. John Partridge.
Q. And at Hebert, were you still providing services at Hebert?
A. No, because they finished. They ended the contract with Dr. Stewart.
Q. When did they end the contract?
A. I don't know. But I expect that it was before -- it was earlier, because they had met with me in April to tell me.
Q. Were you still providing services at East Gate?
A. No.
Q. Were you still providing services at Pine Grove?
A. No.
Q. Were you still providing services at Haven Health?
A. No.
Q. Were you providing services at Grand Island?
A. No. I never did provide any services at Grand Island.
Q. Did you inform any of your patients that you were leaving?
A. Eventually, yes.

Q. When did you inform them that you were leaving?

A. At the time when I was orienting another person. I -- because I left in -- so in January of 2007, I informed patients that I was leaving.

Q. And where were these patients?

A. At The Holiday mostly. Many of them I had cared for for five years.

Q. And what was your last day working for GeriCare?

A. I don't recall. It was -- my coverage time, my letter says I have resigned effective June 1, 2006.

Q. Now what was your first day of working for MedOptions?

A. I don't recall the date.

Q. And when did you first learn of the existence of a position at MedOptions?

A. I don't recall the date.

Q. Is there anything you could review that would help you refresh your recollection as to the date in which you first learned of a position at MedOptions?

A. Do you have any paperwork from

MedOptions?

MR. PEIKES: You just have to answer her question based on what you know.

A. No.

Q. How did you first learn of a position opening at MedOptions?

A. I received a postcard in my mailbox in the Cumberland Post Office. After Mr. Partridge had mentioned that Grand View was going to go with MedOptions, I received a postcard telling me that there were openings in MedOptions in Rhode Island.

Q. And at which post office in Cumberland was this post office box?

A. It's the only Cumberland post office, it's the only one I'm aware of, P.O. Box 7304, Cumberland Rhode Island, 02864.

Q. And was this post office box held in your name?

A. Yes.

Q. And what were your reasons for opening a post office box?

A. Because of my divorce.

Q. What about your divorce caused you to open up a post office box?

A. Because I preferred that my former husband not know where I lived.

Q. On what date did you receive that postcard?

A. I don't recall.

Q. On what date did you apply for a position?

A. I don't know that either.

Q. And what did your application -- did you submit any materials to MedOptions by way of application?

A. The MedOptions, Laurel Wood was the manager and Melissa Ferdinande met me for coffee at Panera Bread, and gave me some information about the company.

Q. Panera, and where was this located?

A. Greenville, Rhode Island.

Q. On what date did this meeting take place?

A. I know it was a Thursday because I was in Greenville, but I can't tell you what date.

Q. Do you know where you had been on that date?

A. I had been at the Hebert Nursing Home. I'm sorry. That can't be right. I'm not sure

where I was.

Q. Where did you go after the interview?

A. I don't recall.

Q. About what time of day did you go, were you at this interview?

A. Lunchtime.

Q. Did you have lunch?

A. No. I had something to drink.

Q. Now what did you discuss during that meeting at Panera?

A. That there were openings in Rhode Island. That another woman who had previously worked for GeriCare was now working with MedOptions.

Q. And what was that woman's name?

A. Ann Rameika.

Q. And what else did you discuss at that interview?

A. That -- their ability to provide health care, health insurance. That they would be able to provide health insurance with as little as three days a week of work.

Q. Was there anything else discussed at that meeting?

A. Not that I can specifically recall.

Q. Did they discuss the company itself?
A. That Lucia Catalano, they talked a little about Lucia, the founder of the company.
Q. What did they tell you about Lucia?
A. That she's from Connecticut, and that she wanted to help nurses to get what they needed, and so she decided to make a nurse run company that would give the nurses flexibility around their hours, and health insurance benefits.
Q. Did they indicate specifically what openings were available in Rhode Island?
A. They mentioned Grand View.
Q. Now did this meeting take place before or after you had submitted your letter of April 9th?
A. After.
Q. Did they discuss any other openings besides Grand View?
A. That there was work in the northern corner. They talked about Oakland Grove Health Care Center in Woonsocket, because Melissa Ferdinande, the nursing supervisor with MedOptions, was commuting from Jamestown, Rhode Island, or someplace down south, all the way up

to Woonsocket.

And so they were very happy to think that someone could be in the north.

Q. Now the postcard, did you receive that before or after you got the letter from I believe it was Precious Blood?

A. After. While I was thinking about going to the Sisters of the Precious Blood, I interviewed with the Community Health Network, which is a temping home care agency in Massachusetts.

Q. I'm sorry, what was the name again?

A. Community Health Network.

Q. All right.

A. When I thought that I was going to the Sisters of the Precious Blood, I thought I didn't need to work very long, and so I thought I would take a temporary position doing home care.

After they said we don't recommend that you apply, the amount of work involved in learning the community health, in which I hadn't practiced since 1999, there were a lot of changes. So I didn't continue my application with the Community Health Network. I did interview there. Because I thought that that

And the Prudence Crandall Center for Domestic Violence was leasing a building that belonged to the Daughters of Mary. And that building is under construction on the property of the Daughters of Mary right now.

So this seemed a very providential thing, that Lucia Catalano had come up at both places.

Q. Okay. And you reported for orientation at Woonsocket. Do you recall the day of orientation?

A. I don't.

Q. And besides the billing codes, what did orientation consist of?

A. We saw patients together, myself and another Nurse Practitioner, Melissa. And we discussed them. We talked about -- I also was able to meet staff and find out who were the contact people in that facility.

Q. And then what were your -- after orientation -- Withdrawn. How long did orientation last?

A. I don't recall. The company had productivity expectations for me, which were -- that was how I would earn my health insurance.

And so the plan for me to be able to get to that point was flexible, within a range. But I don't know the date at which they expected me to be able to -- I can't recall the date.

Q. How long did the meeting at Oakland Grove last?

A. I spent the day there.

Q. And then when was the next time, did you have a further orientation?

A. I had several days of orientation with Melissa Ferdinande.

Q. What was the next day of orientation?

A. I don't recall that too, but we continued at Oakland Grove because they were, they needed help. There was another facility that I was sent to called Bayberry Commons that was contracted with MedOptions. I was sent there and I got some orientation there, with Melissa also.

Q. How many employees does MedOptions have?

A. I don't know.

Q. And what kind of services does MedOptions provide?

A. MedOptions provides mental health care.

Q. Did they provide any other types of care?
A. Not that I'm aware of.
Q. And they sent you to Oakland Grove and to Bayberry Commons.
A. Yes.
Q. And how did you get paid?
A. I got paid by submitting my paperwork, faxing a list of who was seen, and the codes.
Q. All right.
A. I was paid as an employee with orientation time, which was office time, and I was also provided with health insurance right away. I did not have to do any of my own estimated taxes. I had withholding done from my pay.
Q. And did you receive a percentage of the revenue coming in from the patients?
A. No. The productivity units, my goal was 15 productivity units.
Q. What was a productivity unit?
A. It was based on the billing code, and each billing code had a numeric value, and the total of the numeric value for my week was the -- the goal was 15.

Q. So a billing code would translate into a numerical value, which would be added up to reach, to make a productivity unit?
A. Yes.
Q. Okay. Who assigned the codes? If you saw a particular patient, how would it be determined what code would be used?
A. The codes had Medicare requirements for what was the skilled level of care expected for each of the codes. So Medicare did that.
Q. You, yourself, did not say this code would apply to this service, that you just provided?
A. Oh, yes, I did. That's -- you're -- I misunderstood the question I think.
When I saw the patient, I looked at what the patient's needs were and I found the code from the list that the company provided, that matched what I did.
Q. And where else besides Oakland and Bayberry did you provide services on behalf of MedOptions?
A. Eventually I provided services with -- at The Holiday Nursing Home, the Heritage Hills Nursing Home, the Hebert Nursing Home, Grand

View, and Balou. I had two other homes that were called the Hospice St. Antoine and Mount St. Rita Health Care.

Q. When did you provide services to The Holiday Nursing Home on behalf of MedOptions?

A. I don't recall the date.

Q. When did you begin to provide service for Heritage on behalf of MedOptions?

A. It was a month after I began with MedOptions.

Q. At what time did you begin providing services at Hebert on behalf of MedOptions?

A. It was in the fall. Maybe it wasn't. I don't recall. I must say I don't recall.

Q. When did you begin providing services at Grand View on behalf of MedOptions?

A. I don't recall.

Q. When did you begin providing services to Balou on behalf of MedOptions?

A. I don't recall.

Q. When you were working for MedOptions, did you provide staff training to the nursing homes?

A. No. Not classes. I -- you know, I could qualify that because I was always teaching

the staff how to care for the patients, but not education classes.

Q. Did MedOptions provide staff training to the nursing homes, formal classes, in services?

A. I don't know.

Q. What was your title at MedOptions?

A. Nurse Practitioner.

Q. And what services did you provide?

A. Mental health services.

Q. What did those mental health services consist of?

A. Evaluation and treatment.

Q. Were they the same type of services that you provided at GeriCare?

A. Similar. With different billing codes. Similar.

Q. You say that they were similar. You provided similar services on behalf of MedOptions as you did at GeriCare. How were they different?

A. The billing codes were different. The -- really that's what's different. The billing codes are different.

Q. When you worked for Holiday, Heritage, Hebert or Grand View, did you see any of the

patients that you had formerly seen for GeriCare?
A. Yes.
Q. How many?
A. I don't know.
Q. When you saw a patient for MedOptions that you had formerly seen at GeriCare, did you treat that as an initial visit?
A. Some of the patients needed to have an initial evaluation. Some were already involved with MedOptions, and some were not.
Q. If you had been treating them at GeriCare, why would they need another initial evaluation?
A. Well, the treatment, the companies were different, so the patients had to be admitted and registered for MedOptions. The initiation of the treatment plan with this company involved signing them up with the recommending -- registering them, and admitting them to the other agency.
Q. And how was it determined which nursing homes you would be providing services?
A. MedOptions assigned work to me.
Q. Did MedOptions provide you with any professional development?
A. Yes.

with MedOptions, defendant provided services to Grand View Center, Cumberland, The Holiday Lincoln, Rhode Island, Heritage Hills Nursing Center, Smithfield, Balou home and Woonsocket, Rhode Island. Defendant does not possess further information responsive to this interrogatory." Are those all of the nursing homes which you provided services while you worked for MedOptions?

A. No.

Q. Which others were the --

A. Oakland Grove, and Bayberry Commons. And that's what I can remember.

Q. If I can flip you back to Exhibit 7.

A. Exhibit 7, which -- okay.

Q. Page 2.

A. Yes.

Q. Last sentence, of the paragraph marked "Response."

A. "Subject to and without waiving these objections, during the course of her Association with MedOptions, Sullivan provided services to Grand View Center, Cumberland, The Holiday Lincoln, Rhode Island, Heritage Hills, Smithfield,sales, Balou Home in Woonsocket, and

Morgan Center." That is not true. Morgan Health Care Center, I did not service as part of MedOptions. Hebert Nursing Home, Pine Grove Health Care Center. That is not true either.

And I asked that they be struck from the document. So that is true except for Morgan Health Care Center and Pine Grove Health Care Center.

Q. Okay. And Exhibit 7, page 3. Could you read the first sentence of the last paragraph.

A. "Ms. Sullivan was thereafter interviewed by Mary Ann Wright."

Q. The first sentence.

A. I'm sorry, could you please give me guidance again?

Q. Just read the entire paragraph, labeled "Response." The last paragraph.

A. "On or about May 1, 2006, Ms. Sullivan contacted MedOptions in response to a newspaper or web based classified ad. Ms. Sullivan was thereafter interviewed by Mary Ann Wright, MedOptions Director of Recruiting and completed the interviewing process, culminating in an offer of employment. MedOptions has no record of any

interviewed by Melissa Ferdinande, and may I ask the other person's name?

A. Laurel Wood.

Q. Laurel Wood. What's Laurel Wood's title?

A. Oh, gee, she's a vice-president, but I couldn't tell you exactly.

Q. And Melissa Ferdinande?

A. Nursing supervisor.

Q. When did you leave the employ of MedOptions?

A. Mid-June, this year.

Q. And if I may direct your attention to interrogatory 9. On page 7.

MR. PEIKES: Which set is this?

Q. Exhibit 7, I'm sorry. Could you read that for me.

A. I have the wrong one.

Q. 7.

A. "Please indicate whether Defendant, Sullivan, is still providing services on behalf of Defendant, MedOptions, and if not, please provide the date on which Defendant, Sullivan, ceased to provide services on behalf of Defendant, MedOptions. The reasons why

Defendant, Sullivan ceased to provide services on behalf of Defendant, MedOptions, the date, time and place of any communications to any facilities and/or patients regarding the cessation of services, and/or any arrangements made to provide replacement services and the name, title, address and telephone number of any persons having custody of any record of said communications. Response. Ms. Sullivan resigned from MedOptions effective June 15, 2006, at Ms. Sullivan's request, responsibility for servicing the facilities in question were transferred to other practitioners in late December, 2006."

Q. Is that a true statement?

A. No.

Q. Why is it not true?

A. It's true that the -- at my request, the servicing of the facilities was transferred in January, 2007.

Q. And when did you make that request?

A. I requested to transfer my position from Rhode Island to Connecticut in November of 2006.

Q. And why did you make that request?

A. Because I was accepted into the Sisters

of the Daughters of Mary October 7th.
Q. October 7th.
A. October 7th, I was accepted to the Daughters of Mary. And then I made plans to move to Connecticut.
Q. What nursing homes were you servicing at the time that you ceased -- I'm sorry. For what period of time did you provide services on behalf of MedOptions at Balou?
A. Oh, I don't know my start time. And I finished in January of 2007.
Q. Did you finish working for Grand View on behalf of MedOptions at the same time?
A. Yes.
Q. Hebert, did you finish working for Hebert on behalf of MedOptions at the same time?
A. Yes.
Q. Did you finish working at Heritage Hills on behalf of MedOptions at the same time?
A. Same week.
Q. Did you finish working for Holiday at the same time?
A. Yes.
Q. Did you finish working for Morgan on behalf of MedOptions at the same time as you

ceased working --

A. No. No, I did not. I did not work at Morgan on behalf of MedOptions.

Q. Did you work for East Gate on behalf of MedOptions?

A. No.

Q. Did you work for Pine Grove on behalf of MedOptions?

A. No.

Q. Did you work for Haven Health on behalf of MedOptions?

A. No.

Q. Did you work for Grand Island on behalf of MedOptions?

A. No.

Q. Why did you leave MedOptions?

A. I transferred from Rhode Island to Connecticut, in order to go to the Sisters. And I left MedOptions entirely in June of 2007, in order to be a Sister.

Q. Were you ever dissatisfied with your employment at MedOptions?

A. No.

MS. BEJMA: Give me one minute.

(Pause in the Proceedings)