**UNITED STATES DISTRICT COURT**
**DISTRICT OF RHODE ISLAND**

| | | |
|---|---|---|
| HUMAN SERVICES CONSULTANTS, LTD, dba GERICARE, and RONALD MARK STEWART MD,<br><br>Plaintiffs,<br>v.<br><br>ANN TAMULE, aka, ANN M. SULLIVAN, alias, and MEDOPTIONS INC.,<br><br>Defendants. | : | Case. No. 1:06-cv-00486-ML-DLM |

**DEFENDANT SULLIVAN'S MOTION FOR SUMMARY JUDGMENT**

Pursuant to Fed. R. Civ. P. 56, defendant Ann M. Sullivan ("Sullivan") hereby moves for summary judgment. As grounds for this Motion, Sullivan relies on the Statement of Undisputed Facts, appended exhibits, and Memorandum of Law filed herewith.

Respectfully submitted,

DEFENDANT,
ANN M. SULLIVAN,
By her Attorneys,

/s/ Christine K. Bush
Christine K. Bush (#5587)
Rachelle R. Green (#5870)
DUFFY, SWEENEY & SCOTT, LTD.
One Turks Head Place, Suite 1200
Providence, RI 02903
(401) 455-0700-telephone
(401) 455-0701-facsimile

and

Lawrence Peikes
Admitted *Pro Hac Vice*
lpeikes@wiggin.com
WIGGIN AND DANA LLP
400 Atlantic Street
P.O. Box 110325
Stamford, CT 06911-0325
(203) 363-7600-telephone
(203) 363-7676 -facsimile

Dated: February 22, 2008

## CERTIFICATE OF SERVICE

I hereby certify that the within **Defendant Sullivan's Motion for Summary Judgment** was filed through the ECF system on this 22nd day of February, 2008 and will be sent electronically to the below named counsel who are registered participants identified on the Notice of Electronic Filing:

Stephen M. Robinson, Esq.
The Law Offices of Stephen M. Robinson
155 South Main Street
Suite 402
Providence, RI 02903

Vicki J. Bejma, Esq.
The Law Offices of Stephen M. Robinson
155 South Main Street
Suite 402
Providence, RI 02903

/s/ Christine K. Bush
Christine K. Bush

H:\Clients\MedOptions\Tamule\Pleadings\USDC RI\Drafts\MSJ Sullivan.DOC

**UNITED STATES DISTRICT COURT**
**DISTRICT OF RHODE ISLAND**

| | | |
|---|---|---|
| HUMAN SERVICES CONSULTANTS, LTD, dba GERICARE, and RONALD MARK STEWART MD, | : | Case. No. 1:06-cv-00486-ML-DLM |
| Plaintiffs, | : | |
| v. | : | |
| ANN TAMULE, aka, ANN M. SULLIVAN, alias, and MEDOPTIONS INC., | : | |
| Defendants. | : | |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT SULLIVAN'S MOTION FOR SUMMARY JUDGMENT**

This diversity suit was initiated by plaintiffs Human Services Consultants, Ltd. d/b/a GeriCare ("GeriCare") and its owner, Ronald Mark Stewart, M.D. ("Dr. Stewart") (collectively "plaintiffs"), against a former GeriCare employee, Ann M. Sullivan ("Sullivan"), and her subsequent employer, MedOptions, Inc. ("MedOptions") (collectively "defendants"). The case is rooted in a non-competition covenant Sullivan, a nurse practitioner, was compelled to sign as a condition of her continued employment by GeriCare, a provider of psychiatric care to nursing home residents.

Because, as shown below, the restrictive covenant is unenforceable as a matter of settled Rhode Island law, and extensive discovery has unearthed not a shred of evidence supporting plaintiffs' tort claims against Sullivan, summary judgment is properly entered in her favor.

## I. INTRODUCTION

Plaintiffs purport to advance three separate common law claims against Sullivan. One count sounds in breach of contract while the other two allege tortious interference with advantageous business relationships.

The contract plaintiffs accuse Sullivan of breaching is, as noted, a non-competition covenant. That covenant, however, is geographically unbounded, and hence overly broad, and in any event does not serve to protect any legitimate business interest. That is, Sullivan never possessed, much less misappropriated and exploited, any of plaintiffs' confidential information; plaintiffs did not provide Sullivan with any unique training; and, Sullivan presented no threat to plaintiffs' good will, and more to the point she played no role in MedOptions' procurement of business from former GeriCare customers. This absence of a protection-worthy business interest renders the covenant not to compete unenforceable, thereby precluding plaintiffs from asserting a viable claim for breach of contract.

Plaintiffs' tortious interference claims are no more viable than their breach of contract claim. The business relationships in question were actually abandoned by plaintiffs, unilaterally and of their own volition. Thus, as detailed more fully below, upon Sullivan's announcement of her intention to resign from GeriCare effective June 1, 2006, plaintiffs immediately issued contract termination notices to the nursing homes Sullivan had been servicing on GeriCare's behalf. Sullivan was later hired by MedOptions, who replaced GeriCare as the provider of psychiatric care services to many of these same facilities. MedOptions logically assigned Sullivan to cover the nursing homes she had previously serviced for GeriCare, but by that point GeriCare had no actual or expectant

business relationship with which Sullivan could possibly have interfered. Besides, Sullivan engaged in no conduct that could remotely be characterized as wrongful or tortious -- she simply honored her employer's directives by reporting to the nursing homes she was assigned to service.

For these and a variety of other reasons that are more fully articulated below, plaintiffs' claims necessarily fail as a matter of law.

## II. STATEMENT OF FACTS

Per LR Cv 56(a), the facts of materiality are set out in the accompanying Statement of Undisputed Facts. These facts are summarized below and supplemented as necessary to provide context.

### A. Sullivan's Employment by GeriCare

GeriCare employed Sullivan as a nurse practitioner from June 2002 until her voluntary resignation effective June 1, 2006. In this capacity, Sullivan was generally responsible for conducting psychological evaluations and assessments of nursing home residents at various facilities serviced by GeriCare in Rhode Island pursuant to contractual instruments. (Undisputed Fact, "UF," ¶ 1; Complaint ¶¶ 7-9).

As a condition of her employment by GeriCare, Sullivan was required to sign a Provider Agreement containing a broad six-month non-competition covenant. (UF ¶ 3). By its terms, the restrictive covenant purported to bar Sullivan from working for a competing enterprise. Although GeriCare operates exclusively in Rhode Island (Complaint ¶ 5), the covenant is not geographically restricted. (UF ¶ 4).

At GeriCare's insistence, Sullivan executed a new Provider Agreement in June 2004 modifying her compensation arrangement; the restrictive covenant, however, was unaltered. (UF ¶ 5).

**B. Sullivan's Resignation**

In late March or early April 2006, Alice Mellucci, the director of nursing for Hebert Nursing Home ("Hebert"), one of the facilities serviced by Sullivan on behalf of GeriCare, advised Sullivan that Hebert would be terminating its contract with GeriCare. By way of explanation, Ms. Mellucci assured Sullivan she was quite pleased with her performance as a nurse practitioner but was suspicious of possible Medicare fraud on the part of Dr. Stewart, GeriCare's owner. According to Ms. Mellucci, Dr. Stewart had submitted paperwork from Florida for services rendered to Hebert residents on a date when nobody in the facility saw him and, more importantly, documenting a supposed visit with at least one patient who was not a resident at the time. (UF ¶ 6).

Concerned about being implicated in a potentially fraudulent scheme, and having already decided to leave the private sector and pursue a religious life, Sullivan elected to resign from GeriCare; she did so by letter to Dr. Stewart dated April 9, 2006, advising that her last day would be June 1, 2006. Sullivan provided some seven weeks notice of her intention to resign in order to allow time for GeriCare to hire and orient a new nurse practitioner. (UF ¶ 7).

**C. GeriCare's Termination of its Service Contracts**

Within a matter of days after learning that Sullivan would be resigning, Dr. Stewart, by letter dated April 20, 2006, notified all but one of Sullivan's assigned

facilities that because GeriCare had no expectation of finding a replacement for Sullivan it was terminating their service contracts effective June 1, 2006. (UF ¶ 8).

In the interim, GeriCare asked another nurse practitioner on staff, Sharon Borges, whether she would be interested in taking over responsibility for any of the nursing homes serviced by Sullivan, but she declined.[1] (UF ¶ 9). Beyond that, GeriCare did nothing to recruit a nurse practitioner to fill Sullivan's spot in the week or so between learning of her decision to resign and issuing notice to the nursing homes that it was terminating their contracts. (UF ¶ 10).

**D. Sullivan's Employment by MedOptions**

Coincidentally, Sullivan's plan to enter religious life hit some roadblocks and, as a result, she found it necessary to pursue employment elsewhere until such time as she was able to join a convent whose mission comported with her spiritual objectives. This job search initiative quickly led Sullivan to MedOptions, by whom she was hired on June 1, 2006. (UF ¶ 11).

MedOptions initially assigned Sullivan to a pair of Rhode Island facilities not previously serviced by GeriCare, namely Oakland Grove Health Care Center and Bayberry Commons, as well as Grandview Center ("Grandview"), a facility previously serviced by Sullivan on behalf of GeriCare. In its quest to find a service provider to replace GeriCare, Grandview had contacted, and eventually retained, MedOptions. (UF ¶¶ 12-13).

Eventually, MedOptions secured service contracts with a number of the other nursing homes that had been abandoned by GeriCare, including Hebert, The Holiday

---

[1] Ms. Borges did offer to cover Heritage Hills Nursing Home on a limited basis -- "going in once a week after 4PM and seeing 8 to 10 patients weekly..." -- but the facility rejected that arrangement. (UF ¶ 9).

Retirement Home ("Holiday"), Heritage Hills Nursing Home ("Heritage Hills") and Ballou Home for the Aged ("Ballou"). (UF ¶ 15). Like Grandview, each of these homes contacted MedOptions in search of an alternative provider. (UF ¶ 16). Given Sullivan's prior experience treating residents at these particular facilities, and her proximity to those locations, MedOptions naturally assigned them to Sullivan as well. (UF ¶ 18).

On October 7, 2006, Sullivan received notice that she had been accepted into a convent located in New Britain, Connecticut where, consistent with her calling, she would be able to utilize her skills and experience as a nurse in furtherance of a charitable mission. To facilitate her transition, Sullivan requested a reassignment to facilities in the New Britain area and a reduction in hours. MedOptions obliged, transferring Sullivan to Connecticut in January 2007 and assigning her responsibility for two nursing homes. Sullivan remained at MedOptions and worked a part-time schedule until June 2007, when she entered the convent on a permanent basis. (UF ¶ 20).

**E. Plaintiffs' Suit**

On October 17, 2006, plaintiffs brought suit against Sullivan and MedOptions in Providence County Superior Court alleging common law claims for breach of contract against Sullivan and tortious interference with advantageous business relationships against both Sullivan and MedOptions. The case was timely removed to federal court on the basis of diversity of citizenship.

In a nutshell, plaintiffs contend that even though, within a matter of moments after learning that Sullivan would be moving on, GeriCare volitionally terminated its service contracts with all but one of the facilities to which Sullivan had been assigned, MedOptions somehow interfered with plaintiffs' *past* relationships by eventually taking

over for GeriCare at certain of these nursing homes, and Sullivan somehow engaged in improper competition by accepting her new employer's assignment to service the facilities GeriCare had forsaken.

As demonstrated below, plaintiffs' claims are unsustainable as a matter of law.

## III. LAW AND ARGUMENT

### A. Summary Judgment Standard

"The object of summary judgment is 'to pierce the boilerplate of the pleadings and assay the parties' proof in order to determine whether trial is actually required.'" Davila v. Corporacion de Puerto Rico Para La Difusion Publica, 498 F.3d 9, 12 (1st Cir. 2007)(Citation omitted).

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). "For this purpose, an issue is genuine if 'a reasonable jury could resolve the point in favor of the nonmoving party.' By like token, a fact is material if it has the potential to determine the outcome of the litigation." Davila, 498 F.3d at 12 (Citations omitted).

"The moving party bears the burden of demonstrating that no genuine issue of material fact exists. 'In determining whether that burden is met, a court must view the record in the light most favorable to the nonmoving party and give that party the benefit of all reasonable inferences in its favor.' Once the moving party has made this preliminary showing, the nonmovant 'may not rest upon the mere allegations or denials of its pleading,' but must 'produce specific facts, in suitable evidentiary form, to establish

the presence of a trialworthy issue.' 'Nor may the court accept the nonmovant's subjective characterizations of events, unless the underlying events themselves are revealed.' 'As to any essential factual element of its claim on which the nonmovant bears the burden of proof at trial, its failure to come forward with sufficient evidence to generate a trialworthy issue warrants summary judgment to the moving party.'" Vineberg v. Bissonnette, 2007 WL 4571154, at *1 (D.R.I. Dec. 27, 2007)(Lisi, J.)(Citations and alterations omitted).

"Importantly, in an action such as this one, summary judgment is not necessarily precluded where the plaintiffs' claims involve 'elusive concepts such as motive or intent' if plaintiffs oppose the motion with only 'conclusory allegations, improbable inferences, and unsupported speculation.'" Feinstein v. Brown, 432 F. Supp. 2d 258, 263 (D.R.I. 2006)(Citation omitted). Yet that is the best plaintiffs can possibly do here.

**B. Breach of Contract**

Plaintiffs aver that by accepting a position with MedOptions, ostensibly a GeriCare competitor, Sullivan breached the Provider Agreement's restrictive covenants. The covenants in question, however, plainly overreach and are hence unenforceable.

"It is well settled that covenants not to compete are disfavored and subject to strict judicial scrutiny. As a result, Rhode Island courts will uphold and enforce such provisions if, *inter alia*, the party seeking to enforce the noncompetition clause (the promisee) shows that the provision is ancillary to an otherwise valid transaction or relationship, and that 'the contract is reasonable and does not extend beyond what is apparently necessary for the protection of those in whose favor it runs.'" Cranston Print Works Co. v. Pothier, 848 A.2d 213, 219 (R.I. 2004)(Citations and footnote omitted).

"Whether a restrictive covenant is reasonable is ultimately a question of law determined by the court." Durapin, Inc. v. American Products, Inc., 559 A.2d 1051, 1053 (1989)(Citation omitted).

This "particular noncompete clause[] lack[s] ... a geographical limitation. Although such broad restraints are not unenforceable *per se*, courts should uphold them only to the extent they are necessary to protect the promisee's legitimate interests." Cranston Print Works, 848 A.2d at 220 (Citation omitted). Because plaintiffs' business was limited to the State of Rhode Island (Complaint ¶¶ 5, 7), the geographically unbounded non-competition covenant imposed on Sullivan by GeriCare is, by definition, overly broad in scope. See id. (restrictive covenant's "geographical restriction ... should be tailored ... to ... the true scope of [the promisee's] legitimate commercial interests ...").

To be sure, Rhode Island courts are empowered to resize a restrictive covenant deemed overly broad in geographic scope, see id., but undue expanse is only one flaw plaguing the Provider Agreement's non-competition clause. In addition, and more importantly, the covenant not to compete, as applied to Sullivan, in no way protects a legitimate business interest. See Durapin, Inc., 559 A.2d at 1053 ("... the party seeking to enforce a noncompetition provision must show that ...," *inter alia*, "there exists a legitimate interest that the provision is designed to protect.")(Citation omitted). That is, "[t]here has been no showing by [plaintiffs] that, in order to protect its legitimate interests, it is necessary to go to the extreme of prohibiting former employees from working for a competitor ..." Nestle Food Co. v. Miller, 836 F. Supp. 69, 75 (D.R.I. 1993).

Precedent reveals there to be but a handful of commercial interests that might theoretically justify a restriction on competitive activities:

> Courts have upheld protection of good will which was acquired in a transaction involving the sale of a business, where competition by the seller would deprive the buyer of part of the consideration paid. Courts have also enforced restrictive covenants when the plaintiff had trained the defendant in unique or novel services in exchange for which the defendant agreed not to use those unique skills to compete against the original employer.... Frequently, cases which have upheld enforcement of restrictive covenants against former employees involved the employee's misuse of trade secrets to give the employee an unfair competitive advantage over the former employer. Even where trade secrets were involved, however, the court narrowly tailored the enforcement of the covenant to a precise protection of a specifically defined interest of the former employer, such as confidential information.

Dial Media, Inc. v. Schiff, 612 F. Supp. 1483, 1489 (D.R.I. 1985)(Citations omitted). Sullivan's employment by MedOptions places none of these legitimate interests at risk.

GeriCare did not purchase a business owned by Sullivan so as to trigger protection of acquired good will. Be that as it may, it is undisputed Sullivan had no role in soliciting customers for MedOptions -- in fact, the nursing homes approached MedOptions about replacing GeriCare, without any overture from MedOptions whatsoever. (UF ¶¶ 13, 16).[2] Hence, any loss of good will suffered by plaintiffs could not possibly be attributed to Sullivan. And because there is no link between Sullivan's employment by MedOptions, allegedly in breach of the non-competition covenant, and MedOptions' procurement of service contracts from facilities formerly serviced by GeriCare, enforcement of the restrictive covenant would not further GeriCare's legitimate interest in safeguarding customer relationships. See Hawkins v. Daly Commerce, Inc.,

[2] Notably, Dr. Stewart acknowledged that nursing home engagements in this industry are typically procured by word-of-mouth. (UF ¶ 23).

2003 WL 302358, at *4 (R.I. Super. Feb. 10, 2003)(denying enforcement of restrictive covenant where former employee's activities did not cause loss of business).

Nor did plaintiffs train Sullivan. To the contrary, Sullivan came to GeriCare in June 2002 with a Bachelor's Degree in Nursing, a Master's Degree in Nursing, an Advanced Graduate Certificate as an Adult Nurse Practitioner, and over 15 years of experience in the nursing field. (UF ¶ 2). "At most, the training which [Sullivan] received from [plaintiffs] enabled [her] to improve [her] skills to become a more effective [nurse practitioner]. Toward this end, 'an employer cannot by contract prevent his employee from using the skill and intelligence acquired or increased and improved through experience or through instruction received in the course of the employment.'" Asters v. Management Search of Rhode Island, Inc., 1988 WL 1017330, at *4 (R.I. Super. July 7, 1988)(Citation omitted).

Finally, Sullivan did not possess, much less misappropriate and exploit, any of plaintiffs' trade secrets or confidential information. At deposition, Dr. Stewart purported to characterize GeriCare's standard medical record forms as proprietary. Dr. Stewart conceded, however, that once filled out by a GeriCare health care professional, the forms remain at the nursing home to be consulted in the future. As such, any other provider of psychiatric care that took over for GeriCare, be it MedOptions or another entity, would have, indeed need, ready access to the GeriCare forms, a point likewise admitted by Dr. Stewart. (UF ¶ 21). By definition, then, the forms are not confidential or otherwise protected. APG, Inc. v. MCI Telecommunications Corp., 436 F.3d 294, 307 (1st Cir.

2006)(applying Rhode Island law and concluding that technical information that "was obtainable within normal business channels" was not a trade secret).[3]

Dr. Stewart further suggested that the identities of nursing home contact points are confidential. But the contact point for a nursing home is invariably the facility administrator or director of nursing (UF ¶ 22), and identifying those persons requires nothing more than a telephone call. Indeed, Dr. Stewart testified that the nursing home community in Rhode Island is small and close knit, where everyone pretty much knows one another. (UF ¶ 22). As such, plaintiffs cannot legitimately claim ownership rights over the identity of a nursing home and/or its management team.

To the contrary, this "information [] is readily ascertainable through ordinary business channels or business directories," Home Gas Corp. of Massachusetts, Inc. v. DeBlois Oil Co., 691 F. Supp. 567, 574 (D.R.I. 1987), and, therefore, not proprietary to plaintiffs. Go-Van Consolidators, Inc. v. Piggy Back Shippers, Inc., 306 A.2d 164, 165 (R.I. 1973)(trade secret status does not attach to customer identities that are readily ascertainable); Callahan v. Rhode Island Oil Co., 240 A.2d 411, 413-14 (R.I. 1968)(same); Chemart Co. v. Nixon, 1992 WL 813516, at *6 (R.I. Super. Feb. 21, 1992)(same); Eastern Scientific Co. v. Yapchaian, 1985 WL 663131, at *4 (R.I. Super. Jan. 15, 1985)(same). See also Chelo's of Woonsocket, Inc. v. Chelo, 2004 WL 603417, at *5 (R.I. Super. March 8, 2004)("Unlike a trade secret or confidential customer information, ... items [that are] easily visible and discoverable to the public [] are [] non-protectable.").

---

[3] Dr. Stewart further admitted he had no factual basis for believing Sullivan appropriated, or otherwise compromised, GeriCare's forms for the benefit of MedOptions. (UF ¶ 21).

To summarize, then, "[i]n the present case, the [p]laintiff has not asserted that [Sullivan] used trade secrets to acquire an unfair advantage to [GeriCare's] detriment, nor has [p]laintiff demonstrated any unique or novel training of [Sullivan]. Thus, the only interest which [p]laintiff could assert is the desire to be free of competition from its former employee, who had engaged in the activity which [p]laintiff seeks to prohibit before coming to work for [GeriCare]. This interest is not a protectable one since in the absence of trade secret abuse, misappropriation of good will, or other damage [p]laintiff is simply attempting to restrain competition which is in this instance an unreasonable restraint on trade." Dial Media, Inc., 612 F. Supp. at 1489 (Citations and footnote omitted).

Because the restrictive covenant contained in the Provider Agreement is unenforceable as a matter of law, plaintiffs' breach of contract claim against Sullivan is unsustainable and properly disposed of on summary judgment.

**C. Tortious Interference With Advantageous Business Relationships**

Under Rhode Island law, the elements of a claim for tortious interference with prospective or advantageous business relations are: "(1) the existence of a business relationship or expectancy, (2) knowledge of the interferer of the relationship or expectancy, (3) an intentional act of interference, (4) proof that the interference caused the harm sustained, and (5) damages to the plaintiff." Avilla v. Newport Grand Jai Alai LLC, 935 A.2d 91, 98 (R.I. 2007)(Citations and internal quotation marks omitted).

Assuming "the plaintiff establishes these prima facie elements, 'the burden of proving sufficient justification for the interference shifts to the defendant.' To demonstrate intentional interference, a claimant need not show actual malice or ill will.

Legal malice, 'an intent to do harm without justification,' is sufficient. To prevail, then, the plaintiff must prove that, ultimately, the defendant acted 'without justification' or for an 'improper' purpose." UST Corp. v. General Road Trucking Corp., 783 A.2d 931, 937 (R.I. 2001)(Citations omitted).

***1. Plaintiffs Have Adduced No Evidence of a Business Relationship or Expectancy***

It is undisputed that on or about April 20, 2006, plaintiffs sent identical letters to Grandview, Ballou, Holiday, Morgan and Hebert, advising that (i) Sullivan had tendered her resignation effective May 31, 2006, (ii) "[f]inding another Advance Practice Nurse (APN) is not expected to be possible in the near future," and, consequently, (iii) "GeriCare must terminate our contract with your facility as of June 1, 2006." (UF ¶ 8; see also Exh. E to Sullivan's Statement of Undisputed Facts). It is likewise undisputed that the contracts did in fact terminate effective June 1, 2006. (UF ¶ 10).

Notwithstanding these undisputed facts, plaintiffs allege that Sullivan somehow committed a tort by subsequently servicing certain of GeriCare's former customers on behalf of MedOptions. Sullivan, however, only first came into contact with these facilities as a representative of MedOptions when she was assigned there after the GeriCare contracts terminated and MedOptions replaced GeriCare as the provider of on-site psychiatric care. (UF ¶ 18). The undisputed facts therefore conclusively demonstrate that Sullivan took no action to interfere with any of GeriCare's *ongoing* business relationships.

Plaintiffs contend, however, there remained an expectancy of reviving these relationships by virtue of a "belie[f] that had we been able to procure a substitute, we could have persuaded the above nursing homes to enter into a new contractual

relationship." That's a hope, not an expectancy. And not much of a hope at that given Dr. Stewart's acknowledgment in the termination notices he sent out on April 20, 2006 that he had *no expectation* of procuring a substitute for Sullivan at any point in the foreseeable future. Indeed, plaintiffs admit that aside from Heritage Hills, they never presented any of the nursing homes with a proposed replacement for Sullivan; as for Heritage Hills, that facility rejected the lone nurse practitioner plaintiffs' offered in place of Sullivan, as was their absolute right. (UF ¶ 8; see also Exh. E to Sullivan's Statement of Undisputed Facts).

Thus, "the summary judgment record ... [reveals] no evidence of the existence of a business relationship or the expectancy of one. As such, as a matter of law, Plaintiffs['] interference with prospective contractual relations' claim fails." Champlin's Realty Assoicates v. Carcieri, 2006 WL 2927632, at *5 (D.R.I. Oct. 12, 2006)(Lisi, J.).

***2. Plaintiffs Have Adduced No Evidence That Sullivan Had Knowledge of an Actual or Prospective Business Relationship or Expectancy***

Plaintiffs have likewise adduced no evidence suggesting that Sullivan, at the time she was assigned by MedOptions to cover the former GeriCare accounts, had reason to believe there was any prospect of GeriCare re-contracting with those facilities in the future. All Sullivan knew was that the facilities no longer were doing business with GeriCare and instead contracted with MedOptions. Under the circumstances, Sullivan reasonably believed GeriCare's relationship with these nursing homes was non-existent; she had no grounds to suspect, much less did she know, that GeriCare was still in the picture (which in fact it was not). (UF ¶ 19).

For this separate and independent reason, summary judgment is properly entered in Sullivan's favor as to Counts Two and Three of plaintiffs' Complaint.

### *3. Plaintiffs Have Adduced No Evidence That Sullivan Acted Without Justification or With an Improper Purpose*

It is well-settled that "a defendant may not be held liable for tortious interference unless the defendant's conduct was 'improper' or unjustified. Otherwise, a defendant would be subject to liability for such lawful and benign activities as 'competing with a plaintiff for business.'" Pharmacy Services, Inc. v. Swarovski North America Limited, 2006 WL 753055, at *4 (D.R.I. March 21, 2006)(Citations omitted). Thus, "the elements of the tort require showing an 'intentional and improper' act of interference, not merely an intentional act of interference." Avilla, 935 A.2d at 98 (Citations omitted).

"Viewed through this prism, [the court] must determine whether there is any issue of material fact about whether [Sullivan] engaged in an improper interference. In making this determination, [the court must] consider (1) the nature of the actor's conduct; (2) the actor's motive; (3) the contractual interest with which the conduct interferes; (4) the interests sought to be advanced by the actor; (5) the balance of the social interests in protecting freedom of action of the actor and the contractual freedom of the putative plaintiff; (6) the proximity of the actor's conduct to the interference complained of; and (7) the parties' relationship. Determining improper conduct depends upon the judgment and choice of values in each situation, therefore, the factors listed above are not exhaustive for making such a determination." Id. (Citations and internal quotation marks omitted).

Each of these factors, and any others that might be pertinent, reveal an absence of so much as a hint of impropriety on Sullivan's part.

1. *The Actor's Conduct:* The record shows that Sullivan did nothing more than service certain former GeriCare facilities at the direction of her employer. She had absolutely no role in bringing those customers to MedOptions.

2. *The Actor's Motive:* Sullivan's motive in accepting these assignments is patently obvious and perfectly legitimate – she was simply fulfilling her job duties in order to earn a living.

3. *The Contractual Interest With Which the Conduct Interferes:* At the time of the alleged interference, plaintiffs had *no* contractual relationship with any of the facilities in question, nor have plaintiffs adduced a shred of evidence suggesting there was any realistic prospect of regaining this business.

4. *The Interests Sought to be Advanced by the Actor:* As alluded to above in regard to item 2, Sullivan's interests were purely economic.

5. *The Balance of the Social Interests in Protecting Freedom of Action of the Actor and the Contractual Freedom of the Putative Plaintiff:* Without question, this balance strikes in favor of Sullivan since she only started working at the former GeriCare facilities *after* plaintiffs terminated the contracts, and hence their business relationships.

6. *The Proximity of the Actor's Conduct to the Interference Complained of:*

Again, Sullivan's "conduct" amounted to the mere acceptance of a work assignment; to reiterate, it is undisputed that Sullivan played no role in procuring business for MedOptions with any former GeriCare customer.

7. *The Parties' Relationship:* Sullivan's relationship to plaintiffs is that of former employee whose allegiance to plaintiffs terminated with her resignation. Upon joining MedOptions, Sullivan became a GeriCare competitor. Hence, in terms of proving

a claim for tortious interference, "the hurdle is even higher." Pascale Service Corp. v. International Truck and Engine Corp., 2007 WL 2905622, at *4 (D.R.I. Oct. 1, 2007).

Apart from these specific factors, it bears emphasis that "[c]onduct in furtherance of business competition is generally held to justify interference with others' contracts [or business relationships], so long as the conduct involves neither wrongful means nor unlawful restraint of trade." Id. (Citation and internal quotation marks omitted). Even were plaintiffs capable of proving interference (which they plainly cannot since the customer relationships were non-existent when MedOptions came on the scene), the record is devoid of evidence remotely suggesting that MedOptions, much less Sullivan, utilized "wrongful means" to procure business in Rhode Island. Sullivan's actions "are therefore privileged and legally justified." Barkan v. Dunkin' Donuts, Inc., 520 F. Supp. 2d 333, 342 (D.R.I. 2007).

On this alternative ground as well, plaintiffs' claims for tortious interference with business relationships fail as a matter of law. Id. (dismissing tortious interference claim where defendant merely acted to safeguard a bona fide business interest); Feinstein v. Brown, 432 F. Supp. 2d 258, 268 (D.R.I. 2006)(granting summary judgment on tortious interference claim where defendant's "motive was to obtain payment" and there was no evidence that defendant had an intent to harm plaintiff without justification).

#### *4. Plaintiffs Have Adduced No Evidence Of Causation*

Even assuming plaintiffs were capable of establishing an act of interference on Sullivan's part, "[u]nder Rhode Island law, [plaintiffs] must prove either that 'but for' [Sullivan's] interference, it would not have suffered injury, or that 'it is reasonably probable that but for the interference' [plaintiffs] would not have been injured.

[Plaintiffs] must therefore prove that it is at least 'reasonable and probable' that [GeriCare] would have completed a [new] deal to [provide services to the nursing homes in question] had [Sullivan] not interfered improperly ..." APG, Inc. v. MCI Telecommunications Corp., 436 F.3d 294, 304 (1st Cir. 2006).

In the APG, Inc. case, the First Circuit "construe[d] this to be a high level of probability—at least more likely than not—given the 'but for' starting point for the causation inquiry," noting that "[i]n another context, the Rhode Island Supreme Court has ruled that such a likelihood depends on evidence that is reasonably definite and is neither speculative nor remote." Id. (Citation omitted). Here, plaintiffs' own actions portray an expectation that as of June 1, 2006 the business at issue would be lost, not resurrected.

Thus, Dr. Stewart admitted at deposition that the reason termination notices were sent out so quickly after Sullivan announced her intention to resign was to allow the nursing homes ample opportunity to find another provider. (UF ¶ 7). The notices say as much: "Therefore, regretfully, in fairness to you, GeriCare must terminate our contract with your facility as of June 1, 2006. We cannot maintain our quality service standards and cover all your needs in the near future." (UF Exh. E).

To be sure, GeriCare's relationship with Heritage Hills was terminated by the facility, not GeriCare, but under the circumstances this is a distinction without a legal difference. It is undisputed that the only nurse practitioner presented by GeriCare to Heritage Hills, Sharon Borges, had limited availability and could not satisfy Heritage Hills' requirements. (UF ¶¶ 9-10). Consequently, assuming Heritage Hills wished to continue providing on-site psychiatric care for its residents, it necessarily had to seek out

and retain an alternative vendor. That, of course, is precisely what Heritage Hills did, eventually contracting with MedOptions. (UF ¶ 15).

Plaintiffs' gripe with Sullivan, then, is not the loss of business -- that was a foregone conclusion -- but rather her alleged role in procuring this business for MedOptions. But whether it was MedOptions or some other GeriCare competitor, the business was, by dint of GeriCare's own actions, going elsewhere. As such, there is no causal link between the conduct Dr. Stewart speculatively (and erroneously) attributes to Sullivan and the damage plaintiffs claim to have incurred, specifically the loss of a fruitful relationship with Grandview, Hebert, Holiday, Heritage Hills and Ballou.

This absence of causation provides yet another separate and independent basis for dismissing plaintiffs' tortious interference claims against Sullivan. APG, Inc., 436 F.3d at 304-05 (affirming grant of summary judgment on tortious interference claim for want of evidence sufficient to establish a connection between the defendant's improper interference and the plaintiff's loss of earnings).

## IV. CONCLUSION

For the foregoing reasons, there is no genuine issue of material fact at issue in this case and, consequently, summary judgment is properly entered in favor of Sullivan as to all counts.

Respectfully submitted,

DEFENDANT,
ANN M. SULLIVAN,

By her Attorneys,

/s/ Christine K. Bush
Christine K. Bush (#5587)
DUFFY, SWEENEY & SCOTT, LTD.
One Turks Head Place, Suite 1200
Providence, RI 02903
(401) 455-0700-telephone
(401) 455-0701-facsimile

and

Lawrence Peikes
Admitted *Pro Hac Vice*
lpeikes@wiggin.com
WIGGIN AND DANA LLP
400 Atlantic Street
P.O. Box 110325
Stamford, CT 06911-0325
(203) 363-7600-telephone
(203) 363-7676 -facsimile

Dated: February 22, 2008

## CERTIFICATE OF SERVICE

I hereby certify that the within **Memorandum of Law in Support of Defendant Sullivan's Motion for Summary Judgment** was filed through the ECF system on this 22nd day of February, 2008 and will be sent electronically to the below named counsel who are registered participants identified on the Notice of Electronic Filing:

Stephen M. Robinson, Esq.
The Law Offices of Stephen M. Robinson
155 South Main Street
Suite 402
Providence, RI 02903

Vicki J. Bejma, Esq.
The Law Offices of Stephen M. Robinson
155 South Main Street
Suite 402
Providence, RI 02903

/s/ Christine K. Bush
Christine K. Bush

H:\Clients\MedOptions\Tamule\Pleadings\USDC RI\Mem in Support of Sullivan MSJ.DOC