# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

-------------------------------x
HUMAN SERVICES CONSULTANTS, :
LTD, d/b/a GERICARE, :
RONALD MARK STEWART, MD, :
Plaintiffs : CA No. 06 486
-v- :
ANN TAMULE a/k/a :
ANN M. SULLIVAN, Alias, and :
MEDOPTIONS, INC., :
Defendant. :
-------------------------------x

Deposition of ANN MARIE SULLIVAN, taken pursuant to the Federal Rules of Civil Procedure, at the Law Offices of Pepe & Hazard, 30 Jelliff Lane, Southport, Connecticut, before James A. Martone, LSR and Notary Public, in and for the State of Connecticut, on November 5, 2007 at 11:20 a.m.

Wallingford.

Q. Brook Hollow Mental --

A. Brook Hollow Health Care Center.

Q. Do you have any children?

A. No.

Q. Could you describe your educational background?

A. I have a high school diploma. I have a Bachelor's Degree in Nursing. I have a Master's Degree in Nursing. And I have an Advanced Graduate Certificate as an Adult Nurse Practitioner.

Q. And where did you get your Bachelor's Degree in Nursing?

A. Boston College.

Q. And your Master's?

A. Boston University.

Q. And your advanced graduate studies?

A. Mass General Institute of Health Professions.

Q. All right. And could you describe your employment history.

A. I've recently left MedOptions.

Q. When did you leave MedOptions?

A. June.

Q. June. And was the work at Brook Hollow part of your employment at -- by MedOptions?
A. Yes.
Q. Okay. And when did you begin working for MedOptions?
A. June of 2006.
Q. And who was your employer prior to that?
A. GeriCare.
Q. And when did you work for GeriCare?
A. 2002 to 2006.
Q. And prior to GeriCare, how were you employed?
A. I taught nursing at Simmons College in Boston.
Q. And prior to Simmons?
A. I worked for the Visiting Nurse Association of Boston.
Q. And on what dates was that employment?
A. 1988 to 1999.
Q. And what was your employment prior to that Visiting Nurse of Boston?
A. I taught nursing at Assumption College in Worcester.
Q. What were the dates of that employment?

A. '86 to '88.

Q. And how were you employed before you worked for Assumption?

A. I was a student actually in graduate school. I was at Boston University '84 to '86.

Q. Okay. And while you were a graduate student, were you employed?

A. I worked some for the Visiting Nurse Association of Boston.

Q. And before you did your graduate work, how were you employed?

A. Let's see. I also worked for the Visiting Nurse Association of the South Shore in Braintree, Massachusetts. I can't think of when I started there. But I was there until I went to graduate school.

Q. And prior to your working for Visiting Nurse of South Shore at Braintree, how were you employed?

A. I worked at Carney Hospital in Dorchester.

Q. What were the dates of your employment there?

A. This is quite a ways back. I -- '79 I finished at BC. So '79 -- it was between 1979

and 1984.

Q. All right. And have you ever held political office?

A. No.

Q. Have you ever performed volunteer work?

A. Yes.

Q. Where have you performed volunteer work?

A. I'm doing it now at Bojnowski Manor. B O J N O W S K I.

Q. And Bojnowski Manor, and what is Bojnowski Manor?

A. It's a nursing home.

Q. It's a nursing home. And what are the nature of services are you providing?

A. I play the guitar and I pray the Rosary, and pray with people. I'm also a religious education -- I teach CCD, that's volunteer.

Q. Okay. And what professional licenses do you currently hold?

A. I have licenses from Massachusetts and Connecticut as a Registered Nurse and as a Nurse Practitioner.

Q. And do you currently hold any

Dr. Stewart at Whalen Square, did he hire you at that point?
A. I believe so.
Q. Do you recall the date you were hired?
A. No.
MS. BEJMA: I'm going to have this document marked Exhibit 2.
(Plaintiffs' Exhibit 2 marked For identification.)
Q. Can you review that document briefly.
A. Yes.
Q. Can I draw your attention to the last page of that document.
A. Yes.
Q. Is that your signature?
A. Yes.
Q. Okay. And the date of that document?
A. 3rd day of June, 2002.
Q. Do you have any reason to believe that document, or that date is incorrect?
A. No.
Q. I'd also like to draw your attention to the first page of that agreement.
A. Yes.
Q. Section 1.

A. Yes.

Q. Could you read that for us?

A. "General Noncompete Agreement. The contractor agrees not to directly or indirectly compete with the business of the company during the period of contraction. The term 'noncompete' shall mean that the contractor shall not directly or indirectly own, operate, consult to or be employed by any firm in a business substantially similar to or competitive with the present business of the company or such business activity in which the company may engage during the term of the agreement and for six months thereafter." The contractor hereby acknowledges that the company shall or may in reliance of this agreement provide the contractor access to trade secrets, customers and other confidential data and that this agreement is reasonably necessary to protect the company and its clients."

Q. And when did you first see this document?

A. I believe -- I don't know. Clearly I saw it on June 3rd, 2002.

Q. Do you remember who gave it to you?

A. Christine Richards.

Q. Christine Richards. And what position did Christine Richards have?

A. She was involved with leadership in the GeriCare company.

Q. Were you given this document before or after your conversation with Dr. Stewart?

A. After.

Q. About how long after?

A. I don't know.

Q. Had you begun working for GeriCare at the time that you were given this document?

A. I don't know.

Q. Did you read this document before you signed it?

A. Yes.

Q. And what was your understanding as to what that section, general noncompete agreement, what was your understanding as to what that agreement meant?

A. I believe that meant that I was not -- I was agreeing to not accept a position of a competitor of GeriCare for six months after leaving GeriCare.

Q. Did you discuss the contents of that section with anybody at GeriCare?

A. I don't recall.
Q. Did you ask that changes be made to this noncompete agreement?
A. No.
Q. Did anybody at GeriCare explain to you why they wanted you to sign that agreement?
A. No.
Q. Did you talk to a lawyer about this agreement?
A. No.
Q. Had you ever signed a noncompete agreement before this time?
A. No.
Q. Did you speak to anybody else about this agreement?
A. My husband. At that time.
Q. Your husband. Okay.
A. Yes.
MS. BEJMA: I'm going to have this agreement marked.
(Plaintiffs' Exhibit 3 marked For identification.)
Q. If I can direct your attention to the last page of that agreement. And is that your signature?

A. Yes.
Q. Okay. And when did you sign this agreement?
A. June 16th, 2004.
Q. Okay. May I redirect your attention to the first page of that agreement.
A. Yes.
Q. Okay. And if you could review section 1.
A. Yes.
Q. Would you agree that this general noncompete agreement is the same as the one in Exhibit 2?
A. Yes.
Q. Okay. When did you first receive a copy of Exhibit 3, the second agreement?
A. June 16th, 2004.
Q. Who gave it to you?
A. I don't recall, if it was Dr. Stewart or Christine Richards. But it was given to me by GeriCare.
Q. Did you discuss the contents of the agreement with anybody at GeriCare?
A. I don't recall.
Q. Did you ask that changes be made?

A. No.

Q. Did anybody at GeriCare explain why they wanted you to sign the new agreement?

A. I don't recall.

Q. Did you discuss this agreement with a lawyer?

A. No.

Q. Did you discuss it with anybody else?

A. No.

Q. And what were the nature of the services you provided for Human Services?

A. I did mental health treatment of patients in nursing homes in Rhode Island.

Q. And what did that consist of?

A. Evaluating and assessing patients who were referred from the nursing homes for mental health evaluations. And implementing treatment plans, planning treatment plans for them.

Q. You referred to an orientation.

A. Yes.

Q. At The Holiday.

A. Yes.

Q. Who gave you that orientation?

A. Dr. Stewart.

Q. And what did that orientation consist

Q. And what was the nature of your dissatisfaction?

A. A key factor was not being able to get health insurance, that GeriCare does not provide health insurance.

Q. Was there any other reason?

A. Is the question about what started my discontent?

Q. What started your -- yes, please tell me what started your discontent.

A. So what started the discontent was this problem at Morgan, where my paperwork was missing. And we were not able to -- I felt I wanted to leave there, but I didn't want to leave the patients with no one to take care of them.

And I asked Dr. Stewart and Christine to find somebody to replace me. And they were not able to do that. But then I made the decision I had to leave regardless, because this situation was compromising the care that I wanted to give. So that started it.

Q. And was there any other situation that caused you to be unhappy while working for GeriCare?

A. Yes.

Q. And what was that situation?
A. In the spring of 2006, Alice Mellucci, who is the director at Hebert, requested to meet with me, and told me that she was ending her contract, their contract with GeriCare.
Q. Did she explain why?
A. She did. She wanted to tell me, because she explained that she was happy with my services, but that she did not want to continue with GeriCare, and had concerns about Dr. Stewart's services.
Q. Did she explain why she wasn't happy with Dr. Stewart's services?
A. Yes.
Q. What did she say about why she was dissatisfied?
A. Alice described that she had received in the mail an envelope postmarked from Florida with paperwork from Dr. Stewart, and that she had not seen Dr. Stewart in the building, and that included in that paperwork were documentations for a patient who was not in the building on the date that Dr. Stewart's paperwork said that he saw this person.
Q. Did she give any other reasons for

being dissatisfied with Dr. Stewart?
A. Not that I can recall.
Q. Did she give any other reasons for being dissatisfied with GeriCare in general?
A. Again, not that I can recall.
Q. Was there any other situation that caused you to be dissatisfied with your employment?
A. No.
Q. What made you decide to leave GeriCare?
A. The decision to leave was based on Alice Mellucci's conversation with me.
Q. Did you discuss Alice Mellucci's conversation with Dr. Stewart?
A. No.
Q. Did you discuss Alice Mellucci's conversation with Christine Richards?
A. No.
Q. Did you discuss Alice Mellucci's conversation with anybody?
A. There was a social worker working at the facility also. Debbie Robataille was her name, and she and I talked because Alice had revealed that she would end the contract with GeriCare, so that would effect Debbie Robataille

Massachusetts, the -- my goal was to work in the north -- northern Massachusetts border communities, or in northern Rhode Island on the Massachusetts border. And Pine Grove was on the distant corner, the other corner of the State.

Q. After you gave them your resignation letter of April 9th, 2006, did you discuss with anybody at GeriCare arrangements you would be making for transitional care?

A. After --

Q. After you submitted your resignation letter of April 9th, 2006, did you discuss with anybody at GeriCare, arrangements for transitional care of your patients?

A. Yes.

Q. And with whom did you have those discussions?

A. Dr. Stewart.

Q. And what did those discussions consist of?

A. Dr. Stewart called me at work, and I asked that he call me at home.

Q. All right.

A. And he called me at home. And I asked about orienting another person, and Dr. Stewart

did not have anybody planned for me to orient.
Q. And when did this conversation take place?
A. About ten days after.
Q. And did you discuss anything about the transition with the nursing homes?
A. No.
Q. What nursing homes were you working for at the time?
A. Holiday, Heritage Hills, Balou, Grand View, and that's what I can recall.
Q. And you did not discuss with anybody at Holiday, Heritage, Balou or Grand View, what arrangements were going to be made to take over the care of these patients?
A. At this time, no.
Q. At any other time did you discuss with anybody at Holiday, Heritage, Balou, Grand View or any other nursing home that you were working for about arrangements to care for these patients after you left?
A. It did come up in the discussion, yes.
Q. Which discussion was that?
A. I don't understand the question.
Q. We'll break it down. After giving

finished their contract. And so they expressed a lot of concern about that for the patient care.

Q. And when did this conversation take place?

A. Again, I don't know the date.

Q. At the time that you left, were you still performing services at Grand View?

A. At Grand View, a very interesting thing happened at Grand View. When Dr. Stewart ended the contract with Grand View, Grand View signed on with MedOptions. So when they brought to my attention, they said we know that you're leaving Dr. Stewart, "we know that Dr. Stewart is not continuing here, we've signed on with MedOptions," I asked them questions about that company. "How did you find out about that company?" And they said it's a nurse run company. It's run by a Nurse Practitioner. And it's based in Connecticut. And I wished them well.

Q. Now prior to that, had you ever heard of MedOptions?

A. No.

Q. And who did you have this conversation with at Grand View?

A. John Partridge.

Q. And at Hebert, were you still providing services at Hebert?

A. No, because they finished. They ended the contract with Dr. Stewart.

Q. When did they end the contract?

A. I don't know. But I expect that it was before -- it was earlier, because they had met with me in April to tell me.

Q. Were you still providing services at East Gate?

A. No.

Q. Were you still providing services at Pine Grove?

A. No.

Q. Were you still providing services at Haven Health?

A. No.

Q. Were you providing services at Grand Island?

A. No. I never did provide any services at Grand Island.

Q. Did you inform any of your patients that you were leaving?

A. Eventually, yes.

Q. When did you inform them that you were leaving?

A. At the time when I was orienting another person. I -- because I left in -- so in January of 2007, I informed patients that I was leaving.

Q. And where were these patients?

A. At The Holiday mostly. Many of them I had cared for for five years.

Q. And what was your last day working for GeriCare?

A. I don't recall. It was -- my coverage time, my letter says I have resigned effective June 1, 2006.

Q. Now what was your first day of working for MedOptions?

A. I don't recall the date.

Q. And when did you first learn of the existence of a position at MedOptions?

A. I don't recall the date.

Q. Is there anything you could review that would help you refresh your recollection as to the date in which you first learned of a position at MedOptions?

A. Do you have any paperwork from

MedOptions?

MR. PEIKES: You just have to answer her question based on what you know.

A. No.

Q. How did you first learn of a position opening at MedOptions?

A. I received a postcard in my mailbox in the Cumberland Post Office. After Mr. Partridge had mentioned that Grand View was going to go with MedOptions, I received a postcard telling me that there were openings in MedOptions in Rhode Island.

Q. And at which post office in Cumberland was this post office box?

A. It's the only Cumberland post office, it's the only one I'm aware of, P.O. Box 7304, Cumberland Rhode Island, 02864.

Q. And was this post office box held in your name?

A. Yes.

Q. And what were your reasons for opening a post office box?

A. Because of my divorce.

Q. What about your divorce caused you to open up a post office box?

A. Because I preferred that my former husband not know where I lived.

Q. On what date did you receive that postcard?

A. I don't recall.

Q. On what date did you apply for a position?

A. I don't know that either.

Q. And what did your application -- did you submit any materials to MedOptions by way of application?

A. The MedOptions, Laurel Wood was the manager and Melissa Ferdinande met me for coffee at Panera Bread, and gave me some information about the company.

Q. Panera, and where was this located?

A. Greenville, Rhode Island.

Q. On what date did this meeting take place?

A. I know it was a Thursday because I was in Greenville, but I can't tell you what date.

Q. Do you know where you had been on that date?

A. I had been at the Hebert Nursing Home. I'm sorry. That can't be right. I'm not sure

where I was.
Q. Where did you go after the interview?
A. I don't recall.
Q. About what time of day did you go, were you at this interview?
A. Lunchtime.
Q. Did you have lunch?
A. No. I had something to drink.
Q. Now what did you discuss during that meeting at Panera?
A. That there were openings in Rhode Island. That another woman who had previously worked for GeriCare was now working with MedOptions.
Q. And what was that woman's name?
A. Ann Rameika.
Q. And what else did you discuss at that interview?
A. That -- their ability to provide health care, health insurance. That they would be able to provide health insurance with as little as three days a week of work.
Q. Was there anything else discussed at that meeting?
A. Not that I can specifically recall.

Q. Did they discuss the company itself?
A. That Lucia Catalano, they talked a little about Lucia, the founder of the company.
Q. What did they tell you about Lucia?
A. That she's from Connecticut, and that she wanted to help nurses to get what they needed, and so she decided to make a nurse run company that would give the nurses flexibility around their hours, and health insurance benefits.
Q. Did they indicate specifically what openings were available in Rhode Island?
A. They mentioned Grand View.
Q. Now did this meeting take place before or after you had submitted your letter of April 9th?
A. After.
Q. Did they discuss any other openings besides Grand View?
A. That there was work in the northern corner. They talked about Oakland Grove Health Care Center in Woonsocket, because Melissa Ferdinande, the nursing supervisor with MedOptions, was commuting from Jamestown, Rhode Island, or someplace down south, all the way up

to Woonsocket.

And so they were very happy to think that someone could be in the north.

Q. Now the postcard, did you receive that before or after you got the letter from I believe it was Precious Blood?

A. After. While I was thinking about going to the Sisters of the Precious Blood, I interviewed with the Community Health Network, which is a temping home care agency in Massachusetts.

Q. I'm sorry, what was the name again?

A. Community Health Network.

Q. All right.

A. When I thought that I was going to the Sisters of the Precious Blood, I thought I didn't need to work very long, and so I thought I would take a temporary position doing home care.

After they said we don't recommend that you apply, the amount of work involved in learning the community health, in which I hadn't practiced since 1999, there were a lot of changes. So I didn't continue my application with the Community Health Network. I did interview there. Because I thought that that

the paperwork, this letter, you know, informing about my resignation to Dr. Stewart, and I hadn't heard from him. For the ten days. But I believe Christine had told me that Dr. Stewart would call me.

Q. And was there any other discussion after that about your leaving?

A. No. I was very surprised. I expected they might say "What can we do to keep you," or you know, "Do you want -- we'll give you health insurance now," or "what do you need?" I didn't have any other discussion about that.

Q. Okay. You had said that after you got the letter from Precious Blood, you interviewed with Community Health Services.

A. Community Health Network.

Q. In Massachusetts.

A. In Massachusetts.

Q. Did you apply to any place else?

A. No. But Elaine DelSesto, who was the nurse manager at The Holiday, indicated that she would recommend me to the Community Health Network.

So I requested her to give me a reference there, because when she was asking me

"what are you going to do," I said "I don't know. I want to be a Sister. I want to work for God. And I just have the find the right place."

And then she said she would recommend me there. I think I'll have to work, if I can't go to Precious Blood I'll have to work some because I have to support myself while I figure this out I said. So Elaine had planned to recommend me there. When I told them that I was going to be finishing at The Holiday.

Q. Now between the time of June 1st, 2006, to June 1st, 2005, had you applied anywhere else?

A. No.

Q. Now you had the meeting at Panera?

A. Yes.

Q. What happened after that?

A. MedOptions met with me at Panera. Offered me a position.

Q. Did you submit an application? Had you submitted an application to MedOptions?

A. I don't recall.

Q. Did you submit a resume' to MedOptions?

A. I don't recall that either.

Q. Did you fill out a form provided by MedOptions?

And the Prudence Crandall Center for Domestic Violence was leasing a building that belonged to the Daughters of Mary. And that building is under construction on the property of the Daughters of Mary right now.

So this seemed a very providential thing, that Lucia Catalano had come up at both places.

Q. Okay. And you reported for orientation at Woonsocket. Do you recall the day of orientation?

A. I don't.

Q. And besides the billing codes, what did orientation consist of?

A. We saw patients together, myself and another Nurse Practitioner, Melissa. And we discussed them. We talked about -- I also was able to meet staff and find out who were the contact people in that facility.

Q. And then what were your -- after orientation -- Withdrawn. How long did orientation last?

A. I don't recall. The company had productivity expectations for me, which were -- that was how I would earn my health insurance.

And so the plan for me to be able to get to that point was flexible, within a range. But I don't know the date at which they expected me to be able to -- I can't recall the date.

Q. How long did the meeting at Oakland Grove last?

A. I spent the day there.

Q. And then when was the next time, did you have a further orientation?

A. I had several days of orientation with Melissa Ferdinande.

Q. What was the next day of orientation?

A. I don't recall that too, but we continued at Oakland Grove because they were, they needed help. There was another facility that I was sent to called Bayberry Commons that was contracted with MedOptions. I was sent there and I got some orientation there, with Melissa also.

Q. How many employees does MedOptions have?

A. I don't know.

Q. And what kind of services does MedOptions provide?

A. MedOptions provides mental health care.

Q. Did they provide any other types of care?

A. Not that I'm aware of.

Q. And they sent you to Oakland Grove and to Bayberry Commons.

A. Yes.

Q. And how did you get paid?

A. I got paid by submitting my paperwork, faxing a list of who was seen, and the codes.

Q. All right.

A. I was paid as an employee with orientation time, which was office time, and I was also provided with health insurance right away. I did not have to do any of my own estimated taxes. I had withholding done from my pay.

Q. And did you receive a percentage of the revenue coming in from the patients?

A. No. The productivity units, my goal was 15 productivity units.

Q. What was a productivity unit?

A. It was based on the billing code, and each billing code had a numeric value, and the total of the numeric value for my week was the -- the goal was 15.

Q. So a billing code would translate into a numerical value, which would be added up to reach, to make a productivity unit?

A. Yes.

Q. Okay. Who assigned the codes? If you saw a particular patient, how would it be determined what code would be used?

A. The codes had Medicare requirements for what was the skilled level of care expected for each of the codes. So Medicare did that.

Q. You, yourself, did not say this code would apply to this service, that you just provided?

A. Oh, yes, I did. That's -- you're -- I misunderstood the question I think.

When I saw the patient, I looked at what the patient's needs were and I found the code from the list that the company provided, that matched what I did.

Q. And where else besides Oakland and Bayberry did you provide services on behalf of MedOptions?

A. Eventually I provided services with -- at The Holiday Nursing Home, the Heritage Hills Nursing Home, the Hebert Nursing Home, Grand

View, and Balou. I had two other homes that were called the Hospice St. Antoine and Mount St. Rita Health Care.

Q. When did you provide services to The Holiday Nursing Home on behalf of MedOptions?

A. I don't recall the date.

Q. When did you begin to provide service for Heritage on behalf of MedOptions?

A. It was a month after I began with MedOptions.

Q. At what time did you begin providing services at Hebert on behalf of MedOptions?

A. It was in the fall. Maybe it wasn't. I don't recall. I must say I don't recall.

Q. When did you begin providing services at Grand View on behalf of MedOptions?

A. I don't recall.

Q. When did you begin providing services to Balou on behalf of MedOptions?

A. I don't recall.

Q. When you were working for MedOptions, did you provide staff training to the nursing homes?

A. No. Not classes. I -- you know, I could qualify that because I was always teaching

the staff how to care for the patients, but not education classes.
Q. Did MedOptions provide staff training to the nursing homes, formal classes, in services?
A. I don't know.
Q. What was your title at MedOptions?
A. Nurse Practitioner.
Q. And what services did you provide?
A. Mental health services.
Q. What did those mental health services consist of?
A. Evaluation and treatment.
Q. Were they the same type of services that you provided at GeriCare?
A. Similar. With different billing codes. Similar.
Q. You say that they were similar. You provided similar services on behalf of MedOptions as you did at GeriCare. How were they different?
A. The billing codes were different. The -- really that's what's different. The billing codes are different.
Q. When you worked for Holiday, Heritage, Hebert or Grand View, did you see any of the

patients that you had formerly seen for GeriCare?
A. Yes.
Q. How many?
A. I don't know.
Q. When you saw a patient for MedOptions that you had formerly seen at GeriCare, did you treat that as an initial visit?
A. Some of the patients needed to have an initial evaluation. Some were already involved with MedOptions, and some were not.
Q. If you had been treating them at GeriCare, why would they need another initial evaluation?
A. Well, the treatment, the companies were different, so the patients had to be admitted and registered for MedOptions. The initiation of the treatment plan with this company involved signing them up with the recommending -- registering them, and admitting them to the other agency.
Q. And how was it determined which nursing homes you would be providing services?
A. MedOptions assigned work to me.
Q. Did MedOptions provide you with any professional development?
A. Yes.

Q. What did that professional development consist of?

A. Orientation to their computer. Class with Dr. Rosenzweig. A pharmacy representative meeting similar to what had happened with GeriCare.

Q. Did MedOptions provide you with any forms for evaluation or billing?

A. Yes.

Q. Did you utilize any forms from GeriCare while you worked for MedOptions?

A. No.

Q. Did MedOptions, to the best of your knowledge, provide forensic services for the nursing homes?

A. Not that I know of.

Q. Did MedOptions provide counseling for dementia patients?

A. Yes. Counseling is a service available by social work.

Q. And the counseling services were provided to dementia patients?

A. I'm not certain. There was counseling available.

Q. Were you supervised by a physician

with MedOptions, defendant provided services to Grand View Center, Cumberland, The Holiday Lincoln, Rhode Island, Heritage Hills Nursing Center, Smithfield, Balou home and Woonsocket, Rhode Island. Defendant does not possess further information responsive to this interrogatory." Are those all of the nursing homes which you provided services while you worked for MedOptions?

A. No.

Q. Which others were the --

A. Oakland Grove, and Bayberry Commons. And that's what I can remember.

Q. If I can flip you back to Exhibit 7.

A. Exhibit 7, which -- okay.

Q. Page 2.

A. Yes.

Q. Last sentence, of the paragraph marked "Response."

A. "Subject to and without waiving these objections, during the course of her Association with MedOptions, Sullivan provided services to Grand View Center, Cumberland, The Holiday Lincoln, Rhode Island, Heritage Hills, Smithfield,sales, Balou Home in Woonsocket, and

Morgan Center." That is not true. Morgan Health Care Center, I did not service as part of MedOptions. Hebert Nursing Home, Pine Grove Health Care Center. That is not true either.

And I asked that they be struck from the document. So that is true except for Morgan Health Care Center and Pine Grove Health Care Center.

Q. Okay. And Exhibit 7, page 3. Could you read the first sentence of the last paragraph.

A. "Ms. Sullivan was thereafter interviewed by Mary Ann Wright."

Q. The first sentence.

A. I'm sorry, could you please give me guidance again?

Q. Just read the entire paragraph, labeled "Response." The last paragraph.

A. "On or about May 1, 2006, Ms. Sullivan contacted MedOptions in response to a newspaper or web based classified ad. Ms. Sullivan was thereafter interviewed by Mary Ann Wright, MedOptions Director of Recruiting and completed the interviewing process, culminating in an offer of employment. MedOptions has no record of any

interviewed by Melissa Ferdinande, and may I ask the other person's name?

A. Laurel Wood.

Q. Laurel Wood. What's Laurel Wood's title?

A. Oh, gee, she's a vice-president, but I couldn't tell you exactly.

Q. And Melissa Ferdinande?

A. Nursing supervisor.

Q. When did you leave the employ of MedOptions?

A. Mid-June, this year.

Q. And if I may direct your attention to interrogatory 9. On page 7.

MR. PEIKES: Which set is this?

Q. Exhibit 7, I'm sorry. Could you read that for me.

A. I have the wrong one.

Q. 7.

A. "Please indicate whether Defendant, Sullivan, is still providing services on behalf of Defendant, MedOptions, and if not, please provide the date on which Defendant, Sullivan, ceased to provide services on behalf of Defendant, MedOptions. The reasons why

Defendant, Sullivan ceased to provide services on behalf of Defendant, MedOptions, the date, time and place of any communications to any facilities and/or patients regarding the cessation of services, and/or any arrangements made to provide replacement services and the name, title, address and telephone number of any persons having custody of any record of said communications. Response. Ms. Sullivan resigned from MedOptions effective June 15, 2006, at Ms. Sullivan's request, responsibility for servicing the facilities in question were transferred to other practitioners in late December, 2006."

Q. Is that a true statement?

A. No.

Q. Why is it not true?

A. It's true that the -- at my request, the servicing of the facilities was transferred in January, 2007.

Q. And when did you make that request?

A. I requested to transfer my position from Rhode Island to Connecticut in November of 2006.

Q. And why did you make that request?

A. Because I was accepted into the Sisters

of the Daughters of Mary October 7th.

Q. October 7th.

A. October 7th, I was accepted to the Daughters of Mary. And then I made plans to move to Connecticut.

Q. What nursing homes were you servicing at the time that you ceased -- I'm sorry. For what period of time did you provide services on behalf of MedOptions at Balou?

A. Oh, I don't know my start time. And I finished in January of 2007.

Q. Did you finish working for Grand View on behalf of MedOptions at the same time?

A. Yes.

Q. Hebert, did you finish working for Hebert on behalf of MedOptions at the same time?

A. Yes.

Q. Did you finish working at Heritage Hills on behalf of MedOptions at the same time?

A. Same week.

Q. Did you finish working for Holiday at the same time?

A. Yes.

Q. Did you finish working for Morgan on behalf of MedOptions at the same time as you

ceased working --

A. No. No, I did not. I did not work at Morgan on behalf of MedOptions.

Q. Did you work for East Gate on behalf of MedOptions?

A. No.

Q. Did you work for Pine Grove on behalf of MedOptions?

A. No.

Q. Did you work for Haven Health on behalf of MedOptions?

A. No.

Q. Did you work for Grand Island on behalf of MedOptions?

A. No.

Q. Why did you leave MedOptions?

A. I transferred from Rhode Island to Connecticut, in order to go to the Sisters. And I left MedOptions entirely in June of 2007, in order to be a Sister.

Q. Were you ever dissatisfied with your employment at MedOptions?

A. No.

MS. BEJMA: Give me one minute.

(Pause in the Proceedings)