# EXHIBIT F

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

HUMAN SERVICES CONSULTANTS, LTD
d/b/a GERICARE; RONALD MARK STEWART, M.D.

vs. C.A. No. 06-486

ANN TAMULE a/k/a ANN M. SULLIVAN
alias, and MEDOPTIONS, INC.

DEPOSITION OF RONALD M. STEWART, M.D., a Plaintiff in the above-entitled case, taken on behalf of the Defendants, before Linda L. Guglielmo, RPR-RMR, a Notary Public in and for the State of Rhode Island, at the offices of Stephen M. Robinson, Esquire, 155 South Main Street, Providence, Rhode Island on February 6, 2008 at 2:00 P.M.

APPEARANCES:

FOR THE PLAINTIFFS....LAW OFFICE OF STEPHEN M. ROBINSON
BY: VICKI BEJMA, ESQUIRE
155 SOUTH MAIN STREET
PROVIDENCE, RI 02903

FOR THE DEFENDANTS....WIGGIN AND DANA
BY: LAWRENCE PEIKES, ESQUIRE
400 ATLANTIC STREET
STAMFORD, CT 06911

ALLIED COURT REPORTERS, INC.
115 PHENIX AVENUE
CRANSTON, RHODE ISLAND 02920
401/946-5500

on the part of Ed Sullivan and MedOptions, and that's why the lawsuit was brought.

I thought we were badly treated. We were treated unfairly by Ann Sullivan-Tamule or Ann Tamule-Sullivan and MedOptions. Otherwise, I wouldn't have gotten involved in this whole complicated process of litigation. I'm 66 years old, and I'm very savvy about legal processes, as much as a layman can be, I guess, and, you know, I'm not likely to -- I don't go around suing people. It's not a good thing to do. It's complicated, and it's difficult, and it's a pain in the neck. So if I didn't feel very, very wronged by this whole thing, I wouldn't have pursued it.

Q. I appreciate your explanation, but just try to confine yourself to my questions if you can.

A. Thank you.

Q. What sort of confidential information would Ann Rameaka have been provided by GeriCare? You indicated the noncompete, at least the spirit of it was defined to protect confidential information; did I get that right?

A. Yes.

Q. What kind of confidential information would any

nurse practitioner be provided from GeriCare?
A. All of them would have had our manual or our training information and our forms, our patient evaluation forms, our case opening forms, our contacts with, whoever the contact people were at the facility, administrator, the director of nursing, nursing supervisors.
Q. You mean just knowledge of who those people are?
A. And their actual names and telephone numbers.
Q. Why couldn't somebody find that out by calling the home or looking it up in the phone book?
A. Because they had relationships with these people. They would talk to them. They would make friends with them.
Q. But what's confidential about the identity of the contact people at a nursing home?
A. I think our forms are confidential in that they're only used inpatient assessment. They have confidentiality and also they're proprietary information. They're our forms, we designed those forms.
Q. Do you have any reason to believe that Ann Sullivan took any copies of GeriCare's forms?
A. I don't know. She may have. She very well may have, just by the fact she's going back into

our nursing homes within a very short period of time she has access to those patient's forms that we had produced with her.

Q. Those patients forms -- you said when Ann Sullivan went back into the nursing homes on behalf of MedOptions, she had been servicing for GeriCare, she then had access to GeriCare's forms, right?

A. Yes, and my forms.

Q. And those forms were provided to her by the nursing home, right?

A. Correct. But if she hadn't gone back in there, MedOptions wouldn't have had those forms.

Q. What makes you think MedOptions took those forms?

A. She's a MedOptions employee. If she has access to them, MedOptions has access to them.

Q. Wouldn't any service provider need access to those forms if they're going to see residents of the nursing home?

A. Not without -- not without -- not knowing the significance of these forms as Ann did and not being privileged to the training she's done for us, she was a trainer for us and virtually all of our nursing homes. When a nurse practitioner would leave a nursing home, she would go to that nursing home, virtually any nursing home in the

state that we had, and she would bring a new hire in there and orient that hire, she really had a lot more than just like Ann Rameaka, let's say. Comparing her and Ann Rameaka is comparing apples and oranges.

Q. Let me just ask you about the GeriCare forms. When a nurse practitioner goes in to a facility as a representative of GeriCare, she uses the GeriCare forms, right?

A. Yes.

Q. Okay. And then those GeriCare forms are put in the patient's file, right?

A. Correct.

Q. And the reason they're put in the file is so there is a record of whatever treatment or evaluation has been made, right?

A. For continuity of care.

Q. And so if the nursing home for whatever reason discontinues its relationship with GeriCare, and goes to another provider, whether it's MedOptions or somebody else, you would expect that that subsequent provider would have access to the GeriCare forms?

A. Yes.

Q. Okay. Now you said that Ms. Sullivan also was

Exhibit 9?
A. I have reason to believe that page 0002 has been extracted, and there may have been more information on that that I don't have, and I feel that that document has been tampered with.
Q. Why do you believe it's been tampered with?
A. Because 002 isn't there. 001 is there, 003, 4, 5, 6, 7 and 8 are there. All of them except 2, so it has to be someplace. It was either -- it's been taken away or it's been -- something has happened to it. These documents don't disappear. It strains credibility to think we have 001, we've got 003 through 8 and there is no 002. Where is that page?
Q. What do you think is on Page 002?
A. God knows. God knows. Who knows? What other information she might have been on there. I don't know, but I'd like to see it.
Q. Would there be anything inappropriate about a nurse practitioner who is going to rely on an administrator at a nursing home or director of nursing at a nursing home as a reference to let that person know in advance they were going to be contacted by a prospective employer?
A. Hypothetically, no.

Q. Did you ever provide contact information for a nursing home that you provided services to for another nursing home to contact in checking out about you and the services you provide?

A. When other nursing homes have expressed interest in hiring on with us, coming on with us, they have asked us what other nursing homes we do business with and we have told them the names of the nursing homes. All these nursing homes in Rhode Island, it's a small state, there is only 60 or 70 nursing homes in the states, so they all know each other. So through the Health Council and everything like that, one administrator knows the other, we just said -- let's say nursing home ABC calls up and says could you come and take us, providers aren't showing up or whatever and who else do you guys work with. I said, well, we work with XYZ, JQS and a couple other nursing homes in our area. They say, I know so-and-so, I'll call them up. Fine. That's how it goes.

As a matter of fact, last month, Grand View called us up and told us that MedOptions wasn't showing up, they weren't servicing the place, and they wanted us back. So we went back. I mean, so it's -- this is the kind of thing that happens in

management billing services for their processing. I feel every two week and biweekly is probably the same thing.

Q. Was there any change made to the compensation --

A. Here's what happens, I'm sorry to do this, I'm anticipating what you're asking. On the third-year anniversary of hire, contractors will be given an increase to 55 percent of said receipts, and that's C. That's what -- now I recollect that she was with us three years and she was given a 5 percent bonus or something along those lines, which also is an administrative decision Christine made. I don't have much to do with that stuff.

Q. Is it your understanding that her compensation arrangement was improved when Exhibit B was entered into?

A. It appears so, by 5 percent.

(RECESS)

(DEFENDANTS' EXHIBITS C THROUGH F MARKED FOR IDENTIFICATION)

Q. Dr. Stewart, how, if at all, does GeriCare market its services?

A. Mostly word of mouth.

Q. Did Ann Sullivan when she was employed or worked

companies or anything else. If she said anything like that, I would have said, gee whiz, what can we do to keep you.

Q. When Ann told you about going to settling her parents down and entering the religious life, is that in the conversation you had with her about her resignation?

A. That's when I called her up to wish her well.

Q. When did Ann actually stop working for GeriCare?

A. I don't know. Christine has all that stuff. I don't know, some time, whenever, in June or May or whatever. I don't really know for sure.

Q. Between the time that you had the conversation with Ann on the subject of her resignation and to wish her well and the time she actually stopped working for GeriCare, did you speak to her at all?

A. No, I don't believe. No, the next time I saw her, I didn't speak to her, was at the deposition.

Q. After you received Ann's resignation letter, what, if anything, did you do to try and backfill her spot, in other words, to try and hire somebody?

A. We had a nurse who worked with us, Sharon Borges, who was going to go in there to Heritage Hills, and Christine was advertising and polling our various nurse practitioners if they could take

another home and whatever.

Q. What else, if anything, did you do to find somebody to replace Ann?

A. She was doing -- Christine was doing that stuff. I wasn't doing -- I'm not the one who does that stuff. That's her job, not mine. I'm supposed to see the patients and do my practice in my office, forensic stuff.

Q. Did you offer any of the homes other than Heritage Hills a replacement for Ann?

A. Christine would have done that. I wouldn't do it.

Q. Take a look at Exhibit D, that's an E-mail exchange with Sharon Borges and Christine?

A. Yes.

Q. The E-mail address here that says psychlawmd@aol.com, whose address that?

A. That's me. Where is that -- where did you see that?

Q. On Exhibit D on the first page towards the middle. E-mail sent Sunday, April 16th?

A. That's a copy to me. That's cc to me. That's what that it, it was sent to Christine and copied to me and Christine cc'd me to keep me in the loop.

Q. And according to this E-mail, Christine offered Sharon Borges a number of Ann's homes, including Ballou, Grand View, Heritage Hills, The Holiday and Morgan as well as East Gate, right?
A. Yes.
Q. And the only one that Sharon Borges was interested in was Heritage Hills, right?
A. Yes.
Q. The others were too far away from her?
A. Apparently so.
Q. Is that how you assigned them to facilities, based on proximity to their residence?
A. As was testified to by the executive from MedOptions, we try to keep people as close to their homes as possible. You know, it makes it a lot easier for them and the home and everybody else. But then again, the assignments and who goes where and moving the pieces on the chess board is very much Christine's deal, not mine. Sorry, I don't mean to not answer your question.
Q. I'm only asking about what you know. Did you ever speak to somebody at Heritage Hills about the possibility of Sharon Borges taking over for Ann?
A. I believe I may have talked to Barbara Langshaw about it. I just clearly don't recall

right now.

Q. Do you know whether Christine spoke to Heritage Hills about Sharon taking over?

A. I guess she may have. I don't know for sure. I can't remember for sure one way or the other.

Q. Did Sharon Borges ever take over for Ann at Heritage Hills?

A. I think that Heritage Hills cancelled our contract because they were already hooked up with MedOptions and Ann Sullivan before Sharon could go in there.

Q. Do you know whether Heritage Hills rejected Sharon as a replacement for Ann?

A. I don't know for sure. I don't know for sure how that all went down.

Q. Okay. If you look at the top E-mail from Sharon to Christine, the first sentence says, "If Heritage Hills is open to me going in once a week after 4:00 P.M. and seeing eight to ten patients weekly, they are my choice to replace Grand Islander." Do you recall those restrictions as outlined in the first sentence of this E-mail on Exhibit D were not acceptable to Heritage Hills?

A. I imagine they weren't, or they would have taken Sharon. Unless, of course -- see, they

always would have taken Ann over Sharon because they knew Ann. You know, I really wasn't involved in this, all this stuff here, except for them sending me a cc of this and knowing Ann was leaving and Christine was trying to get somebody to go into the homes.

Q. If you look at Exhibit F, skip Exhibit E for a minute, an E-mail between Christine and Sharon. The first E-mail --

A. I got it.

Q. The first E-mail in this exchange is actually the lower half of the page, dated June 12th of 2006.

A. I found it.

Q. In the first sentence Christine writes to Sharon, "Yes, Heritage Hills cancelled our contract because they want someone during the day, (now they tell us)"?

A. Right.

Q. So the hours that Sharon was willing to visit Heritage Hills were not during the day, right? They were after 4:00 P.M.?

A. I guess so, yes.

Q. Looking at Exhibit F, does that help refresh your recollection as to why Heritage Hills elected not to go with Sharon?

A. Well, Sharon had said that in her other E-mail here, that she could only go in after 4:00 and see eight to ten patients.
Q. That was not acceptable to Heritage Hills, right?
A. Yes, sir.
Q. If you go back now to Exhibit E, this is a letter to Grand View dated April 20, 2006, that's signed by you and Christine?
A. Yes.
Q. Yes?
A. Yes, sir.
Q. Okay. Whose handwriting is it at the top that says sent to each of her six homes?
A. I don't know. It doesn't look like handwriting. It's printing. You know, I'll tell you something, it's not mine.
Q. Do you know what homes this same letter was sent to, other than Grand View?
A. Whatever -- it might be Christine's, but I'm not sure, though, because I don't -- I can't recognize the printing or not. Let me see something. Hold on a second. I can't say for sure it's Christine's, but it might be. I don't know exactly which homes. I imagine if it's her six homes, it must have been Heritage Hills and

Q. Since Ann left, have you hired any new nurse practitioners?
A. Yes.
Q. Who?
A. Lynn somebody or other from Attleboro, Massachusetts. She's from Attleboro and she work at Kindred Heights.
Q. And is she still with you?
A. No. She's gone to be a hospital-based nurse practitioner.
Q. How long was she with GeriCare?
A. Six months, a year, I don't know, something like that.
Q. Then the next sentence, "Therefore, regretfully in fairness to you, GeriCare must terminate our contract with your facility as of June 1, 2006." Right?
A. Right.
Q. Was that one of the purposes of this letter, to give the homes advance notice that as of June 1, 2006 GeriCare would no longer be providing services?
A. Yes, and an opportunity to find services.
Q. Under the agreements you had with these facilities, GeriCare had the right to terminate

the contract on 30-days' notice; is that right?
A. The nursing homes, yes, we did.
Q. You were fulfilling that requirement with regard to these letters, right?
A. Yes, sir.
Q. So the six homes that this letter was sent to, Exhibit E, all of those contracts were terminated by GeriCare effective June 1, 2006, right?
A. Except for Heritage Hills, they didn't get a letter.
Q. Whoever this letter was sent to, those contracts were terminated on June 1, 2006, right?
A. To the best of my knowledge, yes.
Q. And one of the reasons that you gave these homes more than 30-days' notice was because you wanted to give them the best opportunity to find an alternative provider?
A. Yes.
Q. You understood once your agreement with these homes terminated, they would be looking for somebody to replace GeriCare, right?
A. Yes.
Q. And who else provided such services in Rhode Island other than yourself and MedOptions?
A. There's Dr. Cass's group and Dr.