# EXHIBIT M

MEDOPTIONS Inc. P.O. BOX 825 • AVON, CT 06001 • 1-800-370-3651 • FAX: 860-679-7744

## SERVICE AGREEMENT

This document is to serve as a Service Agreement between the Holiday Retirement Home, Inc. (hereinafter the Facility) and **MedOptions, Inc.** (hereinafter the Agency) concerning the provision of Mental Health Services.

This Agreement made effective as of June 1, 2006.

WHEREAS, the Agency and the Facility desire to enter into an Agreement whereby the Agency will provide the Facility with mental health professionals to provide behavioral health services to residents of the Facility.

NOW, therefore, in consideration of the mutual agreements hereinafter expressed the parties agree as follows:

The Agency agrees to do the following:

(1) Provide psychiatric evaluations at the request of the attending physician for the purpose of assessing the specific need of residents with psychiatric symptomatology and recommending therapeutic interventions.

(2) Perform psychopharmacological consults and monitoring; and psychotherapeutic services.

(3) Provide 24 hours a day, seven days per week "on-call" telephone consultation.

(4) To provide services to all residents referred by the Facility medical staff as long as the resident meets eligibility criteria, which consist of medical necessity and the ability to cover the cost of services, either directly or through third party payers.

(5) Act as a liaison for emergency situations in the event of a psychiatric crisis (i.e., referral to psychiatric in-patient facilities).

(6) Meet with medical and professional personnel of the Facility to assist in treatment planning and behavioral management.

(7) Assume responsibility for billing third party insurance or other sources through the Agency's business office.

(8) Provide the Facility with documentation on all services rendered to facilities residents.

(9) Negotiate with the case manager of identified managed care companies that the Agency does not have a contract with in an effort to serve their members or work directly with Facility staff regarding managed care residents.

(10) Provide proof of Worker's Compensation and Professional Liability Insurance for all clinicians.

PETITIONER'S EXHIBIT Wood 10 1/10/08

The Facility agrees to do the following:

(1) Assure that all referrals to Agency have been ordered by a physician member of the Facility's medical staff.

(2) Provide space at the Facility for the provision of clinical services that shall insure the resident's privacy and confidentiality.

(3) Provide information regarding insurance and responsible party for residents for proper billing.

(4) Assume responsibility for maintenance of confidentiality of records.

(5) Assign Facility staff to work with Agency staff to coordinate the resident's care.

(6) Pay MedOptions the Medicare allowable rate (our rate) for visits to residents who do not have a source of payment as verified by the Agency's billing department. The Facility will be given the opportunity to authorize the visit and accept responsibility for payment prior to our visit to the resident.

MedOptions is a covered entity under the Health Insurance Portability and Accountability Act of 1996 (HIPPA) and therefore is in compliance with these regulations. Protected Health Information (PHI) is utilized in strict accordance with HIPPA regulations.

AGENCY and Facility shall indemnify and hold harmless the other party from and against any and all liabilities, claims, expenses, damages, losses, judgments and costs, including reasonable attorney's fees and disbursements caused by the negligent acts or omissions of each party's own employees or agents arising out of the performance of this Agreement.

If it is felt by either party that the terms of this agreement are not being satisfied, each party shall have 30 days to rectify the situation. The 30 days shall commence upon receipt of written documentation of the problem. If the problem is not rectified, the contract shall be cancelled 60 days from the receipt of the original complaint.

The term of this Agreement shall commence on 6-1-06 and shall continue in full force and effect until terminated by either party. Either party shall be able to cancel this contract for any reason upon 60 days written notice.

[signature] 5-25-06

Administrator Date

[signature] 5-31-06

Medoptions, Inc. Date

MedOptions

# CONSULTANT AGREEMENT

This document is to serve as a Service Agreement between Pine Grove Health Center (hereinafter the Facility) and MedOptions, Inc. (hereinafter the Consultant) concerning the provision of Mental Health Services.

This Agreement made effective as of March 12, 2007.

WHEREAS, the Consultant and the Facility desire to enter into an Agreement whereby the Consultant will provide the Facility with mental health professionals to provide behavioral health services to residents of the Facility.

NOW, therefore, in consideration of the mutual agreements hereinafter expressed the parties agree as follows:

The Consultant agrees to do the following:

(1) Provide psychiatric evaluations at the request of the attending physician for the purpose of assessing the specific need of residents with psychiatric symptomatology and recommending therapeutic interventions.

(2) Perform psychopharmacological consults and monitoring; and psychotherapeutic services.

(3) Provide 24 hours a day, seven days per week "on-call" telephone consultation.

(4) To provide services to all residents referred by the Facility medical staff as long as the resident meets eligibility criteria, which consist of medical necessity and the ability to cover the cost of services, either directly or through third party payers.

(5) Act as a liaison for emergency situations in the event of a psychiatric crisis (i.e., referral to psychiatric in-patient facilities).

(6) Four (4) meetings per year, which the Facility determines with MedOptions. These meetings may include:
a) in-services;
b) attendance at staff meetings, family meetings, or clinical case conferences;
c) attendance at meetings to prepare for state surveys; and
d) educational sessions for families of residents.

(7) Assume responsibility for billing third party insurance or other sources through the Consultant's business office.

(8) Provide the Facility with documentation on all services rendered to facilities residents.

(9) Negotiate with the case manager of identified managed care companies that the Consultant does not have a contract with in an effort to serve their members or work directly with Facility staff regarding managed care residents.

(10) Provide proof of Worker's Compensation and Professional Liability Insurance for all clinicians.

The Facility agrees to do the following:

(1) Assure that all referrals to Consultant have been ordered by a physician member of the Facility's medical staff.

(2) Provide space at the Facility for the provision of clinical services that shall insure the resident's privacy and confidentiality.

(3) Provide information regarding insurance and responsible party for residents for proper billing.

(4) Assume responsibility for maintenance of confidentiality of records.

(5) Assign Facility staff to work with Consultant staff to coordinate the resident's care.

(6) Pay MedOptions the Medicare allowable rate (our rate) for visits to residents who do not have a source of payment as verified by the Consultant's billing department. The Facility will be given the opportunity to authorize the visit and accept responsibility for payment prior to our visit to the resident.

MedOptions is a covered entity under the Health Insurance Portability and Accountability Act of 1996 (HIPPA) and therefore is in compliance with these regulations. Protected Health Information (PHI) is utilized in strict accordance with HIPPA regulations.

CONSULTANT and Facility shall indemnify and hold harmless the other party from and against any and all liabilities, claims, expenses, damages, losses, judgments and costs, including reasonable attorney's fees and disbursements caused by the negligent acts or omissions of each party's own employees or agents arising out of the performance of this Agreement.

In exchange for Consultant's provision of the Services, Facility agrees to compensate Consultant at a monthly rate of $300. Payment shall be made monthly, in arrears and shall be due upon receipt of invoice therefore. In the event that additional services are requested in writing or otherwise by the Facility, the Consultant shall consider whether to provide such services, and if such services shall be provided, payment therefore shall be made upon receipt of invoice at the Consultant's usual and customary rates for such additional services.

If it is felt by either party that the terms of this agreement are not being satisfied, each party shall have 30 days to rectify the situation. The 30 days shall commence upon receipt of written documentation of the problem. If the problem is not rectified, the contract shall be cancelled 60 days from the receipt of the original complaint.

The term of this Agreement shall commence on March 12,2007 and shall continue in full force and effect until terminated by either party. Either party shall be able to cancel this contract for any reason upon 60 days written notice.

Linda Wheeler
Linda Wheeler, Administrator

3/1/07
Date

Melissa Ferdinandi for Andrew Rosenzweig
Andrew S. Rosenszweig, MD, MPH, Medical Director
MedOptions, Inc.

3/1/07
Date

MedOptions™
20 Research Parkway
Old Saybrook, CT 06475
T: 800.370.3651 F: 860.510.0020

# CONSULTANT AGREEMENT

This document is to serve as a Service Agreement between Morgan Health Center (hereinafter the Facility) and MedOptions, Inc. (hereinafter the Consultant) concerning the provision of Mental Health Services.

This Agreement made effective as of July 1, 2007.

WHEREAS, the Consultant and the Facility desire to enter into an Agreement whereby the Consultant will provide the Facility with mental health professionals to provide behavioral health services to residents of the Facility.

NOW, therefore, in consideration of the mutual agreements hereinafter expressed the parties agree as follows:

The Consultant agrees to do the following:

(1) Provide psychiatric evaluations at the request of the attending physician for the purpose of assessing the specific need of residents with psychiatric symptomatology and recommending therapeutic interventions.

(2) Perform psychopharmacological consults and monitoring; and psychotherapeutic services.

(3) Provide 24 hours a day, seven days per week "on-call" telephone consultation.

(4) To provide services to all residents referred by the Facility medical staff as long as the resident meets eligibility criteria, which consist of medical necessity and the ability to cover the cost of services, either directly or through third party payers.

(5) Act as a liaison for emergency situations in the event of a psychiatric crisis (i.e., referral to psychiatric in-patient facilities).

(6) Four (4) meetings per year, which the Facility determines with MedOptions. These meetings may include:
   a) in-services;
   b) attendance at staff meetings, family meetings, or clinical case conferences;
   c) attendance at meetings to prepare for state surveys; and
   d) educational sessions for families of residents.

(7) Assume responsibility for billing third party insurance or other sources through the Consultant's business office.

(8) Provide the Facility with documentation on all services rendered to facilities residents.

(9) Negotiate with the case manager of identified managed care companies that the Consultant does not have a contract with in an effort to serve their members or work directly with Facility staff regarding managed care residents.

(10) Provide proof of Worker's Compensation and Professional Liability Insurance for all clinicians.

The Facility agrees to do the following:

(1) Assure that all referrals to Consultant have been ordered by a physician member of the Facility's medical staff.

(2) Provide space at the Facility for the provision of clinical services that shall insure the resident's privacy and confidentiality.

(3) Provide information regarding insurance and responsible party for residents for proper billing.

(4) Assume responsibility for maintenance of confidentiality of records.

(5) Assign Facility staff to work with Consultant staff to coordinate the resident's care.

(6) Pay MedOptions the Medicare allowable rate (our rate) for visits to residents who do not have a source of payment as verified by the Consultant's billing department. The Facility will be given the opportunity to authorize the visit and accept responsibility for payment prior to our visit to the resident.

MedOptions is a covered entity under the Health Insurance Portability and Accountability Act of 1996 (HIPPA) and therefore is in compliance with these regulations. Protected Health Information (PHI) is utilized in strict accordance with HIPPA regulations.

CONSULTANT and Facility shall indemnify and hold harmless the other party from and against any and all liabilities, claims, expenses, damages, losses, judgments and costs, including reasonable attorney's fees and disbursements caused by the negligent acts or omissions of each party's own employees or agents arising out of the performance of this Agreement.

In exchange for Consultant's provision of the Services, Facility agrees to compensate Consultant at a monthly rate of $300 for Census 99 or under, $400 for Census 100-110 and $500 for Census 110-120. Payment shall be made monthly, in arrears and shall be due upon receipt of invoice therefore. In the event that additional services are requested in writing or otherwise by the Facility, the Consultant shall consider whether to provide such services, and if such services shall be provided, payment therefore shall be made upon receipt of invoice at the Consultant's usual and customary rates for such additional services.

If it is felt by either party that the terms of this agreement are not being satisfied, each party shall have 30 days to rectify the situation. The 30 days shall commence upon receipt of written documentation of the problem. If the problem is not rectified, the contract shall be cancelled 60 days from the receipt of the original complaint.

The term of this Agreement shall commence on July 1, 2008 and shall continue in full force and effect until terminated by either party. Either party shall be able to cancel this contract for any reason upon 60 days written notice.

Dianna Shaw

Dianna Shaw, Administrator

6/17/07

Date

Laurel Wood

Laurel Wood, Vice President of Operations
MedOptions, Inc.

6/8/2007

Date

MEDOPTIONS Inc. P.O. BOX 825 • AVON, CT 06001 • 1-800-370-3651 • FAX: 860-679-7744

# SERVICE AGREEMENT

This document is to serve as a Service Agreement between Heritage Hills Nursing Centre (hereinafter the Facility) and MedOptions, Inc. (hereinafter the Agency) concerning the provision of Mental Health Services.

This Agreement made effective as of July 1, 2006.

WHEREAS, the Agency and the Facility desire to enter into an Agreement whereby the Agency will provide the Facility with mental health professionals to provide behavioral health services to residents of the Facility.

NOW, therefore, in consideration of the mutual agreements hereinafter expressed the parties agree as follows:

The Agency agrees to do the following:

(1) Provide psychiatric evaluations at the request of the attending physician for the purpose of assessing the specific need of residents with psychiatric symptomatology and recommending therapeutic interventions.

(2) Perform psychopharmacological consults and monitoring; and psychotherapeutic services.

(3) Provide 24 hours a day, seven days per week "on-call" telephone consultation.

(4) To provide services to all residents referred by the Facility medical staff as long as the resident meets eligibility criteria, which consist of medical necessity and the ability to cover the cost of services, either directly or through third party payers.

(5) Act as a liaison for emergency situations in the event of a psychiatric crisis (i.e., referral to psychiatric in-patient facilities).

(6) Meet with medical and professional personnel of the Facility to assist in treatment planning and behavioral management.

(7) Assume responsibility for billing third party insurance or other sources through the Agency's business office.

(8) Provide the Facility with documentation on all services rendered to facilities residents.

(9) Negotiate with the case manager of identified managed care companies that the Agency does not have a contract with in an effort to serve their members or work directly with Facility staff regarding managed care residents.

(10) Provide proof of Worker's Compensation and Professional Liability Insurance for all clinicians.

The Facility agrees to do the following:

(1) Assure that all referrals to Agency have been ordered by a physician member of the Facility's medical staff.

(2) Provide space at the Facility for the provision of clinical services that shall insure the resident's privacy and confidentiality.

(3) Provide information regarding insurance and responsible party for residents for proper billing.

(4) Assume responsibility for maintenance of confidentiality of records.

(5) Assign Facility staff to work with Agency staff to coordinate the resident's care.

(6) Pay MedOptions the Medicare allowable rate (our rate) for visits to residents who do not have a source of payment as verified by the Agency's billing department. The Facility will be given the opportunity to authorize the visit and accept responsibility for payment prior to our visit to the resident.

MedOptions is a covered entity under the Health Insurance Portability and Accountability Act of 1996 (HIPPA) and therefore is in compliance with these regulations. Protected Health Information (PHI) is utilized in strict accordance with HIPPA regulations.

AGENCY and Facility shall indemnify and hold harmless the other party from and against any and all liabilities, claims, expenses, damages, losses, judgments and costs, including reasonable attorney's fees and disbursements caused by the negligent acts or omissions of each party's own employees or agents arising out of the performance of this Agreement.

If it is felt by either party that the terms of this agreement are not being satisfied, each party shall have 30 days to rectify the situation. The 30 days shall commence upon receipt of written documentation of the problem. If the problem is not rectified, the contract shall be cancelled 60 days from the receipt of the original complaint.

The term of this Agreement shall commence on July 1, 2006 and shall continue in full force and effect until terminated by either party. Either party shall be able to cancel this contract for any reason upon 60 days written notice.

Jo Sormanti (signature) — 7-27-06

Joyce Sormanti, Administrator — Date

Laurel Wood (signature) — 7-1-06

MedOptions, Inc. — Date

**EXHIBIT A**

1. 24 hours per day, 7 days per week emergency coverage via beeper or answering service.
2. Not less than monthly, and not more than twice monthly, regularly scheduled visits by licensed geriatric psychiatrist, neurologist, and/or geriatric advanced practice registered nurse (APRN) to treat residents referred for consultation and/or treatment by residents primary care physician. **Frequency of visits will be monthly or twice monthly depending on needs of Nursing Home.**
3. Assistance with and expedition of admission to an appropriate inpatient psychiatric unit when necessary.
4. Consultative services to address issues of appropriateness of potential new admissions, and issues regarding use of psychopharmacological medications.
5. **Four (4) meetings** per year, which the facility determines with Long-Term Care Psychiatry. These meetings may include:
   a) in-services;
   b) attendance at staff meetings, family meetings, or clinical case conferences;
   c) attendance at meetings to prepare for state surveys; and
   d) educational sessions for families of residents.

Services shall include psychiatric evaluation for purposes of determining competency to make medical decisions as required in connection with rendering medical care to patients as required in the normal course of medical treatment. Services shall not routinely include competency determinations in connection with evaluations of legal competency for purposes of guardianship or similar proceedings, nor shall Services routinely include completion of Decision Making Assessment Tools or provision of written or other expert court testimony.

**COMMENCEMENT DATE:** __June 1, 2006__

**TERMINATION DATE:** __May 31, 2007__

# GERIATRIC PSYCHIATRY CONSULTANT AGREEMENT

THIS AGREEMENT, (the "Agreement") dated as of the Commencement Date set forth in Exhibit A is by and between MEDOPTIONS, INC., 345 Blackstone Boulevard, 1st. Floor Weld Building, Providence, Rhode Island 02906 a Rhode Island professional corporation (hereinafter referred to as "Consultant") and HEBERT NURSING HOME, 180 Log Road, Smithfield, RI 02917 (hereinafter referred to as "Nursing Home").

*WITNESSETH*

WHEREAS, Nursing Home desires to provide its patients with the services identified on Exhibit A through a psychiatrist specializing in the care of geriatric patients;

WHEREAS, Consultant is qualified to provide such services to Nursing Home.

NOW, THEREFORE, in consideration of the mutual covenants contained herein and other consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto agree as follows:

1. **Engagement; Provision of Services**: Nursing Home hereby engages Consultant, on an independent contractor basis, to provide the services described on **Exhibit A** hereto (the "Services") in accordance with the standards of medical care applicable in the State of Rhode Island.

2. **Term**: The term of this Agreement shall be for a period of one (1) year, beginning and ending on the dates so indicate on Exhibit A unless earlier terminated in accordance with Section 6 below.

3. **Compensation**. In exchange for Consultant's provision of the Services, Nursing Home agrees to compensate Consultant at a monthly rate of **$600**. Payment shall be made monthly, in arrears and shall be due upon receipt of invoice therefore. In the event that additional services are requested in writing or otherwise by the Nursing Home, the Consultant shall consider whether to provide such services, and if such services shall be provided, payment therefore shall be made upon receipt of invoice at the Consultants usual and customary rates for such additional services. Notwithstanding any provision herein to the contrary, Consultant shall have no obligation to provide services not identified on Exhibit A.

4. **Independent Contractors**. Consultant and Nursing Home are and shall at all times be deemed to be as independent contractors. Nothing in this Agreement shall be construed to create a joint venture, partnership, association or other affiliation or like relationship between the parties. Consultant and Nursing Home shall at all times and in all circumstances be considered independent parties and, in no event, shall either be liable for the debts and obligations of the other. Neither the Nursing Home nor any employee or agent of the Nursing Home shall have any claim against Consultant for vacation pay, paid sick leave, retirement benefits, social security, workers compensation, health, disability, professional malpractice or unemployment insurance benefits or other benefits.

5. **Credentialing**. All members of Consultants staff providing Services for which a license, certificate or accreditation is required under Rhode Island law shall at all times be properly licensed, certified, or accredited in the State of Rhode Island.

6. **Termination**. Either party hereto may terminate this Agreement:

   a. a party fails, refuses to perform, or otherwise materially breaches its non-financial obligations under this Agreement, in which event the party not in breach shall provide written notice to the breaching party stating the cause for termination and the effective date of such termination, and the party in breach shall have the right within thirty (30) days of the receipt of such notice to cure the alleged breach to the reasonable satisfaction of the non-breaching party;

   b) immediately in the event the other party is excluded or suspended from participation in the Medicaid or Medicare programs or fails to maintain the insurance described in Section 7 of this Agreement;

   c) immediately upon written notice if the terminating party reasonably believes that such termination is necessary to safeguard patient health or safety or to ensure compliance by either party with federal or state licensing laws.

Notwithstanding any provision hereof to the contrary, the Consultant may terminate this agreement upon written notice upon failure by the Nursing Home to pay any amount due and payable hereunder within fifteen (15) days of the date such payment is due, and in any event the Consultant may charge Nursing Home a late fee of 5% of the amount due over such period. Either party may terminate this Agreement without cause upon thirty (30) days notice to the other party.

7. **Insurance. Insurance.** Consultant shall maintain professional liability insurance in an amount not less than $1,000,000 per occurrence and $3,000,000 in the aggregate. Nursing Home shall maintain professional liability insurance in the minimum amount of $1,000,000 per occurrence and $3,000,000 in the aggregate. Each party shall furnish the other with a certificate demonstrating the insurance coverage in this Agreement at any time upon reasonable request by the other party, and each certificate shall provide that the both parties shall have the benefit of such insurance as their interests may appear, and that no insurance shall be cancelled for lack of premium unless notice has been given to all parties not less than 30 days prior to the effective date of such cancellation. Each party shall immediately report by written notice to the other party any decrease or cancellation of the insurance coverage required to be maintained by such party under this Agreement. The parties agree that each shall assume and bear the entire risk of loss and of damage caused by its negligence of its agents, servants or employees incident to the performance of their respective duties hereunder, and that each shall fully indemnify the other therefore.

8. **Indemnification.** Each party is responsible for its own actions, inactions, and/or omissions, including those of the parties' employees, agents, servants, advisors, shareholders, invitees and officers. Consultant and Nursing Home will indemnify, defend and hold harmless the other party from any and all liability, loss, claims, lawsuits, damages, injury, cost, or expenses (including reasonable attorney's fees) arising out of, or incident to, the performance or no performance of any duty or responsibility under this Agreement by the indemnifying party or representative, agent, or employee; except to the extent such losses, claims, damages, etc. result from the negligent or willful acts or omissions of the party seeking indemnification. The parties shall indemnify and hold harmless one another, their directors, agents, servants, employees, management companies and their directors, agents, servants, employees and affiliates from and against any and all claims, demands, causes of action, losses, damages, fines, penalties, liabilities, costs and expenses, including reasonable attorney's fees and court costs sustained or incurred by or asserted against one part by reason of or arising out or the other party's negligent or willful acts or omissions or any acts beyond the scope of the authority hereunder.

9. **Access by Government to Records.** Nursing Home and Consultant agree that for a period of four (4) years following the furnishing of services hereunder, or for such longer period as may be required under any federal or state statute, regulation, or standard, the Secretary of Health and Human Services or the U.S. Comptroller General, or their designees, shall have the right to inspect and shall be provided access to the books of account and other corporate documents and records of Consultant and Nursing Home to the extent and degree necessary or reasonable required by Section 952 of the Omnibus Reconciliation Act of 1980 (P.L. 96-449), as amended from time to time, and regulations promulgated thereunder.

10. **Notice**. Any notice, approval or consent required or permitted under this Agreement shall be in writing and shall be sent by registered or certified mail, return receipt requested, postage prepaid or hand delivered, addressed to each party as follows:

11.

If to Consultant, to:
**MedOptions, Inc.**
345 Blackstone Blvd., Weld Building, 1st. Floor
Providence, Rhode Island 02906
Attention: Andrew S. Rosenzweig, MD, MPH, Medical Director

If to the Nursing Home, to:
**Hebert Nursing Home**
180 Log Road
Smithfield, RI 02917
Attention: Paul Hebert, Administrator

The parties may, by notice to the other in the manner aforesaid, designate such other address or addresses to which notice must be sent.

12. **Governing Law**: This Agreement shall be interpreted and governed in accordance with the laws of the State of Rhode Island, without reference to such states laws concerning conflicts of law, and by federal statutory law, but not federal common law, as the same may be applicable. This Agreement and the Exhibits hereto contain the entire agreement of the parties and no modification or amendment thereof shall be binding unless signed by the parties hereto. This Agreement shall be binding upon each of the parties, and upon its agents, employees, successors and assigns, and notwithstanding any provision herein to the contrary, shall not be assignable by either party

13. **Confidentiality.** Nursing Home shall comply with all applicable federal, state, and local laws and regulations relating to confidentiality and privacy, including without limitation the federal Health Insurance Portability and Accountability Act of 1996, and shall take reasonable steps to insure the physical security of any confidential patient information or data under its control. The Nursing Home agrees that it will inform each of its employees or agents having any involvement with confidential health care information, personal data or other confidential information of the laws and regulations relating to confidentiality. Without limiting the foregoing, Nursing Home will also comply with other HIPAA regulations, including those regarding notification of residents and/or their legal proxies about their rights under the HIPAA regulations.

IN WITNESS WHEREOF, the parties have executed this Agreement on this 3rd day of May, 2007.

By: [signature]
**Paul Hebert, Administrator**
**Hebert Nursing Home**

By: [signature]
**Andrew S. Rosenzweig, MD, MPH, Medical Director**
**MedOptions, Inc.**

# EXHIBIT A

1. 24 hours per day, 7 days per week emergency coverage via beeper or answering service.

2. Regularly scheduled visits by a licensed geriatric psychiatrist, neurologist, and/or geriatric advanced practice registered nurse (APRN) or nurse practitioner (NP) to treat residents referred for consultation and/or treatment by residents primary care physician. **Frequency of visits will be monthly.**

3. Assistance with and expedition of admission to an appropriate inpatient psychiatric unit when necessary.

4. Consultative services to address issues of appropriateness of potential new admissions, and issues regarding use of psychopharmacological medications.

5. **Four (4) meetings** per year, which the facility determines with MedOptions. These meetings may include:

   a) in-services;

   b) attendance at staff meetings, family meetings, or clinical case conferences;

   c) attendance at meetings to prepare for state surveys; and

   d) educational sessions for families of residents.

Services shall include psychiatric evaluation for purposes of determining competency to make medical decisions as required in connection with rendering medical care to patients as required in the normal course of medical treatment. Services shall not include competency determinations in connection with evaluations of legal competency for purposes of guardianship or similar proceedings, nor shall Services include completion of Decision Making Assessment Tools or provision of written or other expert court testimony.

**COMMENCEMENT DATE:** June 1, 2007

**TERMINATION DATE:** May 31, 2008

MEDOPTIONS Inc. P.O. BOX 825 • AVON, CT 06001 • 1-800-370-3651 • FAX 860-679-7744

# SERVICE AGREEMENT

This document is to serve as a Service Agreement between Grandview Center (hereinafter the Facility) and MedOptions, Inc. (hereinafter the Agency) concerning the provision of Mental Health Services.

This Agreement made effective as of June 1, 2006.

WHEREAS, the Agency and the Facility desire to enter into an Agreement whereby the Agency will provide the Facility with mental health professionals to provide behavioral health services to residents of the Facility.

NOW, therefore, in consideration of the mutual agreements hereinafter expressed the parties agree as follows:

The Agency agrees to do the following:

(1) Provide psychiatric evaluations at the request of the attending physician for the purpose of assessing the specific need of residents with psychiatric symptomatology and recommending therapeutic interventions.

(2) Perform psychopharmacological consults and monitoring; and psychotherapeutic services.

(3) Provide 24 hours a day, seven days per week "on-call" telephone consultation.

(4) To provide services to all residents referred by the Facility medical staff as long as the resident meets eligibility criteria, which consist of medical necessity and the ability to cover the cost of services, either directly or through third party payers.

(5) Act as a liaison for emergency situations in the event of a psychiatric crisis (i.e., referral to psychiatric in-patient facilities).

(6) Meet with medical and professional personnel of the Facility to assist in treatment planning and behavioral management.

(7) Assume responsibility for billing third party insurance or other sources through the Agency's business office.

(8) Provide the Facility with documentation on all services rendered to facilities residents.

(9) Negotiate with the case manager of identified managed care companies that the Agency does not have a contract with in an effort to serve their members or work directly with Facility staff regarding managed care residents.

(10) Provide proof of Worker's Compensation and Professional Liability Insurance for all clinicians.

The Facility agrees to do the following:

(1) Assure that all referrals to Agency have been ordered by a physician member of the Facility's medical staff.

(2) Provide space at the Facility for the provision of clinical services that shall insure the resident's privacy and confidentiality.

(3) Provide information regarding insurance and responsible party for residents for proper billing.

(4) Assume responsibility for maintenance of confidentiality of records.

(5) Assign Facility staff to work with Agency staff to coordinate the resident's care.

(6) Pay MedOptions the Medicare allowable rate (our rate) for visits to residents who do not have a source of payment as verified by the Agency's billing department. The Facility will be given the opportunity to authorize the visit and accept responsibility for payment prior to our visit to the resident.

MedOptions is a covered entity under the Health Insurance Portability and Accountability Act of 1996 (HIPPA) and therefore is in compliance with these regulations. Protected Health Information (PHI) is utilized in strict accordance with HIPPA regulations.

AGENCY and Facility shall indemnify and hold harmless the other party from and against any and all liabilities, claims, expenses, damages, losses, judgments and costs, including reasonable attorney's fees and disbursements caused by the negligent acts or omissions of each party's own employees or agents arising out of the performance of this Agreement.

If it is felt by either party that the terms of this agreement are not being satisfied, each party shall have 30 days to rectify the situation. The 30 days shall commence upon receipt of written documentation of the problem. If the problem is not rectified, the contract shall be cancelled 60 days from the receipt of the original complaint.

The term of this Agreement shall commence on June 1, 2006 and shall continue in full force and effect until terminated by either party. Either party shall be able to cancel this contract for any reason upon 60 days written notice.

Lori A. Brothers — 5-11-06

Administrator — Date

Laurie Work — 5-15-06

MedOptions, Inc. — Date

# EXHIBIT A

1. 24 hours per day, 7 days per week emergency coverage via beeper or answering service.

2. Not less than monthly, and not more than twice monthly, regularly scheduled visits by licensed geriatric psychiatrist, neurologist, and/or geriatric advanced practice registered nurse (APRN) to treat residents referred for consultation and/or treatment by residents primary care physician. **Frequency of visits will be weekly or twice monthly depending on needs of Nursing Home.**

3. Assistance with and expedition of admission to an appropriate inpatient psychiatric unit when necessary.

4. Consultative services to address issues of appropriateness of potential new admissions, and issues regarding use of psychopharmacological medications.

5. **Four (4) meetings** per year, which the facility determines with Long-Term Care Psychiatry. These meetings may include:

   a) in-services;

   b) attendance at staff meetings, family meetings, or clinical case conferences;

   c) attendance at meetings to prepare for state surveys; and

   d) educational sessions for families of residents.

Services shall include psychiatric evaluation for purposes of determining competency to make medical decisions as required in connection with rendering medical care to patients as required in the normal course of medical treatment. Services shall not routinely include competency determinations in connection with evaluations of legal competency for purposes of guardianship or similar proceedings, nor shall Services routinely include completion of Decision Making Assessment Tools or provision of written or other expert court testimony.

**COMMENCEMENT DATE:** June 1, 2006

**TERMINATION DATE:** May 31, 2007

# GERIATRIC PSYCHIATRY CONSULTANT AGREEMENT

THIS AGREEMENT, (the "Agreement") dated as of the Commencement Date set forth in Exhibit A is by and between <u>MEDOPTIONS, INC., 345 Blackstone Boulevard, 1st. Floor Weld Building, Providence, Rhode Island 02906</u> a Rhode Island professional corporation (hereinafter referred to as "Consultant") and <u>BALLOU HOME FOR THE AGED, 60 Mendon Road, Woonsocket, RI 02895</u> (hereinafter referred to as "Nursing Home").

*WITNESSETH*

WHEREAS, Nursing Home desires to provide its patients with the services identified on Exhibit A through a psychiatrist specializing in the care of geriatric patients;

WHEREAS, Consultant is qualified to provide such services to Nursing Home.

NOW, THEREFORE, in consideration of the mutual covenants contained herein and other consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto agree as follows:

1. **<u>Engagement; Provision of Services</u>:** Nursing Home hereby engages Consultant, on an independent contractor basis, to provide the services described on **<u>Exhibit A</u>** hereto (the "Services") in accordance with the standards of medical care applicable in the State of Rhode Island.

2. **<u>Term</u>:** The term of this Agreement shall be for a period of one (1) year, beginning and ending on the dates so indicate on Exhibit A unless earlier terminated in accordance with Section 6 below.

3. **<u>Compensation</u>.** In exchange for Consultant's provision of the Services, Nursing Home agrees to compensate Consultant at a monthly rate of <u>$450</u>. Payment shall be made monthly, in arrears and shall be due upon receipt of invoice therefore. In the event that additional services are requested in writing or otherwise by the Nursing Home, the Consultant shall consider whether to provide such services, and if such services shall be provided, payment therefore shall be made upon receipt of invoice at the Consultants usual and customary rates for such additional services. Notwithstanding any provision herein to the contrary, Consultant shall have no obligation to provide services not identified on Exhibit A.

4. **<u>Independent Contractors</u>.** Consultant and Nursing Home are and shall at all times be deemed to be as independent contractors. Nothing in this Agreement shall be construed to create a joint venture, partnership, association or other affiliation or like relationship between the parties. Consultant and Nursing Home shall at all times and in all circumstances be considered independent parties and, in no event, shall either be liable for the debts and obligations of the other. Neither the Nursing Home nor any employee or agent of the Nursing Home shall have any claim against Consultant for vacation pay, paid sick leave, retirement benefits, social security, workers compensation, health, disability, professional malpractice or unemployment insurance benefits or other benefits.

5. **<u>Credentialing</u>.** All members of Consultants staff providing Services for which a license, certificate or accreditation is required under Rhode Island law shall at all times be properly licensed, certified, or accredited in the State of Rhode Island.

6. **<u>Termination</u>.** Either party hereto may terminate this Agreement:

    a. a party fails, refuses to perform, or otherwise materially breaches its non-financial obligations under this Agreement, in which event the party not in breach shall provide written notice to the breaching party stating the cause for termination and the effective date of such termination, and the party in breach shall have the right within thirty (30) days of the receipt of such notice to cure the alleged breach to the reasonable satisfaction of the non-breaching party;

    b) immediately in the event the other party is excluded or suspended from participation in the Medicaid or Medicare programs or fails to maintain the insurance described in Section 7 of this Agreement;

    c) immediately upon written notice if the terminating party reasonably believes that such termination is necessary to safeguard patient health or safety or to ensure compliance by either party with federal or state licensing laws.

Notwithstanding any provision hereof to the contrary, the Consultant may terminate this agreement upon written notice upon failure by the Nursing Home to pay any amount due and payable hereunder within fifteen (15) days of the date such payment is due, and in any event the Consultant may charge Nursing Home a late fee of 5% of the amount due over such period. Either party may terminate this Agreement without cause upon thirty (30) days notice to the other party.

7. **Insurance. Insurance.** Consultant shall maintain professional liability insurance in an amount not less than $1,000,000 per occurrence and $3,000,000 in the aggregate. Nursing Home shall maintain professional liability insurance in the minimum amount of $1,000,000 per occurrence and $3,000,000 in the aggregate. Each party shall furnish the other with a certificate demonstrating the insurance coverage in this Agreement at any time upon reasonable request by the other party, and each certificate shall provide that the both parties shall have the benefit of such insurance as their interests may appear, and that no insurance shall be cancelled for lack of premium unless notice has been given to all parties not less than 30 days prior to the effective date of such cancellation. Each party shall immediately report by written notice to the other party any decrease or cancellation of the insurance coverage required to be maintained by such party under this Agreement. The parties agree that each shall assume and bear the entire risk of loss and of damage caused by its negligence of its agents, servants or employees incident to the performance of their respective duties hereunder, and that each shall fully indemnify the other therefore.

8. **Indemnification.** Each party is responsible for its own actions, inactions, and/or omissions, including those of the parties' employees, agents, servants, advisors, shareholders, invitees and officers. Consultant and Nursing Home will indemnify, defend and hold harmless the other party from any and all liability, loss, claims, lawsuits, damages, injury, cost, or expenses (including reasonable attorney's fees) arising out of, or incident to, the performance or no performance of any duty or responsibility under this Agreement by the indemnifying party or representative, agent, or employee; except to the extent such losses, claims, damages, etc. result from the negligent or willful acts or omissions of the party seeking indemnification. The parties shall indemnify and hold harmless one another, their directors, agents, servants, employees, management companies and their directors, agents, servants, employees and affiliates from and against any and all claims, demands, causes of action, losses, damages, fines, penalties, liabilities, costs and expenses, including reasonable attorney's fees and court costs sustained or incurred by or asserted against one part by reason of or arising out or the other party's negligent or willful acts or omissions or any acts beyond the scope of the authority hereunder.

9. **Access by Government to Records.** Nursing Home and Consultant agree that for a period of four (4) years following the furnishing of services hereunder, or for such longer period as may be required under any federal or state statute, regulation, or standard, the Secretary of Health and Human Services or the U.S. Comptroller General, or their designees, shall have the right to inspect and shall be provided access to the books of account and other corporate documents and records of Consultant and Nursing Home to the extent and degree necessary or reasonable required by Section 952 of the Omnibus Reconciliation Act of 1980 (P.L. 96-449), as amended from time to time, and regulations promulgated thereunder.

10. **Notice**. Any notice, approval or consent required or permitted under this Agreement shall be in writing and shall be sent by registered or certified mail, return receipt requested, postage prepaid or hand delivered, addressed to each party as follows:

11.

If to Consultant, to:
**MedOptions, Inc.**
345 Blackstone Blvd., Weld Building, 1st. Floor
Providence, Rhode Island 02906
Attention: Andrew S. Rosenzweig, MD, MPH, Medical Director

If to the Nursing Home, to:
**Ballou Home for the Aged**
60 Mendon Road
Woonsocket, RI 02895
Attention: Carl Newell, Administrator

The parties may, by notice to the other in the manner aforesaid, designate such other address or addresses to which notice must be sent.

12. Governing Law: This Agreement shall be interpreted and governed in accordance with the laws of the State of Rhode Island, without reference to such states laws concerning conflicts of law, and by federal statutory law, but not federal common law, as the same may be applicable. This Agreement and the Exhibits hereto contain the entire agreement of the parties and no modification or amendment thereof shall be binding unless signed by the parties hereto. This Agreement shall be binding upon each of the parties, and upon its agents, employees, successors and assigns, and notwithstanding any provision herein to the contrary, shall not be assignable by either party

13. Confidentiality. Nursing Home shall comply with all applicable federal, state, and local laws and regulations relating to confidentiality and privacy, including without limitation the federal Health Insurance Portability and Accountability Act of 1996, and shall take reasonable steps to insure the physical security of any confidential patient information or data under its control. The Nursing Home agrees that it will inform each of its employees or agents having any involvement with confidential health care information, personal data or other confidential information of the laws and regulations relating to confidentiality. Without limiting the foregoing, Nursing Home will also comply with other HIPAA regulations, including those regarding notification of residents and/or their legal proxies about their rights under the HIPAA regulations.

IN WITNESS WHEREOF, the parties have executed this Agreement on this 4th day of May, 2007.

By: Carl Newell Adm

**Carl Newell, Administrator**
**Ballou Home for the Aged**

By: [signature]

**Andrew S. Rosenzweig, MD, MPH, Medical Director**
**MedOptions, Inc.**

# EXHIBIT A

---

1. 24 hours per day, 7 days per week emergency coverage via beeper or answering service.

2. Regularly scheduled visits by a licensed geriatric psychiatrist, neurologist, and/or geriatric advanced practice registered nurse (APRN) or nurse practitioner (NP) to treat residents referred for consultation and/or treatment by residents primary care physician. **Frequency of visits will be twice monthly.**

3. Assistance with and expedition of admission to an appropriate inpatient psychiatric unit when necessary.

4. Consultative services to address issues of appropriateness of potential new admissions, and issues regarding use of psychopharmacological medications.

5. **Four (4) meetings** per year, which the facility determines with MedOptions. These meetings may include:

   a) in-services;

   b) attendance at staff meetings, family meetings, or clinical case conferences;

   c) attendance at meetings to prepare for state surveys; and

   d) educational sessions for families of residents.

Services shall include psychiatric evaluation for purposes of determining competency to make medical decisions as required in connection with rendering medical care to patients as required in the normal course of medical treatment. Services shall not include competency determinations in connection with evaluations of legal competency for purposes of guardianship or similar proceedings, nor shall Services include completion of Decision Making Assessment Tools or provision of written or other expert court testimony.

COMMENCEMENT DATE: June 1, 2007

TERMINATION DATE: May 31, 2008

| Facility | | Start Date |
| --- | --- | --- |
| Grandview | - | 6/1/2006 |
| The Holiday | - | 6/1/2006 |
| Heritage | - | 7/1/2006 |
| Ballou Home | - | 9/1/2006 |
| Morgan Health | - | 7/1/2007 |
| Hebert Home | - | 9/1/2006 |
| Pine Grove | - | 3/12/2007 |