**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

| | | |
|---|---|---|
| **HUMAN SERVICES CONSULTANTS, LTD.,** | : | |
| **Dba GERICARE** | : | |
| **RONALD MARK STEWART MD** | : | |
| **Plaintiffs** | : | |
| | : | |
| | : | |
| | : | |
| **vs.** | : | **C.A. # 06-486** |
| | : | |
| | : | |
| **ANN TAMULE, aka ANN M. SULLIVAN,** | : | |
| **Alias, and MEDOPTIONS INC.** | : | |
| **Defendants** | : | |

**PLAINTIFFS' MEMORANDUM IN SUPPORT OF THEIR OBJECTION TO DEFENDANT SULLIVAN'S MOTION FOR SUMMARY JUDGMENT**

## I. INTRODUCTION

This matter is presently before this Court on the cross-motions of Plaintiffs and Defendants for Summary Judgment pursuant to Fed.R.Civ.P. 56. At issue is a non-compete agreement entered into by Plaintiffs and Defendant Sullivan. Despite the existence of this agreement, Defendant Sullivan began working for Plaintiffs' competitor, Defendant MedOptions, almost immediately after terminating her contract with the Plaintiffs. As a result, Plaintiffs have brought various state law claims against Defendants. Count I of Plaintiffs' Complaint alleged that Defendant Sullivan breached her non-compete agreement by accepting that employment. Furthermore, Counts II and III of Plaintiffs' Complaint alleged that Defendant Sullivan and Defendant MedOptions, working in concert, tortiously interfered with Plaintiffs' advantageous business relationships with Plaintiffs' longstanding clients.[1]

---

[1] Plaintiffs also have pending a Motion to Amend, which adds as parties to the Complaint several newly-discovered entities related to MedOptions, and also clarifies the tortious interference counts.

Plaintiffs filed their Motion for Summary Judgment against both Defendants on February 22, 2008. Shortly after the filing of that Motion, Plaintiffs received Defendant Sullivan's Motion for Summary Judgment, and then another Motion for Summary Judgment filed on behalf of Defendant MedOptions. Plaintiffs now submit this Memorandum in support of their objection to Defendant Sullivan's Motion for Summary Judgment.

## II. FACTS AND TRAVEL

Plaintiffs have already provided an account of the material facts of this case in their own Memorandum in Support of Their Motion for Summary Judgment. In the interests of avoiding prolixity, Plaintiffs will not reproduce that account here. Instead, Plaintiffs will utilize this section to address several factual allegations raised by the Plaintiffs.

A great deal of factual dispute surrounds Defendant Sullivan's motivations for terminating her independent contractor arrangement with GeriCare. Defendant Sullivan asserts that she was approached by Alice Mellucci, the director of nursing at Hebert Nursing Home, one of the nursing homes that had a contract with GeriCare. Defendant Sullivan alleges that Ms. Mellucci indicated to her that she was suspicious of possible Medicare fraud on behalf of Dr. Stewart, and that therefore Hebert would be cancelling its contract with GeriCare. Defendant Sullivan would suggest to this Court that Defendant Sullivan had then made the decision to resign from GeriCare out of concerns about ". . . being implicated in a potentially fraudulent scheme, and having already decided to leave the private sector and pursue a religious life . . ." (Defendant Sullivan's Memorandum in Support of Summary Judgment, p. 4.)

There is substantial evidence contradicting Defendant Sullivan's alleged reasons for terminating her contract with GeriCare. In the first instance, the "evidence" of Medicare fraud cited by Defendant Sullivan amounts to little more than potential clerical error. More

importantly, neither Ms. Mellucci nor anybody else from Hebert ever approached GeriCare regarding any Medicare fraud. Dr. Stewart had had a longstanding business relationship with the Hebert Nursing Home and Ms. Mellucci. Throughout this relationship of approximately 15 years, Ms. Mellucci had always been very quick to address any comments or concerns that she might have with Dr. Stewart. (Plaintiffs' Response to Sullivan's Statement of Undisputed Fact, ¶ 6.) For that matter, Hebert never cancelled the contract with GeriCare. (Plaintiffs' Response to Sullivan's Statement of Undisputed Fact, ¶ 6.) Defendant Sullivan herself admits that she never brought to GeriCare's attention the fact that one of its clients was displeased with GeriCare and was contemplating terminating the contract. (Plaintiffs' Response to Sullivan's Statement of Undisputed Fact, ¶ 6.) Additionally, her letter of resignation references nothing but positive emotions towards GeriCare and its staff. (Plaintiffs' Motion for Summary Judgment, Exhibit H.) As such, these allegations smack of an after-the-fact attempt on Defendant Sullivan's part to manufacture an excuse for her behavior, and should be given no credence by this Court.

Additionally, Defendant Sullivan has repeatedly given contradicting accounts of her life plans at the time that she submitted her resignation letter to GeriCare. Her resignation letter of April 9, 2006 indicated that she would no longer be providing services to GeriCare, and also indicated that "[i]t is now time for me to move forward with my life in Massachusetts." (Plaintiffs' Motion for Summary Judgment, Exhibit H.) Roughly a week to ten days after providing that resignation, she informed Dr. Stewart that she was going to Massachusetts to take care of her aging parents and then enter a religious order. (Plaintiffs' Response to Sullivan's Statement of Undisputed Fact, ¶ 6.) At deposition, she denied that her parents' illness played any role in her decision to leave GeriCare, and even denied that they had had any health problems that required her to go to Massachusetts. (Plaintiffs' Response to Sullivan's Statement

of Undisputed Fact, ¶ 6.) For that matter, she appears to have been less than candid with Dr. Stewart regarding her plans to enter a convent. By spring of 2006, Sullivan had considered applying for two separate orders, but never got beyond a preliminary exploratory stage to determine whether these orders were appropriate for her. By the spring, she had already determined that they were not. (Plaintiffs' Response to Sullivan's Statement of Undisputed Fact, ¶ 6.) It is hardly credible that one might resign employment without any solid plans for one's future. More significantly, Sullivan testified that at deposition, during the spring of 2006, she had made active attempts to search for work in the private sector, and had applied elsewhere before applying to MedOptions. (Plaintiffs' Response to Sullivan's Statement of Undisputed Fact, ¶ 6.)

Defendant Sullivan also alleges that GeriCare's response to her April 9, 2006 resignation letter was to simply surrender its relationships with the nursing homes previously assigned to her (except for Heritage Hills) without having made any effort to replace her. This allegation could not be further from the truth. GeriCare, as a general business practice, had always made efforts to locate and recruit qualified staff. (Plaintiffs' SUF, ¶ 24.) The April 20, 2006 letters were sent out because GeriCare had made attempts to find a replacement for Defendant Sullivan, but realized that it could not guarantee a replacement in enough time to ensure continuity of care. Accordingly, in the interests of fulfilling its medical and ethical obligations to its patients, GeriCare sent these letters to release the nursing homes from their contractual obligations in order to deal with the possibility that GeriCare might never find a replacement. These letters specifically left open the possibility that GeriCare might find a replacement and would be able to continue to provide services. (Plaintiffs' Motion for Summary Judgment, Exhibit A, p. 79:1124; 82:12-20; Exhibit J; Plaintiffs' SUF ¶ 25.)

Defendant Sullivan concedes that GeriCare offered Heritage Hills a replacement, but that that replacement was rejected due to the hours proposed by that replacement. There is substantial evidence suggesting that Heritage Hills' stated reason for terminating the agreement with GeriCare was pretextual. Defendant Sullivan also testified during her deposition that Joyce Sormanti had informed her that Dr. Stewart was going to continue with the Heritage Hills patients after Defendant Sullivan left. (Plaintiffs' Response to Sullivan's Statement of Undisputed Fact, ¶ 9.) Therefore, replacement of Defendant Sullivan was not a pressing issue. Furthermore, Heritage Hills had never before indicated that it was necessary that a provider work during the day, nor was there any clinical reason for doing so. Heritage Hills was offered the opportunity to speak with Sharon Borges further regarding scheduling. Heritage Hills never contacted Ms. Borges, but simply terminated the agreement before the 30-day period agreed to in its contract with GeriCare by its letter dated May 31, 2006. That letter indicated that there was in fact a need for a new provider to work during the evening. (Plaintiffs' Motion for Summary Judgment, Exhibit C, Plaintiffs' Responses to Interrogatories #1 and 5, See Exhibit U; Plaintiffs' SUF ¶ 51; Plaintiffs' Response to Sullivan's Statement of Undisputed Fact, ¶ 6.) Immediately after that period expired, Heritage Hills signed an agreement with MedOptions - although it is clear from the face of that agreement and Heritage Hills' eagerness to drop GeriCare that Heritage Hills and MedOptions had begun discussions at least by June 1, 2006. (Plaintiffs' Motion for Summary Judgment Exhibit T, p. M-00009, "Commencement Date;" Plaintiffs' SUF ¶ 51.) Significantly, Defendant Sullivan had already been hired by Defendant MedOptions. (Plaintiffs' Response to Sullivan's Statement of Undisputed Facts, ¶ 11; Plaintiffs' Motion for Summary Judgment, Exhibit B, p. 72:14-73:5; Exhibit K, p. 34:24-35:4; Plaintiffs' SUF ¶ 31.) For that matter, when applying for the position at MedOptions, Defendant Sullivan made a point of informing

MedOptions that she was in contact with Barbara Langshaw-Soares. Ms. Langshaw-Soares was one of the key contact people at Heritage Hills. (Plaintiffs' SUF, ¶ 34, Plaintiffs' Motion for Summary Judgment, Exhibit P; Affidavit of Dr. Stewart, ¶ 2, appended to Plaintiffs' Response to Sullivan's Statement of Undisputed Facts as Exhibit 2.) The Plaintiffs will address other key facts as necessary in the memorandum.

## III. LEGAL ARGUMENT

### A. PLAINTIFFS HAD A VALID NONCOMPETE AGREEMENT WITH DEFENDANT SULLIVAN.

The chief thrust of Defendant Sullivan's Motion is to undermine the validity of the non-compete agreement. Defendant Sullivan criticizes the validity of the agreement that she entered into on two bases. First, Defendant Sullivan cites the lack of geographical limitation. Secondly, Defendant Sullivan alleges that the agreement did not protect any legitimate business interest. Neither argument has any validity.

Defendant Sullivan herself provides the response to her argument that the agreement should be deemed invalid due to a lack of a geographical limitation. She concedes that the Rhode Island courts will adjust a non-compete agreement that extends beyond what is reasonably necessary to protect the promisee's business interest. See, e.g., Durapin v. American Products, Inc., 559 A.2d 1051, 1058 (R.I. 1989). GeriCare's business extended throughout the entire State of Rhode Island. Affidavit of Dr. Stewart, ¶ 17, appended to Plaintiffs' Response to Sullivan's Statement of Undisputed Facts as Exhibit 2.) As such, it would be entirely reasonable for this Court to read this agreement to include a statewide scope.

In any case, the lack of a geographical limitation is hardly at issue here. Defendant Sullivan's employment at MedOptions took her to many of the same nursing homes that she had

been servicing on behalf of GeriCare - in some cases with barely even a week's break in service. She began working at Grand View Center on June 2, 2006, The Holiday on June 6, 2006, and Heritage Hills on July 5, 2006. (Plaintiffs' SUF, ¶ 38-40.) She would even be seeing many of the same patients as she saw while providing services for GeriCare. (Plaintiffs' SUF ¶ 42.)

Defendant Sullivan also apparently misunderstands the legitimate business interests being protected by the agreement. Defendant Sullivan alleges that the forms developed by GeriCare do not deserve protection because they could have been accessed by other health care providers with access to the files. However, unless and until one had undertaken to provide psychiatric services in the stead of GeriCare, one could not as a matter of law have gained access to those files, as they are protected by stringent medical confidentiality laws. R.I.G.L. § 5-37.3 *et* seq. For that reason, it can hardly be said that these forms could be easily accessed. Additionally, Defendant Sullivan had access to other materials that could not be accessed by an examination of patient files, such as training documents that GeriCare had compiled. (See Plaintiffs' SUF, ¶ 11.)

Furthermore, Defendant overlooks the fact that she was indeed provided with training in a unique or novel service. Such training can form the basis of a valid non-compete agreement. *See* Dial Media v. Schiff, 612 F.Supp. 1483, 1489 (D.R.I. 1985). Although Defendant Sullivan came to GeriCare with nursing experience, she had had no experience in working in nursing homes or the mental health fields. (See Plaintiffs' SUF, ¶ 16.) GeriCare provided her with the training to deal with its very specialized area -- that is, the unique mental health needs of nursing home patients. (Exhibit A, p. 17:25-18:4, 19:2-5; Plaintiffs' SUF ¶ 2.) Defendant Sullivan received the benefit of training in this particular sub-specialty from GeriCare, both in its clinical

and administrative aspects. (Exhibit A, p. 35:7-19; 37:11-20, 62:2-6; Exhibit B, p. 38:11-23; 51:9-2; Exhibit C, Response to Interrogatories, #9; Plaintiffs' SUF ¶ 8-12, 17.) Dr. Stewart provided specific training to Defendant Sullivan on concepts of geriatric psychiatry as applied to patients confined to nursing homes. These concepts included information regarding the patients' ability to benefit from and tolerate psychiatric medications and potential polypharmacy issues. These concepts also included information about distinguishing between a patient's psychiatric issues and common physical problems associated with aging. (Affidavit of Dr. Stewart, ¶ 8, appended to Plaintiffs' Response to Sullivan's Statement of Undisputed Facts as Exhibit 2.) Ms. Richards, the Executive Director, provided Defendant Sullivan with training in the administrative aspects. (Affidavit of Christine Richards, ¶ 2-3, appended to Plaintiffs' Response to Sullivan's Statement of Undisputed Facts as Exhibit 3, Plaintiffs' SUF ¶ 10.)

Dr. Stewart would also introduce Defendant Sullivan to new concepts in the care of nursing home patients in Rhode Island. GeriCare pioneered in the use of social workers to provide individual counseling to nursing home patients. Previously, the mental health care of nursing home patients in Rhode Island had centered almost exclusively on pharmacology. GeriCare also introduced a more holistic approach to the care of nursing home patients. Specifically, GeriCare, unlike its competitors, made a point of seeking input from the most immediate caregivers in the nursing home environment - the nursing assistants, who could provide information based upon direct observation. (Affidavit of Dr. Stewart, ¶ 12, 13, appended to Plaintiffs' Response to Sullivan's Statement of Undisputed Facts as Exhibit 2.)

Finally, and perhaps most importantly, Defendant Sullivan overlooks the fact that non-compete covenants may also be enforced where aimed at protecting goodwill, where the promisee has invested a great deal of business effort in developing information regarding the

potential clients' wants and needs, and thus forged a strong business relationship with those clients. See Nestle Food Company v. Miller, 836 F.Supp. 69, 74-75 (D.R.I. 1993). The need for a non-compete is particularly recognized as legitimate when the promisor is in a position to develop a "special relationship" can be with clients, that is, where the promisor, as a result of his relationship with the promissee, has become aware of the special and otherwise unknown needs of the client. ***See*** Duranin v. American Products, Inc., 559 A.2d 1051, 1057 (R.I. 1989), ***citing*** Rego Displays, Inc. v. Fournier, 379 A.2d 1098, 1101 (1977). Indeed, it has been recognized in Rhode Island law that one of the legitimate concerns to be protected by a non-compete agreement is the opportunity for a business to prove itself to its existing clients once a key employee leaves -that is, the agreement protects the business's ability to maintain its goodwill. ***See*** Block v. Vetcor of Warwick, LLC, 2000 WL 1634784, *6 (Williams, J.), ***citing*** Concord Orthopedics Professional Ass'n v. H. James Forbes, M.D., 702 A.2d 1273, 1276 (N.H. 1997).

It is far from an exaggeration to say that goodwill was perhaps the most crucial business asset in GeriCare's possession. Although one might possibly be able to learn the identity of nursing home administrators through a telephone canvass, far more than a phone call went into gaining and keeping nursing home business. As the Defendant concedes, the nursing home business in Rhode Island is a close-knit community, where ". . . everybody pretty much knows one another." (Defendant Sullivan's Statement of Undisputed Facts, ¶ 22-23.) Defendant MedOptions similarly concedes that most if not all of its Rhode Island business came through word-of-mouth. (Defendant Sullivan's Statement of Undisputed Facts, ¶ 22-23. See also Deposition of Jeffrey Kinnell, p. 29:3-8, appended hereto as Exhibit 1.) In fact, MedOptions' first break into the Rhode Island nursing home business came about when one of its former employees in Connecticut moved to Rhode Island and took a job as director of nursing in a

Rhode Island nursing home. (Deposition of Laurel Wood, p. 16:14-18:12, appended hereto as Exhibit 2.) In other words, one could hardly expect to simply make a phone call and sales pitch and expect nursing home business.[2] Established relationships were everything in GeriCare's business.

Furthermore, far more work went into developing that those relationships than Defendant Sullivan apparently cares to admit. GeriCare had expended a great deal of business effort over the years into developing these relationships with the nursing homes. This included not only providing first-rate service to the nursing home patients - the source of revenue -- but also in providing additional free services to the nursing homes - the source of referrals. These included free in-services to nursing home staff on how to deal with mental health issues in their patients on a day-to-day basis. GeriCare also provided assistance in nursing home risk-management issues, such as hazards in patient rooms, competency, environmental problems, and abuse/exploitation. Dr. Stewart would also make himself available to nursing home administrators who were having trouble with individual staff members who were in personal crisis. This would be free of charge as well. (Affidavit of Dr. Stewart, ¶ 11, appended to Plaintiffs' Response to Sullivan's Statement of Undisputed Facts as Exhibit 2.) GeriCare had also developed a great deal of information regarding the wants and needs of the specific nursing homes and their administrators, such as the cultural background of the residents, and the extent to which the administration wished to be involved in GeriCare's work. (Affidavit of Dr. Stewart, ¶ 9, appended to Plaintiffs' Response to Sullivan's Statement of Undisputed Facts as Exhibit 2.)

---

[2] Indeed, Jeffrey Kinnell, one of MedOptions' CEO, would indicate that the advertising, solicitation and marketing budget for MedOptions was less than $10,000.00

Defendant Sullivan similarly received the benefit of GeriCare's goodwill, and was in the position to be able to develop the "special relationship" with GeriCare's clients that could be protected by a non-compete agreement. Defendant Sullivan was also introduced and had access to important contacts within the nursing homes themselves. (Exhibit A, p. 32:2-7; 37:11-15; 62:2-6; Plaintiffs' SUF ¶ 13-14.) Defendant Sullivan was also privy to information regarding the specific wants and needs of each nursing home. (Affidavit of Dr. Stewart, ¶ 9, appended to Plaintiffs' Response to Sullivan's Statement of Undisputed Facts as Exhibit 2.) Finally, in her day-to-day work at the nursing home, Defendant Sullivan had access to the high-level individuals responsible for making decisions regarding mental health services at each nursing home, and could therefore develop a business relationship with them. (Affidavit of Dr. Stewart, ¶ 10, appended to Plaintiffs' Response to Sullivan's Statement of Undisputed Facts as Exhibit 2.)

Accordingly, there were numerous legitimate business interests that could be protected by the non-compete agreement. For that reason, Defendant Sullivan's attempt to avoid it must fail. Defendant Sullivan was bound by that agreement, and must accept the consequences of its breach.

## II. MATERIAL ISSUES OF FACT EXIST AS TO WHETHER DEFENDANT SULLIVAN HAD TORTIOUSLY INTERFERED WITH PLAINTIFFS' BUSINESS ADVANTAGE.

Defendant Sullivan also seeks summary judgment on the issue of whether she had tortiously interfered with Plaintiffs' advantageous business relationships with its nursing home clients. In order to establish a wrongful interference with economic advantage, one must establish the existence of a business relationship or expectancy, knowledge by the interferor of

the relationship or expectancy; an intentional act of interference; proof that the interference caused the harm sustained; and damages to the plaintiff. ***See*** L.A. Rgy. Real1y v. Town Council of the Town of Cumberland, 698 A.2d 202, 207 (R.I. 1997). Contrary to Defendant Sullivan's assertions, Plaintiff has established a viable claim for this tort.

Defendant Sullivan asserts that she could not be liable for having interfered with GeriCare's advantageous business relationships there was no longer any business relationship to interfere with. In support of that allegation, she points to the letters sent to Grandview, Ballou, Holiday, Morgan, and Hebert of April 20, 2006 regarding Defendant Sullivan's departure. Defendant Sullivan misunderstands the import of those letters. Those letters simply served to notify GeriCare's nursing homes of the problem of Defendant Sullivan's departure and GeriCare's potential inability to find a replacement. As Dr. Stewart testified at his deposition, the sole intent of those letters was to inform the nursing homes that in the event that no replacement for Sullivan could be found, he would not be holding them to the written agreements. (Plaintiffs' Response to Sullivan's Statement of Undisputed Fact, ¶ 8.) Most significantly, those letters specifically left open the possibility that GeriCare might somehow been able to find a replacement. (Plaintiffs' Motion for Summary Judgment, Exhibit J.)

The longstanding nature of Dr. Stewart's relationship with these nursing homes and their administrators is a crucial point to understanding the level to which Dr. Stewart could expect to regain his nursing home business. Dr. Stewart had developed substantial business relationships with these nursing homes and their individual administrators extending over many years - in

many cases, back to about 1991.[3] (Affidavit of Dr. Stewart, ¶ 2-7, appended to Plaintiffs' Response to Sullivan's Statement of Undisputed Facts as Exhibit 2.) As such, there is every reason to believe that even when those letters were sent, GeriCare's situation was still recoverable. Indeed, since this action was brought, one of its nursing homes has expressed dissatisfaction with MedOptions' services - and returned to GeriCare. (Affidavit of Dr. Stewart, ¶ 18, appended to Plaintiffs' Response to Sullivan's Statement of Undisputed Facts as Exhibit 2.)

Defendant Sullivan certainly knew of the longstanding nature of the relationships. (Affidavit of Dr. Stewart, ¶ 16, appended to Plaintiffs' Response to Sullivan's Statement of Undisputed Facts as Exhibit 2.) In any case, Defendant Sullivan's argument can hardly extend to the case of Heritage Hills. No letter was sent to Heritage Hills, because - as Sullivan knew -it was contemplated that Dr. Stewart could take over. (See Plaintiffs' Response to Sullivan's Statement of Undisputed Fact, ¶ 9.)

Furthermore, there is evidence on the record undermining Defendant Sullivan's assertions that she in no way interfered with GeriCare's relationship with the nursing homes. Indeed, Defendant Sullivan appears to be worthy of very little credence at all. As noted above, she was far from candid with Dr. Stewart about her reasons for leaving GeriCare. (See Plaintiffs' Response to Sullivan's Statement of Undisputed Fact, ¶ 6.) Assuming that her story about her conversation with Alice Mellucci of Hebert Nursing Home is true, she did nothing to inform him of a client's dissatisfaction - thus calling her loyalty to GeriCare into serious question. (See

---

[3] Indeed, a number of these nursing homes were family owned and operated, thus adding another level of permanency to the relationship.

Plaintiffs' Response to Sullivan's Statement of Undisputed Fact, ¶ 6.) She interviewed for employment with MedOptions with the full knowledge that that employment was in direct contravention of her contract with GeriCare. (Plaintiffs' SUF, ¶ 30.) Although there is a dispute as to precisely when Sullivan first discussed joining MedOptions, there is documented evidence clearly indicating that she began the application process before her contract with GeriCare expired on June 1, 2006, that is, while she was still employed with those nursing homes. (Plaintiffs' SUF, ¶ 33.)

Also significantly, it is clear that Defendant Sullivan was keeping GeriCare's clients abreast of her plans to work for MedOptions. On or about the same day that she submitted her application, she would send to Ms. Wood of MedOptions a fax indicating that she had spoken to Elaine DelSesto from The Holiday and Barbara Langshaw-Soares from Heritage Hills Nursing Center.[4] (Exhibit P; SUF ¶ 34.) It is also significant that these individuals were not listed as potential references in Defendant Sullivan's application materials. (Plaintiffs' Motion for Summary Judgment, Exhibit O.) Defendant Sullivan also used an employee of Ballou as a reference. (Plaintiffs' Motion for Summary Judgment, Exhibit O.) Given Defendant Sullivan's relationships with the nursing homes, and the continuity of care that Defendant Sullivan could offer, her decision to work for MedOptions represented a major business advantage for MedOptions in expanding its business. Even if this relationship had not been a factor, it is still significant that Defendant Sullivan at least enabled Defendant MedOptions to service its new

[4] Given that Defendant Sullivan was given an offer letter the same day, it is clear that the application process was little more than a formality, and Defendant Sullivan's employment was already assured. Indeed, Defendant Sullivan was offered a job on the spot at the Panera Bread interview, and had accepted. (Plaintiffs' Response to Sullivan's Statement of Undisputed Fact, 11.)

nursing homes. It is also worth noting that the contract documents for a number of the nursing homes were being signed even before GeriCare's termination date of June 1, 2006. (Plaintiffs' Motion for Summary Judgment, Exhibit T.)

The situation at Heritage Hills is particularly significant. Defendant Sullivan would have it that Heritage Hills decided to end its relationship with GeriCare due to dissatisfaction with the replacement for Sullivan offered, and then just happened to fall into MedOptions' arms. There is substantial evidence suggesting that Heritage Hills' stated reason for terminating the agreement with GeriCare was pretextual. Defendant Sullivan testified during her deposition that Joyce Sormanti had informed her that Dr. Stewart was going to continue with the Heritage Hills patients after Defendant Sullivan left. Therefore, replacement of Defendant Sullivan was not a pressing issue. Heritage Hills rejected GeriCare's proffered replacement because she was told that she would be working during the late afternoon. Heritage Hills, however, had never before indicated that it was necessary that a provider work during the day, nor was there any clinical reason for doing so. GeriCare did suggest that Heritage Hills speak to the replacement to discuss hours in greater detail. Heritage Hills did not take advantage of this opportunity. Instead, Heritage Hills simply terminated the agreement - even before the 30-day period agreed to in its contract with GeriCare by its letter dated May 31, 2006.[5] That letter, however, indicated that there was in fact a need for a new provider to work during the evening. (See Plaintiffs' Motion for Summary Judgment, Exhibit C, Plaintiffs' Responses to Interrogatories #1 and 5, See Exhibit

---

[5] This effort to retain Heritage Hills itself cost GeriCare even more business, as Ms. Borges' assuming responsibility for Heritage required that GeriCare give up two other nursing homes. (See Affidavit of Christine Richards, ¶ 8, appended to Plaintiffs' Response to Statement of Undisputed Facts as Exhibit 3.)

U; Plaintiffs' SUF ¶ 51; Plaintiffs' Response to Defendant Sullivan's Statement of Undisputed Fact, ¶ 9.)

Immediately after that period expired, Heritage Hills signed an agreement with MedOptions. However, it is clear from the face of that agreement that Heritage Hills and MedOptions had begun discussions at least by June 1, 2006. (See Plaintiffs' Motion for Summary Judgment Exhibit T, p. M-00009, "Commencement Date;" Plaintiffs' SUF ¶ 51.) Heritage Hills' eagerness to drop the agreement with GeriCare similarly points to earlier discussions with MedOptions. Finally, as noted above, Barbara Langshaw-Soares was one of the major contact people at Heritage Hills - and Defendant Sullivan had found it important to let Ms. Wood know that she had been in contact with her in her fax of May 18, 2006. (Plaintiffs' Motion for Summary Judgment, Exhibit P; Plaintiffs' SUF, ¶ 34.) As such, there is at least some evidence creating a dispute of fact as to whether Defendant Sullivan was in any way involved with Defendant MedOptions' acquisition of Heritage Hills - the one nursing home which had never been given one of the April 20, 2006 notice letters.

Defendant Sullivan also overlooks the fact that another advantageous business relationship was tortiously interfered with - her own non-compete with GeriCare. GeriCare clearly had an advantageous business relationship as a result of its agreement with Defendant Sullivan. Although Defendant Sullivan had handed in her resignation on or about April 9, 2006, Defendant Sullivan had announced her intention to continue providing services to the Plaintiffs until June 1, 2006. (Plaintiffs' Motion for Summary Judgment, Exhibit H; SUF ¶ 19.) Even after that date, Plaintiffs and Defendant Sullivan still had a contractual relationship flowing from their non-compete agreement, which was to remain in effect for six months after she ceased to provide services on behalf of Plaintiffs. (Plaintiffs' Motion for Summary Judgment, Exhibit E; SUF ¶ 7.)

Defendant MedOptions was well aware of the existence of that agreement, and intentionally interfered with that agreement by encouraging and assisting Defendant Sullivan in her breach of it. Defendant Sullivan informed Defendant MedOptions' representative of the existence of that agreement at her job interview at Panera Bread. (Plaintiffs' Motion for Summary Judgment, Exhibit B, p. 97:11-23; Exhibit K, p. 40:3-41:15.) Nevertheless, both Defendants pressed forward. Even after having been contacted by Plaintiffs regarding the non-compete agreement, Defendants did not alter their course of conduct. Defendant Sullivan continued to provide services in Rhode Island on behalf of Defendant MedOptions until she herself requested a transfer to Connecticut on her acceptance into a religious order, in January, 2007. (Plaintiffs' Motion for Summary Judgment, Exhibit B, p. 112:18-113:5; SUF ¶ 52-54.)

When an employer hires an employee despite the employer's knowledge that the proposed employment will violate the employee's non-compete agreement, that hire is recognized as a species of tortious interference. *See* German Publishing Co. v. Stillman, 516 F.Supp. 98, 106 (N.D. Ill. 1981); Corroon & Black of Illinois, Inc. v. Magner, 494 N.E.2d 785 (III.App. 1986). Defendant MedOptions, then, must be deemed liable for having tortiously interfered with Plaintiffs' agreement with Defendant Sullivan. Furthermore, Defendant Sullivan, although a party to the non-compete agreement, similarly incurs liability for tortious interference based upon the fact that she had acted in concert with Defendant MedOptions in their tortious behavior. Where a party breaching a non-compete agreement acts in concert with others to bring about that breach, the party to a non-compete agreement may be liable for both the breach of the agreement and for tortious interference with that agreement. *See* Hart, Niniger and Campbell Associates, Inc. v. Rogers, 548 A.2d 758, 764 (Conn.App. 1988).

We also observe that there is still an issue of fact as to whether Defendant Sullivan had been approached by and accepted employment from MedOptions, and her true reason for departing from GeriCare. It is hardly credible to believe that Defendant Sullivan would abruptly quit a job without having another lined up. Her lack of truthfulness to Dr. Stewart as to her true reasons for leaving further undermines her credibility- as does the basic lack of loyalty demonstrated by her failure to alert Dr. Stewart to Hebert's dissatisfaction (assuming that that dissatisfaction ever existed). Although Defendant Sullivan's application materials were not submitted until May 18, 2006, after the resignation letter, she received a formal offer letter on May 19, 2006 - the very next day. (Plaintiffs' Response to Defendant Sullivan's Statement of Undisputed Fact, ¶ 11.) This speed strongly suggests that the written application process was a mere formality, and that Defendant Sullivan had in fact been given a firm offer well before. For that matter, there is testimony by all that Defendant Sullivan had been given an offer at the Panera Bread interview - but nobody can recall the date.[6] (Plaintiffs' Response to Defendant Sullivan's Statement of Undisputed Fact, ¶ 11.) Based upon this evidence, a jury could reasonably choose to believe that Defendant Sullivan had been offered a job from MedOptions long before she had ever submitted her resignation to GeriCare, and thus precipitated the entire chain of events leading to a massive hemorrhage of GeriCare's business.

---

[6] Admittedly, Defendant Sullivan's responses to interrogatories have indicated that she was first approached by MedOptions by postcard on May 1, 2006, and then the interview with Panera Bread was set up. However, at deposition, she admitted that she had no recollection of that date, but that it had been provided by the attorney.(Deposition of Sullivan, p. 94:9- 95:4, Exhibit 3.) Similarly, Jeffrey Kinnell, CEO of MedOptions, who provided the May 1, 2006 date in his own interrogatories, indicated at deposition that he would have obtained that from records maintained by the personnel recruiter. (Deposition of Kinnell, p. 57:15-25, Exhibit 1.) However, Defendant MedOptions never produced this in response to the Plaintiffs' request for records relating to Defendant Sullivan's hiring.

Finally, Defendant Sullivan attempts to absolve herself by claiming that her actions in providing services to MedOptions were somehow justifiable. This argument only succeeds if one completely overlooks the fact that at the time of her employment by MedOptions, Defendant Sullivan was still bound by her non-compete agreement with GeriCare. Defendant Sullivan knew perfectly well what she had agreed to - to refrain from working from GeriCare's competitors. (Deposition of Sullivan, p. 31:16-23, Exhibit 3.) Nevertheless, she chose to completely ignore an agreement that she had voluntarily entered into. This blatant disregard for contractual obligations can not and should not be deemed justifiable and acceptable behavior by this Court.

Furthermore, there is a material issue of fact as to whether Defendants' actions were injurious to the Plaintiffs. There is an issue of fact as to whether the employment relationship entered into by Defendants was the true reason for Defendant Sullivan's departure and GeriCare's resultant inability to service its clients. Even if we accept as true the assertion that the employment relationship came after Defendants formed the employment relationship, there is still an issue of fact as to whether Defendant Sullivan and MedOptions acted in concert to gain GeriCare's business. In this regard, it must be noted that even if Defendant Sullivan did not directly engage in solicitation of the nursing homes, she at least enabled Defendant MedOptions to service the nursing homes.

The Plaintiffs, then, have succeeded in producing sufficient evidence that Defendant Sullivan, acting in concert with Defendant MedOptions, engaged in tortious interference with their advantageous business relationships. The evidence clearly demonstrates that both interfered with the non-compete agreement. Furthermore, there is at least a triable issue of fact as to whether the two Defendants, acting in concert, tortiously interfered with Plaintiffs' relationships with their nursing home clients.

**IV. CONCLUSION**

For the above-referenced reasons, Defendant Sullivan's Motion for Summary Judgment should be DENIED.

Respectfully submitted,

/s/ Stephen M. Robinson
Stephen M. Robinson #2103
The Law Offices of Stephen M. Robinson
155 South Main Street, Suite 402
Providence, RI 02903
(401) 331-6565
(fax) 331-7888
March 10, 2008
srobinson@smrobinsonlaw.com

/s/ Vicki J. Bejma
Vicki J. Bejma #6498
The Law Offices of Stephen M. Robinson 155
South Main Street, Suite 402 Providence, RI
02903
(401) 331-6565
(fax) 331-7888
March 10, 2008
vbejma@smrobinsonlaw.com

CERTIFICATION

I, the undersigned, hereby certify that on March 10, 2008, I sent a true copy of the within by electronic filing to all of the parties below:

Christine K. Bush, Esq.
Rachelle R. Green, Esq.
Duffy Sweeney & Scott, Ltd.
One Turks Head Place, Suite 1200
Providence, RI 02903

Lawrence Peikes, Esq.
Wiggin & Dana, LLP
400 Atlantic Street
P.O. Box 110325
Stamford, CT 06911-0325

/s/ Vicki J. Bejma