**Exhibit 1**

A. Some of them provide a monthly fee.
Q. How much is that monthly fee?
A. It ranges between a couple hundred dollars to 6 or 700 a month.
Q. How is that fee calculated?
A. It's negotiated on an individual facility basis.
Q. Are the nurse practitioners employees or independent contractors?
A. For the most part, employees.
Q. What is the salary of a nurse practitioner?
A. Varies. Could be anywhere between, depending upon whether they're full or part time, anywhere -- for a full-time individual would be 65 to $70,000.
Q. Is there any -- is there any kind of manner in which salaries are calculated based on productivity?
A. Yes.
Q. Could you describe that arrangement?
A. We basically negotiate salaries. We determine how many patients the clinician will be seeing on a daily basis, and they're compensated based upon that.
Q. Do they receive fringe benefits in addition to



their salary?
A. If they elect to, yes.
Q. What sort of benefit packages do you offer?
A. Health care, dental, life insurance.
Q. And what is the rate at -- at what rate are patients charged for the services of a nurse practitioner?
A. They're charged based upon codes established by Medicare.
Q. Is Medicare the only insurance provider to these patients?
A. No.
Q. What are the other insurers?
A. They would include United HealthCare, United Behavioral Health, EverCare, Rhode Island Blue Cross, Blue CHiP, those would be the major carriers in Rhode Island.
Q. Does MedOptions provide staff training for the nursing homes?
A. As requested.
Q. Does MedOptions provide forensic services to the nursing homes?
THE WITNESS: Can you clarify what forensic services means?
MS. BEJMA: To determine legal



competence.
A. Yes.
Q. Does MedOptions provide counseling for dementia patients?
A. Yes.
Q. Does MedOptions provide risk management services?
THE WITNESS: Can you clarify what that means?
Q. Would it help -- would it provide to nursing homes seeking to ensure that, you know, problems don't happen as a result of the patients' mental condition, elopements?
A. Our staff is trained to provide support to the nurses at a facility to help deal with problems.
Q. Does MedOptions provide counseling for dementia parents?
A. Yes.
Q. Does MedOptions provide the nurse practitioners with various forms to use, such as evaluation checklists?
A. Yes.
Q. Now, how would MedOptions form a relationship with a particular nursing home?
A. The general nature is we would receive a call



from a facility and respond to a request for services.
Q. How would the nursing home come to have heard about you?
A. Generally, through word of mouth. The way we got started in Rhode Island was a nursing home administrator from Connecticut moved to Rhode Island and contacted us when she moved here.
Q. Who was that administrator?
A. I don't know.
Q. Does MedOptions advertise in any way?
A. From time to time we send out marketing letters to facilities.
Q. Do you engage in any other types of marketing?
A. No.
Q. Do you have a website?
A. Yes.
Q. How long have you had a website?
A. It was prior to the time that I joined the company.
Q. What materials are on the website?
A. Basic information about our services.
Q. Do you have staff profiles on your website?
A. I believe we do.
MS. BEJMA: Mark this as Exhibit 3.

(PLAINTIFFS' EXHIBIT 3 MARKED FOR IDENTIFICATION)
Q. Take the opportunity to review that. Have you ever seen that letter before?
A. No.
Q. Have you ever seen a letter like that before?
A. I don't recall.
Q. Do you have -- I would assume that -- would I be correct in assuming that MedOptions prepares an annual budget?
A. Yes.
Q. Would advertising and solicitation and marketing be on that budget?
A. Yes.
Q. And what would the total budget be for advertising, solicitation and marketing?
A. I don't have any idea, sitting here today.
Q. Can you give me an estimate?
A. Not a good one.
Q. The best estimate you can give.
A. It would be less than $10,000.
Q. Do you have a standard set of materials that you give to nursing homes that might be interested in your services, brochure?
A. Yes.



Q. What would be your standard package?
A. The brochure would include a summary description of the company, summary description of our behavioral services, what those entail, our primary care services and a standard template contract.
Q. Can you describe any efforts you make to recruit staff?
A. Yes.
Q. Could you describe those?
A. We have ads on Career Builder, on monster.com, also send out materials in the mail, postcards on a periodic basis. We attend various job fairs and other such industry events.
Q. Do you have a budget for recruitment?
A. Yes.
Q. How much would that amount to in a year?
A. I don't know.
Q. When you have a potential employee, do you make any effort to check their background?
A. Yes. We generally ask for references.
Q. You ask for references. Do you check their criminal records?
A. We do review it to determine if they are excluded from the Medicare program.



Q. What would exclude one from the Medicare program?
A. Bad deeds, fraud, et cetera.
Q. Would you speak to their former employers?
A. Generally, we don't.
Q. Why is that?
A. Because generally it's just too sensitive.
Q. Sensitive in what way?
A. They might be currently employed. We just generally ask for references.
Q. Okay. Who makes the decisions on hiring?
A. I would say it's really the regional people who make that decision.
Q. Has that always been true, so long as you've been the CEO?
A. Yes.
Q. Does Laurel Wood have the authority to hire?
A. Yes, she does.
Q. How is it determined at what nursing company a nurse practitioner would provide services?
A. It's generally based upon location. We try to schedule them as close to their homes as we could.
Q. Now, you wouldn't put anyone to work for you that didn't happen -- you didn't check their background and do the background check or check their



references or anything, would you?
A. No. That would not be something that we would do as a matter of course.
Q. As a matter of course?
A. Yes.
Q. Would there be any reason that you would put someone to work for you when you hadn't checked their references or done --
A. Might have been somebody that somebody knew, for example.
Q. When did you first hear of Ann Sullivan?
A. I believe it was in the summer of 2006.
Q. How did you first come to know about her?
A. Laurel Wood interviewed her for a position.
Q. When did Laurel interview her for a position?
A. I don't recall the exact date.
Q. Were you present at that interview?
A. No, I was not.
Q. How do you know an interview took place?
A. Because she approached me wanting to get approval to make an offer.
Q. Okay. How did she approach you with that, did she come to you in person, did she E-mail to you, did she write to you?
A. We spoke on the phone, I believe as we

Page 54

A. I don't recall that I did.
Q. Did you yourself ever form any belief as to whether the agreement was enforceable?
A. No.
Q. Did you --
A. I didn't.
Q. Did you ever form any belief as to whether the agreement was going to be enforced?
A. No, I didn't. I'm not an attorney.
Q. Okay. Were you aware as to whether or not Ann Rameaka had had a similar noncompete agreement with GeriCare?
A. No.
Q. Have you read the deposition of Ann Sullivan in this matter?
A. No, I have not.
Q. Have you ever discussed the deposition of Ann Sullivan with anybody in this matter?
A. No, I have not.
Q. Have you read the deposition of Laurel Wood in this matter?
A. No, I have not.
Q. Have you discussed the deposition of Laurel Wood in this matter?
A. No, I have not.

Page 55

Q. Have you read the deposition of Melissa Ferdinandi in this matter?
A. No, I've not.
Q. Have you discussed that deposition with anyone?
A. No, I have not.
Q. When did you first learn that this action was being brought?
A. When we received the letter in September.
Q. Did you speak to Ann Sullivan about this suit?
A. Yes, when she contacted me.
Q. At any other time?
A. We had one or two other conversations.
Q. Did you talk to Melissa Ferdinandi about it?
A. No. No, I don't believe that I did.
Q. Did you talk to Laurel Wood about it?
A. Just generally.
Q. What exactly did you say?
A. I told her that Ann contacted me, and she was concerned, and that I reassured her that we would work with her, help her handle the situation.
Q. Okay. Did you discuss this lawsuit with anybody?
A. With my partner.
Q. And what was -- when as that discussion?
A. When we received the litigation.
Q. And what was the nature of that discussion?

Page 56

A. Again, we just generally described the facts and talked about the process that we were engaged in.
Q. Did you have any further discussions with your partner about this matter?
A. No.
(PLAINTIFFS' EXHIBIT 13 MARKED FOR IDENTIFICATION)
Q. Review this document for a moment. If I could draw your attention to Page 14. Is that your signature?
A. Yes.
Q. You took an oath before a notary when signing this?
A. Yes.
Q. Okay. If I can direct your attention to Page 2, interrogatory Number 2. Now, you reviewed this document before signing this, correct?
A. Yes.
Q. Did you check it over for accuracy?
A. Yes.
Q. And if you would review your response to Interrogatory Number 2 for a moment. Where did you get your information by which you provided the response?

Page 57

A. I had asked one of the folks, one of our people in the office.
Q. With which one of the people?
A. Karen Hart.
Q. What's Karen's Hart's position?
A. Director of information services, and Gail Lemieux who is VP of administration.
Q. If I can direct your attention to interrogatory Number 4 on Page 4?
THE WITNESS: Interrogatory 4 or 5?
MS. BEJMA: Interrogatory 4 on Page 3.
Q. If you could review that for a moment.
(PAUSE)
Q. Where did you obtain the information contained in that interrogatory response?
A. From Marianne Wright.
Q. Where would she have obtained that date?
A. From her files.
Q. Does Ms. Wright maintain records of when a particular candidate, particular potential employee first contacts you?
A. We do try to keep records of that, yes.
Q. Where would those records be kept?
A. In her files.

Q. Would those be part of the employee's personnel file?
A. Not necessarily.
Q. If I can direct your attention to Interrogatory Number 10 on Page 8 -- I'm sorry, it starts on Page 7. If you could review Interrogatory Number 10.
(PAUSE)
Q. Where did you get the information contained in that interrogatory?
A. From the files that we had related to the litigation.
Q. Where would you have obtained the date September 11th?
A. I believe it was from a letter that we received.
Q. A letter from Dr. Stewart you referred to earlier?
A. I believe so, yes.
Q. Okay. That interrogatory reads, "Ms. Sullivan provided MedOptions with a copy of the agreement containing restrictive covenants that she was required to sign in connection with her provision of services to GeriCare." To whom did she supply that agreement?
A. She would have supplied it to me.



MS. BEJMA: I'd like to have this marked Exhibit 14.
(PLAINTIFFS' EXHIBIT 14 MARKED FOR IDENTIFICATION)
Q. Can you identify this document?
A. Yes. It's a supplemental response of MedOptions to plaintiffs' interrogatories.
Q. Have you seen this document prior to today?
A. Yes.
Q. And if I can direct your attention to Interrogatory Number 4 starting on Page 2, if you could review that for a moment.
(PAUSE)
Q. Do you believe that response to be a true and accurate answer to Interrogatory Number 4?
A. Uh-huh.
MR. PEIKES: You have to say yes.
A. Yes.
Q. If I can redirect your attention to Exhibit 13, Interrogatory Number 5 beginning -- I'm sorry Interrogatory Number 4 beginning on Page 3. Would you agree that the answer to Interrogatory Number 4 given on Exhibit 13 is very different from that given on Exhibit 14?
MR. PEIKES: Objection to the form.



You can answer.
A. Yes. Subsequently we found out more details.
Q. How did you find out more details?
A. Through discussion with Melissa and Laurel Wood.
Q. When did those discussions with Melissa and Laurel Wood take place?
A. Those are discussions that they had with counsel.
Q. You never discussed the Panera Bread interview in Paragraph Number 5 with Melissa?
A. No.
Q. You never discussed the Panera Bread interview with Ms. Wood?
A. Only generally.
Q. When did those discussions take place?
A. I don't recall.
Q. If you could start reading the response to -- supplemental response beginning at, "It is Ms. Sullivan's recollection."
THE WITNESS: Do you want me to read this?
MS. BEJMA: Yes.
A. "It is Ms. Sullivan's recollection during the interview she mentioned to Ms. Ferdinandi and Ms.



Wood that she had signed a noncompetition agreement with GeriCare."
Q. Keep reading?
A. "They had further advised her that MedOptions had hired another former GeriCare employee who was subject to a similar agreement and there were no problems. None of the participants could recall whether Ms. Sullivan produced a copy of the agreement at issue in this case to Ms. Ferdinandi or Ms. Wood at the time of the interview."
Q. Now, did you at any time discuss -- I take it you've read this document before today, you just testified to that?
A. Yes.
Q. Ms. Sullivan's recollection during the interview she mentioned to Ms. Ferdinandi and Ms. Wood she signed a noncompetition agree with GeriCare. They advised her they hired another former GeriCare employee who was subject to a similar agreement and there were no problems. Did you ever discuss with Ms. Wood that -- Ms. Sullivan's recollection?
A. No, I did not.
Q. Ms. Sullivan is recollecting that Ms. Wood told her that there had been no problems with a similar noncompete agreement before, according to this