**UNITED STATES DISTRICT COURT**
**DISTRICT OF RHODE ISLAND**

| | | |
|---|---|---|
| HUMAN SERVICES CONSULTANTS, LTD, dba GERICARE, and RONALD MARK STEWART MD,<br><br>Plaintiffs,<br><br>v.<br><br>ANN TAMULE, aka, ANN M. SULLIVAN, alias, and MEDOPTIONS INC.,<br><br>Defendants. | : | Case. No. 1:06-cv-00486-ML-DLM |

**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF OBJECTION TO PLAINTIFFS' MOTION FOR LEAVE TO AMEND COMPLAINT**

Notwithstanding that discovery in the above-captioned case has closed, and cross-motions for summary judgment are pending, plaintiffs Human Services Consultants, Ltd. d/b/a GeriCare ("GeriCare") and its owner, Ronald Mark Stewart, M.D. ("Dr. Stewart") (collectively "plaintiffs"), seek leave to amend their Complaint to add several new defendants and to "clarify" -- actually change -- the legal theory underlying one of their two counts alleging tortious interference with advantageous business relationships.

Because, as demonstrated below, plaintiffs' eleventh hour attempt to expand the scope of this suit comes far too late, and the proposed new claim, alleging that defendants MedOptions, Inc. ("MedOptions") and Ann Sullivan ("Sullivan") tortiously interfered with the non-competition agreement plaintiffs required Sullivan to execute as a condition of her continued employment, could not survive summary judgment, leave to amend should be denied.

## I. BACKGROUND

Plaintiffs commenced this action in the Superior Court of Rhode Island, judicial district of Providence/Bristol, by filing a Summons and Complaint on October 17, 2006, some fifteen (15) months before the instant motion was brought. On November 6, 2006, defendants timely removed the action to this Court, invoking federal diversity jurisdiction.

Thereafter, the parties engaged in extensive written discovery. Each party served, and responded to, one or more sets of comprehensive interrogatories and document requests, as well as detailed and extensive requests for admission. In addition, the parties conducted numerous depositions -- in particular, plaintiffs deposed Sullivan and three of MedOptions' highest ranking executives, Jeff Kinell, co-Chief Executive Officer, Laurel Wood, Vice President of Operations, and Melissa Ferdinandi, former Regional Manager, and defendants deposed Dr. Stewart. Discovery closed on February 8, 2008.

In accordance with the governing Scheduling Order, on February 22, 2008, defendants filed separate motions for summary judgment seeking dismissal of all counts. For their part, plaintiffs simultaneously moved for partial summary judgment on the breach of contract claim against Sullivan and, curiously, the tortious interference claim first articulated in the proposed new complaint that accompanied the instant motion for leave to amend. That motion was filed on February 27, 2008, five (5) days after the litigation entered the summary judgment phase.

For the reasons that follow, leave ought be denied.

## II. ARGUMENT

"Rule 15(a) stipulates that leave to amend should be freely granted when justice so requires, but the Rule's liberal amendment policy does not mean that leave will always be granted. The First Circuit has explained that a district court may deny a motion to amend 'so long as the record evinces an arguably adequate basis for the court's decision (e.g., futility, bad faith, undue delay, or a dilatory motive on the movant's part).'" Harvey v. Snow, 281 F. Supp. 2d 376, 379-80 (D.R.I. 2003)(Citations omitted).

Hence, as First Circuit precedent makes plain, "[f]utility of the amendment constitutes an adequate reason to deny the motion to amend. The motion may also be denied if a proffered amendment comes 'too late,' or if it 'otherwise would serve no useful purpose.'" Todisco v. Verizon Communications, Inc., 497 F.3d 95, 98 (1st Cir. 2007)(Citations omitted).

Plaintiffs' motion is properly denied as "too late" and/or because the proposed amendment represents an exercise in futility.

### A. Leave To Amend Should Be Denied On The Basis Of Undue Delay

"It is black-letter law that 'regardless of the context, the longer a plaintiff delays, the more likely a motion to amend will be denied, as protracted delay, with its attendant burdens on the opponent and the court, is itself a sufficient reason for the court to withhold permission to amend.'" ACA Financial Guaranty Corp. v. Advest, Inc., 512 F.3d 46, 57 (1st Cir. 2008)(Citations and alterations omitted).

As alluded to above, plaintiffs filed this motion well over a year after the suit was removed to federal court. Plaintiffs offer no legitimate excuse for their dilatoriness.

Indeed, the cryptic reasons offered by plaintiffs to explain away their delay in seeking leave to amend are not only baseless, they are patently misleading.

### *1. The Proposed Amendment to Add New Defendants*

In their supporting memorandum of law, plaintiffs contend that "at the deposition of Jeffrey Kinnell [sic] on February 6, 2007 [sic], Plaintiff [sic] discovered the identity of several other potential defendants, entities closely related to the original Defendant, MedOptions." Plaintiffs offer no explanation as to why they could not have discovered the existence of these related entities at the time suit was filed, nor do plaintiffs elucidate any legal basis for imposing liability on a MedOptions' affiliate.

More importantly, though, contrary to the representations made to the Court, plaintiffs did not first identify the defendants they wish to rope into this lawsuit at the February 6 deposition of Mr. Kinell -- counsel questioned Ms. Wood about one of the proposed defendants at her deposition on January 10, 2008. (Wood Dep. at pp. 13-14; a copy of relevant excerpts from the Wood Dep. is attached hereto as Exhibit A). Plaintiffs immediately followed up with an interrogatory specifically naming several MedOptions' affiliates, including both proposed defendants, and seeking further details as to how they fit into MedOptions' corporate structure. (See Pltfs' Second Set of Interrogatories, No. 1; a copy of these interrogatories is attached hereto as Exhibit B).

Surely, the information relied upon by plaintiffs in formulating these discovery inquiries was equally available when they filed suit. That plaintiffs may have neglected to unearth this information until discovery was on the verge of closure is neither here nor there, and does not justify adding new defendants at this late date. "At the end of the day, when 'considerable time has elapsed between the filing of the complaint and the motion

to amend, plaintiffs have the burden of showing some valid reason for their neglect and delay.' It is clear ... that plaintiffs in the present case have failed to sustain that burden." Harvey, 281 F. Supp. 2d at 381 (Alterations omitted), quoting Grant v. News Group Boston, Inc., 55 F.3d 1, 6 (1st Cir. 1995).

*2. The Proposed Amendment to Add a New Claim*

Plaintiffs again mislead the Court in characterizing the proposed amendment of their tortious interference counts as a mere clarification. Quite the contrary, the proposed amended complaint articulates an entirely new and different theory of recovery nowhere found, much less adequately plead, in the original Complaint.

"While a complaint ... does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do. Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." Bell Atlantic Corp. v. Twombley, __ U.S. __, 127 S. Ct. 1955, 1964-65, 167 L. Ed. 2d 929 (2007)(Citations and alterations omitted). At a bare minimum, then, Fed. R. Civ. P. 8(a)(2) obligates a plaintiff to "provid[e] not only 'fair notice' of the nature of the claim, but also the 'grounds' on which the claim rests." Id. at 1965, n.3 (Citation omitted).

The operative Complaint originally filed in State court alleges two separate, but virtually indistinguishable, claims entitled Interference With Advantageous Business Relationship. Neither count provides "fair notice" of a claim for tortious interference

with the non-competition covenants contained in the Provider Agreement signed by Sullivan in June 2004 as a condition of her continued employment by GeriCare.

Count II alleges in substance that, "Defendant Sullivan's and the other Defendants' intentional and malicious acts and omissions, by continuing to work at the facilities listed in paragraph 7 of the Complaint, have *resulted in the involuntary termination of Plaintiff's business relationships with said facilities*." (Complaint ¶ 33)(Emphasis added). Plaintiffs further allege in Count II that defendants "intended to damage or destroy Plaintiff's [sic] long-standing business relationships and but for Defendants' actions and interference, the Plaintiffs would still continue in *their business relationships with Plaintiffs' clients*." (Complaint ¶ 34)(Emphasis added). In Count III, plaintiffs similarly allege that defendants "wrongfully, unlawfully and maliciously conspired to damage and destroy Plaintiffs' business relationships *with the parties identified in Paragraph 7 of this complaint*." (Complaint ¶ 36)(Emphasis added).

Conspicuously absent from both Counts II and III is a reference to Sullivan's non-competition agreement or any interference therewith. Rather, as the italicized language makes plain, both counts concern alleged interference with plaintiffs' customer relationships. Defendants structured their summary judgment motions accordingly and did not address plaintiffs' unstated claim for tortious interference with the Provider Agreement's restrictive covenants. That such a claim cannot be read into either Count II or III is obvious from not only the factual allegations supporting those counts but also the label plaintiffs attach to them, namely Interference With Advantageous *Business Relationship*.

Rhode Island recognizes two distinct types of tort claims sounding in interference, one denominated as tortious interference with a contractual relationship and the other tortious interference with a business advantage. Avila v. Newport Grand Jai Alai LLC, 935 A.2d 91, 97-98 (R.I. 2007). Both claims require the same elements of proof, the difference being that the latter concerns "a business relationship or expectancy, rather than [] an actual contract." APG, Inc. v. MCI Telecommunications Corp., 436 F.3d 294, 303 (1st Cir. 2006)(Citation omitted). The appropriate designation for plaintiffs' proposed claim accusing defendants of banding together to deprive GeriCare of the benefit of Sullivan's non-competition agreement -- "an actual contract" -- would, of course, be tortious interference with a contractual relationship.

Plaintiffs obviously recognize as much, lest they would not have found it necessary to move for leave to amend the Complaint. In so doing, plaintiffs inevitably concede that the facts alleged in support of Counts II and III do not meet the liberal notice pleading rules applicable in federal court. That is, if the Complaint contained a "short and plain statement" sufficient to give defendants "fair notice" they were being sued for tortious interference with Sullivan's employment contract, and particularly the restrictive covenants contained within, there would, by definition, be no need for plaintiffs to "clarify."

"This is not an instance in which newly discovered evidence, not previously available, suddenly came to light; the plaintiff[s] [were] aware of the factual predicate on which [their] new theory rested before [they] brought suit." Palmer v. Champion Mortgage, 465 F.3d 24, 31 (1st Cir. 2006)(affirming denial of tardy motion for leave to amend). Plaintiffs are therefore left with literally no excuse for their laggardness in

seeking to add a tortious interference with *contract* claim. Federal Ins. Co. v. Boston Water and Sewer Comm., 514 F. Supp. 2d 130, 135 (D. Mass. 2007)(denying motion for leave to add new claim sounding in trespass where "plaintiff has not explained why it could not have brought the trespass claim before the original deadline imposed for the filing of amended pleadings or at least before the defendant moved for summary judgment.").

"Any belated amendment of the complaint on the cusp of summary judgment ... would be unfair to [defendants]. In short, [defendants] should not be made to shoot at a continuously moving target." Brooks v. AIG SunAmerica Life Assurance Co., 480 F.3d 579, 590 (1st Cir. 2007)(Citation omitted).

**B. Plaintiffs' Motion For Leave To Add A New Claim For Tortious Interference With Contract Should Be Denied On Futility Grounds**

Even were the Court inclined to overlook plaintiffs' unexplained delay in seeking to add a claim for tortious interference with Sullivan's non-competition agreement, leave should still be denied on futility grounds.

"When leave to amend is sought prior to the completion of discovery and the filing of motions for summary judgment, the standard for futility is whether the complaint as amended would survive a motion to dismiss under Rule 12(b)(6)." Ferriera v. City of Pawtucket, 365 F. Supp. 2d 215, 216 (D.R.I. 2004)(Lisi, J.)(Citation omitted). But "[t]he bar for a plaintiff tendering an amended complaint is higher after a motion for summary judgment has been filed, as the plaintiff must demonstrate 'that the proposed amendments were supported by substantial and convincing evidence.'" Adorno v. Crowley Towing and Transportation Co., 443 F.3d 122, 126 (1st Cir. 2006)(Citations omitted). This bar proves too high for plaintiffs to traverse.

"The elements of a claim for tortious interference with contractual relations under Rhode Island law are: (1) the existence of a contract; (2) defendants' knowledge of the contract; (3) defendants' intentional interference with the contract; (4) damages caused by the interference." APG, Inc., 436 F.3d at 303 (Citations omitted). Discovery reveals plaintiffs to be incapable of establishing any of these elements.

Indeed, plaintiffs' freshly minted tortious interference claim is vulnerable to disposition at summary judgment on no less than four (4) separate and independent grounds: (i) the non-competition agreement is unenforceable as a matter of settled Rhode Island law, and hence there is no contract with which MedOptions or Sullivan could have interfered; (ii) Sullivan cannot be sued for tortious interference with a contract to which she was a party; (iii) the record is devoid of evidence that MedOptions used improper means to recruit Sullivan or did so without justification; and (iv) plaintiffs were not damaged by MedOptions' hiring of Sullivan, it being undisputed that she did nothing to facilitate MedOptions' procurement of service agreements from GeriCare's former customers.

Because points (i), (iii) and (iv) were fully briefed by defendants in their summary judgment papers, they are addressed below in précis fashion.

### *1. The Non-Competition Agreement is Unenforceable*

Sullivan's summary judgment brief establishes that the non-competition agreement in question is unenforceable as a matter of Rhode Island law. That being so, plaintiffs are incapable of satisfying the threshold element of a claim for tortious interference with contract.

"It is well settled that covenants not to compete are disfavored and subject to strict judicial scrutiny. As a result, Rhode Island courts will uphold and enforce such provisions if, *inter alia*, the party seeking to enforce the noncompetition clause (the promisee) shows that the provision is ancillary to an otherwise valid transaction or relationship, and that 'the contract is reasonable and does not extend beyond what is apparently necessary for the protection of those in whose favor it runs.'" Cranston Print Works Co. v. Pothier, 848 A.2d 213, 219 (R.I. 2004)(Citations and footnote omitted). "Whether a restrictive covenant is reasonable is ultimately a question of law determined by the court." Durapin, Inc. v. American Products, Inc., 559 A.2d 1051, 1053 (1989)(Citation omitted).

Because plaintiffs' business was limited to the State of Rhode Island (Complaint ¶¶ 5, 7), the geographically unbounded non-competition covenant imposed on Sullivan by GeriCare is, by definition, overly broad in scope. Cranston Print Works, 848 A.2d at 220 (restrictive covenant's "geographical restriction ... should be tailored ... to ... the true scope of [the promisee's] legitimate commercial interests ..."). This flaw would not necessarily sound the death knell for the covenant not to compete, but the absence of a protection-worthy business interest does. See Durapin, Inc., 559 A.2d at 1053 ("... the party seeking to enforce a noncompetition provision must show that ...," *inter alia*, "there exists a legitimate interest that the provision is designed to protect.")(Citation omitted).

Rhode Island recognizes but a handful of commercial interests that might theoretically justify a restriction on competitive activities, namely (i) goodwill acquired in connection with the sale of a business; (ii) portable training in "unique or novel" services; and (iii) exploitable trade secrets and confidential information. Dial Media, Inc.

v. Schiff, 612 F. Supp. 1483, 1489 (D.R.I. 1985)(Citations omitted). Sullivan's employment by MedOptions placed none of these legitimate interests at risk.

**(i) Goodwill**

GeriCare did not purchase a business owned by Sullivan so as to trigger protection of acquired good will. Be that as it may, it is undisputed Sullivan had no role in soliciting customers for MedOptions -- in fact, the nursing homes approached MedOptions about replacing GeriCare, without any overture from MedOptions whatsoever. (UF ¶¶ 13, 16).[1] Because any loss of good will suffered by plaintiffs could not possibly be attributed to Sullivan, the restrictive covenant does nothing to further GeriCare's otherwise legitimate interest in safeguarding customer relationships. See Hawkins v. Daly Commerce, Inc., 2003 WL 302358, at *4 (R.I. Super. Feb. 10, 2003)(denying enforcement of restrictive covenant where former employee's activities did not cause loss of business).

**(ii) Training**

Nor did plaintiffs train Sullivan. To the contrary, Sullivan came to GeriCare in June 2002 with a Bachelor's Degree in Nursing, a Master's Degree in Nursing, an Advanced Graduate Certificate as an Adult Nurse Practitioner, and over 15 years of experience in the nursing field. (UF ¶ 2).

In furtherance of their motion for summary judgment, plaintiffs' note that "GeriCare's practice was not limited to psychiatry, but geriatric psychiatry" and, more particularly, "the unique needs of nursing home patients." Against this backdrop plaintiffs aver that "Sullivan received the benefit of training in this particular sub-

---

[1] "UF ¶ __" is a cross-reference to the numbered paragraphs of the Statement of Undisputed Facts submitted by Sullivan in support of her motion for summary judgment.

specialty from GeriCare, both in its clinical and administrative aspects." (Pltfs' Mem. in Support of Their Motion for Summary Judgment, hereinafter "Pltfs' SJ Mem.," at pp. 14-15). According to Dr. Stewart, however, the "training" provided to Sullivan was in the nature of an orientation that lasted no more than a few days. (Stewart Dep., at pp. 61-62; a copy of relevant excerpts from the Stewart Dep. is attached hereto as Exhibit C). This is not the sort of "unique or novel" education courts recognize as sufficient to justify restrictions on one's employability.

While Rhode Island law is not well-developed on the point, precedent from other jurisdictions that take a similar approach to non-competition covenants teaches that, "In order for training to be a protectible business interest, it must be extraordinary. Training is classified as extraordinary when it exceeds 'what is usual, regular, common. or customary in the industry in which the employee is employed.'" Dyer v. Pioneer Concepts, Inc., 667 So.2d 961, 964 (Fla. 2d DCA 1996)(Citations omitted). See also Brown & Brown, Inc. v. Ali, 494 F. Supp. 2d 943, 953 (N.D. Ill. 2007)(training that is customary in the industry was not extraordinary and specialized); Ride the Ducks, L.L.C. v. Duck Boat Tours, Inc., 2005 WL 670302, at *12-13 (E.D. Pa. March 21, 2005)(same); Moore Business Forms, Inc. v. Foppiano, 181 W. Va. 305, 382 S.E.2d 499, 501-02 (1989)(same).[2]

"At most, the training which [Sullivan] received from [plaintiffs] enabled [her] to improve [her] skills to become a more effective [nurse practitioner]. Toward this end, 'an employer cannot by contract prevent his employee from using the skill and intelligence

---

[2] Notably, even training of an extraordinary and specialized nature will not justify a non-competition covenant unless it is "combined with other factors weighing in favor of a protectable business interest such as trade secrets, confidential information, or special customer relationships." 7's Enterprises, Inc. v. Del Rosario, 111 Hawai'i 484, 143 P.3d 23, 32 (2006). Here, as Sullivan demonstrated in her summary judgment submission, no such interests are implicated.

acquired or increased and improved through experience or through instruction received in the course of the employment.'" Asters v. Management Search of Rhode Island, Inc., 1988 WL 1017330, at *4 (R.I. Super. July 7, 1988)(Citation omitted).

**(iii) Confidential Information**

Finally, Sullivan did not possess, much less misappropriate and exploit, any of plaintiffs' proprietary information.

Contrary to plaintiffs' contention (Pltfs' SJ Mem., at p. 15), GeriCare's standard medical record forms are not confidential in the sense contemplated by trade secret law -- the forms are retained in patient files and hence readily accessible by any provider of medical care, including of course a successor to GeriCare, be it MedOptions or another entity. (UF ¶ 21). *A fortiori*, plaintiffs cannot justify shackling Sullivan with a non-competition covenant based on a supposed desire to protect GeriCare's forms. APG, Inc., 436 F.3d at 307 (applying Rhode Island law and concluding that technical information that "was obtainable within normal business channels" was not a trade secret).[3]

Because the non-competition covenant contained in the Provider Agreement is unenforceable as a matter of law, plaintiffs' cannot establish the threshold element of a claim for tortious interference with contractual relations, namely the existence of a viable contract.

---

[3] At deposition, Dr. Stewart suggested that the identities of nursing home contact points are confidential. But, as Sullivan demonstrated in her summary judgment pleadings, the contact point for a nursing home is invariably the facility administrator or director of nursing (UF ¶ 22), and identifying those persons requires nothing more than a telephone call. In other words, like the GeriCare forms, this "information [] is readily ascertainable through ordinary business channels or business directories," Home Gas Corp. of Massachusetts, Inc. v. DeBlois Oil Co., 691 F. Supp. 567, 574 (D.R.I. 1987), and, therefore, not proprietary to plaintiffs. (See Sullivan's SJ Mem., at p. 12, and cases cited therein).

### 2. *Sullivan Cannot be Held Liable for Tortious Interference With Her Own Non-Competition Agreement*[4]

Citing the Connecticut Appellate Court's decision in Hart, Nininger & Campbell Associates, Inc. v. Rogers, 16 Conn. App. 619, 548 A.2d 758 (1988), plaintiffs argue in their summary judgment brief that, "Where a party breaching a non-compete agreement acts in concert with others to bring about that breach, the party to a non-compete agreement may be liable for both the breach of the agreement and for tortious interference with that agreement." (Pltfs' SJ Mem., at p. 18)(Citation omitted). Hart, Nininger, however, was decided under Connecticut, not Rhode Island, law and, in any event, plaintiffs significantly inflate the court's holding.

In that case, the plaintiff, a manufacturing representative, successfully sued two former sales representatives who left the plaintiff's employ to start a competing business. Connecticut's Appellate Court agreed with the trial court that the defendants were not only liable for breaching their *individual* restrictive covenants, but also affirmed a finding for plaintiff on its claim for tortious interference with a contractual relationship. Contrary to plaintiffs' reading of the opinion, however, the court did not did not hold the individual defendants liable for interference with their own employment contracts; rather, the defendants were found to have "combined, cooperated and consulted with each other in efforts to solicit and induce [the plaintiff's] clients to allow the defendants individually,

---

[4] It is not entirely clear whether plaintiffs actually intend to advance a claim against Sullivan predicated on the theory that she tortiously interfered with her own non-competition agreement. The memorandum of law submitted by plaintiffs in support of their motion for leave to amend expresses a desire to "clarify that one of the business relationship [sic] that the *MedOptions Defendants* interfered with was that contractual relationship between Plaintiffs and Defendant Sullivan, which provided that Defendant Sullivan not engage in businesses competing with Plaintiffs for a period of six (6) months." (Emphasis added). In the proposed amended complaint, however, plaintiffs further allege that Sullivan also interfered with the restrictive covenants agreement. Plaintiffs also prematurely moved for summary judgment on this proposed claim, asserting that both MedOptions and Sullivan were liable as a matter of law. Given this ambiguity, we will, in an abundance of caution, assume the proposed claim is brought against both defendants.

instead of [the plaintiff], to be their sales representative." Id. at 628-29, 548 A.2d at 764. That is, the defendants interfered with *each other's* restrictive covenants.

Here, by contrast, plaintiffs accuse Sullivan of interfering with a non-competition agreement to which she was a party. "Because it is well-settled that a party cannot tortiously interfere with its own contract," Robertson Stephens, Inc. v. Chubb Corp., 473 F. Supp. 2d 265, 275 (D.R.I. 2007)(Citation omitted), plaintiffs' proposed claim alleging tortious interference with the Provider Agreement is, as against Sullivan, plainly unsustainable. Cf. Jolicoeur Furniture Co., Inc. v. Baldelli, 653 A.2d 740, 752 (R.I. 1995).

### *3. Plaintiffs Have Adduced No Evidence of Improper Motive or Wrongful Means*

As MedOptions demonstrated on summary judgment, plaintiffs are incapable of making the requisite showing that MedOptions' hiring of Sullivan was fueled by an improper motive.

Plaintiffs speculate that MedOptions was looking to exploit Sullivan's relationships with the nursing homes she had been servicing on behalf of GeriCare in the hopes of taking over as the contractual provider of psychiatric care to residents of those facilities. (See Pltfs' SJ Mem. at pp. 17-18). It is undisputed, however, that Sullivan had absolutely no involvement in the marketing of MedOptions' services to the former GeriCare customers, or any nursing home for that matter. (UF ¶¶ 13-17).

The undeniable fact of the matter is that MedOptions hired Sullivan because its customer base in Rhode Island was expanding, giving rise to a need for her services (See Wood Dep., at pp. 33-34), a perfectly legitimate motivation. See Barkan v. Dunkin' Donuts, Inc., 520 F. Supp. 2d 333, 342 (D.R.I. 2007)(because defendant's actions were

undertaken in an effort to protect a bona fide business interest, tortious interference claim would not lie).

Moreover, where, as here, an alleged act of interference is in furtherance of business competition, a qualified privilege attaches barring liability in the absence of wrongful means. Pascale Service Corp. v. International Truck and Engine Corp., 2007 WL 2905622, at *4 (D.R.I. Oct. 1, 2007). The summary judgment record is devoid of evidence remotely suggesting that MedOptions targeted Sullivan, much less sought her out as part of a scheme to steal GeriCare's customers, or more accurately former customers. To the contrary, it is undisputed that Sullivan contacted MedOptions in response to a mass mailing (Wood Dep., at pp. 25-26, 29; Sullivan Dep., at p. 65, a copy of relevant excerpts from the Sullivan Dep. is attached hereto as Exhibit D), which is obviously not a "wrongful means" of recruiting talent.

There being no evidentiary basis for a showing that MedOptions hired Sullivan on the wings of an improper motive, or employed wrongful means to do so, allowing plaintiffs' proposed amendment to add a claim against MedOptions for tortious interference with Sullivan's covenant not to compete would be a futile gesture.

#### *4. The Alleged Interference With Sullivan's Non-Competition Agreement Caused Plaintiffs No Damage*

Futility of the proposed amendment is also grounded in an absence of provable damages associated with the interference alleged to be tortious.

Because, as alluded to above, Sullivan did not in any way facilitate MedOptions' procurement of service agreements with GeriCare's former customers, and in any event GeriCare had terminated its contracts with these customers before Sullivan ever "breached" the non-competition covenant by joining MedOptions, there can be no link

between the alleged act of interference (i.e., MedOptions' hiring of Sullivan) and plaintiffs' loss of business. For this reason as well, plaintiffs' proposed claim is destined to fail, such that amendment is futile.

## III. CONCLUSION

For the foregoing reasons, plaintiffs' belated motion for leave to amend their Complaint should be denied.

Respectfully submitted,

DEFENDANTS,
MEDOPTIONS, INC. and ANN SULLIVAN

By Their Attorneys,

/s/ Christine K. Bush
Christine K. Bush (#5587)
DUFFY, SWEENEY & SCOTT, LTD.
One Turks Head Place, Suite 1200
Providence, RI 02903
(401) 455-0700-telephone
(401) 455-0701-facsimile

and

Lawrence Peikes
Admitted *Pro Hac Vice*
lpeikes@wiggin.com
WIGGIN AND DANA LLP
400 Atlantic Street
P.O. Box 110325
Stamford, CT 06911-0325
(203) 363-7600-telephone
(203) 363-7676 -facsimile

Dated: March 11, 2008

**CERTIFICATE OF SERVICE**

I hereby certify that the within **Defendants' Memorandum of Law in Support of Objection to Plaintiffs' Motion for Leave to Amend Complaint** was filed through the ECF system on this 11th day of March, 2008 and will be sent electronically to the below named counsel who are registered participants identified on the Notice of Electronic Filing:

Stephen M. Robinson, Esq.
The Law Offices of Stephen M. Robinson
155 South Main Street
Suite 402
Providence, RI 02903

Vicki J. Bejma, Esq.
The Law Offices of Stephen M. Robinson
155 South Main Street
Suite 402
Providence, RI 02903

/s/ Christine K. Bush
Christine K. Bush

H:\Clients\MedOptions\Tamule\Pleadings\USDC RI\Mem Support Obj MAmend.DOC