# EXHIBIT B

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

HUMAN SERVICES CONSULTANTS, LTD
d/b/a GERICARE; RONALD MARK STEWART, M.D.

vs. C.A. No. 06-486

ANN TAMULE a/k/a ANN M. SULLIVAN
alias, and MEDOPTIONS, INC.

DEPOSITION OF RONALD M. STEWART, M.D., a Plaintiff in the above-entitled case, taken on behalf of the Defendants, before Linda L. Guglielmo, RPR-RMR, a Notary Public in and for the State of Rhode Island, at the offices of Stephen M. Robinson, Esquire, 155 South Main Street, Providence, Rhode Island on February 6, 2008 at 2:00 P.M.

APPEARANCES:

FOR THE PLAINTIFFS....LAW OFFICE OF STEPHEN M. ROBINSON
BY: VICKI BEJMA, ESQUIRE
155 SOUTH MAIN STREET
PROVIDENCE, RI 02903

FOR THE DEFENDANTS....WIGGIN AND DANA
BY: LAWRENCE PEIKES, ESQUIRE
400 ATLANTIC STREET
STAMFORD, CT 06911

ALLIED COURT REPORTERS, INC.
115 PHENIX AVENUE
CRANSTON, RHODE ISLAND 02920
401/946-5500

companies or anything else. If she said anything like that, I would have said, gee whiz, what can we do to keep you.

Q. When Ann told you about going to settling her parents down and entering the religious life, is that in the conversation you had with her about her resignation?

A. That's when I called her up to wish her well.

Q. When did Ann actually stop working for GeriCare?

A. I don't know. Christine has all that stuff. I don't know, some time, whenever, in June or May or whatever. I don't really know for sure.

Q. Between the time that you had the conversation with Ann on the subject of her resignation and to wish her well and the time she actually stopped working for GeriCare, did you speak to her at all?

A. No, I don't believe. No, the next time I saw her, I didn't speak to her, was at the deposition.

Q. After you received Ann's resignation letter, what, if anything, did you do to try and backfill her spot, in other words, to try and hire somebody?

A. We had a nurse who worked with us, Sharon Borges, who was going to go in there to Heritage Hills, and Christine was advertising and polling our various nurse practitioners if they could take

another home and whatever.
Q. What else, if anything, did you do to find somebody to replace Ann?
A. She was doing -- Christine was doing that stuff. I wasn't doing -- I'm not the one who does that stuff. That's her job, not mine. I'm supposed to see the patients and do my practice in my office, forensic stuff.
Q. Did you offer any of the homes other than Heritage Hills a replacement for Ann?
A. Christine would have done that. I wouldn't do it.
Q. Take a look at Exhibit D, that's an E-mail exchange with Sharon Borges and Christine?
A. Yes.
Q. The E-mail address here that says psychlawmd@aol.com, whose address that?
A. That's me. Where is that -- where did you see that?
Q. On Exhibit D on the first page towards the middle. E-mail sent Sunday, April 16th?
A. That's a copy to me. That's cc to me. That's what that it, it was sent to Christine and copied to me and Christine cc'd me to keep me in the loop.

Q. And according to this E-mail, Christine offered Sharon Borges a number of Ann's homes, including Ballou, Grand View, Heritage Hills, The Holiday and Morgan as well as East Gate, right?

A. Yes.

Q. And the only one that Sharon Borges was interested in was Heritage Hills, right?

A. Yes.

Q. The others were too far away from her?

A. Apparently so.

Q. Is that how you assigned them to facilities, based on proximity to their residence?

A. As was testified to by the executive from MedOptions, we try to keep people as close to their homes as possible. You know, it makes it a lot easier for them and the home and everybody else. But then again, the assignments and who goes where and moving the pieces on the chess board is very much Christine's deal, not mine. Sorry, I don't mean to not answer your question.

Q. I'm only asking about what you know. Did you ever speak to somebody at Heritage Hills about the possibility of Sharon Borges taking over for Ann?

A. I believe I may have talked to Barbara Langshaw about it. I just clearly don't recall

Q. Since Ann left, have you hired any new nurse practitioners?
A. Yes.
Q. Who?
A. Lynn somebody or other from Attleboro, Massachusetts. She's from Attleboro and she work at Kindred Heights.
Q. And is she still with you?
A. No. She's gone to be a hospital-based nurse practitioner.
Q. How long was she with GeriCare?
A. Six months, a year, I don't know, something like that.
Q. Then the next sentence, "Therefore, regretfully in fairness to you, GeriCare must terminate our contract with your facility as of June 1, 2006." Right?
A. Right.
Q. Was that one of the purposes of this letter, to give the homes advance notice that as of June 1, 2006 GeriCare would no longer be providing services?
A. Yes, and an opportunity to find services.
Q. Under the agreements you had with these facilities, GeriCare had the right to terminate

the contract on 30-days' notice; is that right?
A. The nursing homes, yes, we did.
Q. You were fulfilling that requirement with regard to these letters, right?
A. Yes, sir.
Q. So the six homes that this letter was sent to, Exhibit E, all of those contracts were terminated by GeriCare effective June 1, 2006, right?
A. Except for Heritage Hills, they didn't get a letter.
Q. Whoever this letter was sent to, those contracts were terminated on June 1, 2006, right?
A. To the best of my knowledge, yes.
Q. And one of the reasons that you gave these homes more than 30-days' notice was because you wanted to give them the best opportunity to find an alternative provider?
A. Yes.
Q. You understood once your agreement with these homes terminated, they would be looking for somebody to replace GeriCare, right?
A. Yes.
Q. And who else provided such services in Rhode Island other than yourself and MedOptions?
A. There's Dr. Cass's group and Dr.