UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

HUMAN SERVICES CONSULTANTS, LTD., dba GERICARE, and RONALD MARK STEWART, M.D.,
Plaintiffs,

v. CV 06-0486ML

ANN TAMULE, aka ANN M. SULLIVAN, alias, and MEDOPTIONS, INC.,
Defendants.

**MEMORANDUM AND ORDER**

Plaintiffs, Human Services Consultants, Ltd. ("GeriCare") and Dr. Ronald Stewart, filed a complaint alleging breach of contract (Count I), tortious interference with business relationship (Count II) and conspiracy to tortiously interfere with business relationship (Count III). The parties have filed cross motions for summary judgment. For the reasons set forth below, Plaintiffs' motion is DENIED and Defendants' motion is DENIED in part and GRANTED in part.

I. Background

Plaintiff GeriCare is a provider of psychiatric services for nursing home patients. Plaintiff Dr. Stewart, a psychiatrist, participated in the formation of GeriCare and works under its aegis. Defendant Sullivan is an Adult Nurse Practitioner who started working for GeriCare in 2002, providing mental health treatment for patients in nursing homes.

Sullivan came to GeriCare highly trained, with a Bachelor's and Master's Degree in Nursing, an Advanced Graduate Certificate as an Adult Nurse Practitioner, and over 15 years of experience in the nursing field. In addition, Plaintiffs offer evidence that they provided her with specific training on psychiatric treatment of the elderly in nursing homes. Plaintiffs' training covered unique medication issues, how to distinguish between psychiatric issues and physical aging, and other clinical and administrative aspects of this subspecialty.

In 2002 and again in 2004, Sullivan entered into Provider Agreements with GeriCare ("agreements"). Both agreements included a noncompete provision which prohibited Sullivan from working for a competitor for six months after her employment with GeriCare. The nursing homes Sullivan served on GeriCare's behalf included Morgan Health Care Center, The Holiday Retirement Home, Heritage Hills Nursing Center ("Heritage Hills"), Herbert Nursing Home, Grand View Center, and Ballou Home for the Aged.

On April 9, 2006, Defendant Sullivan presented GeriCare with a letter which stated her intention to resign on June 1, 2006. About a week afterwards, she explained to Dr. Stewart that she was leaving because she wished to enter a religious order.[1] Sullivan later said in her deposition that she was, at the time, in discussion with two convents, but that sometime in the spring of 2006, she determined that neither order was the right fit for her.

[1] The parties dispute whether Sullivan also gave her parents' health as a reason for her resignation. However, this factual dispute is not relevant to a determination of this summary judgment motion.

On April 20, 2006, GeriCare sent a letter to all the nursing homes in which Sullivan had worked on GeriCare's behalf except Heritage Hills. The letter stated in relevant part:

> It is with dismay that we must notify you that Ann Sullivan NP has given her resignation effective May 31, 2006 to pursue other interests in Massachusetts. Finding another available Advance Practice Nurse (APN) is not expected to be possible in the near future. We have been advertising for months now for new APNs with no success due to competition with the hospitals and physician offices and a general nationwide shortage of nursing personnel. Therefore, regretfully, in fairness to you, GeriCare must terminate our contract with your facility as of June 1, 2006. …
>
> If an opportunity arises where we have hired an Advance Nurse Practitioner …, we will notify you for reconsideration. (Pls.' Mot. for Summ. J. Ex. J.)

Plaintiffs did not send this letter to Heritage Hills. Instead, Plaintiffs offered Heritage Hills a replacement for Sullivan. However, Heritage Hills ultimately cancelled its contract with GeriCare at the end of June, 2006.

After offering her resignation to GeriCare, Sullivan actively searched for work in the private sector. Her efforts included an application to the Community Health Network in Massachusetts. Then, around May 1, 2006, Sullivan received a postcard in the mail about Defendant MedOptions, Inc. ("MedOptions"). Like GeriCare, MedOptions provides mental health services to nursing home patients. Sullivan interviewed with MedOptions and was offered a job on the spot. At that interview, Sullivan told MedOptions about her noncompete agreement. The MedOptions representatives, however, told her that a similar noncompete agreement with GeriCare had not been a problem for another nurse whom MedOptions hired. MedOptions then confirmed its job offer to Sullivan by letter dated May 19, 2006, which Sullivan accepted.

During this process, Sullivan sent a fax dated May 18, 2006 to MedOptions stating that she had "spoke[n]" to representatives from The Holiday Retirement Home

and Heritage Hills.[2] (Pls.' Statement of Undisputed Facts ("UF") ¶ 34; Pls.' Mot. For Summ. J. Ex. P.) She also included contacts from The Holiday Retirement Home and Ballou Home for the Aged as references in her application to MedOptions.

MedOptions soon contracted with facilities which Sullivan had served on GeriCare's behalf. The agreements included a contract with Grand View Center (executed May 15, 2006, effective June 1, 2006), a contract with The Holiday Retirement Home, (executed May 31, 2006, effective June 1, 2006), and a contract with Heritage Hills (executed July 27, 2006, effective July 1, 2006[3]).

Sullivan resigned from her employment with GeriCare on June 1, 2006 and, the next day, started working for MedOptions. Soon after, she began work at nursing homes she had previously served during her employment with GeriCare. She started working at Grand View Center on June 2, 2006, at The Holiday Retirement Home on June 6, 2006, at Heritage Hills on July 5, 2006, at Hebert Nursing Home on September 22, 2006, and at Ballou Home for the Aged on October 4, 2006.

## II. Analysis

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). An issue is "genuine" if the pertinent evidence is such that a rational factfinder could resolve the issue in favor of either party, and a fact is "material" if it "has the capacity to sway the outcome of the litigation under the applicable law." Nat'l Amusements, Inc. v. Town of Dedham, 43 F.3d 731, 735 (1st Cir. 1995). The moving party bears the burden

[2] The parties do not indicate what Sullivan spoke to these representatives about in their briefs or in their statements of undisputed facts.
[3] Apparently, MedOptions and Heritage Hills signed a contract which was effective retroactively.

of showing the Court that no genuine issue of material fact exists. Id. Once the movant has made the requisite showing, the nonmoving party "may not rely merely on allegations or denials in its own pleading; rather, its response must ... set out specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e). The court views all facts and draws all reasonable inferences in the light most favorable to the nonmoving party. Cont'l Cas. Co. v. Canadian Universal Ins. Co., 924 F.2d 370, 373 (1st Cir. 1991). Cross-motions for summary judgment do not change the standard for granting summary judgment. Fed. R. Civ. P. 56(c); Latin American Music Co. v. Archdiocese of San Juan of the Roman Catholic & Apostolic Church, 499 F.3d 32, 38 (1st Cir. 2007).

## A. Tortious Interference with Business Relationship

Plaintiffs must show the following elements to prove a claim for tortious interference with a business relationship: "'(1) the existence of a business relationship or expectancy, (2) knowledge by the interferer of the relationship or expectancy, (3) an intentional act of interference, (4) proof that the interference caused the harm sustained, and (5) damages to the plaintiff.'" Avilla v. Newport Grand Jai Alai LLC, 935 A.2d 91, 98 (R.I. 2007). Unlike its sister claim of tortious interference with contract, tortious interference with business relationship does not require that the plaintiff have a contractual relationship. See Ed Peters Jewelry Co. v. C & J Jewelry Co., 51 F.Supp.2d 81, 102 (D.R.I. 1999). Instead, Plaintiffs must show that they at least possessed a "'probable future business relationship anticipating a reasonable expectancy of financial benefit.'" See Singh v. Blue Cross/Blue Shield of Mass., Inc., 308 F.3d 25, 48 (1st Cir. 2002); Am. Private Line Servs., Inc. v. Eastern Microwave, Inc., 980 F.2d 33, 36 (1st Cir.

1992).[4] Of course, the existence of a contract may show that a business relationship exists, but it is not required. The element of causation in tortious interference requires proof "'either that but for the interference there would have been a relationship or that it is reasonably probable that but for the interference the relationship would have been established.'"[5] L.A. Ray Realty v. Town Council of Town of Cumberland, 698 A.2d 202, 207 (R.I. 1997).

Plaintiffs claim that Defendants interfered with Plaintiffs' business relationships with the nursing homes Sullivan served on GeriCare's behalf. The first question then is whether and when Plaintiffs had a business relationship with these nursing homes. Clearly, Plaintiffs had contractual relationships, and therefore had business relationships, with the nursing homes through the end of May, 2006. From June 1, 2006 forward, however, Plaintiffs' contracts terminated in accordance with Plaintiff's letter on April 20, 2006. Thus, this Court must determine whether there was a business relationship after May 31st when Plaintiffs had no ongoing contracts with the nursing homes.

As a "probable future business relationship anticipating a reasonable expectancy of financial benefit," a business relationship relies on communication between the parties expressing "reasonable expecta[tions]" that it will continue. See Singh, 308 F.3d at 48; Am. Private Line Servs., Inc., 980 F.2d at 36. Therefore, if one party communicates to

---

[4] This standard for business relationships comes from Massachusetts law. Am. Private Line Servs., Inc., 980 F.2d at 36 (citing Owen v. Williams, 77 N.E.2d 318, 362 (Mass. 1948)). It has been, however, favorably cited by Rhode Island courts. Chain Store Maint., Inc. v. Nat'l Glass & Gate Serv., 2004 WL 877599 at *8 (R.I. Super. 2004). Moreover, Rhode Island and Massachusetts law on tortious interference with business relationships is substantively the same. Pride Hyundai, Inc. v. Chrysler Fin. Co., 263 F.Supp.2d 374, 388 (D.R.I. 2003) ("The Court can discern no material conflict of law between Massachusetts and Rhode Island as respects claims of tortious interference with prospective contractual relations . . . .")

[5] Rhode Island law has not established which standard is proper. APG, Inc. v. MCI Telecomms. Corp., 436 F.3d 294, 304 (1st Cir. 2006); L.A. Ray Realty v. Town Council of Town of Cumberland, 698 A.2d 202, 207 (R.I. 1997); Mesolella v. City of Providence, 508 A.2d 661, 671 (R.I. 1986). As discussed later in the opinion, where causation is an issue in this case, Plaintiffs' evidence either meets both standards or fails to meet either standard. This Court, therefore, need not decide which standard of causation to apply.

the other that it will relinquish the relationship at a certain point, that future relationship expires. In the present case, Plaintiffs clearly had an expectancy of a business relationship with the nursing homes for the period after May 31st before sending the letters on April 20, 2006. However, this Court finds that Plaintiffs surrendered their business expectancy with all the nursing homes but Heritage Hills for the period after May 31st by sending the letters on April 20. Heritage Hills is a special case because Plaintiffs did not send it the termination letter. This Court will therefore analyze Plaintiffs' claim of tortious interference with their Heritage Hills' business relationship separately.

In their letters on April 20th, Plaintiffs informed the nursing homes that GeriCare did not expect to be able to serve them after May 31, 2006. As Dr. Stewart stated in his deposition, the purpose of sending the letters on April 20th was to allow the nursing homes to make other arrangements. The nursing homes did exactly that. Some, such as The Holiday Retirement Center and Grand View Center, even made arrangements with MedOptions before May 31st for services starting in June. As long as Defendants contracted with these nursing homes for the period after May 31st and began contract negotiations after April 20th, however, they were not interfering with Plaintiffs' business relationships.

Plaintiffs argue that the expectancy of a business relationship with the nursing homes continued despite the April 20 letters because the letters specifically left open the possibility that Plaintiffs might find a replacement for Sullivan. Plaintiffs are correct in that there was a possibility that the business relationship might continue. If Plaintiffs had found a replacement and if a nursing home had not already contracted elsewhere,

Plaintiffs could have continued providing services. For the purposes of a claim for tortious interference, however, Plaintiffs must show more than a *possibility* of a business relationship. They must show a "probable future business relationship anticipating a reasonable expectancy of financial benefit." See Singh, 308 F.3d at 48; Am. Private Line Servs., Inc., 980 F.2d at 36. Upon sending the letters, Plaintiffs had to reasonably expect that the nursing homes would likely enter into binding contracts with other providers. As a result of the new contractual relationships, the nursing homes might not be able to return to Plaintiffs even if Plaintiffs had found a replacement nurse. Plaintiffs, in their own words, however, did not think that regaining their business relationships was probable because Plaintiffs did not even expect to find a replacement. As GeriCare stated in its letters on April 20, 2006: "Finding another available Advance Practice Nurse (APN) is not expected to be possible in the near future." (Pls.' Mot. for Summ. J. Ex. J.) In short, Plaintiffs have failed to show that they had business relationships with the nursing homes[6] for the period after May 31, 2006 after they sent the letters surrendering those relationships on April 20, 2006.

1. MedOptions

Because Plaintiffs, after April 20th, did not have a business expectancy for the post-May 31st period, MedOptions cannot be liable for tortious interference with Plaintiffs' post-May 31st business relationships for any actions taken after April 20, 2006. Although it may seem unfair to penalize Plaintiffs for so scrupulously giving notice to their clients on April 20th, in tort law, liability must be based on causation and harm. Swift v. United States, 866 F.2d 507, 508 (1st Cir. 1989) ("[T]he essential

[6] These nursing homes only include those in which Sullivan worked for GeriCare, with the exception of Heritage Hills.

elements of a common law tort action [are] duty, breach, causation (actual and proximate), and damages."). Using either standard of causation, either the "reasonably probable" 'but for' or the 'but for' standard, MedOptions is not liable. See L.A. Ray Realty, 698 A.2d at 207. Here, MedOptions did not cause the harm of losing business to Plaintiffs. Rather, Plaintiffs' own actions caused them to lose the business.

Conversely, although Plaintiffs did have a business expectancy prior to April 20th, they have not presented any evidence of MedOptions' interference before that date.[7] Accordingly, MedOptions' motion for summary judgment on tortious interference with business relations claim is granted for the nursing homes Plaintiffs wrote to on April 20, 2006.

2. Heritage Hills

Heritage Hills is a special case because Plaintiffs did not send it a letter relinquishing their business relationship on April 20, 2006. Instead, Plaintiffs offered to replace Sullivan's services with those of another practitioner. As a result, Plaintiffs' business relationship with Heritage Hills continued.

In the case of Heritage Hills, there is some evidence that Defendants tortiously interfered with Plaintiffs' business relationship. First, Plaintiffs present evidence of communications between Sullivan, MedOptions and Heritage Hills before May 31, 2006. On May 18, 2006, Sullivan sent MedOptions a fax stating that she had "spoke[n]" to

[7] Plaintiffs point out that there is some uncertainty in the record regarding when Sullivan and MedOptions first made contact. (Pls.' Response to Def. MedOptions' Mot. for Summ. J. 13-14.) Sullivan states in her answers to interrogatory that she received a postcard from MedOptions on about May 1, 2006 and that, in response, she contacted MedOptions. In her deposition, however, she admits in response to questioning that she is unsure as to when exactly she received the postcard from MedOptions. In any case, Plaintiffs have raised no material issue of fact that MedOptions directly solicited Sullivan prior to April 20, 2006. The most Plaintiffs have shown is that *Sullivan* contacted MedOptions in response to a postcard and then MedOptions responded to Sullivan's interest in a job. Moreover, the more important issue is whether MedOptions contacted GeriCare's clients and offered psychiatric services through Sullivan. Plaintiffs have provided no evidence of such activity prior to April 20, 2006.

Barbara Langshaw, the Director of Nursing, at Heritage Hills. (Pls.' Mot. for Summ. J. Ex. P.) At that point, Sullivan was still working at Heritage Hills for GeriCare. A few weeks later, however, after starting at MedOptions, she was serving patients at Heritage Hills, this time on MedOptions' behalf.

Secondly, the timing of the cancellation and succeeding contract with MedOptions strengthens the inference that Defendants interfered with Plaintiffs' business relationship. Heritage Hills cancelled its contract on May 31, 2006 effective immediately – Sullivan's last day at GeriCare. According to Plaintiffs, the contract was extended another 30 days after May 31st only because GeriCare reminded Heritage Hills that the contract required 30 days notice before cancellation. MedOptions then signed a contract with Heritage Hills effective July 1, 2006, the day after Heritage Hills' contract with GeriCare ended.

To qualify as tortious interference, the interference must not only be intentional, it must be improper, that is, interference unjustified by a lawful purpose. See Ed Peters Jewelry Co., 51 F.Supp.2d at 102; Avilla, 935 A.2d at 98. Although "[c]onduct in furtherance of business competition is generally held to justify interference," that conduct must not involve "'wrongful means' nor 'unlawful restraint of trade.'" See Ocean State Physicians Health Plan, Inc. v. Blue Cross & Blue Shield of R.I., 883 F.2d 1101, 1113 (1st Cir. 1989) (quoting Restatement (Second) of Torts § 768 at 39 (1979)).

In this case, MedOptions and Sullivan too, once she agreed to work for MedOptions, were engaged in business competition with Plaintiffs. However, Plaintiffs have raised a material issue of fact to show that Defendants used wrongful means by violating Plaintiffs' noncompete agreement with Sullivan. Plaintiffs show that Sullivan,

in serving GeriCare's former clients on MedOptions' behalf, breached the noncompete agreement to which she was a party. Similarly, MedOptions, by advising Sullivan to ignore her noncompete agreement and hiring her in spite of it, tortiously interfered with Plaintiffs' contract. Both breach of contract and tortious interference with contract are wrongful means because of the illegality involved. See Avilla, 935 A.2d at 98 ('"We do not believe a searching analysis only of motive is in most instances enough to send [tortious interference] cases to the jury . . . . There must still be something 'illegal' about the means employed."')

Defendants argue that the noncompete agreement was unenforceable because it had no geographic restriction. Under Rhode Island law, however, "a court will attempt to modify an unreasonable covenant and enforce it to an extent that ... is reasonably necessary to protect the promisee's legitimate interests . . . ."[8] Durapin, Inc. v. Am. Prods., Inc., 559 A.2d 1051, 1058 (R.I. 1989). Thus, the lack of a geographic limitation does not automatically make the contract unenforceable. The issue is whether, by working for MedOptions, Sullivan would harm legitimate interests reasonably protected by the noncompete agreement. Even if Defendants believed the noncompete agreement could not be enforced, they are responsible for knowledge of the law. See Kenyon v. United Electric Rys. Co., 151 A. 5, 8 (R.I. 1930) ("Ignorance of the law is no excuse.") Defendants took a legal risk in violating the noncompete agreement. Whether or not they believed their actions were improper, they could be held responsible for acting improperly if the noncompete agreement were found to be enforceable, at least to the extent it reasonably protects legitimate interests.

---

[8] The exception to this rule is when the promisee drafts an over-broad noncompete agreement in bad faith or deliberately over-reaches. See Durapin, 559 A.2d at 1058. However, this Court finds no evidence of such bad faith in the evidence.

Defendants, however, also argue that Plaintiffs had no legitimate interest to protect. Viewing the evidence in the light most favorable to Plaintiffs, the Court finds that Plaintiffs did have legitimate interests. Under Rhode Island law, an employer has a legitimate interest in protecting the goodwill an employee acquires among the employer's clients and in protecting its investment in training an employee in unique or novel services. See Nestle Food Co. v. Miller, 836 F.Supp. 69, 75 (D.R.I. 1993); Dial Media, Inc. v. Schiff, 612 F.Supp. 1483, 1489 (D.R.I. 1985). With regard to goodwill, Plaintiffs have shown that, by working regularly with Plaintiffs' clients over years, Sullivan developed close relationships with key contacts. An employer may reasonably seek to bar a former employee from exploiting this goodwill with the employer's clients at least for the amount of time it would take the clients to cease identifying the employer's goodwill with the former employee. See Nestle, 836 F.Supp. at 75-76.

Plaintiffs have also presented a material issue of fact that Sullivan received training in unique or novel services. Plaintiffs show that Sullivan was provided with introductory training, followed by a monthly lecture series. Although Sullivan was highly trained before starting at GeriCare, she did not have experience or training specifically in the specialty of psychiatric care for the elderly in nursing homes. According to Dr. Stewart, Plaintiffs' training covered unique medication issues, how to distinguish between psychiatric issues and physical aging, and other clinical and administrative aspects of this subspecialty. Sullivan herself stated, "I have learned a great deal." (Def. Sullivan UF Ex. D.)

Given this evidence, the lack of a geographic limitation is irrelevant because Sullivan interfered with legitimate interests protected by the noncompete agreement.

Although Plaintiffs might not reasonably prevent Sullivan by noncompete agreement from practicing in this subspecialty anywhere in the world, it is reasonable to temporarily prevent her from exploiting GeriCare's goodwill and training among GeriCare's former clients. That is exactly what occurred in this case. Sullivan did not work for MedOptions in another state; she worked for MedOptions in Rhode Island. In fact, she served the same clients for MedOptions that she had served for GeriCare. By working with these same clients, Plaintiffs have presented adequate evidence to show that Sullivan harmed Plaintiffs' legitimate interests. At least by the standards of Rule 56, Sullivan's actions in violating the noncompete agreement and MedOptions actions in inducing Sullivan to violate the noncompete agreement were improper. See Fed. R. Civ. P. 56(c).

With regard to the causation element of tortious interference, Defendants argue that Plaintiffs, not MedOptions' tortious interference, caused Heritage Hills to cancel the contract because Plaintiffs failed to offer an acceptable replacement for Sullivan. However, the reasons Heritage Hills gave for cancelling its contract with GeriCare are suspiciously contradictory. The parties do not dispute that Heritage Hills told GeriCare it cancelled the contract with GeriCare because they wanted a nurse to come during the day whereas the nurse GeriCare offered, Sharon Borges, could only come after 4 p.m. But, in the letter cancelling the contract, Heritage Hills stated that it was cancelling GeriCare's contract because it needed a nurse in the *evening*. Giving Plaintiffs the benefit of the doubt, it seems questionable that failure to offer a replacement was the real reason behind Heritage Hills' decision to end the business relationship with GeriCare.

The remaining elements of knowledge and damage are straightforward. This Court must infer that MedOptions was aware that GeriCare had a business relationship

with Heritage Hills because of the fax Sullivan sent to MedOptions discussing her communications with the Director of Nursing at Heritage Hills. Sullivan, as the direct service provider on GeriCare's behalf, certainly knew of the business relationship. With regard to damage, Plaintiffs were clearly damaged by losing the business with Heritage Hills. Since Plaintiffs have presented a material issue of fact as to all the elements of tortious interference with their business relationship with Heritage Hills, both Defendant MedOptions' and Defendant Sullivan's motions for summary judgment as to Heritage Hills are denied.

3. Sullivan and the Other Nursing Homes

Although Plaintiffs have not presented evidence to show that MedOptions interfered with their business relations with the other nursing homes before April 20, 2006, they have provided evidence that Defendant Sullivan engaged in tortious interference before that date. Again, April 20, 2006 was the date that Plaintiffs relinquished their post-May 31st business relationships with the nursing homes Sullivan had served. Plaintiffs present a material issue of fact that Sullivan gave notice to Plaintiffs before April 20, 2006 with the intention of taking Plaintiffs' clients to a competitor.

Viewing all the facts in the light most favorable to Plaintiffs, Sullivan's actions satisfy the elements of a tortious interference claim. See Cont'l Cas., 924 F.2d at 373. As discussed above, Sullivan knew about Plaintiffs' business relationships, and her interference with those business relationships was improper due to her noncompete agreement with GeriCare. Plaintiffs have also provided evidence that they were damaged by the loss of business with the facilities Sullivan had served. Having established above

that Plaintiffs had an expectancy of an ongoing and future business relationship with the nursing homes prior to April 20, the remaining question is whether Sullivan tortiously interfered with Plaintiffs' business relationships, thereby causing Plaintiffs to lose them. See Avilla, 935 A.2d at 98.

Viewing the evidence in the light most favorable to Plaintiffs, this Court may infer that Sullivan intended to leave Plaintiffs and work for a competitor. See Cont'l Cas., 924 F.2d at 373. The fact that Sullivan left GeriCare and, in the ensuing course of events, Plaintiffs lost business relationships is not enough to show tortious interference with those relationships. Employees have a right to leave. Neither is evidence adequate to support a claim for tortious interference that shows that Sullivan left, Plaintiffs renounced their business relationships with their clients and that, later, Sullivan worked for those clients. The element of causation is missing. Here, however, Plaintiffs have presented evidence that Sullivan decided to leave with the intention of taking Plaintiffs' clients and that she in fact did so. This evidence does show causation. Since Sullivan offered her resignation before Plaintiffs sent the April 20, 2006 letters, her decision to leave with an intention, which she later accomplished, of interfering with Plaintiffs' business relationships is enough to show that Sullivan caused the loss of Plaintiffs' relationships.

Although Sullivan told Plaintiffs that she was leaving to enter a religious life, she was still apparently interested in continuing medical work in the private sector. Sullivan's application for a temporary position at Community Health, a medical center in Massachusetts after giving her resignation notice to GeriCare but before May, 2006 indicates this intention. Moreover, after she received notice from the convents that she

would not be a good fit, she did not simply return to GeriCare, but instead applied to its direct competitor, MedOptions. She did so although she could clearly have remained at GeriCare, a company with which she was familiar and which needed nurses like her. She then promptly accepted MedOptions' job offer and started work with them the day after leaving GeriCare. Although the evidence is not overwhelming, this Court must make the inference in favor of Plaintiffs that Sullivan intended some time before April 20th to work for a competitor when she left Plaintiffs' employment. See Cont'l Cas., 924 F.2d at 373.

Plaintiffs also raise a material issue of fact as to Sullivan's intention to take Plaintiffs' clients with her. On May 18, 2006, Sullivan sent a fax to Laurel Wood at MedOptions stating that she had "spoke[n]" with Elaine Delsesto at The Holiday Retirement Home and Barbara Langshaw-Soares at Heritage Hills. (Pls.' Mot. for Summ. J. Ex. P.) The Holiday Retirement Home and Heritage Hills are both nursing homes that Sullivan had served while working for Plaintiffs, and that she later served again while employed at MedOptions. In the same fax, Sullivan stated that she "could orient with Melissa at … Grandview." (Id.) Melissa Ferdinandi was a Regional Manager at MedOptions who interviewed Sullivan for the job. Grand View Center is yet another nursing home where Sullivan worked both on behalf of Plaintiffs and MedOptions. Finally, Sullivan's references in her application to MedOptions included Delsesto from The Holiday Retirement Home and Jocelyn Dubois from Ballou nursing home, another facility at which Sullivan worked for both Plaintiffs and MedOptions.

This evidence suggests that Sullivan communicated both with nursing homes about her move to MedOptions and with MedOptions about her contacts at these nursing

homes. As a result, this Court may infer that Sullivan intended to bring at least some of GeriCare's clients to MedOptions. That the evidence of communications which Plaintiffs have provided occurred after Plaintiffs sent the April 20th letters to these facilities does not vitiate the inference. The fact remains that soon after giving notice to GeriCare, Sullivan applied for work at GeriCare's competitor and apparently informed GeriCare clients of her move. The Court may reasonably infer that this was Sullivan's intention in giving notice to GeriCare before April 20th. Even if Sullivan initially intended to leave in order to join a convent, she may have still decided to take Plaintiffs' clients to a competitor before April 20th. She certainly did not decide to remain at GeriCare, where she was already working in the same capacity.

Plaintiffs have also presented a material issue of fact on the element of causation. Plaintiffs' evidence satisfies the higher standard, that "but for the interference, the relationship would have been established." See L.A. Ray Realty, 698 A.2d at 207. Making all inferences in favor of Plaintiffs, Sullivan decided to leave and take Plaintiffs' clients before Plaintiffs surrendered their business relationships on April 20th. The resulting tortious interference, the fact that Sullivan took over Plaintiffs' clients on behalf of MedOptions, directly caused Plaintiffs to lose business. If it were not for Sullivan's actions, Plaintiffs show they would have maintained their business relationships.

Plaintiffs have shown material issues of fact on all the elements of their tortious interference with business relationship claim with respect to Defendant Sullivan. Defendant Sullivan's motion for summary judgment on the tortious interference claim, therefore, is denied.

B. Breach of Contract

Plaintiffs also allege that Defendant Sullivan breached her noncompete agreement thereby causing Plaintiffs harm. Plaintiffs' claim, however, stumbles in showing that Sullivan's breach caused Plaintiffs' harm. In order to prove the defendant is liable for harm in any breach of contract case, the plaintiff must show that breach of the contract caused the harm. See Wells v. Uvex Winter Optical, Inc., 635 A.2d 1188, 1191 (R.I. 1994). The causation must be both direct and proximate. Id. Here, Plaintiffs do not raise a material issue of fact that the harm was directly caused by the alleged breach. Specifically, Plaintiffs fail to show that Sullivan's alleged breach was the 'but-for' cause of Plaintiffs' damages. See id.

Plaintiffs allege that Sullivan breached the noncompete agreement by working for a competitor and usurping Plaintiffs' clients. Plaintiffs further allege that, as a result, Plaintiffs lost the business of those clients. The evidence shows, however, that Plaintiffs lost those clients because of Sullivan's departure from Plaintiffs' employment and Plaintiffs' ensuing actions, not because Sullivan ultimately decided to work for a competitor and even to work with Plaintiffs' former clients.

The reason that the same facts lead to different outcomes in the tortious interference and breach of contract claims is that Sullivan's intent is not relevant in the breach of contract claim. Regardless of whether Sullivan intended to leave GeriCare and take its business to a competitor in April, Plaintiffs point to no evidence of an actual breach until later. Instead, the relevant issue in the breach of contract claim is whether Sullivan breached the contract and whether this breach caused the claimed harm.

According to the terms of the contract, Sullivan could breach the noncompete agreement by being "employed by any firm in a business substantially similar to or competitive with the present business of the Company or such business activity in which the Company may engage during the term of the agreement and for six (6) months thereafter." (Def. Sullivan's UF Exs. B, C.) If a breach occurred, it occurred when Sullivan started working for MedOptions on June 2, 2006. Plaintiffs have not presented a material issue of fact to show that this breach caused Plaintiffs to lose their clients.

As the parties agree, Sullivan gave Plaintiffs notice on April 9, 2006 that she intended to leave her job with Plaintiff. A week and a half later, Plaintiffs sent a letter to the nursing home facilities which Sullivan had served stating that finding a replacement for Sullivan "is not expected to be possible in the near future" and terminating Plaintiffs' contracts with the facilities as of June 1, 2006. (Pls.' Mot. for Summ. J. Ex. J.) Thus, Plaintiffs' own actions make clear that Plaintiffs lost the business because Sullivan left, not because Sullivan went to a competitor. As stated in GeriCare's letter, GeriCare did not "expect[]" to replace Sullivan because it had "been advertising for months now for new [Advance Practice Nurses] with no success due to competition with the hospitals and physician offices and a general nationwide shortage of nursing personnel." (Id.) Even if Sullivan had not gone to a competitor, GeriCare indicated its own expectation that GeriCare could not serve these clients and would therefore lose their business, at least in the short term.

Damages for breach of contract only place the injured party in "as good a position as if the parties fully performed the contract." Guzman v. Jan-Pro Cleaning Systems, Inc., 839 A.2d 504, 508 (R.I. 2003). Specifically, breach of contract damages grant the

injured party those benefits expected from the performance of the contract. See Clark-Fitzpatrick, Inc./Franki Found. Co. v. Gill, 652 A.2d 440, 451 (R.I. 1994); Restatement (Second) of Contracts § 344 (1981). Here, had Sullivan simply left, GeriCare's own representations show that GeriCare did not expect to find a replacement. Moreover, Plaintiffs have presented no evidence that they did in fact find a nurse to replace Sullivan. Thus, Plaintiffs' claimed damages of lost business do not flow from Sullivan's breach.

Although it seems from the evidence that Sullivan's departure caused Plaintiffs to lose business, she is not liable simply for leaving. She is liable only if her breach caused Plaintiffs to lose business. Plaintiffs have failed to raise a material issue of fact on the question of causation from Sullivan's alleged breach. Therefore, Defendant Sullivan's motion for summary judgment on the claim for breach of contract is granted.

C. Conspiracy to Commit Tortious Interference with a Business Relationship

Plaintiffs' final claim is a civil conspiracy claim against both Defendants for conspiring to commit tortious interference. Although both parties state in their briefs that they are moving for summary judgment on all Plaintiffs' claims, neither party presents any arguments for or against the conspiracy claim. This Court need not consider a motion which the moving party has not bothered to argue. See Ryan v. Royal Ins. Co. of America, 916 F.2d 731, 734 (1st Cir. 1990).

## III. Conclusion

Accordingly, Defendant MedOptions' motion for summary judgment on the claim for tortious interference with business relationships (Count II) is granted for all the nursing homes except Heritage Hills, for which it is denied. Defendant Sullivan's motion for summary judgment is denied on the tortious interference claim (Count II) and granted

on the breach of contract claim (Count I). Both Defendants' motions for summary judgment on the civil conspiracy claim (Count III) are denied. Plaintiffs' motion for summary judgment is denied on all counts.

SO ORDERED

Mary M. Lisi

Mary M. Lisi
United States District Judge
June 30, 2008