**UNITED STATES DISTRICT COURT**
**DISTRICT OF RHODE ISLAND**

| | | |
|---|---|---|
| HUMAN SERVICES CONSULTANTS, LTD, dba GERICARE, and RONALD MARK STEWART MD,<br><br>Plaintiffs,<br><br>v.<br><br>ANN TAMULE, aka, ANN M. SULLIVAN, alias, and MEDOPTIONS INC.,<br><br>Defendants. | : | Case. No. 1:06-cv-00486-ML-DLM |

**DEFENDANTS' PRE-TRIAL MEMORANDUM**

Pursuant to the Pretrial Order entered by the Court on June 8, 2007 and as amended, in part, on July 18, 2008, defendants MedOptions, Inc. ("MedOptions") and Ann Sullivan ("Sullivan") submit the following Pre-Trial Memorandum.

## I. SUMMARY OF DEFENDANTS' EXPECTED PROOF

On October 17, 2006, plaintiffs Human Services Consultants, Ltd. d/b/a GeriCare ("GeriCare") and its owner, Ronald Mark Stewart, M.D. ("Dr. Stewart") (collectively "plaintiffs") filed a three count complaint against defendants. By Memorandum and Order dated June 30, 2008, the Court granted Sullivan's motion for summary judgment on Count I of plaintiffs' complaint, alleging breach of contract, and granted, in part, MedOptions' motion for summary judgment on plaintiffs' claim for tortious interference with business relationships (Count II) for all nursing homes except Heritage Hills.

All that remains for trial are plaintiffs' claims that (i) MedOptions tortiously interfered with the business relationship between plaintiffs and the Heritage Hills Nursing Home ("Heritage Hills") (Count II); (ii) Sullivan tortiously interfered with the business

relationships plaintiffs had with various nursing facilities, including Heritage Hills (Count II); and (iii) defendants conspired to pirate plaintiffs' business relationships with those same nursing homes (Count III). Plaintiffs bear the burden of proof as to each of these claims.

Defendants expect that the evidence at trial will conclusively show that they did not, either individually or collectively, engage in an intentional act of interference that caused harm, or economic damage, to plaintiffs, or either of them. Defendants also expect the evidence to show, *inter alia*, the following facts to support their defenses:

a. Sullivan joined MedOptions on June 1, 2006. Before that Sullivan had been employed by GeriCare as a nurse practitioner for four years, conducting psychological evaluations and assessments of nursing home residents at various facilities serviced by GeriCare in Rhode Island. Sullivan performed these same basic functions for MedOptions.

b. Even before joining MedOptions, Sullivan had decided to leave the private sector and initiated steps toward pursuing a religious life. Sullivan's departure from GeriCare was hastened when, in March 2006, she was advised by a Heritage Hills administrator that Dr. Stewart submitted paperwork for billing purposes that reflected consultations (i) with patients who on the date in question were no longer residing at the facility, and (ii) on days he was not present at the facility. Sullivan hence became concerned about becoming embroiled in a potentially fraudulent scheme.

c. On April 9, 2006, Sullivan resigned from GeriCare effective June 1, 2006. At the time she tendered her resignation, Sullivan was in the midst of discussions with two religious orders, and expected she would soon be joining one of them. As it turned

out, however, neither order was a good fit for Sullivan so she had to renew her search. In the meantime, Sullivan needed to generate income and, therefore, she pursued an opportunity with MedOptions that came to her attention through a mass mailing seeking qualified nurse practitioners.

d. Within a matter of days after learning that Sullivan would be resigning, Dr. Stewart, by letter dated April 20, 2006, notified all of Sullivan's assigned facilities, except for Heritage Hills, that GeriCare was terminating its service contract effective June 1, 2006.

e. Other than asking another nurse practitioner on staff, Sharon Borges, whether she would be interested in taking over responsibility for any of the nursing homes serviced by Sullivan, GeriCare did nothing to recruit a nurse practitioner to fill Sullivan's spot in the week between learning of her decision to resign and issuing notice to the nursing homes that it was terminating their contracts.

f. Ms. Borges declined to assume responsibility for any of Sullivan's facilities, and offered to cover Heritage Hills Nursing Home solely on a limited basis -- "going in once a week after 4PM and seeing 8 to 10 patients weekly..." -- but Heritage Hills rejected that arrangement as unworkable.

g. When it hired Sullivan, MedOptions assigned her to two Rhode Island nursing facilities not previously serviced by GeriCare, namely Oakland Grove Health Care Center and Bayberry Commons, as well as Grandview Center ("Grandview"), a facility that Sullivan had serviced on behalf of GeriCare. After receiving Dr. Stewart's notice terminating their agreement, Grandview had contacted MedOptions because its

residents needed psychiatric care. Sullivan played no role in MedOptions' procurement of a service agreement with Grandview.

h. Eventually, Hebert, The Holiday Retirement Home ("Holiday"), Heritage Hills and Ballou Home for the Aged ("Ballou") also contacted MedOptions in search of an alternative provider of psychiatric services; each of these facilities eventually retained MedOptions. Again, Sullivan was uninvolved; she had no dealings with any of these facilities on behalf of MedOptions until after service agreements were executed and she was assigned there.

i. On October 7, 2006, Sullivan received word that she had been accepted into a convent located in New Britain, Connecticut where, consistent with her calling, she would be able to utilize her skills and experience as a nurse in furtherance of a charitable mission.

j. To facilitate her transition, Sullivan requested a reassignment to facilities in the New Britain area and a reduction in hours. MedOptions obliged, transferring Sullivan to Connecticut in January 2007 and assigning her responsibility for two nursing homes. Sullivan remained at MedOptions and worked part-time until June 2007, when she entered the convent on a permanent basis.

## II. MEMORANDUM OF SUPPORTING LAW

### A. Tortious Interference With Business Relationships

As noted, Count II alleges claims for tortious interference with business relationships against Sullivan and MedOptions. The claim against MedOptions is limited to the Heritage Hills relationship.

### *1. Proof requirements*

Under Rhode Island law, the elements of a claim for tortious interference with prospective or advantageous business relations are: "(1) the existence of a business relationship or expectancy, (2) knowledge of the interferer of the relationship or expectancy, (3) an intentional act of interference, (4) proof that the interference caused the harm sustained, and (5) damages to the plaintiff." Avilla v. Newport Grand Jai Alai LLC, 935 A.2d 91, 98 (R.I. 2007)(citations and internal quotation marks omitted). Assuming "the plaintiff establishes these prima facie elements, 'the burden of proving sufficient justification for the interference shifts to the defendant.' To demonstrate intentional interference, a claimant need not show actual malice or ill will. Legal malice, 'an intent to do harm without justification,' is sufficient. To prevail, then, the plaintiff must prove that, ultimately, the defendant acted 'without justification' or for an 'improper' purpose." UST Corp. v. General Road Trucking Corp., 783 A.2d 931, 937 (R.I. 2001)(citations omitted).

In other words, "the mere existence of intentional interference is not enough; there must be *improper* interference." Tidewater Realty, LLC v. State, 942 A.2d 986, 993 (R.I. 2008)(emphasis in original)(citation omitted). It is therefore well-settled that "a defendant may not be held liable for tortious interference unless the defendant's conduct was 'improper' or unjustified. Otherwise, a defendant would be subject to liability for such lawful and benign activities as 'competing with a plaintiff for business.'" Pharmacy Services, Inc. v. Swarovski North America Limited, 2006 WL 753055, at *4 (D.R.I. March 21, 2006)(citations omitted).

### 2. *Claim against Sullivan*

As to Sullivan, the evidence will show there was no act of interference at all, much less the requisite improper interference. Sullivan did not contact any of the facilities she serviced on behalf of GeriCare for purposes of seeking to transition this business to MedOptions. To the contrary, the clients in question all contacted MedOptions, not Sullivan, about the possibility of entering into a service agreement. In fact, Sullivan played no role whatsoever in marketing MedOptions' services to any potential client.

### 3. *Claim against MedOptions*

Plaintiffs' surviving tortious interference claim against MedOptions pertains exclusively to Heritage Hills. But, like the other facilities Sullivan had serviced while employed by GeriCare, following her departure from GeriCare, Heritage Hills initiated discussions with MedOptions about taking over as the on-site provider of psychiatric services. MedOptions simply responded to Heritage Hills' contact and pursued the opportunity.

Such "[c]onduct in furtherance of business competition is generally held to justify interference with others' contracts [or business relationships], so long as the conduct involves neither wrongful means nor unlawful restraint of trade." Pascale Service Corp. v. International Truck and Engine Corp., 2007 WL 2905622, at *4 (D.R.I. Oct. 1, 2007)(citation and internal quotation marks omitted). Because plaintiffs cannot adduce evidence proving that MedOptions utilized "wrongful means" to procure business in Rhode Island, MedOptions' actions "are ... privileged and legally justified." Barkan v. Dunkin' Donuts, Inc., 520 F. Supp. 2d 333, 342 (D.R.I. 2007).

Furthermore, "[u]nder Rhode Island law, [plaintiffs] must prove either that 'but for' [MedOptions'] interference, it would not have suffered injury, or that 'it is reasonably probable that but for the interference' [plaintiffs] would not have been injured. [Plaintiffs] must therefore prove that it is at least 'reasonable and probable' that [GeriCare] would have completed a [new] deal to [provide services to Heritage Hills] had [MedOptions] not interfered improperly ..." APG, Inc. v. MCI Telecommunications, Inc., 436 F.3d 294, 304 (1st Cir. 2006).

Here, the evidence will show that Heritage Hills terminated the relationship with GeriCare because Sharon Borges, the only nurse practitioner GeriCare presented to Heritage Hills as a potential replacement for Sullivan, offered only limited availability and could not satisfy Heritage Hills' requirements. Heritage Hills needed to continue providing on-site psychiatric care for its residents and, consequently, reached out to MedOptions. As such, MedOptions cannot be said to have caused the damage plaintiffs claim to have incurred, specifically the loss of a fruitful relationship with Heritage Hills.

**B. Civil Conspiracy**

"A civil conspiracy is an agreement between two or more parties to accomplish an unlawful objective or to accomplish a lawful objective by unlawful means. 'A civil conspiracy claim requires the specific intent to do something illegal or tortious.' Civil conspiracy is 'not an independent basis of liability. It is a means for establishing joint liability for other tortious conduct; *therefore it requires a valid underlying intentional tort theory*.'" Narragansett Pellet Corp. v. City of East Providence, 2007 WL 2821538, at *6 (D.R.I. Sept. 25, 2007)(Lisi, J.)(emphasis in original)(citations omitted).

Because the evidence will show that neither defendant engaged in intentional tortious conduct, plaintiffs' derivative claim for civil conspiracy is, by definition, unsustainable. Id. at *7.

## III. **Probable Length of Trial**

Defendants anticipate that the trial of this matter will require three days.

Respectfully submitted,

DEFENDANTS,
MEDOPTIONS, INC. & ANN SULLIVAN

By Their Attorneys,

/s/ Christine K. Bush
Christine K. Bush (#5587)
DUFFY, SWEENEY & SCOTT, LTD.
One Turks Head Place, Suite 1200
Providence, RI 02903
(401) 455-0700-telephone
(401) 455-0701-facsimile
cbush@duffysweeney.com

and

/s/ Lawrence Peikes
Lawrence Peikes (*Pro Hac Vice*)
WIGGIN and DANA, LLP
400 Atlantic Street
P.O. Box 110325
Stamford, CT 06911-0325
(203) 363-7600-telephone
(203) 363-7676-facsimile
lpeikes@wiggin.com

Dated: August 13, 2008

## CERTIFICATE OF SERVICE

I hereby certify that the within **Defendants' Pre-Trial Memorandum** was filed through the ECF system on this 13th day of August, 2008 and will be sent electronically to the below named counsel who are registered participants identified on the Notice of Electronic Filing:

Stephen M. Robinson, Esq.
The Law Offices of Stephen M. Robinson
155 South Main Street
Suite 402
Providence, RI 02903

Vicki J. Bejma, Esq.
The Law Offices of Stephen M. Robinson
155 South Main Street
Suite 402
Providence, RI 02903

/s/ Christine K. Bush
Christine K. Bush

H:\Clients\MedOptions\Tamule\Pleadings\USDC RI\Pre-Trial Memorandum.DOC